## DOCKET NO. 14-11942

# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤

*for the*

# 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

NATIONAL MINING ASSOCIATION; ALABAMA COAL ASSOCIATION; WALTER ENERGY, INC., and WARRIOR INVESTMENT CO., INC.,

*Petitioners,*

*v.*

MINE SAFETY AND HEALTH ADMINISTRATION and THAMAS E. PEREZ, SECRETARY, UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

_____

ON PETITION FOR REVIEW OF A FINAL RULE OF THE FEDERAL MINE SAFETY AND HEALTH ADMINISTRATION

## BRIEF OF PETITIONERS

HENRY CHAJET
AVIDAN MEYERSTEIN
COLLIN O'CONNOR UDELL
GENEA O. BELL
ROSS J. WATZMAN
JACKSON LEWIS P.C.
10701 Parkridge Boulevard
Suite 300
Reston, Virginia 20191
(703) 483-8300

KATIE SWEENEY
NATIONAL MINING ASSOCIATION
101 Constitution Ave, N.W.
Suite 500 East
Washington, D.C. 20001
(202) 463-2600

*Counsel for Petitioners*

*N*ATIONAL *M*INING, *ET AL. V. M*INE *S*AFETY AND *H*EALTH *A*DMIN*.*, *ET AL.*

## CASE NO. 14-11942

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Petitioners certifies that the following listed parties have an interest in the outcome of this case:

1.    Alabama Coal Association – Petitioner

2.    Bell, Genea – Counsel for Petitioners

3.    Chajet, Henry – Counsel for Petitioners

4.    Jackson Lewis P.C. – Counsel for Petitioners

5.    Lord, Samuel Charles – Counsel for Respondent (of record)

6.    Main, Joseph – Assistant Sec'y for Mine Safety & Health, U.S. Dep't of Labor

7.    Meyerstein, Avi – Counsel for Petitioners

8.    Mine Safety and Health Administration – Respondent

9.    National Institute for Occupational Safety and Health

10.    National Mining Association – Petitioner

11.    Nelson, April – Counsel for Respondent

12.    Office of the Solicitor, DOL

13.    Perez, Thomas E.  – Respondent

14.    Schumann, W. Christian – Counsel for Respondent

15.    Smith, Patricia – Counsel for Respondent

C-**1** of **3**

NATIONAL MINING, ET AL. V. MINE SAFETY AND HEALTH ADMIN., ET AL.

### CASE NO. 14-11942

16.    Strassler, Heidi – Counsel for Respondent

17.    Sweeney, Katie – Counsel for Petitioners

18.    Udell, Collin O'Connor – Counsel for Petitioners

19.    United States Department of Labor – Respondent

20.    Waldman, Edward – Counsel for Respondent (of record)

21.    Walter Energy, Inc. ( Stock symbol WLT) – Petitioner

22.    Warrior Investment Co., Inc. – Petitioner

23.    Watzman, Ross – Counsel for Petitioners

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b), and Fed. R. App. P. 26.1, Petitioners identify the following subsidiaries, conglomerates, affiliates and parent corporations:

1.    Atlantic Development & Capital LLC – owned by Jim Walter Resources, Inc.

2.    Atlantic Leaseco LLC – owned by Atlantic Development & Capital LLC

3.    Black Warrior Methane Corp. – owned by Jim Walter Resources, Inc.

4.    Black Warrior Transmission Corp. – owned by Jim Walter Resources, Inc.

*NATIONAL MINING, ET AL. V. MINE SAFETY AND HEALTH ADMIN., ET AL.*

## CASE NO. 14-11942

5.    Blue Creek Energy, Inc. – owned by Walter Energy, Inc.

6.    Jim Walter Resources, Inc. – owned by Walter Energy, Inc.

7.    Maple Coal Co. LLC– owned by Atlantic Development & Capital LLC

8.    Taft Coal Sales & Associates, Inc. – owned by Walter Minerals, Inc.

9.    Tuscaloosa Resources, Inc. – owned by Walter Minerals, Inc.

10.    Walter Black Warrior Basin, LLC – owned by Walter Exploration & Production LLC

11.    Walter Exploration & Production LLC – owned by Walter Natural Gas, LLC

12.    Walter Minerals, Inc. – owned by Walter Energy, Inc.

13.    Walter Natural Gas, LLC– owned by Walter Energy, Inc.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure and 11th Cir. R. 28-1(c), Petitioners respectfully request that this Court hear oral argument. This case presents important questions of law arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801, *et seq.*, Pub. L. No. 95-164, 91 Stat. 1290 (1977) (the "Mine Act") and the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.* (the "APA"). Oral argument will assist this Court in reaching a full understanding of the issues presented and the underlying facts. Moreover, oral argument will allow the attorneys for both sides to address any outstanding legal or factual issues that the Court deems relevant.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ............................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CITATIONS ........................................................................ v

STATEMENT REGARDING ADOPTION
OF BRIEFS OF OTHER PARTIES ........................................................ 1

STATEMENT OF SUBJECT-MATTER AND
APPELLATE JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE ................................................................. 4

      Statement of Facts .................................................................. 4

      Standard of Review ............................................................... 10

SUMMARY OF THE ARGUMENT ......................................................... 13

ARGUMENT ..................................................................................... 17

I.     MSHA Exceeded Its Statutory Authority and Violated the Express
      Language of the Mine Act in Promulgating the Final Rule ......................... 17

      A.     MSHA's Rule Exceeds Its Authority under the Mine Act,
           Which Requires HHS Participation and Action on RCD .................. 17

      B.     Congress Granted HHS, Not MSHA, the Authority to Set
           RCD Permissible Exposure Limits .................................... 21

C.   MSHA Cannot Rely On Its General Rulemaking Authority Instead of the Specific RCD Authorities and Limitations ................. 24

D.   MSHA Does Not Have Authority to Unilaterally Rescind a Joint Finding Previously Subject to the Joint Rulemaking Process ............................................................................................... 27

E.   MSHA Violated the Mine Act by Ignoring and Nullifying Its Plain and Unambiguous Accuracy Requirement .......................... 28

II.   The Final Rule Is Not Technologically and Economically Feasible ............ 31

A.   MSHA Failed to Analyze Feasibility Properly and Demonstrate that the Final Rule Is Technologically Feasible ........... 33

1.  MSHA Did Not and Cannot Establish that Single-Shift Sampling Is Technologically Feasible ............................................................ 34

2.  MSHA Failed to Demonstrate that Use of the Continuous Personal Dust Monitor is Feasible ............................. 40

a.   CPDMs Yield Unreliable and Inaccurate Results .............. 41

b.   MSHA Requires Use of CPDMs Without Sufficient Evidence that They Will Be Available .............. 45

3.  MSHA Failed to Consider or Demonstrate the Feasibility of Its New Silica PEL and Silica-Based, Reduced RCD Limits .................................................................. 46

4.  MSHA Entirely Failed to Analyze the Feasibility of the Combination of Its Final Rule Mandates ...................................... 48

B.  The Record Evidence Demonstrates that MSHA Did Not Analyze the Increased Costs of Delays in Production, Rendering the Final Rule Economically Infeasible ................................. 50

III.   MSHA Failed To Consider the "Best Available Evidence." ........................ 52

A.    MSHA Ignored the Best Available Evidence Regarding Health Risks and the Effectiveness of the Current PEL ................... 53

B.    MSHA Ignored the Best Available Evidence of the Effectiveness of Personal Engineering Controls............................... 56

C.    MSHA Failed To Consider Experience Gained Under Other Health and Safety Laws....................................................... 58

CONCLUSION ................................................................................... 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

EXHIBIT A - Affidavit of Mark Watson (7/28/14)

EXHIBIT B - Statutory Addendum

EXHIBIT C - 37 Fed. Reg. 3833 (Feb. 23, 1972) ("1972 Joint Finding")

EXHIBIT D - 45 Fed. Reg. 23990 (Apr. 8, 1980)

EXHIBIT E - Black Lung Health Improvements Act of 2013, S. 1416, 113th Cong. § 2 (2013)

EXHIBIT F - Centers for Disease Control and Prevention, The Work-Related Lung Disease Surveillance Report, 2007, at 29, Fig. 2-1, *available at* http://www.cdc.gov/niosh/docs/2008-143/ (last accessed July 27, 2014)

EXHIBIT G - HHS.gov "Historical Highlights," *available at* http://www.hhs.gov/about/hhshist.html (last accessed July 27, 2014)

EXHIBIT H - "End Black Lung Frequently Asked Questions," *available at* http://www.msha.gov/endblacklung/faq.asp (last visited July 27, 2014)

EXHIBIT I - Director, Bureau of Mines letter to Congress (November 18, 1969)

EXHIBIT J - NORMAN J. SINGER & J.D. SHAMBIE SINGER, 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:6 (2007)

EXHIBIT K - WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Gove 1961)

# TABLE OF CITATIONS

**Cases:**

*AFL-CIO v. OSHA*,
    965 F.2d 962 (11th Cir. 1992) ..................................................... 32

*Agape Church v. FCC*,
    738 F.3d 397 (D.C. Cir. 2013)................................................... 11, 12, 33, 46

*Akzo Nobel Salt, Inc.*,
    212 F.3d 1301 (D.C. Cir. 2000)................................................... 12

*Am. Mining Cong. v. Marshall*,
    671 F.2d 1251 (10th Cir. 1982) .................................................... 9

*Am. Textile Mfrs. Institute v. Donovan*,
    452 U.S. 490, 101 S. Ct. 2478 (1981) ......................................... 32

*Auer v. Robbins*,
    519 U.S. 452, 117 S. Ct. 905 (1997) ........................................... 12

*BP Am. Prod. Co. v. Burton*,
    549 U.S. 84, 127 S. Ct. 638 (2006); ........................................... 29

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 104 S. Ct. 2778 (1984) .................................... *passim*

*City of Burbank v. Lockheed Air Terminal, Inc.*,
    411 U.S. 624, 93 S. Ct. 1854 (1973) ........................................... 20

*Color Pigments Mfrs. Ass'n v. OSHA*,
    16 F.3d 1157 (11th Cir. 1994) .............................................. 33, 50

*Corning Glass Works v. Brennan*,
    417 U.S. 188, 94 S. Ct. 2223 (1974) ........................................... 22

*Cumberland Coal Resources, LP v. MSHA*,
    717 F.3d 1020 (D.C. Cir. 2013)................................................... 11

*East Tennessee Natural Gas Co. v. F.E.R.C.*,
    953 F.2d 675 (D.C. Cir. 1992)...................................................................... 13

*Florida Manufactured Housing Ass'n v. Cisneros*,
    53 F.3d 1565 (11th Cir. 1995) ................................................................... 12

*Hall v. United States*,
    132 S. Ct. 1882 (2012).......................................................................... 15, 24

*Hamilton v. Lanning*,
    560 U.S. 505, 130 S. Ct. 2464 (2010) ......................................................... 24

*Humane Soc'y v. Locke*,
    626 F.3d 1040 (9th Cir. 2009) ..................................................................... 6

*Judulang v. Holder*,
    132 S. Ct. 476 (2011).................................................................................. 11

*Ginsberg & Sons, Inc. v. Popkin*,
    285 U.S. 204, 52 S. Ct. 322 (1932) ............................................................. 25

*Kawaauhau v. Geiger*,
    523 U.S. 57, 118 S. Ct. 974 (1998) ............................................................. 24

*Kennecott Greens Creek Mining Co. v. MSHA*,
    476 F.3d 946 (D.C. Cir. 2007)............................................................... 32, 33

*Koch Foods, Inc. v. Sec'y, Dep't of Labor*,
    712 F.3d 476 (11th Cir. 2013) ............................................................. 19, 29

*Law v. Siegel*,
    134 S. Ct. 1188 (2014)............................................................................... 25

*Morales v. Trans World Airlines*,
    504 U.S. 374, 112 S. Ct. 2031 (1992) ......................................................... 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983) .................................................... 12, 13

*Nat'l Mining Ass'n v. MSHA*,
153 F.3d 1264 (11th Cir. 1998) ............................................................ *passim*

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct 1749 (2014)...................................................................... 29

*Pub. Citizen Health Research Group v. OSHA*,
557 F.3d. 165 (3rd Cir. 2009)........................................................ 32, 33, 50

*Radlax Gateway Hotel, LLC v. Amalgamated Bank*,
132 S. Ct. 2065 (2012)........................................................ 15, 25

*Russello v. United States*,
464 U.S. 16, 104 S. Ct. 296 (1983) ................................................ 19

*Sebelius v. Cloer*,
133 S. Ct 1886 (2013).................................................................... 29

*Sec'y of Labor v. Keystone Coal Mining Corp.*,
16 F.M.S.H.R.C. 6 (1994) ............................................................ 7

*Sec'y of Labor v. Ohio Valley Coal Co.*,
359 F.3d 531 (D.C. Cir. 2004).................................................... 12

*TRW Inc. v. Andrews*,
534 U.S. 19, 122 S. Ct. 441 (2001) ................................................ 24

*U.S. Pipe and Foundry Co. v. Webb*,
595 F.2d 264 (5th Cir. 1979) ...................................................... 20

*United States v. Ron Pair Enters.*,
489 U.S. 235, 109 S. Ct. 1026 (1989) ........................................... 20

*Utility Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014).................................................................. 31

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014)..................................................... 11

viii

**Rule and Statutes:**

5 U.S.C. § 706(2)(A) .................................................................... 11, 15, 31

30 U.S.C. § 802 ........................................................................... 20

30 U.S.C. § 810 ........................................................................ 34, 40

30 U.S.C. § 811 ........................................................................... 26

30 U.S.C. § 811(a)(6) ................................................................... 60

30 U.S.C. § 811(a)(6)(a) ............................................................... 40

30 U.S.C. § 811(a)(6)(A) ........................................................ *passim*

30 U.S.C. § 811(d) .................................................................... 2, 4

30 U.S.C. § 813(h) ....................................................................... 25

30 U.S.C. § 841(a) ....................................................................... 26

30 U.S.C. § 842 ..................................................................... *passim*

30 U.S.C. § 842(a) ................................................................. *passim*

30 U.S.C. § 842(b)(1) ................................................................... 26

30 U.S.C. § 842(b)(2) ................................................................. 6, 14

30 U.S.C. § 842(d) ................................................................. *passim*

30 U.S.C. § 842(f) ................................................................. *passim*

30 U.S.C. § 842(g) ....................................................................... 19

30 U.S.C. § 842(h) .................................................................. 19, 57

30 U.S.C. § 957 ........................................................................... 25

29 C.F.R. § 1910.1000 ........................................................................ 55, 59

30 C.F.R. § 70.300 .................................................................................... 57

30 C.F.R. § 74.7(a) ................................................................................... 45

30 C.F.R. § 74.8 ................................................................................. 30, 38

30 C.F.R. § 74.8(f) .................................................................................... 40

30 C.F.R. § 90.207 .................................................................................... 39

30 C.F.R. § 90.300 .................................................................................... 39

30 C.F.R. Part 100 .............................................................................. 34, 40

30 C.F.R. Part 104 .............................................................................. 34, 40

30 C.F.R. § 70.209(g)(1) ........................................................................... 39

37 Fed. Reg. 3833 ................................................................................ 6, 38

45 Fed. Reg. 23990 ..................................................................................... 7

45 Fed. Reg. 23997 ..................................................................................... 7

76 Fed. Reg. 35968 ................................................................................... 49

78 Fed. Reg. 56274 ................................................................................... 55

79 Fed. Reg. 24935 ................................................................................... 30

79 Fed. Reg. 24815 ............................................................................. *passim*

79 Fed. Reg. 24934 .............................................................................. 35, 36

Fed. R. App. P. 16 ...................................................................................... 6

Fed. R. App. P. 28(i) ................................................................................... 1

11th Circuit Rule 28-1(f) ......................................................................... 1

**Other Authorities:**

I-1-FR-1 .............................................................................................. 7

I-2BKG-145-47 .................................................................................. 55

I-2BKG-154 ....................................................................................... 55

I-2-FR-1 ..................................................................................... *passim*

I-2-QRA-26 .......................................................................................... 5

I-COMM-5 ......................................................................................... 53

I-COMM-57 .................................................................................. 57, 58

I-COMM-57-6 ................................................................................... 56

I-COMM-58 ............................................................................... *passim*

I-COMM-58-13 ................................................................................. 52

I-COMM-58-14 ......................................................................... *passim*

I-COMM-58-4 ................................................................................... 53

I-COMM-58-9 ........................................................................... passim

I-COMM-74 ....................................................................................... 45

I-COMM-75 ....................................................................................... 42

I-COMM-76 .................................................................................. 40, 50

I-COMM-76-1 .............................................................................. 45, 51

I-COMM-76-3 ................................................................................... 41

I-COMM-76-6.................................................................................... 44

I-COMM-77 ...................................................................................... 37

I-CORR-24 ....................................................................................... 54

I-CORR-25 ....................................................................................... 54

I-CORR-26 ....................................................................................... 54

I-CORR-30 ....................................................................................... 54

III-FR-5 ........................................................................................ 6, 7

V-BKG-78......................................................................................... 58

V-FR-1 ............................................................................................ 7

V-FR-5 ............................................................................................ 7

V-FR-7 ............................................................................................ 7

Black Lung Health Improvements Act of 2013,
    S. 1416, 113th Cong. § 2 (2013)................................................. 23

Bureau of Mines letter to Congress (November 18, 1969)....................................... 6

Centers for Disease Control and Prevention,
The Work-Related Lung Disease Surveillance Report,
    2007 *available at* http://www.cdc.gov/niosh/docs/2008-143/ ....................... 4

"End Black Lung Frequently Asked Questions," *:*
    http *available at* //www.msha.gov/endblacklung/faq.asp ........................... 43

Federal Coal Mine Health and Safety Act (1969) (the "Coal Mine Act") ............... 4
HHS.gov "Historical Highlights," *available at*
    http://www.hhs.gov/about/hhshist.html (last accessed July 27, 2014) .............. 20

Information Circular 9501-Miners' Views about Personal Dust Monitors
(Peters, *et al.*, 2008) ...................................................................... 44

Laney, et al., *Pneumoconiosis Among Underground Bituminous Coal Miners In The United States: Is Silica Becoming More Frequent?*
OCCUPATIONAL AND ENVIRONMENTAL MEDICINE (Sept. 22, 2009) ............. 54

Mine Safety Accountability and Improved Protection Act,
H.R., 112th Cong. § 503 (2011) .................................................... 23

NORMAN J. SINGER & J.D. SHAMBIE SINGER,
2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:6
(2007) .......................................................................................... 24

Novak et al.,
"Respirable Dust Study for Kentucky Coal Mines" (2013) *available at* http://energy.ky.gov/resources/Documents/Respirable%20Dust%20-%20Final%20Report%20-%20NOVAK.PDF ............................................. 46

OSHA-2010-0034-2259,
http://www.regulations.gov/#!documentDetail;D=
OSHA-2010-0034-2259 ............................................................... 47

Regulatory Economic Analysis ("REA") ............................................. 50

Robert C. Byrd Miner Safety and Health Act of 2010,
H.R. 5663, 111th Cong. § 504 (2010) ............................................ 23

Robert C. Byrd Mine and Workplace Safety and Health Act of 2012,
S. 3443, 112th Cong. § 504 (2012)................................................. 23

Robert C. Byrd Mine and Workplace Safety and Health Act of 2013,
S. 805, 113th Cong. § 504 (2013)................................................... 23

S. COMM. ON LABOR AND PUBLIC WELFARE, FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969,
H.R. Rep. 91-761 (1969),
*reprinted in* 1 LEGISLATIVE HISTORY OF THE FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969 (1975).......................................... 22

S. COMM. ON LABOR AND PUBLIC WELFARE, FEDERAL COAL MINE HEALTH AND
SAFETY ACT OF 1969,
> S. 2917 (1969), *reprinted in* 1 LEGISLATIVE HISTORY
> OF THE FEDERAL COAL MINE HEALTH
> AND SAFETY ACT OF 1969 (1975) ............................................................ 4, 22

S. COMM. ON LABOR AND PUBLIC WELFARE, FEDERAL COAL MINE HEALTH AND
SAFETY ACT OF 1969,
> House Debate, at 1107 (Oct. 27, 1969), *reprinted in* 1 LEGISLATIVE HISTORY
> OF THE FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, at 1240
> (1975)............................................................................................................. 5

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Gove 1961) ..................... 29

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Pursuant to Fed. R. App. P. 28(i) and 11th Circuit Rule 28-1(f), Petitioners incorporate and adopt by reference portions of the petitioners' brief in *Murray Energy Corp., et al. v. Mine Safety & Health Administration, et al.*, No. 14-12163, filed July 28, 2014.   In particular, Petitioners adopt and endorse that brief's:

- Statement of the case

- Discussion of the failure of MSHA to establish technological feasibility of its Final Rule, including the discussion of the underlying scientific and statistical background

- Discussion of the failure of MSHA to base its Final Rule on the best available evidence

## STATEMENT OF SUBJECT-MATTER AND
## APPELLATE JURISDICTION

The Mine Act provides United States Courts of Appeals with direct jurisdiction to review rulemaking:

> Any person who may be adversely affected by a mandatory health or safety standard promulgated under this section may, at any time prior to the sixtieth day after such standard is promulgated, file a petition challenging the validity of such mandatory standard with [a] United States Court of Appeals . . . for a judicial review of such standard . . . . *the exclusive means*

1

*of challenging the validity of a mandatory health or safety standard.*

30 U.S.C. § 811(d) (emphasis added). "Mandatory health or safety standard[s]" include "interim mandatory health or safety standards established by titles II and III" of the Act "and the standards promulgated pursuant to title I" of the Act. *Id.* § 802(1). This includes agency findings regarding the "accuracy" of measuring respirable coal dust with single-shift samples. *Nat'l Mining Ass'n v. MSHA*, 153 F.3d 1264 (11th Cir. 1998). On May 1, 2014, the Secretary[1] promulgated the Final Rule, I-2-FR-1, at 24814, (the "Final Rule").[2] Petitioners timely filed for review.

---

[1] Throughout this Brief, "the Secretary" means the Secretary of Labor. The Mine Safety and Health Administration ("MSHA") is a part of the Department of Labor, so MSHA and "the Secretary" are used interchangeably. The "Secretaries" means the Secretary of Labor and the Secretary of Health and Human Services ("HHS") (formerly known as the Secretary of Health, Education, and Welfare). The National Institute of Occupational Safety and Health ("NIOSH") is part of the Department of Health and Human Services, so NIOSH and "the Secretary of Health and Human Services" are sometimes used interchangeably.

[2] As petitioners in Case No. 14-13163 explain, Respondents' Certified Index includes record documents for six rulemaking dockets and identifies the documents in each docket using alphanumeric codes (*e.g.*, "FR-1"). Since Respondents used the same convention for each docket, a code may repeat itself in multiple dockets (*e.g.*, an "FR-1" appears in each docket representing a different document in each). To cite to the record clearly, Petitioners use a Roman-numeral prefix corresponding to the number of the docket listed in the Certified Index's table of contents (*i.e.*, "I-FR-1," "II-FR-1," and so on). Some documents bear different numbers on their faces than their Certified Index numbers.

## <u>STATEMENT OF THE ISSUES</u>

Whether Respondent exceeded its statutory authority, violated the Mine Act, and/or engaged in arbitrary and capricious rulemaking by promulgating the Final Rule regulating respirable coal mine dust ("RCD") exposures and related matters, which:

**A.**   Was not adopted and promulgated by the Secretary of HHS, as required by Sections 202(a) and 202(d) of the Mine Act;

**B.**   Is contrary to an express statutory mandate by reversing, via unilateral MSHA action, a prior, joint rulemaking with HHS under Section 202(f) of the Mine Act, that found single-shift dust sample results were inaccurate;

**C.**   Sets new RCD and silica-based permissible exposure limits ("PELs"), by usurping authority granted solely to HHS by Mine Act Section 202(d);

**D.**   Violates statutory language by redefining the Mine Act term "accurate," contrary to its plain meaning;

**E.**   Fails to analyze and demonstrate the technological and economic feasibility of the numerous, extensive, and complex mandates of the Final Rule, and their cumulative effects; and

**F.**   Relies on flawed scientific data and analysis, fails to consider the best available evidence and experience gained under the Mine Act and other health and safety laws, and reduces safety and health protections.

## **STATEMENT OF THE CASE**

Because this challenge to the Secretary's Final Rule is a direct appeal to this Court under 30 U.S.C. § 811(d), there was no proceeding or disposition below.

**Statement of Facts:**

In 1969, recognizing that long-term excessive, exposures to RCD can cause significant health problems that must be prevented, Congress enacted the Federal Coal Mine Health and Safety Act of 1969 (the "Coal Mine Act"), which set RCD exposure limits and authorized specified agencies to issue new standards if needed in the future.  Pub. L. No. 91-173, 83 Stat. 742 (1969).  The statute, along with industry, employee, and agency efforts, produced "dramatic" reductions in exposures and deaths, as illustrated in the graph below.  *See* I-2-FR-1, at 24827 (lung disease in coal miners dropped from about 30% in 1970 to about 3 to 4% at present); *see also* I-COMM-58-9 (continuing 37% exposure reduction, 1991 - 2010).



4

**Number of deaths, crude and age adjusted death rates, U.S. residents age 15 and over, 1968-2004, from coal workers' pneumoconiosis.**

*See* Centers for Disease Control and Prevention, The Work-Related Lung Disease Surveillance Report, 2007, at 29, Fig. 2-1, *available at* http://www.cdc.gov/niosh/docs/2008-143/ (last accessed July 27, 2014).

Congress faced the reality that measuring RCD is difficult since conditions vary greatly from one location and time to another, and even samples collected side-by-side can produce significantly different results. I-COMM-58-14, at 19-20; I-2-FR-1, at 24938-29.    Likewise, Congress acknowledged that long-term overexposures cause illness.  *See* § 201 of the Coal Mine Act,  Pub. L. No. 91-173, 83 Stat. 742 (1969) (purpose of the Act to reduce exposure to RCD over a miner's "entire adult working life"); *see also* I-2-QRA-26, at 168 (data show risk of impairment over a 45-year working lifetime).

Thus, when Congress adopted a RCD limit of 30 mg/m$^3$,  which was subsequently lowered to 2.0 mg/m, it deliberately rejected contrary legislative proposals and required initially measuring such dust using the average of *multiple* shift samples. *Compare* S. COMM. ON LABOR AND PUBLIC WELFARE, FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, House Debate on Coal Mine Health and Safety Act, at 1107 (October 27, 1969), *reprinted in* 1 LEGISLATIVE HISTORY OF THE FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, at 1240

(1975) (proposal to require single shift measurements) *with* the Coal Mine Act.[3] The Bureau of Mines reported then that "multi-shift averaging is an essential element" of the RCD standard, and that "short-term peaks" in single-shift samples do not reflect health hazards. *See* Exhibit 2, Bureau of Mines letter to Congress (Nov. 18, 1969).

Congress mandated single-shift sampling in the future, unless MSHA and HHS jointly promulgated a finding, through rulemaking, that single-shift samples are inaccurate. *See* Pub. L. 91-173, § 202(f) (1969). In 1972, MSHA and HHS did so, finding jointly that single-shift sampling could not accurately represent miner exposures to RCD. *See* 37 Fed. Reg. 3833 (Feb. 23, 1972) ("1972 Joint Finding"); III-FR-5, at 47886.

When Congress passed the Mine Act in 1977, it retained these 1969 RCD provisions. *See* 30 U.S.C. §§ 842(b)(2), 842(f). The amended Mine Act again

---

[3] This legislative history and other materials omitted from MSHA's Certified Index of the Record are part of the record in this case, as they constitute "evidence . . . before the agency" under Fed. R. App. P. 16. Moreover, the Court can take judicial notice of these public-record documents, and it also can supplement the record under Rule 16(b) with these important documents that inform the arguments raised in the Petition. Because MSHA failed to consider all relevant factors, considering these materials is critical. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1058 (9th Cir. 2009) ("[a] court may consider extra-record documents if necessary to determine whether the agency has considered all relevant factors . . . .").

granted sole RCD rulemaking authority to HHS, and it granted to MSHA and HHS jointly the authority to determine whether single-shift sampling was accurate.  In 1980, MSHA reiterated that multiple shift samples "more accurately represent the dust in the mine . . . atmosphere than would the results of only a single sample taken on a single shift."  *See* 45 Fed. Reg. 23990, 23997 (Apr. 8, 1980).

In 1994, MSHA and HHS together announced their intent to rescind the 1972 Joint Finding and institute single, full-shift sampling, V-FR-1, at 8356-57; *Nat'l Mining Ass'n*, 153 F.3d at 1266; *see also* V-FR-5, at 5664 (1998 final notices on joint finding); V-FR-5, at 5687 (1998 final MSHA enforcement notice). This Court overturned the 1998 Notice of Finding, holding that it was an "interim mandatory health standard," and that the agencies failed to follow the Mine Act Section 101 requirement to establish feasibility.  *Nat'l Mining Ass'n v. Sec'y of Labor*, 153 F.3d 1264, 1266 (11th Cir. 1998); *see also Sec'y of Labor v. Keystone Coal Mining Corp.*, 16 F.M.S.H.R.C. 6 (1994) (rejecting citations for single-shift samples).

MSHA and HHS initiated another joint effort to rescind the 1972 Joint Finding in 2000, but never completed it.  *See* V-FR-7, at 42068; *see also* I-2-FR-1, at 24818.  They reopened the rulemaking record in 2003.  *See* III-FR-5, at 47887; I-2-FR-1, at 24818.  But they never issued a joint, final rule.

7

On October 19, 2010, acting without HHS, MSHA published a proposed RCD rule that became the Final Rule.  *See* I-1-FR-1, at 64412; I-2-FR-1, at 24818-19.   The MSHA Final Rule takes effect in stages through 2016, but implementation begins on August 1, 2014.  *See* I-2-FR-1, at 24813-14.  The Final Rule imposes multiple new dust PELs, mandatory single-shift sampling and enforcement, and extensive new sampling requirements, equipment, and restrictions.  *See* I-2-FR-1, at 24815.

The current permissible exposure limit for RCD to which a miner can be exposed was set by Congress at 2.0 mg/m$^3$.  30 U.S.C. § 842. MSHA's Final Rule generally reduces the PEL to 1.5mg/m$^3$ and further reduces the PEL based on a formula whenever the silica content of the dust exceeds 5%.  *See* I-2-FR-1, at 24973-74 (future 30 C.F.R. §§ 70/71.100(a) and 101(a)),  24980, Table 70-1 (ECV table establishing citable levels down to 0.2mg/m$^3$).  To abate citations, the Final Rule requires operators to collect five samples, on consecutive production shifts below the PEL.  *See, e.g.*, I-2-FR-1, at 24977 (future § 70.207(a)).

The Final Rule requires immediate corrective action if a single, full-shift sample by an operator exceeds the PEL, *id.* at 24815, and mandates citations and penalties if a single-shift sample collected by MSHA exceeds the limit.  *Id.* at 24933.  Recognizing the obvious conflict with the 1972 Joint Finding, MSHA unilaterally announced in the Final Rule that it is "rescinding the 1972 Joint

8

Finding." *Id.* at 24815 (quotations omitted).  Without any involvement by HHS, MSHA summarily explained that "[t]he [2000 Proposed Rule] is integrated into and a part of this final rule." *Id.* at 24818.

The Mine Act provides that sampling must be conducted with a device approved by both MSHA and NIOSH.  30 U.S.C. § 842(a). The "coal mine dust personal sampler unit" ("CMDPSU") is the traditional "gravimetric sampler," which involves a pump on a miner's belt, with a plastic tube leading to an inlet on the miner's lapel.  I-2-FR-1, at 24859, 24876.  The device collects dust, separates it in a "cyclone," and deposits respirable dust on pre-weighed filters, which the MSHA laboratory then examines, weighs, and analyzes, including for RCD and silica content.  *Id.* at 24859-60, 24887, and 24938.  The gravimetric sampler does not display a real-time RCD reading such as on the new device required by the Final Rule.  *See id.; id. at* 24979 (future §§ 70.210(a), 71.210(a)).  Prior to the Final Rule, MSHA traditionally based enforcement on the average concentration of five valid RCD samples, consistent with the 1972 Joint Finding.  *See Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1259 (10th Cir. 1982).

The Final Rule requires the use of the "continuous personal dust monitor" ("CPDM"), which displays the RCD concentration in real time, determined by device calculations of how vibration frequency changes on a dust filter as a result of dust collected and deposited on the filter.  I-COMM-58, at 23-24.  At the same

time, the Final Rule mandates many more designated occupations for sampling, and collecting at least 15 "valid" consecutive samples, at least every quarter, for every designated occupation. I-2-FR-1, at 24884. It only allows sampling to be valid if production is at least 80% of average production (it was 50% under the old rule), increasing sample dust collected. I-2-FR-1, at 24815. The Final Rule also increases the time for sample collection, from 8 hours to a much longer full shift, further increasing dust collected on samples. I-COMM-58, at 34.

Applying the Final Rule's radically new and massive sampling mandates to 2010 MSHA data, the rule would result in total operator sampling events for designated occupations of 263,680 samples, compared with 40,520 samples collected in 2010 under the prior rules. While 2010 saw 133 violations of the prior RCD rule, the new rule would create more than 10,000 yearly over-limit samples, including 3,379 estimated results in excess of the reduced silica-based limits. *See* Affidavit of Mark Watson, Exhibit A.

This challenge followed the publication of the Final Rule.

**Standard of Review:**

When reviewing the Secretary's construction of the Mine Act, this Court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984). If so, "the intent of Congress is clear," and

10

"that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43, 104 S. Ct. at 2781. This is because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843, 104 S. Ct. at 2782 (citing cases).

However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, 104 S. Ct. at 2782*; see also Cumberland Coal Resources, LP v. MSHA*, 717 F.3d 1020, 1025-26 (D.C. Cir. 2013). Under both this second step of Chevron and the APA, the Court determines whether an agency's "actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Verizon v. FCC*, 740 F.3d 623, 635 (D.C. Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)); *see also Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (noting that "*Chevron* Step Two and arbitrary and capricious review is often 'the same'") (citing *Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011)).

A rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to

11

a difference in view or the product of agency expertise." *Agape Church*, 738 F.3d at 410 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983)).

Where there is ambiguity, the Court evaluates "whether the Secretary's interpretation of h[is] own regulation rests on a permissible construction of the language of the regulation." *Sec'y of Labor v. Ohio Valley Coal Co.*, 359 F.3d 531, 534 (D.C. Cir. 2004). Courts reject the Secretary's interpretation of his own regulation where "it is plainly erroneous or inconsistent with the regulation." *Id.*; *see also Akzo Nobel Salt, Inc.*, 212 F.3d 1301, 1303 (D.C. Cir. 2000). The Court only defers to an agency's interpretation of its regulations in the course of litigation when the interpretation "reflects the agency's fair *and considered* judgment on the matter in question." *Akzo*, 212 F.3d at 1304 (quoting *Auer v. Robbins*, 519 U.S. 452, 462, 117 S. Ct. 905, 912 (1997)). This includes considering "whether the agency had previously 'adopted a different interpretation of the regulation or contradicted its position on appeal.'" *Akzo*, 212 F.3d at 1304-05 ("the flip-flops here mark the Secretary's position as the sort of '*post hoc* rationalizations' to which courts will not defer); *see also Florida Manufactured Housing Ass'n v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995) (citations omitted) ("consistency of [the Agency's] interpretation is an important factor in determining the amount of deference owed").

12

To support a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," not ignore important arguments and evidence. *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S. Ct. at 2866 (internal citations omitted); *see also East Tennessee Natural Gas Co. v. F.E.R.C.*, 953 F.2d 675, 679 (D.C. Cir. 1992).

## SUMMARY OF THE ARGUMENT

In promulgating the Final Rule, MSHA patently violated the unambiguous terms of the Mine Act; usurped authority not granted to it by Congress; acted arbitrarily, capriciously, and not in accordance with law; failed to meet statutory obligations to analyze and demonstrate the Final Rule's technological and economic feasibility; and ignored the best available evidence and experience, contrary to law.

First, the Final Rule exceeds MSHA's statutory authority and violates the unambiguous terms of the Mine Act. Mine Act Section 202(a) plainly mandates certain RCD rulemaking by both the Secretaries of Labor (MSHA) and HHS. *See* 30 U.S.C. § 842(a) (samples "shall be taken . . . in accordance with such methods, at such locations, at such intervals, and in such manner *as the Secretaries shall prescribe in the Federal Register . . . .*") (*emphasis added*). Moreover, Section

13

202(d) [842(d)] clearly grants authority only to HHS to promulgate a schedule reducing RCD exposures below the levels established by Congress, if needed and justified. 30 U.S.C. § 842(d).

Defying these specific grants of authority, MSHA's Final Rule *unilaterally* mandates new exposure limits, schedules, and requirements regarding the methods, locations, intervals, and manner of collecting samples. Moreover, MSHA unilaterally rescinded the 1972 Joint Finding it made together with HHS, under Section 202(f) of the Mine Act, which found that relying on just one sample of RCD is inaccurate. Under the Mine Act, both agencies must and did make such a finding; both must be parties to rescinding it. *See* 30 U.S.C. § 842(f).

In addition to exceeding MSHA's authority, the Final Rule repeatedly violated the unambiguous terms of the Mine Act. The Act requires RCD sampling that "accurately represents the atmospheric conditions with regard to respirable dust to which each miner . . . is exposed." 30 U.S.C. § 842(b)(2). The Final Rule violates this mandate by defining "accurate" as plus-or-minus 25%, 95% of the time, and comparing sample results with an arbitrary "measurement objective" that does not represent miners' exposures. Statistics, common sense, and the 1972 Joint Finding disagree.

MSHA cannot circumvent these express statutory provisions and restrictions. It cannot rely on its general rulemaking authority to avoid specific

14

congressional grants of authority since, under rules of statutory construction, "the specific governs the general." *See Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012). It cannot do alone that which the Mine Act delegates jointly to it and HHS or solely to HHS. Moreover, MSHA's solo rulemaking and redefinition of "accurate" would render these Mine Act provisions superfluous when courts give effect to every word. *See, e.g., Hall v. United States*, 132 S. Ct. 1882, 1890 (2012). For all of these reasons, under the first step of the *Chevron* analysis, this Court should hold that the plain text of the statute regarding MSHA's rulemaking authority and accuracy mandate is clear, that no ambiguity exists, that Respondents have violated the Mine Act, and that the Final Rule is invalid.

Second, even if the Court finds ambiguity in the statute, under the second step of *Chevron,* MSHA's promulgation of the Final Rule was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). MSHA failed to analyze or demonstrate the technological and economic feasibility of its Final Rule mandates, individually and collectively. It ignored record evidence that single-shift sampling and a new sampler will significantly increase inaccurate results and require disruptive corrective actions.

MSHA did not analyze and establish the technological feasibility of its new sampling device, especially since the device experiences frequent malfunctions

15

and error codes, lacks analytical integrity checks (which laboratory analysis provides), cannot analyze silica content in samples (despite a new silica exposure limit in the Final Rule), and may not be sufficiently available for purchase from its single, MSHA-selected supplier.    The Final Rule likewise violates Mine Act principles by reducing miner safety, adopting the new sampling device without evaluating its safety risks to miners (including physiological, biomechanical, and distraction).

In addition, MSHA failed to analyze and establish economic feasibility when it ignored the true economic costs of the Final Rule's individual and combined impacts, including dramatic increases in production delays, corrective actions, ventilation plan changes, and enforcement actions, all based on inaccurate single-shift samples and an inaccurate, unreliable device.

Finally, the Final Rule violates MSHA's duty to rely on the best available scientific evidence and experience.    In the face of dramatic declines in RCD-related illness, MSHA relies on flawed scientific data and ignored the most likely explanations for remaining cases of disease.    MSHA failed to consider the latest scientific evidence regarding the effectiveness of personal protective engineering controls, including filtered, clean air helmets, and prohibited their use for compliance.    The agency similarly did not consider, as required by its statute,

16

experience gained under other health and safety laws and agencies that have set higher and/or more detailed RCD exposure limits.

As set forth below, for these reasons, this Court should grant the Petition and declare the Final Rule invalid.

**ARGUMENT**

**I.    MSHA Exceeded Its Statutory Authority and Violated the Express Language of the Mine Act in Promulgating the Final Rule.**

The Final Rule fails under the first step of *Chevron*.  MSHA's rulemaking exceeds the explicit bounds of its authority, the Mine Act requires HHS rulemaking on RCD PELs, and the Final Rule violates the Mine Act's unambiguous requirements for accurate RCD sampling.

**A.    MSHA's Rule Exceeds Its Authority under the Mine Act, Which Requires HHS Participation and Action on RCD.**

Under the first step of *Chevron*, the Final Rule violates the plain language of Section 202 of the Mine Act, which mandates that MSHA and HHS undertake *joint rulemaking* regarding the methods, locations, intervals, and manner by which RCD sampling occurs.  Yet, MSHA imposed these conditions unilaterally in the Final Rule.  Section 202(a) provides:

> Each operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed.  Such

17

> samples shall be taken by any device approved by *the Secretary and the Secretary of Health, Education, and Welfare* [Secretary of Health and Human Services] and in accordance with such methods, at such locations, at such intervals, and in such manner *as the <u>Secretaries</u> shall prescribe* in the Federal Register within sixty days from the date of enactment of this Act and from time to time thereafter . . . .

30 U.S.C. § 842(a) (emphasis added).

Likewise, in defining "average concentration" of RCD, Congress gave the Secretaries joint responsibility for determining whether single-shift sampling could be accurate. *See* 30 U.S.C. § 842(f). Yet, MSHA acted alone. That provision limits RCD exposures:

> (1) as measured, during the 18 month period following the date of enactment of this Act, over a number of continuous production shifts to be determined *by the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services]*, and (2) as measured thereafter, over a single shift only, unless *the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services]* find, in accordance with the provisions of section 101 of this Act [30 U.S.C. § 811], that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

*Id*. (emphasis added). Underscoring its intent, Congress mandated this HHS authority and restricted MSHA authority in the initial 1969 Coal Mine Act and retained it through the 1977 amendments. *See* P.L. 91-173, Title II, § 202, 83 Stat. 760 (1969); P.L. 95-164, Title II, § 202(a), 91 Stat. 1317 (1977). The joint

authority is as much a grant of power to HHS as it is a limitation on MSHA's authority.

Such clear designations of authority occur repeatedly in the Mine Act, and require the expertise of the Secretary of Health and Human Services for a variety of decisions involving miners' health. For example, Congress also required that RCD measurements occur using "a device approved by the *Secretary <u>and</u> the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services]*." 30 U.S.C. § 842(e) (emphasis added). Similarly, the two Secretaries must jointly approve respiratory equipment contemplated by the law. *Id.* § 842(h).

By clear contrast, other parts of the Mine Act delegate authority to MSHA alone or HHS alone, depending on their respective expertise. HHS has exclusive authority to set RCD permissible exposure limits, which relate to health. *See id*. § 842(d). Meanwhile, MSHA has sole authority and responsibility to conduct "frequent spot inspections," part of its inspection and enforcement specialty. *See id*. § 842(g).

In the first step of the *Chevron* analysis, this Court "look[s] to the common usage of words for their meaning." *Koch Foods, Inc. v. Sec'y, Dep't of Labor*, 712 F.3d 476, 480 (11th Cir. 2013); *Russello v. United States*, 464 U.S. 16, 21, 104 S. Ct. 296, 299 (1983). The construction and meaning of Section 202 "begins where

all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters.,* 489 U.S. 235, 241, 109 S. Ct. 1026, 1030 (1989).

In the case of Section 202(a), the word "Secretaries" refers back to the phrase "the Secretary and the Secretary of Health, Education and Welfare [Secretary of Health and Human Services]." Throughout the Act, the term "Secretary" is generally defined as meaning the Secretary of Labor. 30 U.S.C. § 802. There cannot be any dispute as to the identity of the "Secretary of Health, Education and Welfare," now called the "Secretary of Health and Human Services." *See* HHS.gov "Historical Highlights," *available at* http://www.hhs.gov/about/hhshist.html (last accessed July 27, 2014).

The phrase "shall prescribe in the Federal Register" is not ambiguous; it clearly describes the act of rulemaking. *See, e.g., City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 630, 93 S. Ct. 1854, 1858 (1973) (discussing rulemaking and noting that statute directs FAA "to prescribe the regulations . . . "); *see also U.S. Pipe and Foundry Co. v. Webb*, 595 F.2d 264, 273 (5th Cir. 1979).

In the face of this plain statutory language and clear congressional intent, MSHA *unilaterally* promulgated a regulation that required joint rulemaking. Without explanation, or any reference to the Secretary of HHS, the summary of the Final Rule describes the Rule as "(MSHA) . . . revising the Agency's existing standards on miners' occupational exposure to respirable coal mine dust." I-2-FR-

20

1, at 24814.  Although the Rule purports to be "[b]ased on data from the National Institute for Occupational Safety and Health (NIOSH)," *id.*, this is a far cry from the joint rulemaking required by Section 202.

Because the intent of Congress is clear, that is the end of the matter. *Chevron*, 467 U.S. at 842-43.  This Court and the Secretary must give effect to Congress's "unambiguously expressed intent."  *Id.*  MSHA's unilateral Final Rule is beyond its Mine Act authority and should be declared invalid.

## B. Congress Granted HHS, Not MSHA, the Authority to Set RCD Permissible Exposure Limits.

Similarly, MSHA exceeded its authority when it set new RCD PELs in the Final Rule, something only HHS can do.  The Final Rule lowers "the concentration limits for respirable coal mine dust . . . from 2.0 milligrams of dust per cubic meter of air (mg/m$^3$) to 1.5 mg/m$^3$ at underground and surface coal mines." I-2-FR-1, at 24815 (and when the dust contains less than 5% silica, lowers the limit further as the percentage of silica increases).  However, Mine Act Section 202(d) specifically confers on HHS, not MSHA, sole authority for rulemaking to set specific dust exposure limits.  That section provides:

> Beginning six months after the operative date of this title and from time to time thereafter, the Secretary of Health, Education and Welfare [Secretary of Health and Human Services] shall establish, in accordance with the provisions of section 101 of this Act [30 U.S.C. § 811], a schedule reducing the average concentration of respirable dust in the mine atmosphere during

21

> each shift to which each miner in the active workings is exposed
> below the levels established in this section to a level of personal
> exposure which will prevent new incidences of respiratory
> disease and the further development of such disease in any
> person . . . .

30 U.S.C. § 842(d).  Here, again, there is no ambiguity.  The statute mentions only

the Secretary of Health, Education, and Welfare when assigning the duty of, and

authority for, reducing the exposure limits for respirable dust "from time to time."

Historical and recent congressional action confirm that this was a deliberate

choice by Congress.  Upon passing the 1969 Coal Mine Act, the conference report

noted that "[t]he House amendment directed the Secretary of Health, Education,

and Welfare . . . to reduce the dust level below 3.0 milligrams," and "[t]he

conference agreement adopts the House provision."  S. COMM. ON LABOR AND

PUBLIC WELFARE, FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, H.R.

Rep. 91-761, at 75-76 (1969), *reprinted in* 1 LEGISLATIVE HISTORY OF THE

FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, at 1519-20 (1975).  *See*

*also* S. COMM. ON LABOR AND PUBLIC WELFARE, FEDERAL COAL MINE HEALTH

AND SAFETY ACT OF 1969, S. 2917, at 3-4 *reprinted in* 1 LEGISLATIVE HISTORY OF

THE FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, at 784-85 (1975)

(Senate version of bill originally assigning this authority to the "Secretary," *e.g.*,

the Secretary of Labor);  *Corning Glass Works v. Brennan*, 417 U.S. 188, 198-200,

22

94 S. Ct. 2223, 2229-30 (1974) (confirming meaning of statute by analyzing Senate and House versions of the Equal Pay Act).

In addition, repeatedly in recent years, members of Congress have tried to transfer this authority from HHS to MSHA, underscoring that they, too, understand the plain meaning of current law. At least 10 times, and most recently last year, the U.S. House and Senate saw legislation to give MSHA the authority to lower RCD PELs. *See, e.g.*, Black Lung Health Improvements Act of 2013, S. 1416, 113th Cong. § 2 (2013) (striking "Secretary of Health, Education, and Welfare" from 202(d) and providing that "the Secretary" shall lower the PEL); *see also* Robert C. Byrd Mine and Workplace Safety and Health Act of 2013, S. 805, 113th Cong. § 504 (2013) (same); Robert C. Byrd Mine and Workplace Safety and Health Act of 2012, S. 3443, 112th Cong. § 504 (2012) (same); Mine Safety Accountability and Improved Protection Act, H.R. 3697, 112th Cong. § 503 (2011) (same); Robert C. Byrd Miner Safety and Health Act of 2010, H.R. 5663, 111th Cong. § 504 (2010) (same).

These bills never passed. Their introduction shows that members of Congress, including the senior senators from the coal mining states of West Virginia and Pennsylvania, were well aware that current law gives MSHA no authority to issue new RCD exposure limits. Their lack of passage left MSHA

without that authority.   Since MSHA's Final Rule usurped those powers from

HHS, the rule is plainly invalid under the first step of *Chevron*.

### C.    MSHA Cannot Rely On Its General Rulemaking Authority Instead of the Specific RCD Authorities and Limitations.

With no authority to determine RCD sampling methods or accuracy alone

and no power whatsoever to issue reduced RCD PELs, MSHA attempts to simply

ignore Section 202 and instead issue the Final Rule under its general rulemaking

powers in Sections 101(a)(6)(A), 103(h), and 508 of the Mine Act.   Doing so

effectively deletes the Section 202 joint rulemaking requirements from the Mine

Act, violating the axiomatic duty to give effect to every word, clause, and sentence

of a statute.   *See Hall v. United States*, 132 S. Ct. 1882, 1890 (2012); *Hamilton v.

Lanning*, 560 U.S. 505, 518, 130 S. Ct. 2464, 2474 (2010) (finding courts

"hesitant to adopt an interpretation of a congressional enactment which renders

superfluous another portion of that same law") (quoting *Kawaauhau v. Geiger*,

523 U.S. 57, 62, 118 S. Ct. 974, 977 (1998); NORMAN J. SINGER & J.D. SHAMBIE

SINGER, 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46:6, at

230-47 (2007) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449

(2001)) (interpreting no part of a law as "inoperative or superfluous, void or

insignificant").

The provisions cited by MSHA do provide *general* authority to promulgate regulations. *See* 30 U.S.C. §§ 811(a)(6)(A) (authority to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards"); 813(h); 957 (authority to "issue such regulations as each [secretary] deems appropriate to carry out any provisions of this Act").

However, these *general* authority-granting provisions cannot override the *specific, explicit* requirements in Sections 202(a) and 202(f) that MSHA and HHS engage *jointly* in certain aspects of rulemaking for RCD or the *specific*, *explicit* delegation solely to HHS in Section 202(d) to set RCD PELs. *See, e.g., Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) (noting "the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere"); *Radlax*, 132 S. Ct. at 2071 (noting "a commonplace of statutory construction that the specific governs the general," that "a general authorization and a more limited, specific authorization [may] exist side-by-side," and that "the canon avoids . . . the superfluity of a specific provision that is swallowed by the general one" and "the specific authorization must be complied with") (citations omitted); *Morales v. Trans World Airlines*, 504 U.S. 374, 384-85, 112 S. Ct. 2031, 2037 (1992) (discussing the Airline Deregulation Act of 1978 and noting "[w]e do not believe Congress intended to undermine this carefully drawn statute through a general savings clause"); *D. Ginsberg & Sons, Inc. v. Popkin*,

285 U.S. 204, 208, 52 S. Ct. 322, 323 (1932) (finding "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part").

Through a tortured interpretation, MSHA claims that Section 202 no longer applies because it was an "interim mandatory health standard," which MSHA can replace through general Section 101 rulemaking. *See* I-2-FR-1, at 24933; 30 U.S.C. § 841(a) (stating that "the provisions of sections 202 through 206 of this title . . . shall be interim mandatory health standards . . . until superseded"). Yet, a congressional grant of authority and mandate for action is not a "health standard." True, Sections 202 through 206 contain health standards. For instance, Section 202(b)(1) sets an immediate RCD PEL of 3.0 mg/m$^3$; Section 202(b)(2) sets the PEL at 2.0 mg/m$^3$ three years later. Section 202(f) findings of accuracy or inaccuracy through rulemaking are mandatory standards, as this Court held in *Nat'l Mining Ass'n*, 153 F.3d at 1267-68. But, this does not mean that every word in Sections 202 through 206 is an interim health standard.

In order to give effect to every word of the Mine Act, *both* Sections 202 and 101 must apply. It is clear from the plain language of Section 202 that Congress intended to delineate substantive authority for coal dust between MSHA and HHS in very specific terms while invoking the rulemaking requirements of Section 101. Indeed, this Court held that a rulemaking regarding RCD sampling under Section

202 must *also* follow Section 101 rulemaking provisions.  *See Nat'l Mining Ass'n*, 153 F.3d at 1268-69. Reading Section 101 as granting MSHA, through general rulemaking language, the very authority Section 202 specifically delegates to HHS, would render Section 202 entirely superfluous.  Congress' decision to require MSHA to act jointly with HHS on some activities and to require MSHA and HHS to act alone on others would have no effect if at any point MSHA could simply act alone by claiming to "supersede" these provisions under § 101 [811]. [4]

### D.     MSHA Does Not Have Authority to Unilaterally Rescind a Joint Finding Previously Subject to the Joint Rulemaking Process.

Since MSHA and HHS previously proposed and adopted a *joint* final rulemaking to determine that single-shift samples were not accurate, MSHA's *solo* attempt in the Final Rule to mandate single-shift samples is an illegal effort to rescind the joint rulemaking unilaterally.  No provision in the Mine Act gives MSHA the authority to undo unilaterally that which the Act required joint action to do in the first place.  *See* 30 U.S.C. § 202 [842].  Since the 1972 Joint Finding represents an official agency action of NIOSH as well as MSHA, rescinding it requires *both* agencies acting in a joint rulemaking process.

---

[4] In the 1998 *National Mining* case, the Court reviewed a *joint* MSHA/HHS finding, so there was and could be no question before the Court regarding the respective roles of the agencies.  To the extent that Section 201 required HHS to act, on the facts before the Court in 1998, HHS *had* acted in the joint effort.

27

MSHA clearly recognized this in the past, and its changed positions on substance, procedure, and statutory interpretation render its action unworthy of deference. Consistent with Section 202(a) [842(a)], MSHA issued jointly with NIOSH the 1994 Proposed Notice of Finding, the 1998 Final Notice of Finding, the 2000 Proposed Rule, and a 2003 extension of comment period. *See supra* Statement of Facts. Thus, in every prior instance in which MSHA engaged in rulemaking regarding Section 202(a) [842(a)] to overturn the 1972 Joint Finding, it did so jointly with NIOSH. Yet, without justification, MSHA entirely abandoned this statutorily mandated scheme in promulgating the Final Rule, rendering it invalid.

### E.    MSHA Violated the Mine Act by Ignoring and Nullifying Its Plain and Unambiguous Accuracy Requirement.

The Final Rule further violated the unambiguous language of the Mine Act by ignoring the express requirement that RCD sampling methods be "accurate" when it required single-shift sampling, the new sampling device, and adherence to its new PELs and excessive concentration values ("ECVs").

Section 202 of the Mine Act requires operators to "take *accurate* samples." 30 U.S.C. § 842(a) (emphasis added). Further, the statute defines the "average concentration" of RCD as "a determination which *accurately* represents the atmospheric conditions with regard to respirable dust to which each miner in the

28

active workings of a mine is exposed." *Id*. § 842(f) (emphasis added).  Section
842(f) endorses multiple shift sampling if MSHA and HHS "find . . . that such
single shift measurement will not, after applying valid statistical techniques to
such measurement, *accurately* represent" exposures.   *Id*. (emphasis added).
Congress did not define the terms "accurate" or "accurately" in the Mine Act.

Courts construe undefined statutory terms according to their ordinary
meaning. *Sebelius v. Cloer*, 133 S. Ct 1886 (2013); *see also Octane Fitness, LLC
v. ICON Health & Fitness, Inc.*, 134 S. Ct 1749, 1756 (2014) ("The Patent Act
does not define 'exceptional,' so we construe it 'in accordance with its ordinary
meaning.'") (internal citations omitted); *BP Am. Prod. Co. v. Burton*, 549 U.S. 84,
91, 127 S. Ct. 638, 643 (2006); *Koch Foods, Inc. v. Sec'y, Dep't of Labor*, 712
F.3d 476, 480 (11th Cir. 2013).  The term "accurate" is not ambiguous.  It means
"free from error or mistake" and "in exact conformity to truth or to some standard."
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Gove 1961).  *Koch Foods*,
712 F.3d at 480 (noting that "[c]ourts often look to the dictionary definitions of
terms to determine their common usage").

The abundant record evidence, discussed *infra* at Part II.B, establishes that
single-shift sampling remains as inaccurate today as it was when Congress insisted
on accuracy in the Mine Act.  Dust concentrations in a mine vary widely within
short periods of time and even within very short distances, including from one

29

lapel to another in side-by-side samples. I-COMM-58-14 at 19-20; I-2-FR-1, at 24935, 24938-39. The record also shows, as discussed *infra* at Part II.C., that the new continuous personal dust monitor required by the Final Rule is both inaccurate and unreliable, producing highly variable results and errors in extensive testing. *See* I-2-FR-1, at 24862-63.

Given that neither single-shift sampling nor the new device could meet the common and ordinary meaning of "accuracy" imposed by the Mine Act, MSHA simply redefined "accuracy" to fit the limitations of its new sampling method and equipment. Under the Final Rule, "accurate" means "a 95 percent confidence that the recorded measurements are within +/-25 percent of the true respirable dust concentration." 30 C.F.R. § 74.8. Furthermore, MSHA redefined "true" to mean whatever "measurement objective" is measured instead of miners' exposure. I-2-FR-1, at 24865.

These new definitions not only offend common sense but effectively re-write the Mine Act. Where Congress demanded measurements that are "free from error," MSHA allows a 25% margin of error in either direction, 95% of the time. Where Congress recognized that averaging multiple samples often is necessary to accurately measure the atmosphere to which miners are exposed, MSHA declares that a single sample at whatever time and place taken is accurate even if a side-by-

30

side sampling device on the miner's opposite shoulder produces a vastly different reading. *See infra* at Part II.B.

MSHA permits such errors, mistakes, and wild variability simply for administrative convenience despite what Congress required. But, as the Supreme Court recently found, "[a]n agency has no power to 'tailor' legislation to bureaucratic goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress." *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2445 (2014) (citations omitted) (finding EPA could not limit permit requirements to polluting sources above 100,000 tons per year to avoid "calamitous consequences" in administering the rule, when statute set the threshold at 100 tons).

MSHA's re-definition of "accuracy" thus violates the Mine Act, which unambiguously requires precision in RCD sampling and samplers. Consequently, the Final Rule is invalid and should be vacated under the first step of *Chevron*.

## II.    The Final Rule Is Not Technologically and Economically Feasible.

Even if the Court analyzed the Final Rule under the second step of *Chevron*, it should conclude that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In setting standards, MSHA must consider "the latest available scientific data in the

31

field, the feasibility of the standards, and experience gained under this and other health and safety laws." *Nat'l Mining Ass'n*, 153 F.3d at 1266 (quoting 30 U.S.C. § 842(f)) (internal quotation marks omitted).

MSHA must show that mandatory standards are both technologically and economically feasible. *Pub. Citizen Health Research Group v. OSHA,* 557 F.3d 165, 176 (3rd Cir. 2009); *see also Nat'l Mining Ass'n,* 153 F.3d at 1269 n.5. Feasible means "capable of being done, executed, or effected – both technologically and economically." *Kennecott Greens Creek Mining Co. v. MSHA*, 476 F.3d 946, 957 (D.C. Cir. 2007) (quoting *Am. Textile Mfrs. Institute v. Donovan*, 452 U.S. 490, 508-09, 101 S. Ct. 2478, 2489-90 (1981)) (internal quotation marks omitted); *AFL-CIO v. OSHA*, 965 F.2d 962, 980 (11th Cir. 1992) (same). Indeed, "[a]ny standard that was not economically or technologically feasible would *a fortiori* not be reasonably necessary or appropriate." *AFL-CIO v. OSHA*, 965 F.2d at 980 (quoting *Am. Textile*, 452 U.S. at 513 n.31, 101 S. Ct. at 2493 n.31).

As discussed below, MSHA has failed to do every one of these things. Indeed, MSHA's feasibility analysis is entirely lacking because MSHA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." *Agape Church*, 738 F.3d at 410.

### A.     MSHA Failed to Analyze Feasibility Properly and Demonstrate that the Final Rule Is Technologically Feasible.

To show that a standard is technologically feasible, MSHA must analyze and demonstrate "that modern technology has at least conceived some industrial strategies or devices which are likely to be capable of meeting the [standard] and which the industries are generally capable of adopting." *Color Pigments Mfrs. Ass'n v. OSHA*, 16 F.3d 1157, 1161 (11th Cir. 1994) (citation omitted). MSHA may satisfy its burden "by pointing to available technologies, and to emergent technologies that were reasonably capable of experimental refinement and distribution within the standard's deadlines." *Public Citizen,* 557 F.3d at 177 (citation omitted).

However, MSHA must establish "a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the [standards] in most of its operations." *Kennecott*, 476 F.3d at 957. MSHA must provide "plausible reasons for its belief that the industry will be able to solve those problems in the time remaining." *Id.*

Here, the overwhelming record evidence demonstrates that single-shift samples are inaccurate measures of RCD exposure; that the new sampling devices

33

are unreliable, inaccurate, and unavailable; that MSHA did not analyze or demonstrate the feasibility of its new silica PEL and silica-based reductions in RCD limits; and that MSHA entirely failed to analyze the feasibility of meeting its combined Final Rule changes and mandates.  Consequently, the Final Rule is arbitrary and capricious and should be vacated.

## 1.    MSHA Did Not and Cannot Establish that Single-Shift Sampling Is Technologically Feasible.

Based on the results of a single dust sample, the Final Rule imposes dramatic new mandates and costs on operators, including immediate operating changes (known as "corrective action"), and results in increased citations and penalties, which contribute to an operator's history of violations and can trigger increased fines and closure orders.  *See* I-2-FR-1, at 24814-15; 30 U.S.C. § 810; *see also* 30 C.F.R. Part 100 (penalties increase based on history of violations); 30 C.F.R. Part 104 (pattern of violation closure orders).

The overwhelming record evidence shows that single-shift samples do not reliably and accurately represent actual miner exposure.  *See, e.g.* I-COMM-58, at 13-15; I-COMM-58-9, at 5; I-COMM-58-14, at 11-13.  MSHA impliedly admits that single-shift samples are inaccurate measures of the true RCD exposure of miners, per se.  *See* I-2-FR-1, at 24939.  It concedes that samples can vary based on factors that include placement of the sampler, which way a miner faces during

34

sampling, and activities and mining conditions at different times and places, as well as that individual samples vary so much in time and location that even samples collected simultaneously from two different shoulders of the same miner can vary. I-2-FR-1, at 24939.

MSHA further acknowledges the inaccuracy of single-shift samples in admitting that it had to apply a 25% margin of error to address issues with "both precision and uncorrectable bias" and that a single-shift sample only "measures the average respirable coal mine dust on a specific shift *at the sampling location*." I-2-FR-1, at 24934 (emphasis added). This proven spatial "variability" makes it impossible for a single sample to accurately represent the actual exposure of a miner, as recognized by the 1972 Joint Finding. MSHA and NIOSH had to compensate for this inherent sample "variability" by averaging multiple samples.

And, the higher the variability, the less likely a single sample will accurately reflect dust exposure. I-COMM-58-14, at 19. MSHA failed to credit record evidence demonstrating that there is at least a 1 in 6 (or 17%) chance that any single sample will falsely show an overexposure. I-COMM-58-14, at 19.[5] The

---

[5] The National Mining Association's record comments summarized these challenges:

> To declare single shift sample results accurate, MSHA had to go beyond reinventing the English language [by] re-defining the term 'accurate' (+/-25% …, 95% of the

record documents research showing hundreds of inaccurate actual single-shift sample results.  *See* I-COMM-58-9.

Single-shift samples are a snapshot of conditions in a very particular location and time measured in inches and minutes.  *See* I-2-FR-1, at 24934 (a single-shift sample only "measures the average respirable coal mine dust on a specific shift *at the sampling location*") (emphasis added).  They reveal little about overall exposures of a miner or conditions in the mine, much less RCD exposures that may cause risk over a working lifetime to any given miner.  Relying on such

time), and smoothing the data by comparing average results. It ignored the accepted scientific concept of calculating the impact of compounding errors. MSHA did not analyze or consider the significant errors associated with silica analysis on its accuracy finding, even though it reduces its coal mine dust standard for silica content, significantly impacting coal mine dust sampling accuracy. Similarly, MSHA did not evaluate increased errors and inaccuracy at the proposed lower levels of variable coal dust PELs, mandated by the proposed adjustment for shift lengths, nor the proposed silica content PEL reduction adjustment. Nor did MSHA analyze its accuracy finding at the lower levels of coal mine dust reported by current MSHA sampling data, acknowledged by the scientific literature to create greater levels of measurement inaccuracy than higher levels . . . . The accuracy, precision and bias calculations relied upon by MSHA are false, based on how they were determined, and proven false by the Alliance side by side analysis that sets forth actual accuracy and precision data.

I-COMM-58, at 14-15.

samples to mandate operational changes and penalties is particularly inappropriate considering that the hazard of RCD comes from prolonged periods of actual, not merely theoretical, overexposure. I-COMM-58-14, at 19-20. As such, MSHA's chosen compliance and enforcement mechanism bears no connection to the hazard that MSHA seeks to mitigate, a clear indication of arbitrary and capricious rulemaking.

In contrast with commenters' analyses focused on the accuracy of individual samples, MSHA dared not base its feasibility analysis on single-shift measurements. Rather, MSHA tried to support its rule with hypotheticals and analysis of *averages* that smooth over the variability of underlying single-shift samples. *See* I-2-FR-1, at 24868-69 (discussing MSHA's analysis of the mean and median exposure levels of historic inspector samples to make a feasibility determination); *see also* I-COMM-58-9, at 4. MSHA's analysis averaged thousands of historical sample results, smoothing out inaccurate peak results. *Id.* MSHA's Final Rule is arbitrary and capricious, and without any justification in the record, for using such averages of samples to impose on operators unjustified burdens triggered by just one single-shift sample.[6]

---

[6] Because MSHA acted alone, without the required formal HHS participation, it had to informally seek NIOSH's assistance to try to rebut this data. By email, MSHA's acting Deputy Assistant Secretary (on loan from NIOSH), asked his former employee at NIOSH for thoughts. *See* I-COMM-77, at 1. Without

Historically and in the Final Rule itself, MSHA implicitly and explicitly acknowledges the infeasibility of measuring RCD exposures with single-shift samples, contrary to the conclusion it reaches in the Final Rule.  The prior method of averaging multiple samples, first enacted by Congress, was designed to control for this variability. *See* I-2-FR-1, at 24940.  Indeed, MSHA and HHS in the 1972 Joint Finding expressly found that single-shift sampling is not accurate.  *See* 37 Fed. Reg. 3833.

Moreover, the Final Rule's desperate attempt to drastically re-define "accurate," as discussed *supra* at Part I.E., underscores that single sampling is not "free from error" as that term's ordinary meaning requires and thus not feasible. Quite the contrary, MSHA implicitly recognizes massive error in single-shift sample results, which its "accuracy" definition allows to swing by as much as 50%. *See* 30 C.F.R. § 74.8 (defining accuracy as within +/- 25% of the true concentration 95% of the time).

MSHA likewise recognizes the error by adopting ECVs, which seek to compensate for some of the error with limited increases in applicable exposure

---

undergoing normal NIOSH protocols, public review, notice, comment, hearing, peer review, or even identifying authorship, NIOSH responded with an informal endorsement of MSHA's position.  Had HHS/NIOSH fully participated in the rulemaking, as required by law, *see supra* at Part I.A., NIOSH's input might have been more valid and useful.

38

limits. [7] Particularly telling is MSHA's willingness to issue citations based on just one sample, but its insistence that operators show five compliant samples to abate a violation. 30 CFR 70.209(g)(1). Accurate sampling of RCD levels by single-shift samples is not feasible.

---

[7] The ECVs are MSHA's failed attempt to account for the significant errors and imprecision in its chosen sampling approach. They establish levels at which MSHA will cite overexposures based on statistical calculations. However, record evidence shows that the ECVs understate the documented degree of sampling error and variation, failing even to meet MSHA's +/- 25% error margin.

A University of Kentucky study found that the ECVs dramatically understate the error when allegedly trying to adjust for it. *See* Novak et al., "Respirable Dust Study for Kentucky Coal Mines" (2013), *available at* http://energy.ky.gov/resources/Documents/Respirable%20Dust%20-%20Final%20Report%20-%20NOVAK.PDF (last accessed July 27, 2014). For example, for samples governed by a 1.5 mg/m$^3$ exposure limit, MSHA's ECV table proposes to cite operators when the sample exceeds 1.7 mg/m$^3$ in an effort to account for error. *Id.* at 27, Table 11. But, the Kentucky study found that the appropriate number to account for variability and error would be 2.77 mg/m$^3$. *Id.* Likewise, for operators held to a RCD PEL of 0.2 mg/m$^3$ (reduced limit due to silica content), MSHA would cite the operator when levels exceed 0.23 mg/m$^3$. *Id.* However, the Kentucky study found that this does not nearly account for all of the error and imprecision of MSHA's methods, and the real number should be 0.38 mg/m$^3$. *Id.*

MSHA itself admits that the ECVs do not take into account "the degree and pattern of variability observed among different measurements obtained during MSHA sampling," nor do they account for errors inherent in "how the applicable standard was established, or . . . any measurement uncertainties in the process of setting the applicable standard." I-2-FR-1, at 24970.

### 2.    MSHA Failed to Demonstrate that Use of the Continuous Personal Dust Monitor is Feasible.

While single-shift sample measurements are inherently inaccurate no matter what sampling device is used, the new MSHA-mandated Continuous Personal Dust Monitor compounds this error because the CPDM itself cannot feasibly or accurately measure RCD in a mine, nor can it measure the silica content of a sample it collects. The Final Rule requires operators to purchase and use the CPDMs, which continuously report RCD measurements. I-2-FR-1, at 24818. The results determine compliance with respirable dust limits, trigger operator corrective actions and mine plan amendments, and prompt MSHA citations, penalties and closure orders. I-2-FR-1, at 24814-15; 30 U.S.C. § 810; 30 C.F.R. Part 100 and Part 104; 30 C.F.R. §§ 90.207, 90.300. Yet, MSHA has not demonstrated that CPDMs are reliable, accurate, or feasible when used in the coal mine environment.

To be feasible, sampling devices must at least meet the performance criteria of 30 C.F.R. Part 74 for reliability, accuracy and precision. MSHA must do "laboratory and mine testing of the CPDM for accuracy, precision, bias, reliability under diverse environmental conditions (as defined under § 74.7(e) and (g)) . . . ." *See* 30 C.F.R. § 74.8(f). Yet, here, MSHA ignored significant record evidence showing that the CPDMs cannot meet this standard during normal in-mine

40

underground use and thus also ignored the "latest available scientific data in the field," which MSHA must rely upon under 30 U.S.C. § 811(a)(6)(a).

### a.    CPDMs Yield Unreliable and Inaccurate Results.

Though MSHA asserts that the CPDM is reliable, when operators tested CPDMs in their mines, the devices performed poorly.  One operator's experiment using 40 CPDMs revealed that the device has a high malfunction rate.  I-COMM-58, at 25.  Of the 40 units tested, 35% had to be returned to the manufacturer for repair within a 10-month period, not counting in-house repairs or the many returns before the operator began keeping track.  *Id.*; *id.* at n.16.  The operator had to return over 12% of the units multiple times.  *Id.*

MSHA disregarded evidence that, when tested in mine environments, the devices return variable readings in elevated temperature and humidity levels.  I-COMM-76, at 4.  The devices also fail when exposed to certain radio frequency signals.  *Id.*  Furthermore, the CPDMs not only produce results that vary significantly from the current sampler, but they also produce highly variable results from unit to unit.  I-COMM-58-9.

The CPDMs failed to meet MSHA's upside-down definition of "accuracy," too: 42% of the samples were outside of +/- 25% accuracy criteria.  I-COMM-58-9, at 30.  One response by MSHA was to compare the *average* of thousands of samples taken using the traditional gravimetric sampler (0.83 mg/m$^3$) with the

41

"virtually identical" average of samples using the new sampling device (0.82 mg/m$^3$). I-2-FR-1 at 24863. Yet, this comparison is meaningless. An average reveals nothing about how often or how much each sample strayed from the true RCD concentration value. Since a single sample above the limit will now lead to immediate consequences, this distinction matters greatly.

Additionally, during in-mine testing, CPDMs produced frequent error messages of voided samples. I-COMM-76-3, at 3. MSHA does not dispute that 20% of the 1,000 samples collected in the cited study indicated an error, and 6% indicated multiple errors. I-2-FR-1, at 24863-64; I-COMM-58, at 25. Instead, MSHA discounts such errors, asserting that they were merely status conditions logged during sampling, to be used later to determine whether samples are valid or should be voided (*e.g.*, due to errors). *See id.* at 24863-64. This explanation does nothing to change the fact that CPDMs appear to malfunction 200 out of every 1,000 times.

Significantly, MSHA fails to clarify when an error message should invalidate a sample even while the Final Rule requires mine operators to take "immediate corrective actions" based on a single, full-shift valid operator sample and subjects operators to citations based on an MSHA inspector's single-shift sample. MSHA unreasonably requires operators to take action despite any such errors. MSHA fails to show that the CPDM is feasible when the agency masks

42

CPDM errors without identifying any evidence of available solutions. *See* I-2-FR-1, at 24815. Instead, MSHA ignores information in the record, including from the CPDM manufacturer, which suggested that "MSHA establish criteria, with input from stakeholders, for an acceptable sample in the event of an error message during a sample run." I-COMM-75, at 5.

Despite the documented problems with the new device, MSHA abandoned analytical safeguards against inaccurate measurements. I-COMM-58, at 23-24; *see* I-2-FR-1, at 24938. Samples from the prior sampler, the Coal Mine Dust Personal Sampler Unit, were subject to laboratory analysis wherein the lab was able and required to weigh and analyze the samples to weed out excessive "over-sized," non-respirable particles. I-COMM-58, at 23; *see* I-2-FR-1, at 24938. For the new sampler, the Final Rule also eliminates the "control," "blank" filter analysis, which the MSHA lab currently conducts. *See* I-2-FR-1, at 24938. Over-sized particles – which are too large to penetrate the sensitive parts of the lungs and are not regulated as respirable – can contaminate and interfere with "accurate" sampling. MSHA admits that filtering out over-sized particles is critical. I-2-FR-1, at 24938 (describing the process of examining any sample that is over 6 mg or that shows evidence of being dumped and voiding samples that contain over-sized

particles).[8]  The CPDM has no such protection against measuring the wrong particles.

MSHA cannot establish the CPDM's feasibility by making assumptions about the internal mechanisms of this new technology with known deficiencies. Finally, as discussed *infra* at Part II.E., MSHA did not establish the feasibility of using the CPDM given that even when the device works as intended, it cannot measure the silica content of samples.  Operators now are required to: (1) not exceed a new silica maximum exposure limit of 100 µg/m$^3$, and (2) adhere to RCD exposure limits even lower than 1.5 mg/m$^3$ as silica content exceeds 5%. Imposing a sampling device that cannot measure silica leaves operators without a feasible means of complying with these mandates.[9]

---

[8] MSHA tries to minimize the importance of lab inspections by stating that only 26 of the 54,809 inspector samples and only 46 of the 42,846 operator samples were voided under this process.  I-2-FR-1, at 24938.  This statement reflects the fact that MSHA has chosen to inspect only those samples with 6mg or more in weight gain.  At three times the 2mg/m$^3$ PEL, and four times the Final Rule's new 1.5 mg/m$^3$ limit, it is likely that few samples were inspected and thus not surprising that few samples were voided.

[9] MSHA asserts in a non-binding "Frequently Asked Questions" on its website that it will not enforce the new silica PEL.  "End Black Lung Frequently Asked Questions," *available at* http://www.msha.gov/endblacklung/faq.asp (last visited July 27, 2014).  By including it in the Final Rule, however, this PEL is the law, and the remainder of the Final Rule still adjusts RCD limits downward based entirely on silica content derived from inspector samples different than those judged against the reduced PELs.

MSHA was required to analyze fully these CPDM problems and limitations and to demonstrate the device's accuracy and feasibility.  The record evidence shows that MSHA did not do so.[10]

> **b.    MSHA Requires Use of CPDMs Without Sufficient Evidence that They Will Be Available.**

MSHA also failed to show that enough CPDMs will be commercially available to operators when the devices become mandatory.  MSHA acknowledges that there is "only one manufacturer of the device," that sufficient quantities of CPDMs may not exist, and that the Final Rule will create increased demand.  I-2-FR-1, at 24884.  Nevertheless, MSHA based the 18-month phase-in of the CPDM on the manufacturer's projections without obtaining any concrete plans, commitment, proof of availability, or correction of the device's problems.  *See id.*

---

[10] MSHA's CPDM feasibility analysis also falls short because it failed to demonstrate that miners can wear and operate the devices "without impeding their ability to perform their work safely and effectively," 30 C.F.R. § 74.7(a).  MSHA must fully address and evaluate significant record evidence showing that CPDMs may have negative effects on miner safety and health, including increasing their weight load, decreasing mobility, and diverting attention away from the hazards of the mining environment. *See* I-COMM-76-6, at 1-2, 11 (82% of miners experienced discomfort from carrying CPDMs, 67% reported greater fatigue, 55% reported problems with their balance, and 73% reported CPDMs interfering with operating equipment); I-2-FR-1, at 24866 (discussing the Information Circular 9501-Miners' Views about Personal Dust Monitors (Peters, *et al*, 2008)); I-COMM-76-6, at 13 (showing that CPDMs may significantly increase the incidence of musculoskeletal disorders among miners);  I-2-FR-1, at 24866 (recognizing but discounting evidence of CPDM "potential to attract attention"); I-COMM-76-6, at 13 (evidence of risks from miner distraction).

Worse, by the target date, operators must not only purchase the devices but also train all necessary persons to use them.  *Id.* at 24889 (miner training); *id.* at 24990 (requiring training for others besides miners.)

Compounding this problem, MSHA underestimates the number of CPDMs needed.  High error rates, I-COMM-76-1, at 4-5, the need to charge samplers between uses, and evidence that they can only be used one shift per day, I-COMM-58, at 19, demonstrate that operators will need more devices than MSHA estimates.    Meanwhile, the manufacturer with the MSHA-granted monopoly will have little incentive to correct problems, timely and effectively service equipment, or provide competitive, fair pricing.  I-COMM-74, at 4-5.

MSHA must do more than just assert that the CPDM is feasible.  It was required to analyze and *demonstrate* as much.  Because MSHA "entirely failed to consider [ ] important aspect[s] of the problem[s]" with CPDMs, *Agape Church*, 738 F.3d at 410, the Final Rule is arbitrary and capricious and should be vacated.

### 3. MSHA Failed to Consider or Demonstrate the Feasibility of Its New Silica PEL and Silica-Based, Reduced RCD Limits.

MSHA did not even attempt to analyze the feasibility of the Final Rule's new silica mandates.  The Rule creates both a new silica PEL (100 $\mu g/m^3$) and a graduated scale of decreasing RCD/silica limits (or excessive concentration values) – *below* the generic 1.5 $mg/m^3$ – when MSHA reports to an operator that

46

an MSHA-collected and MSHA-analyzed sample contains more than 5% silica. I-2-FR-1, at 24882 & Table 1.

Effectively, this creates at least 19 different exposure limits, created by the regulation's silica formula (ranging from the current $2mg/m^3$ limit down to a $0.2mg/m^3$ limit), as well as the excessive concentration value, single-shift limit that triggers citations. *See* 30 C.F.R. §§ 70.100-101; Table 70-1, I-2-FR-1, at 24980.

MSHA conducted absolutely no analysis of the operational impacts of the new silica PEL and silica formula-driven RCD PELs, which would apply to 24% of samples collected.[11] MSHA did not analyze how many operators would be affected by the lower silica-based PELs or whether operators could feasibly meet PELs well below 1.5 $mg/m^3$. Furthermore, even though it concedes that CPDMs do not measure silica, *id.* at 24866, MSHA failed to analyze whether and how

---

[11] Based on the analysis of 2010 MSHA data, reported on its web site and described by Alliance Coal and NMA testimony, 7,268 Designated Occupation Samples (24.2%) would be governed by silica-reduced standards under the Final Rule. *See* Affidavit of Mark Watson ¶ 9. Commenters did not have the opportunity to calculate the total number of samples that would be subject to or that would exceed the lower silica-based PEL in the Final Rule because MSHA changed the applicable limit (based on less than 5% silica content) from $1mg/m^3$ in the proposed rule to 1.5$mg/m^3$ in the Final Rule, but the proposed rule was calculated to cause 230,000 results in excess of the applicable proposed exposure limit. *Id.* at ¶¶ 6-7; *see also* I-COMM-58-9.

operators could monitor or impact the actual silica content of RCD measured by the CPDM, weeks or months after MSHA reports a reduced PEL to the operator.[12]

### 4. MSHA Entirely Failed to Analyze the Feasibility of the Combination of Its Final Rule Mandates.

Not only did MSHA fail to demonstrate the feasibility of each of these mandates, but it also did not analyze the feasibility of meeting all of them in combination, which increases their impact and the difficulty of compliance. For example, using single-shift samples to determine exposures complicates and increases the impact of other Final Rule provisions, such as the use of the new, inaccurate sampling devices. Likewise, the Final Rule's imposition of a silica PEL and reductions in RCD limits based on silica are inappropriate given that the sampling devices cannot even measure silica. MSHA did not establish the

---

[12] Silica exposure, too, varies from one time, place, and job assignment to another (all depending on how much rock, rather than coal, is disturbed during sampling and how much "rock dust" is applied in the mine for explosion prevention). The rulemaking record for OSHA's proposed silica rule, including the U.S. Chamber of Commerce comments and testimony of Robert Lieckfield, identify the significant inaccuracy of silica analysis. *See* OSHA-2010-0034-2259, *available at* http://www.regulations.gov/#!documentDetail;D=OSHA-2010-0034-2259. MSHA has not addressed or established how such a system is accurate or feasible to implement and comply with.

feasibility of the resulting extremely low RCD limits, or the accuracy of the samplers to measure at those levels.[13]

Similarly, MSHA did not analyze the feasibility of the Final Rule's vast increase in mandated sampling entities and events in combination with other expanded sampling mandates (*e.g.*, sampling only when production is at 80% of average and expanding the sampling time to full shifts).  No multi-factor or multi-variable analysis appears in the Final Rule or supporting documents.

Indeed, the huge increase in samples, the new PEL of 1.5 mg/m$^3$, the reduced PELs based on silica content, the single-shift sampling, and the inaccurate sampler all combine to make compliance with the Final Rule's coal dust limits infeasible.  Because MSHA did not analyze or demonstrate the feasibility of these combined factors, the Final Rule is arbitrary and capricious and should be rejected.

---

[13] MSHA also did not analyze or demonstrate feasibility of the Final Rule provisions in combination with other regulations. For example, new "rock dust" application mandates for underground explosion prevention, 76 Fed. Reg. 35968, will increase the dust and silica content collected by the new samplers since the samples are not examined in a lab and the rock dust contains silica. In response, MSHA did not seek to evaluate or calculate the rock dust impact, and merely noted that there is no solution to collecting required rock dust in samples, instead directing mine operators to speak to their suppliers.    I-2-FR-1, at 24882-83, 24885-86.

49

**B.** **The Record Evidence Demonstrates that MSHA Did Not Analyze the Increased Costs of Delays in Production, Rendering the Final Rule Economically Infeasible.**

To demonstrate feasibility, MSHA must not only show that the standard is technologically feasible, but also that it is economically feasible. *Public Citizen Health Research Group,* 557 F.3d 165 at 176. "[E]conomic feasibility does not involve a cost-benefit analysis." *Id.* at 177 (internal quotation marks omitted). To establish economic feasibility, the agency "must provide a reasonable assessment of the likely range of costs of its standard, and the likely effects of those costs on the industry, so as to demonstrate a reasonable likelihood that these costs will not threaten the existence or competitive structure of an industry, even if it does portend disaster for some marginal firms." *Color Pigments Mfrs. Ass'n*, 16 F.3d at 1163 (citations omitted).

MSHA estimates that the Final Rule's annualized costs will be $24.8 million and its benefits will be $36.9 million. I-2-FR-I, at 24816. However, those numbers belie the true costs. In the first year alone, MSHA estimates the costs "of the actions operators will take to comply with" the Final Rule to be at least $61 million. I-REA-16, at 23, Table IV-1. However, MSHA failed to consider other critical and large-scale costs despite evidence that such costs of compliance are magnitudes higher than MSHA estimates.

In its economic feasibility analysis, MSHA fails to estimate the full costs of conducting expanded mandatory sampling (or even to calculate the number of samples operators must take); the costs of delayed production from readings above the ECVs; the costs of operational and mine plan changes, triggered by CPDM readings that have been shown to be inaccurate; and the costs of the other extensive new mandates, both individually and combined.  Under the Final Rule, an operator must take immediate corrective action to lower the concentration of respirable dust when a single full-shift sample exceeds the PEL and ECV, and modify its ventilation plans, subject to MSHA approval.  I-2-FR-1, at 24815, 24897.  Taking corrective actions or waiting for mine plan approvals often result in delays that halt or reduce production.  I-COMM-76, at 10.  MSHA failed to consider the extensive revenue losses from delayed production, which are estimated at least at $1.6 billion per year for underground coal mines.  I-COMM-76-1, at 16.

Given MSHA's gross miscalculation of the costs associated with the Final Rule, including its failure to consider the costs of compliance, sampling, delayed production and operational and plan changes, as a result of a lower PEL and inaccurate sampling, MSHA has failed to properly analyze or demonstrate the Final Rule's economic feasibility.

51

## III.    MSHA Failed To Consider the "Best Available Evidence."

Independently of its lack of feasibility, the Final Rule violates the Mine Act

because MSHA failed to base it on the best available evidence and experience.

Section 101(a)(6)(A) of the Mine Act provides, in pertinent part, that MSHA:

> The Secretary, in promulgating mandatory standards . . . under
> this subsection, shall set standards which most adequately assure
> on the basis of the best available evidence that no miner will
> suffer material impairment of health or functional
> capacity….Development of mandatory standards under this
> subsection shall be based upon research, demonstrations,
> experiments, and such other information as may be appropriate.
> In addition to the attainment of the highest degree of health and
> safety protection for the miner, other considerations shall be the
> latest available scientific data in the field, the feasibility of the
> standards, and experience gained under this and other health and
> safety laws.

30 U.S.C. § 811(a)(6)(A).  However, in setting the standard for respirable RCD

exposure in the Final Rule at 1.5 mg/m$^3$, MSHA did not comply with its statutory

rulemaking obligation under Section 101(a)(6)(A).

MSHA ignored the best available scientific evidence regarding the health

risks associated with current RCD exposures, instead fashioning a broad rule that

imposes costs across industry based on flawed scientific data applicable to only a

small segment of the industry.  MSHA further failed to adequately consider the

best available evidence or the latest scientific data regarding the effectiveness of

personal or mini-engineering controls, including filtered, clean air helmets that

reduce miner exposures.   MSHA also failed adequately to consider relevant experience gained under other health and safety laws as mandated by its statute.

### A.   MSHA Ignored the Best Available Evidence Regarding Health Risks and the Effectiveness of the Current PEL.

MSHA failed to show that the Final Rule, including its reduced PELs and its ancillary mandates, is necessary to avoid "material impairment of health or functional capacity" or that the current PEL is insufficient.   30 U.S.C. § 811(a)(6)(A).   While every case of occupational lung disease must be prevented, the latest and best scientific data show that the rate of lung disease in miners continues a long-term decline under the existing PEL.   I-COMM-58, at 5; I-COMM-58-13.   In addition, record evidence shows that some lung disease in miners is not from workplace exposure.   I-COMM-58, at Sec. I (referring to the Coal Worker Health Surveillance Program).   According to 2009 MSHA data, the prevalence of lung disease among miners was less than 2%, while the overall prevalence of symptoms indicating lung disease among those not exposed to coal dust was 5.3%.   I-COMM-58, at Sec. I.   Yet, MSHA failed to account for these critical and undisputed scientific facts in the Final Rule.

Further, to the extent that MSHA found limited pockets of new cases of disease, MSHA failed to consider the best available evidence, including its own evidence, showing that: (1) silica likely was the cause, and/or (2) existing dust

controls were not properly used. *See* I-COMM-58, at 2-3 and I-COMM-58-4. MSHA bases its Final Rule on studies showing new cases of advanced or rapidly-progressing lung disease in two counties in western Virginia. *See* I-2-FR-1, at 24829. However, record evidence demonstrates that average coal dust exposures during the years preceding the study were below 1.0 mg/m$^3$ – far below even the new PEL – since 1995. I-COMM-58, at 3. By contrast, crystalline silica concentration levels exceeded the relevant PEL during the same time frame. I-COMM-58, at 3. Similarly, a 2009 study linked the geographic clustering of rapidly progressing lung disease in younger miners to increased exposures to silica. I-COMM-58-4, at 10 (citing Laney, et al., *Pneumoconiosis Among Underground Bituminous Coal Miners In The United States: Is Silica Becoming More Frequent?* OCCUPATIONAL AND ENVIRONMENTAL MEDICINE (Sept. 22, 2009)).

Despite this latest and compelling record evidence that silica was most likely to blame for any recent increase in lung disease (compared with decades of reductions of RCD exposures and related disease), MSHA admittedly did not include silica in its regression analyses even while "agree[ing] that including silica exposures as a covariate *would have improved the credibility of these models*." I-

54

2-FR-1, at 24844 (emphasis added).  It ignored the best available evidence on the issue at the core of its justification for the Final Rule. [14]

In so doing, MSHA also ignored the experience of other agencies, including its sister agency, OSHA, which identified silica regulation as a priority, issued a proposed rule limiting exposures, and mandated a series of silica protective measures.  29 C.F.R. § 1910.1000 Table Z-3; 78 Fed. Reg. 56274 (Sept. 12, 2013).  By contrast, MSHA mandates using a sampling device that cannot even measure silica.

Moreover, MSHA did not adequately explore the opportunity to achieve the same ends by pursuing greater compliance with the existing rule.  MSHA believes that some operators make inadequate use of existing engineering controls, stating that operators could "increase air, quantity, air velocity, the number of water sprays, and the water pressure; balance the quantity of air delivered to the face

---

[14] Indeed, as further evidence of its arbitrary and capricious decision-making, it appears MSHA ignored, or rather, selectively acknowledged, its duty to consider the latest available scientific data related to the rule.  The comment period closed on June 20, 2011.  I-2-FR-1, at 24819. MSHA rejected requests to reopen the record from commenters wishing to submit, among other things, recently-published evidence finding that silica exposure was a likely cause of lung disease in miners.  I-CORR-24, I-CORR-25, I-CORR-26 and I-CORR-30.  Nevertheless, MSHA extensively supplemented the record on its own without permitting interested parties to comment on the new additions or advising them on the importance or relevance of the new documents.  *See, e.g.,* Certified Index of Record, I-2BKG-145-47 (dust sample count and surveys published by MSHA in 2012) and I-2BKG-154 (study published in 2013).

with the scrubber air quantity; and/or change from blowing face ventilation to exhausting face ventilation." I-2-FR-1, at 24869. MSHA says it found numerous instances of improper work practices and malfunctioning dust control technologies. *See id.* at 24872-74. Yet, instead of improving enforcement where needed, it adopted sweeping and largely unnecessary changes to the existing standards, imposing great costs on those operators who are fully committed to compliance and hazard reduction.

### B.    MSHA Ignored the Best Available Evidence of the Effectiveness of Personal Engineering Controls.

Despite MSHA's statutory duty to "set standards which most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity . . . .," 30 U.S.C. § 811(a)(6)(A), MSHA did not take into account evidence related to the efficacy of personal mini-engineering controls. The effectiveness and economy of such controls in containing miner exposure to RCD is well-documented. Yet, the "final rule does not contain provisions to allow operators to use the hierarchy of controls or to use respirators, including PAPRS, Powered Air-Purifying Respirators," even "as supplementary controls to achieve compliance with the respirable dust standards," as the proposed rule allowed. I-2-FR-1, at 24930-31.

56

MSHA's continued rejection of the benefits of such personal controls is unfounded in light of their demonstrated substantial health protections. For example, research, demonstration, and experiments consistently show that filtered, clean air helmets effectively protect miners' health. I-COMM-57-6, 20-22. These helmets use filtered atmospheric air to provide a clean airstream to a miner's breathing zone. I-COMM-57-6, at 20-22. Record evidence shows that airstream helmets were 84% effective at reducing respirable dust in the wearer's breathing zone. I-COMM-57-6, at 13.

In attempting to justify its rejection of methods proven to reduce miner exposure, MSHA cites Section 202(h) and 30 C.F.R. § 70.300, which state that "use of respirators shall not be substituted for environmental control measures in the active workings." I-2-FR-1, at 24931 (quoting 30 U.S.C. § 842(h) and 30 C.F.R. § 70.300). However, MSHA's reliance on Section 202(h) and 30 C.F.R. § 70.300 is misplaced. The use of personal engineering controls is not inconsistent with the preference expressed in Section 202(h) to rely on engineering controls as the "primary" means of controlling respirable dust. In other words, personal mini-engineering controls need not "be substituted" for environmental controls. Rather, they can be used in conjunction with, and as a supplement to, larger engineering controls. Permitting operators to use all available means of reducing the

concentration of respirable dust – including engineering, administrative *and* personal engineering controls – is the best way to ensure miner safety and health.

In developing the Final Rule, MSHA ignored, in violation of Section 101(a)(6)(A), the best available evidence showing the benefits of using a hierarchy of engineering controls, including personal engineering controls such as filtered air helmets and respirators, to comply with the RCD standard promulgated under the Final Rule. Accordingly, the Final Rule should be vacated.

### C. MSHA Failed To Consider Experience Gained Under Other Health and Safety Laws.

MSHA failed to comply with its statutory procedural mandate in failing to consider evidence of experience gained under other health and safety laws, particularly OSHA standards and respirable coal mine dust standards in other countries. I-COMM-57, at 17.

By setting the standard at 1.5 mg/m$^3$, MSHA failed to consider the experiences of its sister agency, OSHA, and other countries where limits for RCD are higher than the PEL in the existing, proposed or final standards. I-COMM-57, at 17. MSHA cites to NIOSH's Criteria for a Recommended Standard Occupational Exposure to Respirable Coal Mine Dust ("Criteria Document") throughout the Final Rule. Yet, MSHA failed to note NIOSH's observation that the OSHA limit for respirable dust, 2.4 mg/m$^3$, is significantly higher than

58

MSHA's proposed limit.  I-COMM-57, at 17 (citing the Criteria Document at 12); 29 C.F.R. § 1910.1000 Table Z-3.

Further, MSHA failed to consider evidence of international coal dust limits even though NIOSH recognized that many other countries have substantially higher limits for RCD than the Final Rule.  V-BKG-78, at 12-13; I-COMM-57, at 17.  This includes Australia (3.0 mg/m$^3$), Germany (4.0 mg/m$^3$), and the United Kingdom (3.8 mg/m$^3$).  V-BKG-78, at 13; I-COMM-57, at 17.  Indeed, the World Health Organization recommended a health-based RCD limit with levels up to 4.0 mg/m$^3$ and provided that the precise limits would depend upon variables including "risk factors (*i.e.*, coal rank or carbon content, proportion of responsible quartz and other minerals, and particle size distribution of the coal dust) . . . that are determined at each mine . . . ."  V-BKG-78; I-COMM-57, at 17.  While the rulemaking comments and Final Rule preamble discuss the importance of these risk factors, MSHA did not use them to formulate its Final Rule.  *See* I-2-FR-1.

Thus, other regulatory authorities promulgating limits for coal dust exposure have not only recognized that standards higher than 1.5 mg/m$^3$ are sufficient to protect miner health, but also that specific characteristics of the coal being mined may factor into determining applicable standards.  MSHA was required to consider this expertise and experience with higher PELs.  *See* 30 U.S.C. § 811(a)(6).  Yet, MSHA makes no mention at all in the Final Rule of other

nations' standards.    In its failure to do so, MSHA has failed to consider "experience gained under other health and safety laws" as mandated by Section 101(a)(6)(A).    Based on these deficiencies, and all those mentioned above, the Final Rule is arbitrary and capricious, not in accordance with applicable law, and should be vacated.

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant Petitioner's Petition and declare the Final Rule invalid.

Respectfully submitted,

Henry Chajet
*Counsel of Record*
Avidan Meyerstein
Collin O'Connor Udell
Genea O. Bell
Ross J. Watzman
JACKSON LEWIS P.C.
10701 Parkridge Boulevard, Suite 300
Reston, Virginia 20191
(703) 483-8300


Katie Sweeney, Esq.
General Counsel, and Senior Vice President,
    Legal Affairs
National Mining Association
101 Constitution Ave N.W.
Suite 500 East
Washington, D.C. 20001
(202) 463-2600

*Attorneys for Plaintiffs-Appellants*

**Certificate of Compliance
With Type-Volume Limitation, Typeface Requirements, and
Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,839 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Professional Edition 2010 in 14 points Times New Roman font.

Henry Chajet

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2014, one originally signed Brief of Petitioners and 6 copies were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

John Ley, Clerk
U.S. Court of Appeals for the 11th Circuit
56 Forsyth Street N.W.
Atlanta, Georgia 30303

On this same date one copy of the Brief of Petitioners was sent via third party commercial carrier to the following:

Edward Waldman
Samuel Charles Lord
U.S. Department of Labor
1100 Wilson Blvd
Floor 22 Room 2208
Arlington VA 22209
202-693-9344

Filing and Service were performed by Direction of Counsel

_____
Counsel Press, LLC
1011 East Main Street
Richmond, VA 23219
(804) 648-3664

# EXHIBIT A

No. 14-11942

# United States Court of Appeals
### for the
# Eleventh Circuit

NATIONAL MINING ASSOCIATION; ALABAMA COAL ASSOCIATION; WALTER
ENERGY, INC.; and WARRIOR INVESTMENT CO., INC.,
*Petitioners,*

*v.*

MINE SAFETY AND HEALTH ADMINISTRATION and
THOMAS E. PEREZ, SECRETARY, UNITED STATES DEPARTMENT OF LABOR,
*Respondents.*

## AFFIDAVIT OF MARK WATSON
## PURSUANT TO 28 U.S.C. § 1746

I, Mark Watson, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief:

1.  I am over eighteen (18) years of age, am competent to make this affidavit, and have personal knowledge of the facts below.  I would testify truthfully to the facts set forth herein if called upon to do so.

2.  I am employed by Alliance Coal, LLC ("Alliance") as the Vice President of Technical Services.  I have been in this position since September of 2006.

3.  I have over 13 years of experience in engineering and operations management in the coal industry.

4.  This Affidavit is submitted in support of Petitioners' Brief on petition for review of a final rule of the Federal Mine Safety and Health Administration ("MSHA").

5.  I was a witness for the National Mining Association and Alliance during the Mine Safety and Health Administration public hearings on the proposed coal dust rule.  Mark Watson and Heath Lovell, *Analysis of MSHA Coal Dust Sampling Data Base & The Impact of the MSHA Proposed Rule*, MSHA Hearing on Proposed Coal Dust Regulations (Feb. 15, 2011).

6.  I analyzed the MSHA proposed rule and the 2010 MSHA data base to determine the impact of the proposed rule's change in exposure limit (e.g. proposed $1mg/m^3$ and continuous sampling).  My findings were presented in my testimony (e.g. more than 700,000 proposed, mandated entity samples and over 230,000 violations versus 40,520 designated occupation and other designated occupation samples collected in 2010 and 133 violations).

7.  Because the Final Rule adopted a $1.5mg/m^3$ limit and sampling mandates for 15 shifts per quarter, not continuously as proposed, and expanded the entities to be sampled, there was no analysis possible of projected samples and violations for the Final Rule in the rulemaking record by NMA or Alliance or other interested parties.

8.   Using the same 2010 MSHA data base spreadsheet I used during the rule making, and a mathematical analysis of the data spreadsheet under the new provisions of the final rule, 263,680 operator collected designated occupation and other designated occupation samples and 9,042 exceedances of the single sample ECV for the new 1.5mg/m3 exposure limit are expected (without lowering the limits for silica content).

9.   When I analyze the silica content reduced standard data in the 2010 MSHA data base, 24 % of the total designated occupation samples collected were reduced (7,268 samples); when applied to the projected Final Rule, 63,863 operator collected designated occupation and other designated occupation samples for reduced silica standards are expected.

10.   The average reduced standard in the 2010 data base is 1.275 mg/m$^3$, and when applied to the 24% of the total projected samples under the Final Rule, and the 2010 data base, 1,189 additional violations are expected to occur due to operator collected samples exceeding the silica based, reduced standard.

11. As a result of the above application of the Final Rule sampling mandates to the 2010 MSHA data base of samples, violations, reduced silica based standards, and violations for those reduced standards, the mathematical application of new mandates results in an estimated total operator sampling events for designated occupations or other designated occupation sample types, of 263,680. Of those total expected samples, results in excess of the single sample ECV applied to the 1.5mg/m$^3$ limit are expected to be  6,852; and 3,379 total reduced silica based samples in excess of the single sample ECV applied to the  average silica reduced limit.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

FURTHER AFFIANT SAYETH NOT.

Dated this _____28th_____ day of July, 2014.          _____
                                                      MARK WATSON

STATE OF ___KY___          )
                           ) ss.
COUNTY OF __Fayette__      )

      Subscribed and sworn to before me this 28th day of July, 2014 by Mark Watson.

Witness my hand and official seal.

My commission expires: ___8/4/2014___

_____
Notary Public

# EXHIBIT B

# STATUTORY ADDENDUM

## § 801. Congressional findings and declaration of purpose

Congress declares that--

(a) the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource--the miner;

(b) deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal or other mines cause grief and suffering to the miners and to their families;

(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines;

(d) the existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated;

(e) the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines;

(f) the disruption of production and the loss of income to operators and miners as a result of coal or other mine accidents or occupationally caused diseases unduly impedes and burdens commerce; and

(g) it is the purpose of this Act (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] and the Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners; (2) to require that each operator of a coal or other mine and every miner in such mine comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State coal or other mine health and safety programs; and (4) to improve and expand, in cooperation with the States and the coal or other

mining industry, research and development and training programs aimed at preventing coal or other mine accidents and occupationally caused diseases in the industry.

## § 802. Definitions

For the purpose of this Act, the term--

(a) "Secretary" means the Secretary of Labor or his delegate;

(b) "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a place in a State and any place outside thereof, or within the District of Columbia or a possession of the United States, or between points in the same State but through a point outside thereof;

(c) "State" includes a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands;

(d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;

(e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine;

(f) "person" means any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization;

(g) "miner" means any individual working in a coal or other mine;

(h) (1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers

underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this Act, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment;

(2) For purposes of titles II, III, and IV [30 USCS §§ 841 et seq., 861 et seq., and 901 et seq.], "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

(i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine;

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated;

(k) "accident" includes a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person;

(l) "mandatory health or safety standard" means the interim mandatory health or safety standards established by titles II and III of this Act [30 USCS §§ 841 et seq. and 861 et seq.], and the standards promulgated pursuant to title I of this Act [30 USCS §§ 811 et seq.];

(m) "Panel" means the Interim Compliance Panel established by this Act; and

(n) "Administration" means the Mine Safety and Health Administration in the Department of Labor.

(o) "Commission" means the Federal Mine Safety and Health Review Commission.

    ***

## § 811. Mandatory safety and health standards

(a) Development, promulgation, and revision. The Secretary shall by rule in accordance with procedures set forth in this section and in accordance with section 553 of title 5, United States Code (without regard to any reference in such section to sections 556 and 557 of such title), develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines.

(1) Whenever the Secretary, upon the basis of information submitted to him in writing by an interested person, a representative of any organization of employers or employees, a nationally recognized standards-producing organization, the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], the National Institute for Occupational Safety and Health, or a State or political subdivision, or on the basis of information developed by the Secretary or otherwise available to him, determines that a rule should be promulgated in order to serve the objectives of this Act, the Secretary may request the recommendation of an advisory committee appointed under section 102(c) [30 USCS § 812(c)]. The Secretary shall provide such an advisory committee with any proposals of his own or of the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], together with all pertinent factual information developed by the Secretary or the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], or otherwise available, including the results of research, demonstrations, and experiments. An advisory committee shall submit to the Secretary its recommendations regarding the rule to be promulgated within 60 days from the date of its appointment or within such longer or shorter period as may be prescribed by the Secretary, but in no event for a period which is longer than 180 days. When the Secretary receives a recommendation, accompanied by appropriate criteria, from the National Institute for Occupational Safety and Health that a rule be promulgated, modified, or revoked, the Secretary must, within 60 days after receipt thereof, refer such recommendation to an advisory committee pursuant to this paragraph, or publish such as a proposed rule pursuant to paragraph (2), or publish in the Federal Register his determination not to do so, and his reasons therefor. The Secretary shall be required to request the recommendations of an advisory committee appointed under section 102(c) [30 USCS § 812(c)] if the rule

to be promulgated is, in the discretion of the Secretary which shall be final, new in effect or application and has significant economic impact.

(2) The Secretary shall publish a proposed rule promulgating, modifying, or revoking a mandatory health or safety standard in the Federal Register. If the Secretary determines that a rule should be proposed and in connection therewith has appointed an advisory committee as provided by paragraph (1), the Secretary shall publish a proposed rule, or the reasons for his determination not to publish such rule, within 60 days following the submission of the advisory committee's recommendation or the expiration of the period of time prescribed by the Secretary in such submission. In either event, the Secretary shall afford interested persons a period of 30 days after any such publication to submit written data or comments on the proposed rule. Such comment period may be extended by the Secretary upon a finding of good cause, which the Secretary shall publish in the Federal Register. Publication shall include the text of such rules proposed in their entirety, a comparative text of the proposed changes in existing rules, and shall include a comprehensive index to the rules, cross-referenced by subject matter.

(3) On or before the last day of the period provided for the submission of written data or comments under paragraph (2), any interested person may file with the Secretary written objections to the proposed mandatory health or safety standard, stating the grounds therefor and requesting a public hearing on such objections. Within 60 days after the last day for filing such objections, the Secretary shall publish in the Federal Register a notice specifying the mandatory health or safety standard to which objections have been filed and a hearing requested, and specifying a time and place for such hearing. Any hearing under this subsection for the purpose of hearing relevant information shall commence within 60 days after the date of publication of the notice of hearing. Hearings required by this subsection shall be conducted by the Secretary, who may prescribe rules and make rulings concerning procedures in such hearings to avoid unnecessary cost or delay. Subject to the need to avoid undue delay, the Secretary shall provide for procedures that will afford interested parties the right to participate in the hearing, including the right to present oral statements and to offer written comments and data. The Secretary may require by subpoena the attendance of witnesses and the production of evidence in connection with any proceeding initiated under this section. If a person refuses to obey a subpoena under this subsection, a United States district court within the jurisdiction of which a proceeding under this subsection is conducted may, upon petition by the Secretary, issue an order requiring compliance with such subpoena. A transcript shall be taken of any such hearing and shall be available to the public.

(4) (A) Within 90 days after certification of the record of the hearing held pursuant to paragraph (3), the Secretary shall by rule promulgate, modify, or revoke such mandatory health or safety standards, and publish his reasons therefor.

(B) In the case of a proposed mandatory health or safety standard to which objections requesting a public hearing have not been filed, the Secretary, within 90 days after the period for filing such objections has expired, shall by rule promulgate, modify, or revoke such mandatory standards, and publish his reasons therefor.

(C) In the event the Secretary determines that a proposed mandatory health or safety standard should not be promulgated he shall, within the times specified in subparagraphs (A) and (B) publish his reasons for his determination.

(5) Any mandatory health or safety standard promulgated as a final rule under this section shall be effective upon publication in the Federal Register unless the Secretary specifies a later date.

(6) (A) The Secretary, in promulgating mandatory standards dealing with toxic materials or harmful physical agents under this subsection, shall set standards which most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life. Development of mandatory standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the miner, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the mandatory health or safety standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

(B) The Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], as soon as possible after the date of enactment of the Federal Mine Safety and Health Amendments Act of 1977 [enacted Nov. 9, 1977] but in no event later than 18 months after such date and on a continuing basis thereafter, shall, for each toxic material or harmful physical agent which is used or found in a mine, determine whether such material or agent is potentially toxic at the concentrations in which it is used or found in a mine. The Secretary of Health,

Education, and Welfare [Secretary of Health and Human Services] shall submit such determinations with respect to such toxic substances or harmful physical agents to the Secretary. Thereafter, the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] shall submit to the Secretary all pertinent criteria regarding any such substances determined to be toxic or any such harmful agents as such criteria are developed. Within 60 days after receiving any criteria in accordance with the preceding sentence relating to a toxic material or harmful physical agent which is not adequately covered by a mandatory health or safety standard promulgated under this section, the Secretary shall either appoint an advisory committee to make recommendations with respect to a mandatory health or safety standard covering such material or agent in accordance with paragraph (1), or publish a proposed rule promulgating such a mandatory health or safety standard in accordance with paragraph (2), or shall publish his determination not to do so.

(7) Any mandatory health or safety standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that miners are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure. Where appropriate, such mandatory standard shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with such hazards and shall provide for monitoring or measuring miner exposure at such locations and intervals, and in such manner so as to assure the maximum protection of miners. In addition, where appropriate, any such mandatory standard shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the operator at his cost, to miners exposed to such hazards in order to most effectively determine whether the health of such miners is adversely affected by such exposure. Where appropriate, the mandatory standard shall provide that where a determination is made that a miner may suffer material impairment of health or functional capacity by reason of exposure to the hazard covered by such mandatory standard, that miner shall be removed from such exposure and reassigned. Any miner transferred as a result of such exposure shall continue to receive compensation for such work at no less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer. In the event of the transfer of a miner pursuant to the preceding sentence, increases in wages of the transferred miner shall be based upon the new work classification. In the event such medical examinations are in the nature of research, as determined by the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], such examinations may be furnished at the expense of the

Secretary of Health, Education, and Welfare [Secretary of Health and Human Services]. The results of examinations or tests made pursuant to the preceding sentence shall be furnished only to the Secretary or the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], and, at the request of the miner, to his designated physician.

(8) The Secretary shall, to the extent practicable, promulgate separate mandatory health or safety standards applicable to mine construction activity on the surface.

(9) No mandatory health or safety standard promulgated under this title shall reduce the protection afforded miners by an existing mandatory health or safety standard.

(b) Emergency temporary mandatory standards.
(1) The Secretary shall provide, without regard to the requirements of chapter 5, title 5, United States Code [5 USCS §§ 501 et seq.], for an emergency temporary mandatory health or safety standard to take immediate effect upon publication in the Federal Register if he determines (A) that miners are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and (B) that such emergency standard is necessary to protect miners from such danger.

(2) A temporary mandatory health or safety standard shall be effective until superseded by a mandatory standard promulgated in accordance with the procedures prescribed in paragraph (3) of this subsection.

(3) Upon publication of such standard in the Federal Register, the Secretary shall commence a proceeding in accordance with section 101(a) [subsec. (a) of this section], and the standards as published shall also serve as a proposed rule for the proceeding. The Secretary shall promulgate a mandatory health or safety standard under this paragraph no later than nine months after publication of the emergency temporary standard as provided in paragraph (2).

(c) Modification of standards. Upon petition by the operator or the representative of miners, the Secretary may modify the application of any mandatory safety standard to a coal or other mine if the Secretary determines that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard, or that the application of such standard to such mine will result in a diminution of safety to the miners in such mine. Upon receipt of such

petition the Secretary shall publish notice thereof and give notice to the operator or the representative of miners in the affected mine, as appropriate, and shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of such operator or representative or other interested party, to enable the operator or the representative of miners in such mine or other interested party to present information relating to the modification of such standard. Before granting any exception to a mandatory safety standard, the findings of the Secretary or his authorized representative shall be made public and shall be available to the representative of the miners at the affected mine. The Secretary shall issue a decision incorporating his findings of fact therein, and send a copy thereof to the operator or the representative of the miners, as appropriate. Any such hearing shall be of record and shall be subject to section 554 of title 5 of the United States Code.

(d) Judicial review. Any person who may be adversely affected by a mandatory health or safety standard promulgated under this section may, at any time prior to the sixtieth day after such standard is promulgated, file a petition challenging the validity of such mandatory standard with the United States Court of Appeals for the District of Columbia Circuit or the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The filing of such petition shall not, unless otherwise ordered by the court, operate as a stay of the standard. No objection that has not been urged before the Secretary shall be considered by the court, unless the failure or neglect to urge such objection shall be excused for good cause shown. The validity of any mandatory health or safety standard shall not be subject to challenge on the grounds that any of the time limitations in this section have been exceeded. The procedures of this subsection shall be the exclusive means of challenging the validity of a mandatory health or safety standard.

(e) Distribution of copies of proposed standards or regulations. The Secretary shall send a copy of every proposed mandatory health or safety standard or regulation at the time of publication in the Federal Register to the operator of each coal or other mine and the representative of the miners at such mine and such copy shall be immediately posted on the bulletin board of the mine by the operator or his agent, but failure to receive such notice shall not relieve anyone of the obligation to comply with such standard or regulation.

***

## § 814. Citations and orders

(a) Issuance and form of citations; prompt issuance. If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this Act has violated this Act, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this Act, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the Act, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation. The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this Act.

(b) Follow-up inspections; findings. If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that the period of time for the abatement should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(c) Exempt persons. The following persons shall not be required to be withdrawn from, or prohibited from entering, any area of the coal or other mine subject to an order issued under this section:

(1) any person whose presence in such area is necessary, in the judgment of the operator or an authorized representative of the Secretary, to eliminate the condition described in the order;

(2) any public official whose official duties require him to enter such area;

(3) any representative of the miners in such mine who is, in the judgment of the operator or an authorized representative of the Secretary, qualified to make such mine examinations or who is accompanied by such a person and whose presence in

such area is necessary for the investigation of the conditions described in the order; and

(4) any consultant to any of the foregoing.

(d) Findings of violations; withdrawal order.
(1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this Act. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall promptly be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of violations similar to those that resulted in the issuance of the withdrawal order under paragraph (1) until such time as an inspection of such mine discloses no similar violations. Following an inspection of such mine which discloses no similar violations, the provisions of paragraph (1) shall again be applicable to that mine.

(e) Pattern of violations; abatement; termination of pattern.
(1) If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health

or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard. The withdrawal order shall remain in effect until an authorized representative of the Secretary determines that such violation has been abated.

(3) If, upon an inspection of the entire coal or other mine, an authorized representative of the Secretary finds no violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine health and safety hazard, the pattern of violations that resulted in the issuance of a notice under paragraph (1) shall be deemed to be terminated and the provisions of paragraphs (1) and (2) shall no longer apply. However, if as a result of subsequent violations, the operator reestablishes a pattern of violations, paragraphs (1) and (2) shall again be applicable to such operator. (4) The Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.

(f) Respirable dust concentrations; dust control person or team. If, based upon samples taken, analyzed, and recorded pursuant to section 202(a) [30 USCS § 842(a)], or samples taken during an inspection by an authorized representative of the Secretary, the applicable limit on the concentration of respirable dust required to be maintained under this Act is exceeded and thereby violated, the Secretary or his authorized representative shall issue a citation fixing a reasonable time for the abatement of the violation. During such time, the operator of the mine shall cause samples described in section 202(a) [30 USCS § 842(a)], to be taken of the affected area during each production shift. If, upon the expiration of the period of time as originally fixed or subsequently extended, the Secretary or his authorized representative finds that the period of time should not be further extended, he shall

determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until the Secretary or his authorized representative has reason to believe, based on actions taken by the operator, that such limit will be complied with upon the resumption of production in such mine. As soon as possible after an order is issued, the Secretary, upon request of the operator, shall dispatch to the mine involved a person, or team of persons, to the extent such persons are available, who are knowledgeable in the methods and means of controlling and reducing respirable dust. Such person or team of persons shall remain at the mine involved for such time as they shall deem appropriate to assist the operator in reducing respirable dust concentrations. While at the mine, such persons may require the operator to take such actions as they deem appropriate to insure the health of any person in the coal or other mine.

(g) Untrained miners.
(1) If, upon any inspection or investigation pursuant to section 103 of this Act [30 USCS § 813], the Secretary or an authorized representative shall find employed at a coal or other mine a miner who has not received the requisite safety training as determined under section 115 of this Act [30 USCS § 825], the Secretary or an authorized representative shall issue an order under this section which declares such miner to be a hazard to himself and to others, and requiring that such miner be immediately withdrawn from the coal or other mine, and be prohibited from entering such mine until an authorized representative of the Secretary determines that such miner has received the training required by section 115 of this Act [30 USCS § 825].

(2) No miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall be discharged or otherwise discriminated against because of such order; and no miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall suffer a loss of compensation during the period necessary for such miner to receive such training and for an authorized representative of the Secretary to determine that such miner has received the requisite training.

(h) Duration of citations and orders. Any citation or order issued under this section shall remain in effect until modified, terminated or vacated by the Secretary or his authorized representative, or modified, terminated or vacated by the Commission or the courts pursuant to section 105 or 106 [30 USCS §§ 815 or 816].
     ***

## § 841. Mandatory health standards for underground mines; enforcement; review; purpose

(a) The provisions of sections 202 through 206 of this title [30 USCS §§ 842-846] and the applicable provisions of section 318 of title III [30 USCS § 878] shall be interim mandatory health standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary under the provisions of section 101 of this Act [30 USCS § 811], and shall be enforced in the same manner and to the same extent as any mandatory health standard promulgated under the provisions of section 101 of this Act [30 USCS § 811]. Any orders issued in the enforcement of the interim standards set forth in this title shall be subject to review as provided in title I of this Act [30 USCS §§ 811 et seq.].

(b) Among other things, it is the purpose of this title to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation-related disease during or at the end of such period.

## § 842. Dust concentration and respiratory equipment

(a) Samples; procedures; transmittal; notice of excess concentration; periodic reports to Secretary; contents. Each operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed. Such samples shall be taken by any device approved by the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] and in accordance with such methods, at such locations, at such intervals, and in such manner as the Secretaries shall prescribe in the Federal Register within sixty days from the date of enactment of this Act [enacted Dec. 30, 1969] and from time to time thereafter. Such samples shall be transmitted to the Secretary in a manner established by him, and analyzed and recorded by him in a manner that will assure application of the provisions of section 104(i) of this Act [30 USCS § 814(i)] when the applicable limit on the concentration of respirable dust required to be maintained under this section is exceeded. The results of such samples shall also be made available to the operator. Each operator shall report and certify to the Secretary at such intervals as

the Secretary may require as to the conditions in the active workings of the coal mine, including, but not limited to, the average number of working hours worked during each shift, the quantity and velocity of air regularly reaching the working faces, the method of mining, the amount and pressure of the water, if any, reaching the working faces, and the number, location, and type of sprays, if any, used.

(b) Standards; noncompliance permit; renewal; procedures; limitations; extension period. Except as otherwise provided in this subsection—

(1) Effective on the operative date of this title, each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed at or below 3.0 milligrams of respirable dust per cubic meter of air.

(2) Effective three years after the date of enactment of this Act [enacted Dec. 30, 1969], each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air.

(3) Any operator who determines that he will be unable, using available technology, to comply with the provisions of paragraph (1) of this subsection, or the provisions of paragraph (2) of this subsection, as appropriate, may file with the Panel, no later than sixty days prior to the effective date of the applicable respirable dust standard established by such paragraphs, an application for a permit for noncompliance. If, in the case of an application for a permit for noncompliance with the 3.0 milligram standard established by paragraph (1) of this subsection, the application satisfies the requirements of subsection (c) of this section, the Panel shall issue a permit for noncompliance to the operator. If, in the case of an application for a permit for noncompliance with the 2.0 milligram standard established by paragraph (2) of this subsection, the application satisfies the requirements of subsection (c) of this section and the Panel determines that the applicant will be unable to comply with such standard, the Panel shall issue to the operator a permit for noncompliance.

(4) In any case in which an operator, who has been issued a permit (including a renewal permit) for noncompliance under this section, determines, not more than ninety days prior to the expiration date of such permit, that he still is unable to comply with the standard established by paragraph (1) of this subsection or the standard established by paragraph (2) of this subsection, as appropriate, he may file

with the Panel an application for renewal of the permit. Upon receipt of such application, the Panel, if it determines, after all interested persons have been notified and given an opportunity for a public hearing under section 5 of this Act [30 USCS § 804], that the application is in compliance with the provisions of subsection (c) of this section, and that the applicant will be unable to comply with such standard, may renew the permit.

(5) Any such permit or renewal thereof so issued shall be in effect for a period not to exceed one year and shall entitle the permittee during such period to maintain continuously the average concentration of respirable dust in the mine atmosphere during each shift in the working places of such mine to which the permit applies at a level specified by the Panel, which shall be at the lowest level which the application shows the conditions, technology applicable to such mine, and other available and effective control techniques and methods will permit, but in no event shall such level exceed 4.5 milligrams of dust per cubic meter of air during the period when the 3.0 milligram standard is in effect, or 3.0 milligrams of dust per cubic meter of air during the period when the 2.0 milligram standard is in effect.

(6) No permit or renewal thereof for noncompliance shall entitle any operator to an extension of time beyond eighteen months from the date of enactment of this Act [enacted Dec. 30, 1969] to comply with the 3.0 milligram standard established by paragraph (1) of this subsection, or beyond seventy-two months from the date of enactment of this Act [enacted Dec. 30, 1969] to comply with the 2.0 milligram standard established by paragraph (2) of this subsection.

(c) Applications for noncompliance; contents. Any application for an initial or renewal permit made pursuant to this section shall contain—

(1) a representation by the applicant and the engineer conducting the survey referred to in paragraph (2) of this subsection that the applicant is unable to comply with the standard applicable under subsection (b)(1) or (b)(2) of this section at specified working places because the technology for reducing the concentration of respirable dust at such places is not available, or because of the lack of other effective control techniques or methods, or because of any combination of such reasons;

(2) an identification of the working places in such mine for which the permit is requested; the results of an engineering survey by a certified engineer of the respirable dust conditions of each working place of the mine with respect to which such application is filed and the ability to reduce such dust to the level required to

be maintained in such place under this section; a description of the ventilation system of the mine and its capacity; the quantity and velocity of air regularly reaching the working faces; the method of mining; the amount and pressure of the water, if any, reaching the working faces; the number, location, and type of sprays, if any; action taken to reduce such dust; and such other information as the Panel may require; and

(3) statements by the applicant and the engineer conducting such survey, of the means and methods to be employed to achieve compliance with the applicable standard, the progress made toward achieving compliance, and an estimate of when compliance can be achieved.

(d) Promulgation of new standards; procedures. Beginning six months after the operative date of this title and from time to time thereafter, the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] shall establish, in accordance with the provisions of section 101 of this Act [30 USCS § 811], a schedule reducing the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed below the levels established in this section to a level of personal exposure which will prevent new incidences of respiratory disease and the further development of such disease in any person. Such schedule shall specify the minimum time necessary to achieve such levels taking into consideration present and future advancements in technology to reach these levels.

(e) Concentration of respirable dust. References to concentrations of respirable dust in this title mean the average concentration of respirable dust measured with a device approved by the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services].

(f) Average concentration. For the purpose of this title, the term "average concentration" means a determination which accurately represents the atmospheric conditions with regard to respirable dust to which each miner in the active workings of a mine is exposed (1) as measured, during the 18 month period following the date of enactment of this Act [enacted Dec. 30, 1969], over a number of continuous production shifts to be determined by the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], and (2) as measured thereafter, over a single shift only, unless the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] find, in accordance with the provisions of section 101 of this Act [30 USCS § 811], that such single shift measurement will not, after applying valid

statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

(g) Compliance inspections. The Secretary shall cause to be made such frequent spot inspections as he deems appropriate of the active workings of coal mines for the purpose of obtaining compliance with the provisions of this title.

(h) Maintenance of respiratory equipment; substitutes for environmental controls. Respiratory equipment approved by the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] shall be made available to all persons whenever exposed to concentrations of respirable dust in excess of the levels required to be maintained under this Act. Use of respirators shall not be substituted for environmental control measures in the active workings. Each operator shall maintain a supply of respiratory equipment adequate to deal with occurrences of concentrations of respirable dust in the mine atmosphere in excess of the levels required to be maintained under this Act.

     ***

## § 845. Dust standards in presence of quartz

In coal mining operations where the concentration of respirable dust in the mine atmosphere of any working place contains more than 5 per centum quartz, the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] shall prescribe an appropriate formula for determining the applicable respirable dust standard under this title for such working place and the Secretary shall apply such formula in carrying out his duties under this title.

## § 846. Noise standards; promulgation of new standards; tests; procedures; protective devices

On and after the operative date of this title, the standards on noise prescribed under the Walsh-Healey Public Contracts Act, as amended, in effect October 1, 1969, shall be applicable to each coal mine and each operator of such mine shall comply with them. Within six months after the date of enactment of this Act [enacted Dec. 30, 1969], the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services] shall establish, and the Secretary shall publish, as provided in section 101 of this Act [30 USCS § 811], proposed mandatory health standards establishing maximum noise exposure levels for all underground coal mines. Beginning six months after the operative date of this title, and at intervals of at least every six months thereafter, the operator of each coal mine shall conduct, in a

manner prescribed by the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services], tests by a qualified person of the noise level at the mine and report and certify the results to the Secretary and the Secretary of Health, Education, and Welfare [Secretary of Health and Human Services]. In meeting such standard under this section, the operator shall not require the use of any protective device or system, including personal devices, which the Secretary or his authorized representative finds to be hazardous or cause a hazard to the miners in such mine.

**Code of Federal Regulations**

**Title 30: Mineral Resources**

    **\*\*\***

## 1.  PART 74—COAL MINE DUST SAMPLING DEVICES

    **\*\*\***

Subpart C—Requirements for Continuous Personal Dust Monitors

    **\*\*\***

## 2.  §74.8 Measurement, accuracy, and reliability requirements.

(a) *Breathing zone measurement requirement.* The CPDM shall be capable of measuring respirable dust within the personal breathing zone of the miner whose exposure is being monitored.

(b) *Accuracy.* The ability of a CPDM to determine the true concentration of respirable coal mine dust at the end of a shift shall be established through testing that demonstrates the following:

(1) For full-shift measurements of 8 hours or more, a 95 percent confidence that the recorded measurements are within ±25 percent of the true respirable dust concentration, as determined by CMDPSU reference measurements, over a concentration range from 0.2 to 4.0 mg/m$^3$; and

(2) For intra-shift measurements of less than 8 hours, a 95 percent confidence that the recorded measurements are within ±25 percent of the true respirable dust concentration, as determined by CMDPSU reference measurements, over the concentration range equivalent to 0.2 to 4.0 mg/m$^3$ for an 8-hour period.[1]

[1]The equivalent dust concentration range to the 8-hour range of $0.2 - 4$ mg/m$^3$ is calculated by multiplying this 8-hour range by the dividend of eight hours divided by the duration of the intrashift measurement specified in units of hours. For example, for a measurement taken at exactly one hour into the shift, the 8-hour

equivalent dust concentration range would be a one-hour average concentration range of: 8 hours/1 hour $\times$ $(0.2 - 4 \text{ mg/m}^3) = 1.6 - 32 \text{ mg/m}^3$; for a two-hour measurement, the applicable concentration range would be calculated as: 8 hours/2 hours $\times$ $(0.2 - 4 \text{ mg/m}^3) = 0.8 - 16 \text{ mg/m}^3$; for a 4-hours measurement, the equivalent range would be: $0.4 - 8 \text{ mg/m}^3$; * * * *etc.* A CPDM must perform accurately, as specified, for intrashift measurements within such equivalent concentration ranges.

(c) *Reliability of measurements.* The CPDM shall meet the accuracy requirements under paragraph (b) of this section, regardless of the variation in density, composition, size distribution of respirable coal mine dust particles, and the presence of water spray mist in coal mines.

(d) *Precision.* The precision of the CPDM shall be established through testing to determine the variability of multiple measurements of the same dust concentration, as defined by the relative standard deviation of the distribution of measurements. The relative standard deviation shall be less than 0.1275 without bias for both full-shift measurements of 8 hours or more, and for intra-shift measurements of less than 8 hours within the dust concentration range equivalent to 0.2 to 4.0 mg/m$^3$ for an 8-hour period, as specified under paragraph (b)(2) of this section.

(e) *Bias.* The bias of the CPDM measurements shall be limited such that the uncorrectable discrepancy between the mean of the distribution of measurements and the true dust concentration being measured during testing shall be no greater than 10 percent. Bias must be constant over the range of dust concentration levels tested, 0.2 to 4.0 mg/m$^3$ for an 8-hour sampling period.

(f) *Testing conditions.* Laboratory and mine testing of the CPDM for accuracy, precision, bias, and reliability under diverse environmental conditions (as defined under §74.7(e) and (g)) shall be determined using the NIOSH testing procedure, "Continuous Personal Dust Monitor Accuracy Testing," June 23, 2008, available at: *http://www.cdc.gov/niosh/mining/pubs/pubreference/outputid3076.htm*. All testing results shall be submitted to NIOSH in writing on the application filed under §74.11.

(1) Persons must proceed in accordance with NIOSH testing procedure "Continuous Personal Dust Monitor Accuracy Testing," June 23, 2008. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Persons may obtain a copy at

the address below: NIOSH-Publications Dissemination, 4676 Columbia Parkway, Cincinnati, OH 45226. *http://www.cdc.gov/niosh/mining*.

   (2) Persons may inspect a copy at MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209-3939, (202) 693-9440, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to:

*http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.*

4833-1846-3772, v. 3

# EXHIBIT C

Case: 14-1942   Date Filed: 07/28/2014   Page: 111 of 194

To implement the purposes of the aforesaid act the following area comprising Cedar Hill and land, interests in land and improvements thereon, consisting of 8.08096 acres, is herein designated for preservation as a part of the park system in the National Capital:

(1) Part of a tract of land called "Chichester," designated for taxation purposes as Parcel 225/6, described in accordance with a plat of computation recorded in Survey Book 162, page 340 of the Records of the Office of the Surveyor for the District of Columbia by metes and bounds as follows:

Beginning for the same on the southeasterly line of 14th Street Southeast, at a point distant south 13°03′ W. 414.62 feet from the intersection of said line of 14th Street with the southwesterly line of W Street and running thence south 50°14′00″ E. 268 feet to a point; thence south 10°23′40″ E. 285.75 feet to a point; thence south 50°14′ E. 190 feet to the northwesterly line of the parcel of land conveyed by Frederick Douglass and Helen Douglass to Mary W. Bryan by deed dated September 10, 1890, and recorded in Liber 1510 folio 453, among the Land Records of the District of Columbia; thence along said line of said conveyance, north 41°31′ E. 37.50 feet to the southwesterly line of Butler Street; thence along said line of Butler Street and the easterly line of 15th Street closed; north 12°36′ E. 849.75 feet to the south line of W Street; thence along the south line of said W Street; north 76°57′ W. 534 feet to the southeasterly line of 14th Street; thence along said southeasterly line of 14th Street, south 13°03′ W. 414.62 feet to the place of beginning. Containing approximately 7.91207 acres as computed from the above-mentioned plat recorded in Survey Book 162, page 340.

Subject to easements for sewer, water mains, and surface drainage as granted and shown on plat recorded in Liber 134, folio 8 of the said Surveyor's Office Records.

Also:

(2) Part of 15th Street SE. closed, in Square numbered Fifty-seven Hundred Ninety-seven (5797) and described in accordance with a plat recorded in Liber 120, page 139 of the Records of the Office of the Surveyor for the District of Columbia by metes and bounds as follows:

Beginning for the same at the intersection of the southerly line of Galen Street and the northwesterly line of 15th Street SE., running thence south 12°36′ W. to the northerly line of Butler Street; running thence along said line of Butler Street to the center line of said 15th Street; thence along said center line of said street; north 12°36′ E. to the southerly line of Galen Street; thence along the said line of Galen Street, 15 feet to the place of beginning. Containing approximately 0.16889 acres as computed from Plat of Survey prepared in the office of the Surveyor of the District of Columbia, Recorded in Survey Book 157, page 81.

The above-described land is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot numbered Eight Hundred Three (803) in Square numbered Fifty-seven Hundred Ninety-seven (5797).

Since the Frederick Douglass home, the objects of historical significance therein and the land within the above-described boundary have been donated to the United States, the Frederick Douglass home is hereby established as a part of the park system in the National Capital.

Dated: February 14, 1972.

ROGERS C. B. MORTON,
*Secretary of the Interior.*

[FR Doc.72-2626 Filed 2-22-72;8:47 am]

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Office of Education

### EDUCATION FOR THE HANDICAPPED

### Notice of Closing Date for Receipt of Applications

Pursuant to the authority contained in section 622 of the Education of the Handicapped Act (84 Stat. 175/182 20 U.S.C. 1422), notice is hereby given that the U.S. Commissioner of Education has established a final closing date for receipt of applications for Centers and Services for deaf-blind children. Such applications must be postmarked on or before the 30th day following the publication of this notice in the FEDERAL REGISTER, or on or before March 1, 1972, whichever is later.

Regulations governing such applications and other programs and projects authorized under Part C of the Act are being developed, and will be published in the FEDERAL REGISTER as notice of proposed rule making, subject to public comment, as soon as they have been completed.

Dated: February 10, 1972.

S. P. MARLAND, Jr.,
*U.S. Commissioner of Education.*

[FR Doc.72-2624 Filed 2-22-72;8:47 am]

### RECEIPT OF PUBLIC LAW 81-815 APPLICATIONS

### Notice of Cutoff Date, Fiscal Year 1972

Pursuant to the authority vested in me by section 3 of Public Law 81-815 (20 U.S.C. 633) and 45 CFR 114.2, notice is hereby given of the cutoff date:

For the purpose of sections 3 and 14 of Public Law 81-815, June 30, 1972, is hereby set as the second cutoff date during Fiscal Year 1972 on or before which complete applications for payments to which an applicant may be entitled under the Act from such funds as may be available for such purposes shall be filed.

Dated: February 15, 1972.

PETER P. MUIRHEAD,
*Acting U.S. Commissioner of Education.*

[FR Doc.72-2625 Filed 2-22-72;8:47 am]

## COAL MINE HEALTH AND SAFETY

### Notice of Finding That a Single Shift Measurement of Respirable Dust Will Not Accurately Represent Atmospheric Conditions During Such Shift

Pursuant to section 202(f) of the Federal Coal Mine Health and Safety Act of 1969 (30 U.S.C. 842(f); 83 Stat. 762), and in accordance with section 101 of the Act, there was published in the FEDERAL REGISTER for July 17, 1971 (36 F.R. 13286), a proposed notice of finding by the Secretary of the Interior and the Secretary of Health, Education, and Welfare that single shift measurement of respirable dust will not, after applying valid statistical techniques to such measurement, accurately represent the atmospheric conditions to which the miner is continuously exposed. Interested persons were afforded a period of 30 days following publication of the proposed notice in the FEDERAL REGISTER within which to submit written comments, suggestions, or objections.

The major thrust of these comments, suggestions, and objections were: (1) To question the validity of the Bureau of Mines data and the statistical validity of the technique employed in analyzing such data in the proposed finding; and (2) to request a periodic review of the proposed finding as new technology becomes available. After careful consideration of all comments, suggestions, and objections, it is the conclusion of the Secretary of the Interior and the Secretary of Health, Education, and Welfare that a valid statistical technique was employed in the computer analysis of the data referred to in the proposed notice[1] and that the data utilized was accurate and supported the proposed finding. Both Departments also intend periodically to review this finding as new technology develops and as new dust sampling data becomes available.

The Departments intend to revise Part 70 of Title 30, Code of Federal Regulations, to improve dust measuring techniques in order to ascertain more precisely the dust exposure of miners. To complement the present system of averaging dust measurements, it is anticipated that the proposed revision would use a measurement over a single shift to determine compliance with respirable dust standards taking into account (1) the variation of dust and instrument conditions inherent in coal mining operations, (2) the quality control tolerance allowed in the manufacture of personal sampler capsules, and (3) the variation in weighing precision allowed in the Bureau of Mines laboratory in Pittsburgh.

[1] Crow, et al., Statistical Manual, Dover Publication, Inc., New York, New York, p. 48 (1960).

Case: 14-11942      Date Filed: 07/28/2014      Page: 112 of 194

The proposed finding, as set forth at 36 F.R. 13286, that a measurement of respirable dust over a single shift only, will not, after applying valid statistical techniques to such measurement, accurately represent the atmospheric conditions to which the miner under consideration is continuously exposed, is hereby adopted without change.

Dated: February 15, 1972.

ROGERS C. B. MORTON,
*Secretary of the Interior.*

Dated: January 27, 1972.

ELLIOT L. RICHARDSON,
*Secretary of Health,
Education, and Welfare.*

[FR Doc.72–2626 Filed 2–22–72;8:46 am]

## OFFICE OF THE ASSISTANT SECRETARY, COMPTROLLER, HEW AUDIT AGENCY

### Statement of Organization, Functions, and Delegations of Authority

Part 1 of the Statement of Organization, Functions, and Delegations of Authority of the Department of Health, Education, and Welfare is hereby amended to add a Statement of the HEW Audit Agency.

*Section 1–W13.00 Mission.* The HEW Audit Agency is responsible for the development and maintenance of a comprehensive audit program for the Department and its operating agencies. In brief, the Agency's mission is to determine whether the Department's operations are being conducted economically and efficiently, and to provide a reasonable degree of assurance that Federal funds are being expended properly and for the purpose for which they were appropriated. The HEW Audit Agency serves as principal advisor to the Secretary and top Department officials in this area.

*Section 1–W13.10 Organization.* A. The HEW Audit Agency is comprised of a staff of auditors and supporting administrative personnel under the supervision of a Director responsible to the Assistant Secretary, Comptroller. The Director shall have direct access to the Secretary, however, when he deems this necessary to the fulfillment of his responsibilities. The Agency consists of:

Division of State and Local Audits.
Division of University and Nonprofit Audits.
Division of Installation and Management Audits.
Division of Social Security Audits.
Division of Audit Coordination.
Regional Audit Directors, Washington Area Audit Director, and their staffs.

B. During the absence of the Director, the Deputy Director serves as Acting Director.

*Section 1–W13.20 Functions.* A. The HEW Audit Agency provides staff assistance to the Secretary, Assistant Secretaries, and operating agency officials in the development and conduct of comprehensive audits which include examinations of the Department and its grantees and contractors.

B. In the performance of its mission, the Audit Agency:

1. Develops policies, procedures, standards, and criteria relating to audit activities at all levels within the Department.

2. Develops general and special audit programs as may be necessary to provide appropriate audit and examination of programs and activities performed by the Department and its operating agencies.

3. Determines when audits and examinations can be most appropriately carried out by organizations outside of the HEW Audit Agency, including other agencies of Government, or by private organizations.

4. Evaluates the adequacy of audits performed for the Department by organizations outside the HEW Audit Agency to determine that such audits are being conducted in consonance with Department objectives.

5. Conducts comprehensive audits of all Department programs, activities, and functions including those carried out by and through the Department's grantees and contractors.

6. Prepares and disseminates reports of audits, examinations, and studies to the Secretary, operating agencies, and others who may be concerned in a particular audit or study.

7. Accumulates and provides operating agencies with data concerning audit reports and uncleared audit findings. This data serves as the basis for each operating agency's Stewardship Report to the Secretary. Evaluates the Stewardship Reports and provides the Secretary and other key Department officials with an analysis of the significant management decisions being made as a result of audit.

8. Conducts followups and special analyses to determine propriety of action taken on previous audit findings and recommendations.

C. Reviews legislative and program proposals for audit implications and evaluates their conformity and consistency with established audit policy.

D. As requested by the Department's operating agencies, performs special reviews of grant or contract proposals for the purpose of determining financial capabilities of grantees or contractors.

E. In the interest of economy and interdepartmental cooperation, performs audits of programs and activities administered by other Federal departments and agencies that involve participation by institutions of higher education and State and local governments.

F. Provides necessary Departmental liaison with the General Accounting Office and other Federal, State, and private auditing organizations on all matters pertaining to audits. With respect to General Accounting Office audits and investigations of Department Activities:

1. Reviews drafts and final reports covering Department activities and advises the Secretary and his staff of significant findings.

2. Reviews all replies to GAO reports prior to release and secures necessary clearance within the Office of the Secretary.

3. Performs followup reviews to determine propriety of action taken with respect to GAO recommendations.

4. Maintains liaison with representatives of the Office of Management and Budget and others regarding General Accounting Office matters.

G. Collaborates with and provides assistance to the Office of Grant Administration Policy in the execution of its responsibilities for the development of grant management and administration policy and indirect cost rates.

H. Functions of Audit Agency Divisions are as follows:

1. Divisions of Audit Coordination

a. Develops agencywide audit policies, procedures and instructions.

b. Develops agencywide work plans, audit schedules and audit priority adjustments for budgetary and operating purposes.

c. Coordinates processing of GAO reports and letters.

d. Maintains liaison with other Federal audit organizations in determining audit cognizance and arranging for cross-servicing.

2. Division of Social Security Audits

a. Develops technical standards and policies for audit of programs and activities of the Social Security Administration.

b. Develops audit programs to evaluate effectiveness of all aspects of the administration of Social Security programs.

c. Reviews issued audit reports and visits regional offices and audit sites to appraise technical adequacy of and provide technical assistance on Social Security audits.

d. Develops consolidated reports to top management based on audit findings on Social Security activities.

e. Maintains liaison with headquarters officials on Social Security audit matters.

3. Division of State and Local Audits, Division of University and Nonprofit Audits, Division of Installation and Management Audits.

Each of the above Divisions is responsible, in its assigned area, for:

a. Developing technical standards and policies for audits.

b. Developing audit programs to evaluate effectiveness of operations.

c. Reviewing issued audit reports and visiting regional offices and audit sites to appraise technical adequacy of audits and to provide technical assistance on audits.

d. Developing consolidated reports and other reports to top management based on audit findings.

e. Maintaining liaison with headquarters officials on audit matters.

Dated: February 15, 1972.

STEVEN D. KOHLERT,
*Acting Deputy Assistant
Secretary for Management.*

[FR Doc.72–2666 Filed 2–22–72;8:49 am]

# EXHIBIT D

## DEPARTMENT OF LABOR

**Mine Safety and Health Administration**

**30 CFR Parts 11, 70, 71, 75 and 90**

**Respirable Dust**

**AGENCY:** Mine Safety and Health Administration, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department of Labor's mandatory health standards, Title 30, Code of Federal Regulations, Part 70 are amended as to the definition of respirable dust and the procedures for sampling respirable dust in underground coal mines. These amendments include revised requirements for certification of persons conducting sampling of respirable dust and calibrating sampling equipment. Sampling of respirable dust in the active workings outby the working face is required in addition to sampling at the working face. This rule also amends Parts 11, 71, 75 and 90. The definition of respirable dust in each of these parts is amended to be consistent with Section 202(e) of the Federal Mine Safety and Health Act of 1977 (Act).

**EFFECTIVE DATES:** April 8, 1980: 30 CFR §§ 11.3(ee), 70.2(n), 71.2(n), 75.2(k) and 90.2(g). November 1, 1980: Part 70.

**FOR FURTHER INFORMATION CONTACT:** Joseph A. Lamonica, Chief, Division of Health, Mine Safety and Health Administration, Room 830, Ballston Tower No. 3, 4015 Wilson Boulevard, Arlington, Virginia 22203, telephone (703) 235–1140.

**SUPPLEMENTARY INFORMATION:**

### I. Rulemaking Background

On November 16, 1977, the Mining Enforcement and Safety Administration (MESA), Department of the Interior, published in the Federal Register (42 FR 59294–59300), a notice proposing amendments to Part 11 of Subchapter B and Parts 70, 71, 75 and 90 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations. The proposed amendments pertained to respirable dust and airborne contaminants. Interested persons were afforded 30 days after publication of the proposed amendments within which to submit written comments and objections to the amendments proposed by the Secretary of the Interior and to request a public hearing on the issues raised. Numerous requests for extension of the time within which to respond were received from operators, organizations representing operators and other interested parties. By publication in the Federal Register for January 5, 1978 (43 FR 979), the time

for submission of comments, objections and requests for public hearing was extended to February 28, 1978.

Under the Federal Mine Safety and Health Act of 1977 (Act), the responsibilities of the Secretary of the Interior under Section 101 of the Federal Coal Mine Health and Safety Act of 1969 (Coal Act), Pub. L. 91–173, were transferred to the Secretary of Labor (Secretary) on March 9, 1978. Rulemaking, commenced by the Department of the Interior under the Coal Act, was continued by the Department of Labor.

The written comments and objections received in response to the proposed amendments published by the Secretary of the Interior included several requests for public hearing. The comments and objections received concerning respirable dust raised issues substantially different in nature from the issues raised by the comments and objections concerning airborne contaminants. In the interest of giving due consideration to the issues raised, the Mine Safety and Health Administration (MSHA) determined that separate public hearings should be held on the amendments concerning respirable dust and airborne contaminants. Notice of three public hearings on the amendments concerning respirable dust were announced in the Federal Register on June 20, 1978 (43 FR 26454). Two additional public hearings were announced in the Federal Register on July 7, 1978 (43 FR 29339). All five public hearings were conducted as scheduled between July 11 and July 28.

### II. Summary of the Rule

#### A. Respirable Dust Standards

Respirable dust is defined by this rule as dust collected with a sampling device approved by the Secretary of Labor (or the Secretary of the Interior under the Coal Act) together with the Secretary of Health, Education, and Welfare in accordance with Part 74 of Title 30, code of Federal Regulations. This amendment to the definition of respirable dust is consistent with section 202(e) of the Act. There, Congress revised the 1969 Coal Act definition of respirable dust to be that dust measured with a device approved by the Secretary and Secretary of Health, Education, and Welfare. This congressionally revised definition is based on the performance characteristics of sampling devices which are approved, rather than a description of the characteristics of respirable dust. The final rule definition of respirable dust is also based on approved sampling devices.

The fundamental requirement of the rule is that the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of a mine is exposed be continuously maintained at or below 2.0 milligrams of respirable dust per cubic meter of air (2.0 mg/m³). The respirable dust standard of 2.0 mg/m³ will be lowered, however, when the respirable dust in the mine atmosphere of the active workings contains more than 5 percent quartz. Under such conditions, the operator is required to continuously maintain respirable dust at or below an average concentration less than 2.0 mg/m³, computed by dividing the percentage of quartz into the number 10. As the quartz content of respirable dust present in the mine atmosphere increases over 5 percent, the respirable dust standard is correspondingly reduced. This method of determining the applicable respirable dust standard when quartz is present is prescribed by the Secretary of Health, Education, and Welfare (HEW). Samples for determining the quartz content of respirable dust present in the mine atmosphere will be analyzed by MSHA. If the quartz content exceeds 5 percent, MSHA will apply the formula set forth in the rule and notify the operator of the respirable dust standard applicable at the mine.

A respirable dust standard for the intake air for working sections is also provided by this rule. Each operator is required to continuously maintain the average concentration of respirable dust in intake airways within 200 feet of the working faces at or below 1.0 milligrams of respirable dust per cubic meter of air.

The respirable dust standards for active workings and intake airways are based on measurements with an MRE instrument (gravimetric sampling device with four channel horizontal elutriator.) Therefore, when an approved sampling device is used for sampling, the concentration of respirable dust measured with the approved device will be converted by MSHA to an equivalent concentration of respirable dust as if measured with an MRE instrument. This conversion is accomplished by multiplying the concentration of respirable dust measured with the approved sampling device by the constant factor prescribed by the Secretary for that approved sampling device.

#### B. Respirable Dust Sampling

1. *Designated occupation and designated area sampling.* Each operator is required to collect respirable dust samples and submit the samples to MSHA for analysis to determine

Case: 14-11942     Date Filed: 07/28/2014     Page: 115 of 194

compliance with the respirable dust standard. The rule specifies two different types of respirable dust samples to be collected and submitted by operators.

The first type of sample is a "designated occupation sample" for each "mechanized mining unit" in the mine. A mechanized mining unit is a unit of mining equipment that a production crew utilizes for the extraction of material. For example, a mechanized mining unit for a continuous mining system would typically consist of two shuttle cars, a roof bolting machine and a continuous mining machine. Designated occupation samples are taken in the environment of the occupation in the mechanized mining unit that is exposed to the greatest concentration of respirable dust. In the continuous mining system the occupation exposed to the greatest concentration of respirable dust generally is the continuous mining machine operator. Accordingly, this occupation would be the subject of the designated occupation sample for that mechanized mining unit. The rule sets forth the job position in most mining . systems on which designated occupation samples are required to be taken, unless otherwise directed by the District Manager. The rule allows  .  · designated occupation samples to be taken by having the miner in the designated occupation wear the  · sampling device or by placing the sampling device at specified locations near the miner's normal work position. Mechanized mining units will be assigned an identification number by MSHA. These identification numbers are retained by the mechanized mining unit, regardless of where it relocates in the mine. When two sets of mining equipment are provided in a series of working places in the mine and only one production crew is employed at any given time on either set of mining equipment the two sets of equipment will be identified as a single mechanized mining unit. However, when two or more mechanized mining units are simultaneously engaged in production within the same working section, each such mechanized mining unit will be separately identified.

The second type of respirable dust sample required under this rule is a "designated area sample." Designated area samples are required to be collected at locations appropriate to best measure concentrations of respirable dust associated with dust generation sources in the active workings of the mine, such as along haulageways, at underground crushers,

or at transfer points. The operator's approved ventilation system and methane and dust control plan, required under 30 CFR 75.316, is required by this rule to also show the specific locations in the mine designated for taking area samples. An amendment to 30 CFR 75.316 conforming to this requirement is published in Part II of today's Federal Register. Area samples are collected by placing an approved sampling device in a specific location in each area designated in the approved ventilation system and methane and dust control plan. Each designated area will be assigned an identification number by MSHA.

2. *Bimonthly sampling cycle.* Designated occupation samples for mechanized mining units and designated area samples are each required to be collected and submitted by operators at bimonthly intervals. The rule provides a separate schedule of bimonthly periods for each of the two types of samples. For example, during the period January 1 through February 28, operators are required to collect and submit designated occupation samples for each mechanized mining unit. The corresponding period for collecting and submitting designated area samples is February 1 through March 31. The bimonthly periods are staggered to reduce the burden of sampling on operators and to enable MSHA to quickly analyze respirable dust samples.

During each bimonthly period for sampling of mechanized mining units, operators are required to collect and submit five samples for each mechanized mining unit. Based on these samples, MSHA will make a determination as to compliance with the applicable respirable dust standard under this rule. During each bimonthly period for designated area sampling, operators are required to collect and submit one sample for each designated area, as described in the operator's approved ventilation system and methane and dust control plan. If a respirable dust sample taken from a designated area exceeds the applicable respirable dust standard, MSHA will notify the operator. The operator will then be required to submit five additional samples collected from that designated area within 15 calendar days. Based upon these samples, MSHA will make a determination as to compliance with the applicable respirable dust standard. MSHA will also make compliance determinations based on occupation samples taken by MSHA inspectors.

When there is a change in the operational status of a mine, a

mechanized mining unit or a designated area that affects these respirable dust sampling requirements, the operator is required to report such status change to the District Manager. Under this rule, status change reports are required to be made in writing within 3 working days after the status change occurs. When the respirable dust standard applicable at a mine is changed due to the presence of quartz, bimonthly sampling of mechanized mining units and designated areas is required to begin on the first production shift of the next full bimonthly period after the operator is notified by MSHA of the revised respirable dust standard.

To satisfy the bimonthly designated occupation and designated area sampling requirements of this rule, operators are required to take "valid respirable dust samples." These are defined as respirable dust samples collected and submitted as required by this part, and not voided by MSHA. Samples not collected and submitted in accordance with all requirements of this rule may be voided by MSHA. Voided or invalid samples will not satisfy the bimonthly sampling requirements, and therefore it may be necessary for an operator to collect and submit additional samples during a bimonthly period. Failure to take the required number of valid respirable dust samples · within a bimonthly period would constitute a violation. Therefore, it is advantageous for operators to collect and submit the samples required for each bimonthly period during the first month of the bimonthly period. This would allow ample opportunity to collect and submit additional samples if necessary. Respirable dust samples received by MSHA in excess of the number required by this part will be considered invalid samples.

3. *Sampling method.* All respirable dust samples collected by operators for purposes of this rule are required to be collected with a sampling device approved by the Secretary (or the Secretary of the Interior under the Coal Act) and the Secretary of Health, Education, and Welfare under Part 74 of Title 30, Code of Federal Regulations. Approved 10 millimeter cyclone sampling devices are required to be operated at a flowrate of 2.0 liters of air per minute. Other sampling devices that may be approved in the future will be required to be operated at the flowrate prescribed by the Secretary of Health, Education, and Welfare.

The rule also prescribes minimum mining activity that must be ongoing during sampling. Designated area samples are required to be collected

during a "production shift." A production shift is defined for purposes of designated area sampling as a shift during which material is produced and routine day-to-day activities are occurring in the designated area. Similarly, designated occupation samples for mechanized mining units are required to be collected during a "normal production shift." A normal production shift is defined as a shift during which the amount of material produced in a mechanized mining unit is at least 50 percent of the average production reported for the last set of five valid samples. If a normal production shift is not achieved, the sample for that shift may be voided by MSHA. However, any designated occupation sample with a respirable dust concentration greater than 2.5 milligrams per cubic meter of air will be used to determine the average concentration of respirable dust for that mechanized mining unit, regardless of production. The rule also requires that sampling devices be operated portal to portal. This means that the sampling devices used by the operator are required to be operated while carried into the mine, during the entire shift or for 8 hours, whichever time is less, and while carried out of the mine.

### C. Transmittal and Analysis of Samples

After the end of a sampling shift, the operator is required to transmit all samples collected to MSHA within 24 hours. All respirable dust samples collected by an operator are deemed by this rule to be taken to fulfill the sampling requirements of Parts 70, 71 or 90 of Title 30, Code of Federal Regulations, unless the operator declares in writing to the District Manager prior to the intended sampling shift that the sampling filter cassettes are to be used for other purposes. Therefore, absent such a written declaration by the operator to the District Manager, all respirable dust samples collected by an operator are required to be submitted to MSHA within 24 hours after the end of the sampling shift.

Each sample transmitted by operators to MSHA is required to be accompanied by the appropriate completed dust data card. Data cards are provided by the filter cassette manufacturer, and each card has an identification number which corresponds with the filter cassette for which it is provided. All dust data cards submitted to MSHA are required to be completed and signed by a person certified to collect samples and must include that person's certification number.

Upon receipt, MSHA will analyze samples submitted by operators as quickly as practicable. Following this analysis, MSHA will provide the operator with a respirable dust sample data report. The data report will include identification of the mechanized mining unit or designated area in the mine from which the samples were taken; the concentration of respirable dust for each valid respirable dust sample; the occupation code, where applicable; and the reason for voiding any samples. Upon receipt, the operator is required to post this data report for at least 31 days on the mine bulletin board.

### D. Enforcement of Respirable Dust Standards

MSHA will make determinations as to compliance with the applicable respirable dust standard under § 70.100(a) or § 70.101 of this rule based on the bimonthly samples taken from each mechanized mining unit. If the samples from a mechanized mining unit show respirable dust concentrations in excess of the applicable standard, the operator will be cited for a violation. MSHA will also determine compliance with the applicable respirable dust standard based on designated area samples. However, if a bimonthly designated area sample shows a respirable dust concentration in excess of the applicable standard, the operator will first be instructed by MSHA to take five additional valid respirable dust samples for that area within 15 calendar days. If these designated area samples show an average concentration of respirable dust in excess of the applicable standard, the operator will be cited for a violation. In addition, the operator may be required to revise the ventilation system and methane and dust control plan for the mine relative to that area.

Upon issuance of any citation for violation of § 70.100(a) or § 70.101 and until abatement of the violation is achieved, the usual bimonthly sampling requirements of this rule will not apply to the affected mechanized mining unit or designated area. During the time for abatement fixed in the citation, the operator is required to take corrective action to lower the concentration of respirable dust in the affected mechanized mining unit or designated area and then sample each production shift until five valid respirable dust samples are taken. Abatement of the violation will be determined on the basis of the first five valid respirable dust samples submitted during the abatement period.

Under this rule, valid respirable dust samples collected and submitted during

the abatement period may also be credited to the bimonthly sampling requirements. This will occur only when a violation is abated, and if, during abatement sampling, valid respirable dust samples are collected by the operator and received by MSHA in a bimonthly period after which the violation occurred. For example, if, based on samples submitted for a designated occupation during the bimonthly period of July 1 through August 31, MSHA determines that a violation occurred and issues a citation on August 25, the operator would be required to take corrective action and then take five valid samples for the designated occupation during the period fixed for abatement. If, after corrective action, the operator takes abatement samples during the end of August and the beginning of September, the start of the next bimonthly period for designated occupation sampling, then the valid respirable dust samples taken by the operator and received by MSHA during September would be credited to the bimonthly sampling requirements for the period September 1 through October 31. In the event that during abatement sampling less than five valid respirable dust samples were taken by the operator and received by MSHA during September, it would be necessary for the operator to submit the additional number of valid respirable dust samples necessary to satisfy the bimonthly sampling requirements for September 1 through October 31.

### E. Certified Persons

Proper maintenance, calibration and use of sampling equipment are essential for operators to meet the sampling requirements of this rule. Accordingly, these tasks are required to be done only by persons certified under this rule. The rule provides a certification for maintaining and calibrating sampling equipment and a certification for conducting sampling. Persons may hold one or both of these certifications. Temporary certification of persons is provided by the rule, pending prompt completion of the certification requirements.

1. *Maintaining and calibrating respirable dust sampling equipment.* To be certified in maintenance and calibration, persons are required to pass the MSHA examination on maintenance and calibration procedures.

The essential maintenance requirement of the rule is that approved sampling devices be maintained in a condition such that they will perform as approved under Part 74 of Title 30, Code of Federal Regulations. Accordingly, each operator should have a rigorous

Case: 14-11842    Date Filed: 07/28/2014    Page: 117 of 194

and regularly scheduled maintenance program for sampling devices used for purposes of this rule. Approved sampling devices are required to be calibrated in accordance with MSHA Informational Report No. 1121, "Standard Calibration and Maintenance Procedures for Wet Test Meters and Coal Mine Respirable Dust Samplers (Supersedes IR 1073)." The rule also provides that coal mine personal sampler units be calibrated at the flowrate of 2.0 liters of air per minute before being put into service and at intervals not to exceed 200 hours of operating time. A calibration mark is required to be placed on the flowmeter of personal sampler units to indicate the proper position of the float when the sampler is operating at its approved flowrate. The proper flowrate is indicated when the lowest part of the float is tangent to the top of the calibration mark.

2. *Collecting respirable dust samples.* To be certified to collect respirable dust samples for purposes of this rule, persons are required to pass MSHA examination in sampling of respirable coal mine dust.

Careful examination and testing of respirable dust sampling devices are required immediately prior to the start of a shift during which samples will be collected for purposes of this rule. The required examination and testing may be done by a person holding either of the certifications provided by the rule and includes testing the battery voltage and examining all external components of the sampling devices to be used. Any necessary external maintenance to assure the sampling devices are clean and in proper working condition is required to be performed at this time by a certified person.

Examination of each sampling device is also required at least twice during the sampling shift. This examination is required to be done only by a person certified to collect samples. The first examination is required to be made during the second hour after the sampling devices are put into operation. This examination is to assure that each sampling device is operating properly and at the proper flowrate. Any necessary adjustment in the flowrate of a sampling device is required to be made at this time by the person certified to collect samples. The second examination is required to be made during the last hour of operation of the sampling devices during the shift. If the proper flowrate has not been maintained, the sample is required to be transmitted to MSHA with a notation

made by the certified person indicating an improper flowrate.

## III. Discussion of Major Issues

### General

The predominant objection to the proposed rule expressed by miners and their representatives was the lack of effective miner participation in the respirable dust sampling program. Commenters repeatedly asserted that the absence of miner participation seriously compromised the sampling program.

Significant miner participation in the respirable dust sampling program was not a part of the proposed rule. Therefore, while miner involvement has been strongly advocated by some, not all interested persons have been afforded an opportunity to comment on such an addition to the sampling program. Accordingly, miner participation is not incorporated in this final rule. However, in response to the substantial number of comments recommending miner participation, MSHA is proposing amendments to this final rule which would require operators to provide miners an opportunity to observe sampling, maintenance and calibration procedures, and to observe the transmittal of samples to MSHA. These proposed revisions to the final rule are set forth in this Federal Register. Similar miner involvement is included in the proposed revisions to the existing respirable dust sampling program for surface coal mines and surface areas of undergound coal mines, 30 CFR Part 71, and the sampling program for miners who have evidence of the development of pneumoconiosis, 30 CFR Part 90, which are also published in this Federal Register.

During the course of the public hearings, MSHA was urged to accept the use of a particular type of personal protective device as a means of compliance with the respirable dust standard in certain longwall mining operations. It was argued that in these operations it has not been proven feasible at this time to institute engineering controls adequate to reduce dust to within permissible concentrations without substantially impairing coal production. MSHA has begun a careful study of the device—known as the "airstream helmet"—to determine its potential usefulness under very limited circumstances. It is currently being field tested under close MSHA scrutiny in a coal mine in New Mexico. Until testing is completed and the results evaluated, MSHA will continue to require implementation of engineering controls in coal mines as the

means of achieving compliance with the applicable dust standard.

A significant number of the miners who appeared at the public hearings on this rule stated that they and many of their fellow miners are reluctant to fully cooperate in the respirable dust sampling program because they fear that the sampling results will be used by coal operators as evidence to defeat possible future Federal or State black lung benefits claims. This issue has previously been raised by miners' representatives with MSHA and its predecessor, MESA, and with the Employment Standards Administration of the Department of Labor, which administers the Department's black lung benefits programs. In August of 1973 and again in June of 1978, the administrators of the Department's black lung benefits program, in letters to representatives of the United Mine Workers of America, gave assurances that individual dust sampling results could not alone provide a sufficient basis for denying benefits. MESA and MSHA have provided similar assurances. A recent informal review of federal black lung benefits cases shows that sampling results have been intoduced into the record in only a very few cases and that in no case were these results relied upon to deny a claimant benefits. Despite these facts, concern appears to persist among some miners that the dust sampling program may jeopardize future benefits. The final rule therefore includes two changes in the existing operator respirable dust sampling program to reduce the likelihood of such samples being introduced as evidence in black lung benefits cases.

First, under the final rule, the existing requirement that each working miner be sampled every six months or every four months, depending on the miner's work assignment, has been deleted. The results of these samples were not used for enforcement of the respirable dust standard, but were solely for the purpose of supplying the Department of Health, Education, and Welfare (HEW) with data for research concerning black lung disease. This aspect of the existing operator sampling program resulted in a large number of samples and in the few cases where sampling results have been introduced as evidence in black lung benefits cases, it has most often been the results of these samples. Therefore, eliminating these samples should greatly reduce the use of sampling results in these cases. MSHA and NIOSH will assure that suitable substitute investigations will be conducted so that research concerning black lung disease can be continued.

The second change in the existing operator sampling program implemented by the final rule is removal of miners' social security numbers from MSHA's report of sampling results. Under the existing program, MSHA's computer print-out of sampling results was sent to the operator and included, among other things, the occupation and social security number of the miner sampled, the date of the samples and the amount of respirable dust collected. This computer print-out has in the past been introduced as evidence in black lung cases. However, with the removal of miners' social security numbers from MSHA's computer print-out report to operators, correlation of sampling results with individual miners by MSHA will be eliminated. MSHA believes these changes are responsive to the miners' concern that the dust sampling program may jeopardize future black lung benefits.

*Section 70.2*

Based on several of the comments received, the term "normal production shift" is defined by the final rule as a shift during which the amount of material produced is at least 50 percent of the average production reported for valid sampling shifts constituting the previous bimonthly series of samples submitted by the operator. This is a change from the proposed rule which specified 60 percent production. The 50 percent production criterion requires sampling in environments which are typical of workers' normal dust exposure while providing sufficient flexibility to account for normal fluctuations in the mining process.

Commenters also suggested that the definition of respirable dust should include a particle size limitation. The final rule defines respirable dust as dust collected wtih sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare. This definition is consistent with the definition of respirable dust in section 202(e) of the Act. Approvals for devices issued by the Secretary of the Interior and Secretary of HEW under the Coal Act and Part 74 of 30 CFR are continued in effect by virtue of the provisions of the Federal Mine Safety and Health Amendments Act of 1977.

The previous definition of respirable dust prior to the 1977 Act was "only dust particulates 5 microns or less in size" [30 CFR 70.2(i)]. This definition was based on an incorrect interpretation of the original definition of respirable dust developed by the British Medical Research Council (BMRC). According to the BMRC, "a selective size sampling device meeting these requirements

would have a 50 percent sampling efficiency for 5 micron spherical particles of unit density, and an absolute cut-off for similar particles of size greater than 7.1 (micron) diameter." The MRE device was designed according to the BMRC definition, and used in the epidemiological studies upon which the 2.0 mg/m³ dust standard in the 1969 Coal Act was based (Jacobson, Rae, Walton and Rogan, 227 Nature 445–47 (1970)).

By prescribing the 5 micron diameter as the absolute cut-off, rather than the 50 percent efficiency diameter as determined by the BMRC, the previous definition of respirable dust was rendered incompatible with the performance of the MRE instrument or any other instrument for sampling respirable dust. Consequently, the Interior Board of Mine Operations Appeals determined that citations based upon this definition were unenforceable. (*Eastern Associated Coal Corporation* (On Reconsideration), 7 IBMA 14 (Sept. 30, 1976) (83 I.D. 425)).

To retain a definition of respirable dust based on a 5 micron particle size limitation would perpetuate these problems. Congress recognized this potential and in the 1977 Act defined respirable dust in terms of approved sampling devices. This same concept is adopted in the final rule which defines respirable dust as dust collected with an approved sampling device.

Alternatives suggested by commenters to this instrument-based statutory definition were the BMRC definition of respirable dust and the definition adopted by the American Conference of Governmental Hygienists (ACGIH). Implementing these alternatives, however, would require substantial data development to convert the dust specified by these definitions either to the original coal worker's pneumoconiosis (CWP) epidemiological measurements made in MRE instruments or to the measurements made with presently approved sampling devices. Under the final rule, measurements made with approved samplers are related to measurements made with an MRE instrument by the conversion factor of 1.38. This links respirable dust samples taken with an approved device to the epidemiological studies on CWP. Since the record does not contain any data on the necessary conversion factor for the BMRC or ACGIH respirable dust definitions, these alternative definitions cannot be implemented at this time.

Although the BMRC or ACGIH definitions of respirable dust cannot be made part of this final rule, NIOSH has announced studies to develop the

necessary data. In addition, MSHA and NIOSH will be reviewing 30 CFR Part 74 under which sampling devices are approved. A new procedure for approving sampling devices under Part 74 would be necessary if the BMRC or ACGIH definitions of respirable dust should be adopted.

*Section 70.100*

Commenters questioned whether a standard of 2.0 milligrams of respirable dust per cubic meter of air should be retained. The respirable dust standard of 2.0 mg/m³ was originally established in the 1969 Coal Act and is retained in the 1977 Act. This average concentration limit for coal mine dust was initially based upon studies conducted in Great Britain. Those studies showed that the probability of developing pneumoconiosis decreases with decreasing exposure to respirable dust concentrations. Data relied on in the studies indicated that the expected incidence of miners contracting simple pneumoconiosis would be 5 percent at respirable dust concentrations of 3.0 mg/m³ and 2 percent at 2.0 mg/m³. British data further indicated that the probability of developing massive fibrosis, or complicated pneumoconiosis, also significantly decreases with decreasing exposure to respirable dust concentrations. S. Rep. No. 91–411, 91st Cong., 1st Sess. 16 (1969). The final rule therefore retains a respirable dust standard of 2.0 mg/m³. It should be noted, however, that the respirable dust standard is lower when the mine atmosphere of the active workings contains greater than 5 percent quartz.

A few of the comments received also indicated confusion over whether compliance with the 2.0 mg/m³ respirable dust standard is based on a time weighted average. Respirable dust sampling under this rule is conducted during production shifts. Sampling devices are required to be operated for the entire shift or for 8 hours, whichever time is less. The total respirable dust collected by a sampling device is then averaged over the time the sampler was operated, in other words, a time weighted average. Compliance determinations are made on the basis of this average concentration of respirable dust collected during the shift.

Several commenters objected to retaining the intake air standard for respirable dust of 1.0 milligrams per cubic meter of air. The purpose of this intake air standard is to assure that the air ventilating working faces is sufficiently uncontaminated to assist in controlling respirable dust at the working faces. No new data have been introduced demonstrating a need for

change in this standard and therefore it is retained in the final rule. It was proposed, however, that operators no longer regularly submit intake air samples to MSHA. This proposal is retained under the final rule and MSHA will sample intake air to monitor compliance with the standard.

*Section 70.101*

A substantial number of comments were received objecting to the proposed respirable dust standard when free silica is present in the active workings of the mine atmosphere. Many of the comments addressed the validity and appropriateness of the NIOSH recommendation, questioning both the data upon which it was based and the methodologies used to arrive at the 50 microgram recommendation. The proposed rule would have required the average concentration of respirable dust to be reduced below 2.0 milligrams per cubic meter of air when the free silica present exceeded .050 milligrams per cubic meter of air, converted to an MRE measurement equivalent of .070 milligrams per cubic meter of air. This proposal was based upon the recommendation made by the National Institute for Occupational Safety and Health (NIOSH) in its 1974 criteria document indicating that workers should not be exposed to levels greater than 50 micrograms of free crystalline silica per cubic meter of air. For the reasons discussed below, MSHA has decided to withdraw this proposed standard at this time pending further action by NIOSH. The final rule retains the existing formula for reducing the respirable dust standard when respirable dust in the mine atmosphere contains greater than 5 percent quartz.

Adopting a standard for free silica which will assure the protection of all workers from lung disease is of paramount concern to the Department of Labor. Both MSHA and OSHA have placed a high and immediate priority on the development of an appropriate silica standard. It is also important for both agencies to coordinate their respective rulemaking activities to the extent possible, particularly where important common hazards exist. Although each agency has an independent statutory mandate and a separate responsibility to develop improved safety and health standards, there are compelling reasons for MSHA to deter final revision of the silica standard at this time.

The proposed rule was published under the Coal Act which required the Secretary of Health, Education, and Welfare (HEW) to develop proposed health standards for the coal mining industry. However, the NIOSH criteria

document used to develop the proposed rule was prepared in response to the HEW mandate to develop criteria dealing with toxic materials under section 20(a)(3) of the Occupational Safety and Health Act of 1970. The criteria document states that the recommended standard was intended to apply to the "processing, manufacture, and use of free silica as applicable under the Occupational Safety and Health Act of 1970."

The 1977 Act for the first time brought the protections of a single law to all miners. MSHA has a responsibility in critical areas such as health, to examine hazards that are common to the coal and metal and nonmetal mining industries in a coordinated manner. Even if separate or different standards eventually emerge from the review of a common hazard, there must be a thorough evaluation of all relevant considerations, and possible common solutions to common problems must be fully explored. MSHA believes it is particularly important to adopt this approach for subject matters such as silica exposure. The risk to metal and nonmetal miners as a whole appears to be at least as serious as the risk to coal miners and much of the pertinent scientific data has been derived from studies of noncoal miners.

MSHA believes that it is appropriate to defer action on the proposed silica standard until it receives from NIOSH a criteria document specifically addressing the silica exposure hazard in mining. NIOSH is currently developing such a criteria document. This should provide MSHA with valuable information not only concerning the proposed revision of the permissible exposure limits, but other equally important matters such as sampling procedures, medical examinations of exposed workers and warning signs and labels.

It should be noted that in addition to the NIOSH criteria document, the record in this rulemaking proceeding contains the results of a number of research efforts aimed at determining the effects of the various components of coal mine dust on the development of chronic obstructive lung disease in coal miners. Although there is strong indication that the contents of the dust inhaled as well as the concentration is a factor in the formation of fibrotic lung tissue and in the development of pulmonary massive fibrosis, these studies are not conclusive. Congress took cognizance of this potentially increased health hazard when it provided in section 205 of the Coal Act and the 1977 Act for a reduced respirable dust standard when the

respirable dust in the mine atmosphere contains more than 5 percent quartz, which is retained in the final rule.

Several comments received requested information regarding MSHA procedures for determining the quartz content of respirable dust for purposes of this rule. These procedures are basically set forth in Bureau of Mines Information Circular No. 8545, "Bureau of Mines Procedure for Evaluating Quartz Content of Respirable Coal Mine Dust," 1972. The procedures set forth in this document have been slightly modified since publication. Upon request, interested persons may obtain complete information on updated MSHA procedures from the MSHA Dust Branch, Health Division, Technical Support Center, 4800 Forbes Avenue, Pittsburgh, Pennsylvania 15213.

*Section 70.201*

Several commenters suggested that respirable dust sampling under this rule be done with sampling devices that can be mounted on mining machinery and give a continuous readout of dust concentrations. Commenters recognized that unlike the currently approved sampling devices, such as the Mine Safety Appliances Monitaire Model G or C-115 and Bendix 3900 Micronair, further technological development is necessary before continuous readout devices can be reliably used to monitor dust in the mines. However, MSHA believes that every effort should be made to advance sampling technology and has embarked on an intensive program to develop a reliable machine-mounted continuous dust monitor. Prototypes have been developed and are currently being tested in several mines. In addition, the Bureau of Mines is pursuing research in this area.

*Sections 70.202 and 70.203*

Respirable dust sampling and the maintenance and calibration of sampling devices are required to be done by persons certified under this rule. The distinction in the proposed rule between "certified" and "qualified" persons has been deleted to avoid confusion. Certification under the final rule is achieved by successfully completing the applicable MSHA examination. A separate certifying examination is provided for respirable dust sampling and for maintenance and calibration of sampling equipment. In response to comments received, the proposed requirement of also completing the applicable MSHA course of instruction prior to taking a certifying examination has been deleted. Although other sources of training are encouraged, MSHA will offer courses of instruction

in both respirable dust sampling and the maintenance and calibration of sampling equipment. Persons seeking certification are urged to avail themselves of these courses. Scheduling information for MSHA training courses and examinations is available at MSHA District Offices.

The proposed requirement that persons certified to conduct respirable dust sampling have 12 months experience in underground coal mines has also been deleted from the final rule. The purpose of this requirement was to ensure that persons required by the rule to go underground were sufficiently familiar with safe work practices so as not to endanger themselves or other miners. However, since publication of the proposed rule, MSHA promulgated the final rule for training and retraining of miners to be codified at 30 CFR Part 48 (43 FR 47454 (October 13, 1978)). Under Part 48, persons conducting sampling will have to be trained in safe work practices. MSHA believes that such mandatory training obviates the need for the proposed 12 months experience requirement.

A few of the comments received asked whether it is necessary to require under this rule certification of persons previously certified or qualified by MSHA to conduct sampling and maintenance and calibration of sampling equipment. The requirement that sampling, maintenance and calibration be done only by persons certified under this rule is an integral part of improving the operator respirable dust sampling program. MSHA believes that certification through examination under this rule will ensure a basic level of competency with the substantially revised sampling requirements and procedures. In addition, MSHA believes that certification of persons under the final rule will improve sampling results through properly maintained and calibrated equipment. Temporary certification pending completion of the certification requirements is provided to alleviate any potential problem of accommodating all persons seeking certification under the final rule.

Several commenters also objected to the proposed requirement that persons be reexamined every two years in order to maintain their certification. MSHA is persuaded by the comments that this proposed requirement would not significantly improve the performance of certified persons in sampling, maintenance and calibration.
Accordingly, this proposed requirement has also been deleted from the final rule. However, MSHA retains the right to revoke certifications if the sampling,

maintenance and calibration procedures prescribed by this rule are not strictly adhered to by certified persons.

## Section 70.204

The proposed maintenance and calibration requirements for approved sampling devices are not substantively changed in the final rule. A few commenters, however, objected to the sampling pump battery voltage requirement of the proposed rule. Commenters indicated that the proposed voltage requirement for nickel cadmium cell batteries would result in many adequate nickel cadmium cell batteries being removed from service. Accordingly, the proposed voltage requirement has been revised and the final rule requires that the voltage for nickel cadmium cell batteries not be lower than the product of the number of cells in the battery pack multiplied by 1.25. The voltage for other than nickel cadmium cell batteries is required to be not lower than the product of the number of cells in the battery pack multiplied by the manufacturer's nominal voltage per cell value.

## Section 70.205

There are also no substantive changes in the proposed operation and flowrate requirements for approved sampling devices. Several comments questioned the need for requiring approved sampling devices to be examined during the second hour after being put into operation and during the last hour of operation. On-shift examination of sampling devices during the second hour of operation is required so that adjustment in the flowrate may be made to account for any surface charge acquired by the sampling pump battery during charging. Battery surface charge is common and dissipates after approximately one hour, often resulting in a reduction in the flowrate of the sampling device. If this occurs, prompt adjustment of the flowrate is necessary to achieve a valid respirable dust sample. On-shift examination of sampling devices during the last hour of operation is required to assure that the proper flowrate has been maintained during the sampling shift.

MSHA believes that these on-shift examinations of sampling devices are an important part of reasonable and prudent sampling techniques. However, several comments received from anthracite coal mine operators indicated that on-shift examination of sampling devices could be potentially dangerous under the conditions of mining an extremely pitching coal seam. Accordingly, under the final rule operators of anthracite coal mines are

exempt from the requirement that the sampling device be examined during the second hour of operation when the device is being operated in the breast or chamber and the full box method of mining is used.

## Section 70.206

The final rule provides that for purposes of compliance determinations, concentrations of respirable dust measured with an approved sampling device will be expressed in terms of equivalent concentrations as if measured with an MRE instrument. To accomplish this, the rule provides that concentrations of respirable dust measured with an approved device will be multiplied by a constant factor prescribed by the Secretary.

Several commenters questioned the requirement of converting concentrations of respirable dust measured with an approved sampling device to equivalent concentrations of respirable dust as measured with an MRE instrument. Congress in the 1969 Coal Act established respirable dust concentrations as measured with an MRE instrument as the standard for evaluating miner exposure to coal mine dust. Congress also recognized the potential for new technology and provided that other approved sampling devices could be used, so long as the concentration of respirable dust measured with such a device was equated to respirable dust concentrations as measured with an MRE instrument. This concept is not changed under the 1977 Act since the respirable dust standard as set forth in the 1969 Coal Act was carried over without change.

After passage of the Coal Act, the Secretary of the Interior and the Secretary of Health, Education, and Welfare approved a dust sampling device smaller and more practical than the MRE instrument. These samplers use a 10 millimeter cyclone to separate respirable dust from the total dust present in the mine atmosphere while the MRE instrument uses a four channel horizontal elutriator. In order to equate the concentrations of respirable dust measured with the 10 millimeter cyclone sampler to concentrations of respirable dust as measured with an MRE instrument, MSHA developed a constant conversion factor.

A few commenters questioned the constant factor of 1.38 specified in the proposal. This factor is based on data reported by Tomb *et al.* in Bureau of Mines Informational Report 7772, (1973), which is available from the Bureau of Mines, 4800 Forbes Avenue, Pittsburgh, Pennsylvania 15213. These data

demonstrated the need for revising the previously prescribed factor of 1.6 to 1.38 to account for the addition of a pulsation dampener to the 10 millimeter cyclone sampler. This improvement in the sampler was made part of its approval under 30 CFR Part 74. Accordingly, the constant conversion factor of 1.38 is adopted by the Secretary for 10 millimeter cyclone samplers already approved by the Secretaries. The final rule, however, does not state the 1.38 constant factor for converting concentrations of respirable dust as measured with a 10 millimeter cyclone sampler. This aspect of the proposed rule was deleted to allow for entirely different constant factors that may be prescribed for newly developed and approved sampling devices.

*Sections 70.207 and 70.208*

These sections of the final rule set forth the bimonthly sampling schedules for mechanized mining units and designated areas. Under the final rule, if the average concentration of respirable dust collected in five valid samples taken from a mechanized mining unit or a designated area exceeds the respirable dust standard applicable at the mine, the operator will be issued a citation and abatement of the unhealthful condition will be required. MSHA believes that these revised sampling procedures will be a significant improvement to the overall respirable dust sampling and control program. In addition, MSHA and NIOSH will be engaging in an assessment of the effectiveness of the new sampling scheme to determine if further improvements can be made.

Commenters have suggested that the rule should include a provision setting forth how the potential for variability in sampling results is accounted for in MSHA's determination of compliance with the respirable dust standard. MSHA recognizes that under this rule, or any sampling program, there may be some variation between the actual concentrations of respirable dust present in the mine atmosphere and the dust concentrations determined by sampling results. MSHA, however, believes that the final rule significantly reduces this variability. Compliance determinations will generally be based on the average concentration of respirable dust measured by five valid respirable dust samples taken by the operator during five consecutive shifts, or five shifts worked on consecutive days. Therefore, the sampling results upon which compliance determinations are made will more accurately represent the dust in the mine atmosphere than

would the results of only a single sample taken on a single shift. In addition, MSHA believes the revised sampling and maintenance and calibration procedures prescribed by the final rule will significantly improve the accuracy of sampling results.

A few commenters, however, argued that the remaining potential variability in sampling results should be resolved by setting an artificial respirable dust standard in the rule, as high as 2.4mg/m³. These commenters suggested that enforcement action should only be taken by MSHA when the average concentration of five valid respirable dust samples exceeds this higher standard. MSHA believes that such an accounting for variability in sampling results under the final rule would be contrary to congressional intent and the express congressional prohibition against average concentrations of respirable dust in the active workings exceeding 2.0 mg/m³ over the course of a working shift.

The health risk for miners posed by respirable coal mine dust was first addressed at length by Congress in the 1969 Coal Act. In section 202(b)(2) of the Coal Act, which is retained in the 1977 Act, Congress provided in relevant part that "* * * each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed at or below 2.0 milligrams per cubic meter of air." It is important to emphasize that this statutory standard is expressed in terms of the average concentration of respirable dust during a shift.

Although single-shift respirable dust sampling would be most compatible with this single-shift standard, Congress recognized that variability in sampling results could render single-shift samples insufficient for compliance determinations. Consequently, Congress defined "average concentration" in section 202(f) of the 1969 Coal Act which is also retained in the 1977 Act. That section provides that "* * * the term 'average concentration' means a determination which accurately represents the atmospheric conditions with regard to respirable dust to which each miner in the active workings of a mine is exposed (1) as measured, during an 18 month period following the date of enactment of this Act, over a number of continuous production shifts to be determined by the Secretary and Secretary of Health, Education, and Welfare, and (2) as measured thereafter, over a single shift only, unless the Secretary and Secretary of Health,

Education, and Welfare, find, in accordance with the provisions of Section 101 of this Act, that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift."

The Secretary of the Interior and Secretary of Health, Education, and Welfare conducted continuous multi-shift sampling and single-shift sampling and, after applying valid statistical techniques, determined that a single-shift respirable dust sample should not be relied upon for compliance determinations when the respirable dust concentration being measured was near 2.0 mg/m³. Accordingly, the Secretary of the Interior and Secretary of Health, Education, and Welfare prescribed consecutive multi-shift samples to enforce the respirable dust standard.

MSHA does not believe that Congress contemplated any further accounting for variability in sampling results. Moreover, further accounting for any remaining variability in sampling results as suggested by the commenters would expressly permit average concentrations of respirable dust exceeding 2.0 mg/m³ in the mine atmosphere during a shift. Such a provision in the final rule would be contrary to the congressional mandate that operators continuously maintain the average concentration of respirable dust at or below the prescribed standard. The legislative history of the Coal Act is replete with congressional expression that the 2.0 mg/m³ respirable dust standard be strictly adhered to and enforced. (*See:* S. Rep. No. 91-411, 91st Cong., 1st Sess. 47 (1969)). In addition, referencing a respirable dust standard higher than 2.0 mg/m³ to determine compliance would ignore the possibility that sampling results may show concentrations lower than were actually present in the mine atmosphere. Therefore, any variability in sampling results remaining after averaging together consecutive multi-shift samples and using improved sampling, maintenance and calibration procedures under the rule cannot be resolved by implementing a higher respirable dust standard for purposes of compliance determinations. Accordingly, the final rule minimizes the potential for variability in sampling results and enforcement action will be taken by MSHA based on these sampling results.

Several commenters addressing the proposal for designated area sampling objected to MSHA issuing citations for violation of the respirable dust standards on the basis of area sampling.

These commenters argued that the respirable dust standard as set forth in the Act requires miners to be sampled personally to determine the average concentration of respirable dust during a shift to which the individual miner was exposed. Therefore, it was argued, no compliance determination could properly be based on samples which measured the average concentration of respirable dust during a shift in particular locations in the mine where miners work or travel, since this would not show an individual miner's exposure for the duration of the shift.

MSHA believes that the Act supports finding violations of the respirable dust standards based on area sampling. Section 202(b)(2) of the Act requires operators to "* * * continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed at or below 2.0 milligrams per cubic meter of air." The purpose of this provision, as set forth in section 201(b) of the Act, is to ensure that "* * * the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation-related disease during or at the end of such period." MSHA believes that the language of these provisions of the Act authorizes finding a violation when the average concentration of respirable dust exceeds the standard at any location in the active workings of a mine. The Act clearly speaks in terms of the "mine atmosphere" and requires operators to continuously maintain the quality of air to which miners are exposed. Under the final rule, designated area samples are required to be taken in the "active workings," which is defined as any place in a coal mine where miners are normally required to work or travel. Therefore, miners clearly are exposed to the mine atmosphere measured by designated area samples.

Basing compliance determinations on samples taken at particular locations in a mine that measure the respirable dust concentrations in the mine atmosphere through which miners normally travel or in which miners work is not new under the final rule nor is it peculiar to designated area sampling. Samples taken at the working face for the high risk occupation under the existing respirable dust sampling program also measure the mine atmosphere in locations in the active workings, rather

than the exposure of any individual miner for the duration of a shift. For example, the operator of a continuous mining machine is normally deemed to be the occupation with the greatest dust exposure at the working face and a sampling device is placed on the continuous mining machine operator, or near the operator's normal work position. This sample measures the mine atmosphere in the area of that work position. If samples show that over the course of a shift the average concentration of respirable dust in the mine atmosphere at this location exceeded the standard, then this condition would constitute a violation. This method of area sampling at the working face is continued under the final rule by providing designated occupation sampling in each mechanized mining unit.

MSHA also believes that enforcement of the respirable dust standards based on area sampling will effectively serve the health protection goal of achieving and continuously maintaining good air quality in the active workings of mines. The results of personal samples would not be useful to pinpoint the source of dust concentrations measured during a shift due to the movement of miners through various areas of the mine in the course of performing their work. With area sampling results, however, respirable dust generation sources can be identified and monitored. If area samples show respirable dust concentrations exceeding the applicable standard, abatement of the condition can be more readily and permanently achieved by the operator. In this manner, MSHA believes that appropriate respirable dust control measures can be made an integral part of each operator's mining system.

Several commenters questioned the effects of the proposal to reduce sampling to five samples on a bimonthly schedule. The existing respirable dust sampling program which this final rule amends was based on ten samples collected and submitted each month.

MSHA evaluated the effect of reducing the number of required shift samples from ten to five statistically and empirically and found no significant change in the number and confidence level of compliance decisions. The statistical evaluation showed that the relative change in the confidence level for a compliance decision decreased approximately five percent when the number of samples is reduced from ten to five. The empirical analysis showed that compliance decisions decreased less than three percent when the

average concentrations was determined from five samples.

MSHA also considered the effect on the overall respirable dust monitoring program of reducing the number of samples. Reducing the number of required shift samples from ten to five will permit more rapid analysis of samples by MSHA, resulting in a rapid return of this information to the operator and prompt abatement of violations of the respirable dust standard. Prompt abatement of violations will reduce the exposure of miners to excessive dust concentrations and therefore improve miner health protection. In addition, MSHA believes that because miners will be sampled less repetitively under this rule, there will be greater miner acceptance of the sampling program. For these reasons the proposal to reduce the number of samples from ten to five is adopted in the final rule.

The effects of the proposal to reduce the frequency of sampling from monthly to bimonthly have also been evaluated. MSHA statistics indicate that nearly 74 percent of all underground coal mine sections were determined to be in compliance with the respirable dust standard for the entire year of 1977. In addition, a significant portion of the remaining 26 percent were found out of compliance only once. As a result, most operators during 1977 were permitted under the existing regulation to use the alternating (bimonthly) sampling cycle. In view of this, MSHA believes that proposed bimonthly sampling cycle would not reduce miner health protection. It should also be noted that sampling under the final rule is expanded to areas of the mine outby the working face, affording miners increased health protection. For these reasons bimonthly sampling is retained in the final rule.

A few commenters suggested that operators of mines with 40 or fewer miners be permitted under the rule to collect and submit fewer samples. MSHA is not convinced that the number of samples required under an effective respirable dust monitoring program can reasonably be related to mine size. Moreover, the significant reduction in the number and frequency of the samples required for all mines was a major aspect of the proposed rule. Accordingly, the final rule does not permit operators of small mines to collect and submit fewer samples.

Under the proposed rule, bimonthly sampling of mechanized mining units and designated areas was required to be done during the first month of each bimonthly period. The purpose of this proposed requirement was to ensure that operators had ample time remaining

to submit additional samples during a bimonthly period in the event samples were voided by MSHA. Samples may be voided by MSHA under the final rule if, for example, there has been insufficient production of material during sampling. Sampling during the first month of each bimonthly period would also take advantage of the staggered bimonthly sampling periods for mechanized mining units and designated areas such that an operator could collect and submit one type of sample each month. Commenters, nevertheless, objected to a specific requirement in the rule that bimonthly sampling be done in the first month of each bimonthly period. This requirement has been deleted from the final rule. However, MSHA recommends that operators collect and submit bimonthly samples during the first month of each bimonthly period to the extent practicable in order to protect against the possibility of failing to meet the bimonthly sampling requirements due to voided samples. Failure to meet the bimonthly sampling requirements would constitute a violation under the final rule.

Commenters also objected to the proposed rule requirement that initial bimonthly sampling of new or reactivated mechanized mining units and designated areas begin on the first production day after the unit or area is placed in production status.
Commenters objected that "production status" and "production day" were not defined in the proposed rule.
Commenters also suggested that initial bimonthly sampling of new or reactivated mechanized mining units and designated areas should be delayed sufficiently to allow time for activities in the unit or area to normalize before samples are collected. The terms "production status" and "production day" have been deleted from the final rule. Under the final rule, the operator is required to meet the sampling requirements for the bimonthly period in which the first "production shift" occurs for a new or reactivated mechanized mining unit or designated area, provided there is sufficient time in the bimonthly period to take the required five valid samples. MSHA will make this determination on a case-by-case basis.

Several commenters objected to the proposal that samples with respirable dust concentrations greater than 2.5 milligrams per cubic meter of air would be considered in determining the average concentration of respirable dust for a mechanized mining unit, even though a "normal production shift" was not achieved. The purpose of requiring respirable dust samples to be collected

during a "normal production shift" is to assure that respirable dust sampling is conducted when dust generation sources are active. If respirable dust is present in concentrations greater than 2.5 mg/m³, it is apparent that some significant dust generation sources are active. Accordingly, this provision of the proposed rule is retained.

A few commenters questioned the proposed provision that respirable dust sampling devices be attached to miners in designated occupations. Commenters indicated that currently approved sampling devices can be cumbersome to wear under certain circumstances. The proposed rule specifically provided that sampling devices may be attached to miners or alternatively be placed at specified locations near the normal work position for the designated occupations, unless otherwise directed by an authorized representative of the Secretary. The proposed rule did not require sampling devices be attached to miners. This aspect of the proposed rule is retained with only a minor change providing that the District Manager, rather than any authorized representative of the Secretary, may direct placement of sampling devices in locations other than those provided by the final rule.

Several commenters also questioned the proposed rule requirement that identification numbers be assigned to each mechanized mining unit. Commenters suggested that identification numbers could instead be assigned to each working section. A fundamental aspect of the final rule is that each mechanized mining unit in a mine be sampled. This is accomplished under the rule by collecting samples from a designated occupation in each mechanized mining unit. Designated occupation samples then need to be related to the mechanized mining unit represented by the samples to ensure that all mechanized mining units are sampled and that the designated occupation samples for each individual mechanized mining unit are analyzed together. The final rule therefore retains the proposed requirement that each mechanized mining unit be identified.

## Section 70.209

Several of the comments received objected to the proposed requirement that samples be transmitted to MSHA within 24 hours after the end of each sampling shift suggesting this could be burdensome for some operators. MSHA has received no information to support the suggestion that additional time is necessary. Moreover, it is important to the efficiency of the revised respirable dust sampling program that samples be

promptly transmitted to MSHA. Accordingly, the final rule requires operators to transmit samples to MSHA within 24 hours after the end of each sampling shift.

Commenters also objected to the proposed rule provision that all respirable dust samples collected by operators would be considered by MSHA to be taken to fulfill the requirements of 30 CFR Parts 70, 71 or 90. Under the proposed rule, samples to be used by operators for other purposes would have to be identified in writing by the operator to the District Manager prior to the intended sampling shift. The purpose of this requirement, which is retained in the final rule, is to maintain the integrity of the sampling program. Respirable dust sampling by operators for purposes other than submission to MSHA is not precluded by this provision. The final rule requires only that any such samples be identified in writing to the District Manager according to each filter cassette identification number, prior to their intended use by the operator. No evidence was received indicating that this requirement will impose a hardship upon operators.

A few commenters also objected to the proposed requirement that samples submitted by operators to MSHA for abatement purposes be sent to a different address than routine samples. Under the final rule, all samples submitted by operators are required to be sent to MSHA's Respirable Dust Processing Laboratory in Pittsburgh, Pennsylvania, unless another address is designated by the District Manager. This latter requirement of the final rule anticipates equipping MSHA's district offices with facilities for dust sample processing in order to expedite abatement sampling results.

## Section 70.210

Several of the comments received objected to the proposed requirement that results of MSHA's respirable dust sample analysis be posted by operators on the mine bulletin board for at least 31 days. This posting requirement is designed to provide miners ready access to current information as to respirable dust conditions in the mine. The data reported to the operator will not contain information identifying individual miners. MSHA has received no information indicating that posting this information would be contrary to the best interests of miners or burdensome for operators. Therefore, the proposed posting requirement is adopted in the final rule.

## IV. Effect on Existing Rules

This final rule substantially revises the existing Part 70 procedure for operator sampling of respirable dust in underground coal mines. To effect an orderly transition from the old sampling program to the new sampling program, the existing operator sampling requirements in Part 70 are suspended as of September 1, 1980. On and after September 1, 1980, operators are not required to collect respirable dust samples until the effective date of this rule, which is November 1, 1980. Only the operator sampling requirements are suspended. Operators will be required to continue to maintain compliance with the respirable dust standard and all other provisions of Part 70.

Respirable dust samples collected in accordance with Part 70 before September 1, 1980, are required to be submitted to MSHA and will be analyzed for compliance with the respirable dust standard. Citations and orders involving noncompliance with any provision of Part 70 issued or outstanding after September 1, 1980, will continue in effect according to their terms unless modified by MSHA.

### Drafting Information

The principal persons responsible for preparing this final rule are: Joseph A. Lamonica and Glenn R. Tinney, Division of Health, Mine Safety and Health Administration; Frank A. White, Office of Standards, Regulations and Variances, Mine Safety and Health Administration; and Edward P. Clair and Edward C. Hugler, Division of Mine Safety and Health, Office of the Solicitor, Department of Labor.

### Regulatory Analysis

It has been determined that a regulatory analysis is not required for this rule under the Department of Labor's final guidelines for implementing Executive Order 12044 (44 FR 5570, January 26, 1979). It is estimated that the changes in the sampling requirements contained in this rule will result in a net savings to the coal industry of approximately 2 million dollars during the first year.

Dated March 28, 1980.

Robert B. Lagather,

*Assistant Secretary for Mine Safety and Health.*

1. Part 70 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations, is amended by revising Subparts A, B, C and E as set forth below:

## PART 70—MANDATORY HEALTH STANDARDS—UNDERGROUND MINES

### Subpart A—General

Sec.
70.1   Scope.
70.2   Definitions.

### Subpart B—Dust Standards

70.100   Respirable dust standards.
70.101   Respirable dust standard when quartz is present.

### Subpart C—Sampling Procedures

70.201   Sampling; general requirements.
70.202   Certified person; sampling.
70.203   Certified person; maintenance and calibration.
70.204   Approved sampling devices; maintenance and calibration.
70.205   Approved sampling devices; operation; air flowrate.
70.206   Approved sampling devices; equivalent concentrations.
70.207   Bimonthly sampling; mechanized mining units.
70.208   Bimonthly sampling; designated areas.
70.209   Respirable dust samples; transmission by operator.
70.210   Respirable dust sample; report to operator; posting.
70.220   Status change reports.
*    *    *    *    *

### Subpart E—Dust From Drilling Rock

70.400   Dust from drilling rock; control.
70.400–1   Dust from drilling rock; approved devices.
70.400–2   Dust from drilling rock; water.
70.400–3   Dust from drilling rock; ventilation.
*    *    *    *    *

Authority: Sections 101 and 103(h) of the Federal Mine Safety and Health Act of 1977, Pub. L. 91–173 as amended by Pub. L. 95–164, 91 Stat. 1291 and 1299 (30 U.S.C. 811 and 813(h)).

### Subpart A—General

§ 70.1   Scope.

This Part 70 sets forth mandatory health standards for each underground coal mine subject to the Federal Mine Safety and Health Act of 1977.

§ 70.2   Definitions.

For the purpose of this Part 70, the term:

(a) "Act" means the Federal Mine Safety and Health Act of 1977, Pub. L. 91–173, as amended by Pub. L. 95–164.

(b) "Active workings" means any place in a coal mine where miners are normally required to work or travel.

(c) "Certified person" means an individual certified by the Secretary in accordance with § 70.202 (Certified person; sampling) to take respirable dust samples required by this part or certified in accordance with § 70.203 (Certified person; maintenance and calibration) to perform the maintenance and

calibration of respirable dust sampling equipment as required by this part.

(d) "Concentration" means a measure of the amount of a substance contained per unit volume of air

(e) "Designated area" means an area of a mine identified by the operator in the plan required under § 75.316 (Ventilation system and methane and dust control plan) of this title and approved by the District Manager.

(f) "Designated occupation" means the occupation on a mechanized mining unit that has been determined by results of respirable dust samples to have the greatest respirable dust concentration.

(g) "District Manager" means the manager of the Coal Mine Safety and Health District in which the mine is located.

(h) "Mechanized mining unit" means: (1) a unit of mining equipment including hand loading equipment used for the production of material; or (2) a specialized unit which utilizes mining equipment other than specified in § 70.207(e) (Bimonthly sampling; mechanized mining units).

(i) "MRE instrument" means the gravimetric dust sampler with a four channel horizontal elutriator developed by the Mining Research Establishment of the National Coal Board, London, England.

(j) "MSHA" means the Mine Safety and Health Administration of the Department of Labor.

(k) "Normal production shift" means (1) a production shift during which the amount of material produced in a mechanized mining unit is at least 50 percent of the average production reported for the last set of five valid samples; or (2) a production shift during which any amount of material is produced by a new mechanized mining unit, until a set of five valid samples is taken.

(l) "Production shift" means (1) with regard to a mechanized mining unit, a shift during which material is produced, or (2) with regard to a designated area of a mine, a shift during which routine material is produced and routine day-to-day activities are occurring in the designated area.

(m) "Quartz" means crystalline silicon dioxide ($SiO_2$) not chemically combined with other substances and having a distinctive physical structure.

(n) "Respirable dust" means dust collected with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title. Sampling device approvals issued by the Secretary of the Interior and Secretary of Health,

Education, and Welfare are continued in effect.

(o) "Secretary" means the Secretary of Labor or his delegate.

(p) "Valid respirable dust sample" means a respirable dust sample collected and submitted as required by this part, and not voided by MSHA.

## Subpart B—Dust Standards

### § 70.100  Respirable dust standards.

(a) Each operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air as measured with an approved sampling device and in terms of an equivalent concentration determined in accordance with § 70.206 (Approved sampling devices; equivalent concentrations).

(b) Each operator shall continuously maintain the average concentration of respirable dust within 200 feet outby the working faces of each section in the intake airways at or below 1.0 milligrams of respirable dust per cubic meter of air as measured with an approved sampling device and in terms of an equivalent concentration determined in accordance with § 70.206 (Approved sampling devices; equivalent concentrations).

### § 70.101  Respirable dust standard when quartz is present.

When the respirable dust in the mine atmosphere of the active workings contains more than 5 percent quartz, the operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed at or below a concentration of respirable dust, expressed in milligrams per cubic meter of air as measured with an approved sampling device and in terms of an equivalent concentration determined in accordance with § 70.206 (Approved sampling devices; equivalent concentrations), computed by dividing the percent of quartz into the number 10.

*Example:* The respirable dust associated with a mechanized mining unit or a designated area in a mine contains quartz in the amount of 20%. Therefore, the average concentration of respirable dust in the mine atmosphere associated with that mechanized mining unit or designated area shall be continuously maintained at or below 0.5 milligrams of respirable dust per cubic meter of air (10/20=0.5 mg/m³).

## Subpart C—Sampling Procedures

### § 70.201  Sampling; general requirements.

(a) Each operator shall take respirable dust samples of the concentration of respirable dust in the active workings of the mine as required by this part with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare under Part 74 (Coal Mine Dust Personal Sampler Units) of this title.

(b) Sampling devices shall be worn or carried directly to and from the mechanized mining unit or designated area to be sampled and shall be operated portal to portal. Sampling devices shall remain operational during the entire shift or for 8 hours, whichever time is less.

(c) Upon request from the District Manager, the operator shall submit the date on which collecting any respirable dust samples required by this part will begin.

(d) During the time for abatement fixed in a citation for violation of § 70.100 (Respirable dust standards) or § 70.101 (Respirable dust standard when quartz is present), the operator shall take corrective action to lower the concentration of respirable dust to within the permissible concentration and then sample each production shift until five valid respirable dust samples are taken.

### § 70.202  Certified person; sampling.

(a) The respirable dust sampling required by this part shall be done by a certified person.

(b) To be certified, a person shall pass the MSHA examination on sampling of respirable coal mine dust.

(c) A person may be temporarily certified by MSHA to take respirable dust samples if the person receives instruction from an authorized representative of the Secretary in the methods of collecting and submitting samples under this rule. The temporary certification shall be withdrawn if the person does not successfully complete the examination conducted by MSHA on sampling of respirable coal mine dust within six months from the issue date of the temporary certification.

### § 70.203  Certified person; maintenance and calibration.

(a) Approved sampling devices shall be maintained and calibrated by a certified person.

(b) To be certified, a person shall pass the MSHA examination on maintenance and calibration procedures for respirable dust sampling equipment.

(c) A person may be temporarily certified by MSHA to maintain and

calibrate approved sampling devices if the person receives instruction from an authorized representative of the Secretary in the maintenance and calibration procedures for respirable dust sampling equipment under this rule. The temporary certification shall be withdrawn if the person does not successfully complete the examination conducted by MSHA on maintenance and calibration procedures within six months from the issue date of the temporary certification.

### § 70.204  Approved sampling devices; maintenance and calibration.

(a) Approved sampling devices shall be maintained as approved under Part 74 (Coal Mine Dust Personal Sampler Units) of this title and calibrated in accordance with MSHA Informational Report No. 1121, "Standard Calibration and Maintenance Procedures for Wet Test Meters and Coal Mine Respirable Dust Samplers (Supersedes IR 1073)," by a person certified in accordance with § 70.203 (Certified person; maintenance and calibration).

(b) Approved sampling devices shall be calibrated at the flowrate of 2.0 liters of air per minute, or at a different flowrate as prescribed by the Secretary and the Secretary of Health, Education, and Welfare for the particular device, before they are put into service and at intervals not to exceed 200 hours of operating time thereafter.

(c) A calibration mark shall be placed on the flowmeter of each approved sampling device to indicate the proper position of the float when the sampler is operating at a flowrate of 2.0 liters of air per minute or other flowrate prescribed by the Secretary and the Secretary of Health, Education, and Welfare for the particular device. The sandard to denote proper flow is when the lowest part of the float is tangent to the top of the calibration mark.

(d) Approved sampling devices shall be tested and examined immediately before each sampling shift and necessary external maintenance shall be performed to assure that the sampling devices are clean and in proper working condition by a person certified in accordance with § 70.202 (Certified person; sampling) or § 70.203 (Certified person; maintenance and calibration). This testing and examination shall include the following:

(1) Testing the voltage of each battery while under actual load to assure the battery is fully charged. The voltage for nickel cadmium cell batteries shall not be lower than the product of the number of cells in the battery pack multiplied by 1.25. The voltage for other than nickel cadmium cell batteries shall not be

Case: 14-11942   Date Filed: 07/28/2014   Page: 126 of 194

lower than the product of the number of cells in the battery pack multiplied by the manufacturer's nominal voltage per cell value;

(2) Examination of all components of the cyclone to assure that they are clean and free of dust and dirt;

(3) Examination of the inner surface of the cyclone on the approved sampling device to assure that it is free of scoring;

(4) Examination of the external tubing on the approved sampling device to assure that it is clean and free of leaks; and,

(5) Examination of the clamping and positioning of the cyclone body, vortex finder and cassette to assure that they are rigid, in alignment, and firmly in contact.

(e) In accordance with 5 U.S.C. 552(a), MSHA Informational Report No. 1121 referenced in paragraph (a) of this section is hereby incorporated by reference and made a part of this section as if it were set forth in full. The incorporated publication is available without charge at each Coal Mine Safety and Health District and Subdistrict office of MSHA and is on file at the Office of the Federal Register Information Center. Any future amendments to MSHA Informational Report No. 1121 will be announced in the Federal Register. This incorporation by reference was approved March 25, 1980, by the Director of the Office of the Federal Register.

**§ 70.205   Approved sampling devices; operation; air flowrate.**

(a) Sampling devices approved in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title shall be operated at the flowrate of 2.0 liters of air per minute, or at a different flowrate as prescribed by the Secretary and the Secretary of Health, Education, and Welfare for the particular device.

(b) Except as provided in paragraph (d) of this section, each approved sampling device shall be examined each shift by a person certified in accordance with § 70.202 (Certified person; sampling) during the second hour after being put into operation to assure that the sampling device is operating properly and at the proper flowrate. If the proper flowrate is not maintained, necessary adjustments shall be made by the certified person.

(c) Each sampling device shall be examined each shift by a person certified in accordance with § 70.202 (Certified person; sampling) during the last hour of operation to assure that the sampling device is operating properly and at the proper flowrate. If the proper flowrate is not maintained, the respirable dust sample shall be

transmitted to MSHA with a notation by the certified person on the dust data card stating that the proper flowrate was not maintained.

(d) Paragraph (b) of this section shall not apply if the approved sampling device is being operated in a breast or chamber of an anthracite coal mine where the full box mining method is used.

**§ 70.206   Approved sampling devices; equivalent concentrations.**

The concentration of respirable dust shall be determined by dividing the weight of dust in milligrams collected on the filter of an approved sampling device by the volume of air in cubic meters passing through the filter and then converting that concentration to an equivalent concentration as measured with an MRE instrument. To convert a concentration of respirable dust as measured with an approved sampling device to an equivalent concentration of respirable dust as measured with an MRE instrument, the concentration of respirable dust measured with the approved sampling device shall be multiplied by the constant factor prescribed by the Secretary for the approved sampling device used, and the product shall be the equivalent concentration as measured with an MRE instrument.

**§ 70.207   Bimonthly sampling; mechanized mining units.**

(a) Each operator shall take five valid respirable dust samples from the designated occupation in each mechanized mining unit during each bimonthly period beginning with the bimonthly period of November 1, 1980. Designated occupation samples shall be collected on consecutive normal production shifts or normal production shifts each of which is worked on consecutive days. The bimonthly periods are:

January 1–February 28 (29)
March 1–April 30
May 1–June 30
July 1–August 31
September 1–October 31
November 1–December 31

(b) When the respirable dust standard is changed in accordance with § 70.101 (Respirable dust standard when quartz is present), respirable dust sampling of mechanized mining units shall begin on the first production shift during the next bimonthly period following notification of such change from MSHA.

(c) Upon issuance of a citation for a violation of § 70.100(a) (Respirable dust standards) or § 70.101 (Respirable dust standard when quartz is present) involving a designated occupation in a

mechanized mining unit, paragraphs (a) and (b) of this section shall not apply to that unit until the violation is abated in accordance with § 70.201(d) (Sampling; general requirements).

(d) Each designated occupation sample shall be taken on a normal production shift. If a normal production shift is not achieved, the sample for that shift may be voided by MSHA. However, any sample, regardless of production, with a respirable dust concentration greater than 2.5 milligrams per cubic meter of air will be used to determine the average concentration for that mechanized mining unit.

(e) Unless otherwise directed by the District Manager, the designated occupation samples shall be taken by placing the sampling device as follows:

(1) *Conventional section using cutting machine.* On the cutting machine operator or on the cutting machine within 36 inches inby the normal working position;

(2) *Conventional section shooting off the solid.* On the loading machine operator or on the loading machine within 36 inches inby the normal working position;

(3) *Continuous mining section other than auger-type.* On the continuous mining machine operator or on the continuous mining machine within 36 inches inby the normal working position;

(4) *Continuous mining machine; auger-type.* On the jacksetter who works nearest the working face on the return air side of the continuous mining machine or at a location that represents the maximum concentration of dust to which the miner is exposed;

(5) *Scoop section using cutting machine.* On the cutting machine operator or on the cutting machine within 36 inches inby the normal working position;

(6) *Scoop section, shooting off the solid.* On the coal drill operator or on the coal drill within 36 inches inby the normal working position;

(7) *Longwall section.* On the miner who works nearest the return air side of the longwall working face or along the working face on the return side within 48 inches of the corner;

(8) *Hand loading section with a cutting machine.* On the cutting machine operator or on the cutting machine within 36 inches inby the normal working position;

(9) *Hand loading section shooting off the solid.* On the hand loader exposed to the greatest dust concentration or at a location that represents the maximum concentration of dust to which the miner is exposed;

(10) *Anthracite mine sections.* On the hand loader exposed to the greatest dust concentration or at a location that represents the maximum concentration of dust to which the miner is exposed.

(f)(1) Each mechanized mining unit will be assigned a four digit identification number by MSHA. The mechanized mining unit shall retain that identification number regardless of where the unit relocates within the mine.

(2) When two sets of mining equipment are provided in a series of working places and only one production crew is employed at any given time on either set of mining equipment, the two sets of equipment shall be identified as a single mechanized mining unit. When two or more mechanized mining units are simultaneously engaged in the production of material within the same working section, each such mechanized mining unit shall be identified separately.

### § 70.208   Bimonthly sampling; designated areas.

(a) Each operator shall take one valid respirable dust sample from each designated area on a production shift during each bimonthly period beginning with the bimonthly period of December 1, 1980. The bimonthly periods are:

February 1–March 31
April 1–May 31
June 1–July 31
August 1–September 30
October 1–November 30
December 1–January 31

(b) When the respirable dust standard is changed in accordance with § 70.101 (Respirable dust standard when quartz is present), respirable dust sampling of designated areas shall begin on the first production shift during the next bimonthly period following notification of such change from MSHA.

(c) Upon notification from MSHA that any respirable dust sample taken from a designated area to meet the requirements of paragraph (a) or (b) of this section exceeds the applicable standard in § 70.100 (Respirable dust standards) or § 70.101 (Respirable dust standard when quartz is present), the operator shall take five valid respirable dust samples from that designated area within 15 calendar days. The operator shall begin such sampling on the first day on which there is a production shift following the day of receipt of notification.

(d) Upon issuance of a citation for a violation of § 70.100 (Respirable dust standards) or § 70.101 (Respirable dust standard when quartz is present) involving a designated area, paragraphs (a), (b) and (c) of this section shall not apply to that designated area until the violation is abated in accordance with § 70.201(d) (Sampling; general requirements).

(e) Designated area samples shall be collected at locations to measure respirable dust generation sources in the active workings. The approved ventilation system and methane and dust control plan required by § 75.316 of this title shall show the specific locations where designated area samples will be collected. Each designated area will be assigned a four digit identification number by MSHA.

(f) MSHA approval of the operator's ventilation system and methane and dust control plan may be revoked based on samples taken by MSHA or in accordance with this Part 70.

### § 70.209   Respirable dust samples; transmission by operator.

(a) The operator shall transmit within 24 hours after the end of the sampling shift all samples collected to fulfill the requirements of this part in containers provided by the manufacturer of the filter cassette to: Respirable Dust Processing Laboratory, Pittsburgh Technical Support Center, 4800–D Forbes Avenue, Pittsburgh, Pennsylvania 15213.
Or to any other address designated by the District Manager.

(b) The operator shall not open or tamper with the seal of any filter cassette or alter the weight of any filter cassette before or after it is used to fulfill the requirements of this part.

(c) A person certified in accordance with § 70.202 (Certified person; sampling) shall properly complete the dust data card that is provided by the manufacturer for each filter cassette. The card shall have an identification number identical to that on the cassette used to take the sample and be submitted to MSHA with the sample. Each card shall be signed by the certified person and shall include that person's certification number. Respirable dust samples with data cards not properly completed will be voided by MSHA.

(d) All respirable dust samples collected by the operator shall be considered taken to fulfill the sampling requirements of Parts 70, 71 or 90 of this title, unless the sample has been identified in writing by the operator to the District Manager, prior to the intended sampling shift, as a sample to be used for purposes other than required by Parts 70, 71 or 90 of this title.

(e) Respirable dust samples received by MSHA in excess of those required by this part shall be considered invalid samples.

### § 70.210   Respirable dust samples; report to operator; posting.

(a) The Secretary shall provide the operator with a report of the following data on respirable dust samples as soon as practicable:

(1) The mine identification number;

(2) The mechanized mining unit or designated area within the mine from which the samples were taken;

(3) The concentration of respirable dust, expressed in milligrams per cubic meter of air, for each valid sample;

(4) The average concentration of respirable dust, expressed in milligrams per cubic meter of air, for all valid samples;

(5) The occupation code, where applicable; and,

(6) The reason for voiding any samples.

(b) Upon receipt, the operator shall post this data for at least 31 days on the mine bulletin board.

### § 70.220   Status change reports.

(a) If there is a change in operational status that affects the respirable dust sampling requirements of this part, the operator shall report the change in operational status of the mine, mechanized mining unit, or designated area to the MSHA District Office or to any other MSHA office designated by the District Manager. Status changes shall be reported in writing within 3 working days after the status change has occurred.

(b) Each specific operational status is defined as follows:

(1) Underground mine:

(i) *Producing*—has at least one mechanized mining unit producing material.

(ii) *Nonproducing*—no material is being produced.

(iii) *Abandoned*—the work of all miners has been terminated and production activity has ceased.

(2) Mechanized mining unit:

(i) *Producing*—producing material from a working section.

(ii) *Nonproducing*—temporarily ceased production of material.

(iii) *Abandoned*—permanently ceased production of material.

(3) Designated Area:

(i) *Producing*—activity is occurring.

(ii) *Nonproducing*—activity has ceased.

(iii) *Abandoned*—the dust generating source has been withdrawn and activity has ceased.

*    *    *    *    *

## Subpart E—Dust From Drilling Rock

**§ 70.400   Dust from drilling rock; control.**

The dust resulting from drilling in rock shall be controlled by use of permissible dust collectors, or by water, or water with a wetting agent, or by ventilation, or by any other method or device approved by the Secretary which is as effective in controlling such dust.

**§ 70.400–1   Dust from drilling rock; approved devices.**

Dust collectors approved under Part 33 (Dust Collectors For Use In Connection With Rock Drilling In Coal Mines) of this title or under Bureau of Mine Schedule 25B are permissible dust collectors for the purpose of § 70.400 (Dust from drilling rock; control).

**§ 70.400–2 . Dust from drilling rock; water**

Water used to control dust from drilling rock shall be applied through a hollow drill steel or stem or by the flooding of vertical drill holes in the floor.

**§ 70.400–3   Dust from drilling rock; ventilation.**

To adequately control dust from drilling rock, the air current shall be so directed that the dust is readily dispersed and carried away from the drill operator or any other workers in the area.

## PART 11—RESPIRATORY PROTECTIVE DEVICES—TESTS FOR PERMISSIBILITY; FEES

2. Part 11 of Subchapter B, Chapter I, Title 30, Code of Federal Regulations is amended by revising paragraph (ee) of § 11.3 as follows:

**§ 11.3   Definitions.**

\* \* \* \* \*

(ee) "Respirable dust" means dust collected with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title. Sampling device approvals issued by the Secretary of the Interior and Secretary of Health, Education, and Welfare are continued in effect.

(Sec. 101, Pub. L. 91–173 as amended by Pub. L. 95–164, 91 Stat. 1291 (30 U.S.C. 811))

## PART 71—MANDATORY HEALTH STANDARDS—SURFACE WORK AREAS OF UNDERGROUND COAL MINES AND SURFACE MINES

3. Part 71 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations is amended by revising paragraph (n) of § 71.2 as follows:

**§ 71.2   Definitions.**

\* \* \* \* \*

(n) "Respirable dust" means dust collected with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title. Sampling device approvals issued by the Secretary of the Interior and Secretary of Health, Education, and Welfare are continued in effect.

(Sec. 101, Pub. L. 91–173 as amended by Pub. L. 95–164, 91 Stat. 1291 (30 U.S.C. 811))

## PART 75—MANDATORY SAFETY STANDARDS—UNDERGROUND COAL MINES

4. Part 75 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations is amended by revising paragraph (k) of § 75.2 as follows:

**§ 75.2   Definitions.**

\* \* \* \* \*

(k) "Respirable dust" means dust collected with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title. Sampling device approvals issued by the Secretary of the Interior and Secretary of Health, Education, and Welfare are continued in effect.

(Sec. 101, Pub. L. 91–173 as amended by Pub. L. 95–164, 91 Stat. 1291 (30 U.S.C. 811))

## PART 90—PROCEDURES FOR TRANSFER OF MINERS WITH EVIDENCE OF PNEUMOCONIOSIS

6. Part 90 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations is amended by revising paragraph (g) of § 90.2 as follows:

**§ 90.2   Definitions.**

\* \* \* \* \*

(g) "Respirable dust" means dust collected with a sampling device approved by the Secretary and the Secretary of Health, Education, and Welfare in accordance with Part 74 (Coal Mine Dust Personal Sampler Units) of this title. Sampling device approvals issued by the Secretary of the Interior and Secretary of Health, Education, and Welfare are continued in effect.

(Sec. 101, Pub. L. 91–173 as amended by Pub. L. 95–164, 91 Stat. 1291 (30 U.S.C. 811))

[FR Doc. 80–10127 Filed 4–7–80; 8:45 am]

**BILLING CODE 4510-43-M**

## 30 CFR Part 75

### Ventilation System and Methane and Dust Control Plan

**AGENCY:** Mine Safety and Health Administration, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department of Labor's mandatory standard on ventilation system and methane and dust control plans, Title 30, Code of Federal Regulations, § 75.316–1 is amended to conform to the requirement of 30 CFR § 70.208(e) regarding designated area sampling of respirable coal mine dust. The rule requires that operators include in the approved ventilation system and methane and dust control plan for each mine the locations in which designated area samples will be collected.

**EFFECTIVE DATE:** November 1, 1980.

**FOR FURTHER INFORMATION CONTACT:** Edward C. Hugler, Office of the Solicitor, Mine Safety and Health, Room 434, 4015 Wilson Boulevard, Arlington, Virginia 22203, Telephone 235–1157.

**SUPPLEMENTARY INFORMATION:** On November 16, 1977, the Mining Enforcement and Safety Administration (MESA), Department of the Interior, published in the Federal Register (42 FR 59294–59300) a notice proposing amendments to Part 11 of Subchapter B and Parts 70, 71, 75 and 90 of Subchapter O, Chapter I, Title 30, Code of Federal Regulations. The proposed amendments included revisions to the respirable dust sampling procedures in 30 CFR Part 70 for underground coal mines. As part of the area sampling procedures, it was proposed that operators indicate where designated area samples would be taken in the ventilation system and methane and dust control plan required for each mine. Part 70 is published as a final rule in Part II of today's Federal Register and retains this proposed requirement.

An approved ventilation system and methane and dust control plan is required by 30 CFR 75.316 for each underground coal mine. Section 75.316–1 prescribes the information the operator must include in each plan. This final rule amends § 75.316–1 to add the information requirement that the operator's plan include the specific locations where designated area samples will be taken for purposes of Part 70, respirable dust sampling in underground coal mines. The rule therefore conforms § 75.316–1 to the provisions of the final rule for Part 70.

### Drafting Information

The principal person responsible for drafting this final rule is Edward C. Hugler, Division of Mine Safety and

# EXHIBIT E

II

113TH CONGRESS
1ST SESSION

# S. 1416

To protect miners from pneumoconiosis (commonly known as black lung disease), and for other purposes.

————————————

## IN THE SENATE OF THE UNITED STATES

JULY 31, 2013

Mr. ROCKEFELLER introduced the following bill; which was read twice and referred to the Committee on Health, Education, Labor, and Pensions

————————————

# A BILL

To protect miners from pneumoconiosis (commonly known as black lung disease), and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the ''Black Lung Health

5    Improvements Act of 2013''.

6    **SEC. 2. TECHNOLOGY RELATED TO RESPIRABLE DUST.**

7    Section 202(d) of the Federal Mine Safety and

8    Health Act of 1977 (30 U.S.C. 842(d)) is amended—

9        (1) by striking ''of Health, Education, and Wel-

10       fare''; and

2

1       (2) by striking the second sentence and insert-
2    ing the following: "Not later than 6 months after
3    the date of enactment of the Black Lung Health Im-
4    provements Act of 2013, the Secretary shall issue a
5    final regulation lowering permissible exposure levels
6    to respirable dust and updating sampling and test-
7    ing procedures, in order to provide the maximum
8    feasible protection from respirable dust, including
9    coal and silica dust, that is achievable through envi-
10   ronmental and engineering controls. Not later than
11   5 years after the date of issuance of such final regu-
12   lation, and once every 5 years thereafter, the Sec-
13   retary shall reexamine the incidence of pneumo-
14   coniosis in miners and, unless there is a decline in
15   pneumoconiosis, shall update the regulation.".

16  **SEC. 3. BLACK LUNG MEDICAL REPORTS.**

17      The Black Lung Benefits Act (30 U.S.C. 901 et seq.)
18  is amended by inserting after section 402 the following:

19  **"SEC. 403. MEDICAL REPORTS.**

20      "In any claim for benefits for a miner under this title,
21  an operator that requires a miner to submit to a medical
22  examination regarding the miner's respiratory or pul-
23  monary condition shall, not later than 14 days after the
24  miner has been examined, deliver to the claimant a com-
25  plete copy of the examining physician's report. The exam-

3

1 ining physician's report shall be in writing and shall set
2 out in detail the examiner's findings, including any diag-
3 noses and conclusions and the results of any diagnostic
4 imaging techniques and tests that were performed on the
5 miner.''.

6 **SEC. 4. GAO REPORT ON BLACK LUNG DISEASE.**

7    (a) IN GENERAL.—Not later than 1 year after the
8 date of enactment of this Act, the Comptroller General
9 of the United States shall submit to Congress a report
10 on any barriers to health care faced by people with pneu-
11 moconiosis.

12    (b) CONTENTS.—The report required under sub-
13 section (a) shall include—

14        (1) a review of the application process, includ-
15    ing the appeals process, with respect to the Black
16    Lung Disability Trust Fund established by section
17    9501 of the Internal Revenue Code of 1986;

18        (2) an assessment of possible barriers to care
19    through the Black Lung Disability Trust Fund, and
20    the degree to which any barriers impact the ability
21    of patients with legitimate medical needs, particu-
22    larly those patients in rural areas, to access treat-
23    ment for pneumoconiosis;

4

1    (3) recommendations necessary to address

2    issues, if any, relating to patient access to care

3    through the Black Lung Disability Trust Fund; and

4    (4) an evaluation of whether the current benefit

5    payments authorized under the Black Lung Benefits

6    Act (30 U.S.C. 901 et seq.) as of the date of the re-

7    port, are sufficient to meet the expenses of disabled

8    miners and survivors.

9    SEC. 5. REVIEW OF BLACK LUNG BENEFITS PROGRAM

10    FORMS.

11    (a) REVIEW OF FEDERAL BLACK LUNG BENEFITS

12 PROGRAM FORMS.—Not later than 6 months after the

13 date of enactment of this Act, the Secretary of Labor shall

14 conduct a review of the forms related to obtaining workers'

15 compensation benefits under the Black Lung Benefits Act

16 (30 U.S.C. 901 et seq.) to determine any paperwork bar-

17 riers that may exist to speedily receiving and processing

18 pneumoconiosis benefits claims and the feasibility of re-

19 ducing the forms required of applicants to such program.

20    (b) REPORT TO CONGRESS.—Not later than 1 year

21 after the date of the enactment of this Act, the Secretary

22 of Labor shall prepare and submit a report to Congress

23 regarding—

24    (1) any changes that the Department has im-

25    plemented to reduce the forms and paperwork in-

1  volved in receiving and processing pneumoconiosis
2  claims under the Black Lung Benefits Act (30
3  U.S.C. 901 et seq.); and

4      (2) any administrative barriers identified in the
5  review conducted under subsection (a) that the De-
6  partment of Labor has addressed.

**SEC. 6. GRANT FUNDS TO STUDY THE PREVENTION AND**
7
8      **TREATMENT OF BLACK LUNG DISEASE.**

9      Section 14(d) of the Mine Improvement and New
10  Emergency Response Act of 2006 (30 U.S.C. 965(d)) is
11  amended—

12      (1) by striking ''or to develop'' and inserting
13  ''to develop''; and

14      (2) by inserting '', or for research and outreach
15  related to the prevention and treatment of pneumo-
16  coniosis'' before the period at the end.

17  **SEC. 7. LEGAL FEE PAYMENT PROGRAM.**

18      The Black Lung Benefits Act (30 U.S.C. 901 et seq.)
19  is amended by inserting after section 403, as added by
20  section 3, the following:

21  **''SEC. 404. LEGAL FEES.**

22      ''(a) PROGRAM ESTABLISHED.—

23      ''(1) IN GENERAL.—Not later than 180 days
24  after the date of enactment of the Black Lung
25  Health Improvements Act of 2013, the Secretary

6

1     shall establish an attorneys' fee payment program to

2     pay attorneys' fees, using amounts from the fund,

3     on behalf of claimants in qualifying claims.

4          "(2) QUALIFYING CLAIM.—A qualifying claim

5     for purposes of this section is a contested claim for

6     benefits under this title for which a final judgment

7     has not been entered within 1 year of the filing of

8     the claim.

9          "(3) USE OF PAYMENTS FROM THE FUND.—

10    Notwithstanding   any   other   provision   of   law,

11    amounts in the fund shall be available for payments

12    authorized by the Secretary under the program

13    under this section.

14    "(b) PAYMENTS AUTHORIZED.—

15         "(1) IN GENERAL.—If a claimant for benefits is

16    a prevailing party on a qualifying claim before an

17    administrative   law   judge,   the   Benefits   Review

18    Board, or a Federal court, and the judge, Board, or

19    court approves attorneys' fees for work done before

20    it, the Secretary shall, through the program under

21    this section, pay an amount of attorneys' fees not to

22    exceed $1,500 at each stage of the administrative

23    and legal process.

24         "(2)   MAXIMUM.—The   program   established

25    under this section shall not pay more than a total

7

1    of $4,500 in attorneys' fees for any single qualifying

2    claim.

3    "(c) REIMBURSEMENT OF FUNDS.—In any case

4  where a qualifying claim results in a final order for com-

5  pensation, the employer subject to such claim shall reim-

6  burse the fund for any payments made under this section

7  on behalf of the claimant, subject to enforcement by the

8  Secretary under section 424 and in the same manner as

9  compensation orders are enforced under section 21(d) of

10  the Longshore and Harbor Workers Compensation Act

11  (33 U.S.C. 921(d)).

12    "(d) ADDITIONAL RULES.—Nothing in this section

13  shall limit or otherwise affect an employer's liability for

14  any attorneys' fees awarded by an administrative law

15  judge, the Benefits Review Board, or a Federal court, that

16  were not paid by the program under this section. Nothing

17  in this section shall limit or otherwise affect the ability

18  to use amounts provided through the fund to pay approved

19  attorneys' fees in claims for benefits under this title for

20  which a final judgment has been ordered, in cases where

21  the employer is unable to do so.

22    "(e) NO RECOUPMENT OF ATTORNEYS' FEES.—Any

23  payment for attorneys' fees made by the Secretary under

24  the program under this section shall not be recouped from

25  the claimant or the claimant's attorney.".

8

1 **SEC. 8. BLACK LUNG BENEFITS ACT TECHNICAL AND CON-**

2 **FORMING AMENDMENTS.**

3  The Black Lung Benefits Act (30 U.S.C. 901 et seq.)

4 is amended—

5   (1) in section 401(a) (30 U.S.C. 901(a)), by in-

6  serting "or who were found to be totally disabled by

7  such disease" after "such disease";

8   (2) by striking subsection (a) of section 411 (20

9  U.S.C. 921) and inserting the following:

10 "(a) The Secretary shall, in accordance with the pro-

11 visions of this part, and the regulations promulgated by

12 the Secretary under this part, make payments of benefits

13 in respect of—

14   "(1) total disability of any miner due to pneu-

15  moconiosis;

16   "(2) the death of any miner whose death was

17  due to pneumoconiosis;

18   "(3) total disability of any miner at the time of

19  his death with respect to claims filed under part C

20  prior to January 1, 1982;

21   "(4) survivors' benefits for any claim filed after

22  January 1, 2005, that is pending on or after March

23  23, 2010, where the miner is found entitled to re-

24  ceive benefits at the time of his death as a result of

25  a lifetime claim filed under part C; and

9

1                 ''(5) survivors' benefits where the miner is

2 found entitled to receive benefits at the time of his

3 death as a result of a lifetime claim filed under part

4 C before January 1, 1982.''; and

5           (3) in section 412(a) (30 U.S.C. 922(a))—

6                (A) by striking paragraph (2) and insert-

7 ing the following:

8                ''(2) In the case of a widow—

9                    ''(A) of a miner whose death is due to

10 pneumoconiosis;

11                    ''(B) in a claim filed after January 1,

12 2005, and that is pending on or after March

13 23, 2010, of a miner who is found entitled to

14 receive benefits at the time of the miner's death

15 as a result of a lifetime claim filed under part

16 C;

17                    ''(C) of a miner who is found entitled to

18 receive benefits at the time of his death as a re-

19 sult of a lifetime claim filed under part C before

20 January 1, 1982; or

21                    ''(D) in a claim filed under part C of this

22 subchapter before January 1, 1982, of a miner

23 who was totally disabled by pneumoconiosis at

24 the time of his death,

10

1 benefits shall be paid to the miner's widow (if any)

2 at the rate the deceased miner would receive such

3 benefits if he were totally disabled.'';

4    (B) in paragraph (3)—

5     (i) by striking ''(3) In the case'' and

6     all that follows through ''section 411(c)''

7     and inserting the following: ''(3)(A) In the

8     case of the child or children of a miner de-

9     scribed in subparagraph (B)''; and

10     (ii) by adding at the end the fol-

11     lowing:

12 ''(B) Subparagraph (A) shall apply in the case

13 of any child or children—

14    ''(i) of a miner whose death is due to pneu-

15    moconiosis;

16    ''(ii) in a claim filed after January 1,

17    2005, that is pending on or after March 23,

18    2010, of a miner who is found entitled to re-

19    ceive benefits at the time of his death as a re-

20    sult of a lifetime claim filed under part C;

21    ''(iii) of a miner who is found entitled to

22    receive benefits at the time of his death as a re-

23    sult of a lifetime claim filed under part C before

24    January 1, 1982;

11

1          "(iv) in a claim filed under part C before

2      January 1, 1982, of a miner who was totally

3      disabled by pneumoconiosis at the time of his

4      death;

5          "(v) of a widow who is found entitled to

6      receive benefits under this part at the time of

7      her death; or

8          "(vi) entitled to the payment of benefits

9      under paragraph (5) of section 411(c)."; and

10         (C) in paragraph (5), by striking "In the

11     case" and all that follows through "not survived

12     at the time of his death by a widow or a child,"

13     and inserting "In the case of the dependent

14     parent or parents of a miner who is not sur-

15     vived at the time of the miner's death by a

16     widow or a child and (i) whose death is due to

17     pneumoconiosis, (ii) in a claim filed after Janu-

18     ary 1, 2005, that is pending on or after March

19     23, 2010, who is found entitled to receive bene-

20     fits at the time of his death as a result of a life-

21     time claim filed under part C, (iii) who is found

22     entitled to receive benefits at the time of his

23     death as a result of a lifetime claim filed under

24     part C before January 1, 1982, or (iv) in a

25     claim filed under part C before January 1,

12

1    1982, who was totally disabled by pneumo-

2    coniosis at the time of death,''.

○

# EXHIBIT F

Case: 14-11942    Date Filed: 07/28/2014    Page: 143 of 194



September 2008

DHHS (NIOSH) Publication Number 2008-143



# The Work-Related Lung Disease Surveillance Report, 2007

The seventh of a series, the *Work-Related Lung Disease (WoRLD) Surveillance Report 2007* provides information on various work-related respiratory diseases and associated exposures in the United States. The *WoRLD Surveillance Report 2007* describes where these diseases are occurring (by industry and geographic location), who is affected (by race, gender, age, and occupation), how frequently they occur, and temporal trends. Volume 2 focuses on respiratory conditions by NORA industrial sector.

The Work-Related Lung Disease Surveillance Report, 2007 (pdfs/2008-143.pdf) [PDF - 29,885 KB]

Centers for Disease Control and Prevention  1600 Clifton Rd. Atlanta, GA 30333, USA
800-CDC-INFO (800-232-4636) TTY: (888) 232-6348 - Contact CDC–INFO



# EXHIBIT G

# HHS.gov

**U.S. Department of Health & Human Services**

## Historical Highlights

*The U.S. Department of Health and Human Services (HHS) serves as the nations principal agency for protecting the health of all Americans, and providing essential human services. HHS has enjoyed many highlights since becoming a separate agency, while its roots go back as far as the early days of our nation.*

Below is a list of major events in HHS history and a list of the Secretaries of HHS/HEW.

### 2010

The Affordable Care Act was signed into law, putting in place comprehensive U.S. health insurance reforms.

### 2003

The Medicare Prescription Drug Improvement and Modernization Act of 2003 was enacted; the most significant expansion of Medicare since its enactment, including a prescription drug benefit.

### 2002

Office of Public Health Emergency Preparedness was created to coordinate efforts against bioterrorism and other emergency health threats.

### 2001

The Centers for Medicare & Medicaid was created, replacing the Health Care Financing Administration.

HHS responds to the nation's first bioterrorism attack -- delivery of anthrax through the mail.

### 2000

Publication of human genome sequencing.

### 1999

The Ticket to Work and Work Incentives Improvement Act of 1999 was signed, making it possible for millions of Americans with disabilities to join the workforce without fear of losing their Medicaid and Medicare coverage. It also modernized the employment services system for people with disabilities.

Initiative to combat bioterrorism was launched.

### 1997

Case: 14-11942    Date Filed: 07/28/2014    Page: 146 of 194

The State Children's Health Insurance Program (SCHIP) was created, enabling states to extend health coverage to more uninsured children.

**1996**

Welfare reform under the Personal Responsibility and Work Opportunity Reconciliation Act was enacted.

The Health Insurance Portability and Accountability Act (HIPAA) was enacted.

**1995**

The Social Security Administration became an independent agency.

**1993**

The Vaccines for Children Program was established, providing free immunizations to all children in low-income families.

**1990**

The Human Genome Project was established.

The Nutrition Labeling and Education Act was passed, authorizing the food label.

The Ryan White Comprehensive AIDS Resource Emergency (CARE) Act began providing support for people with AIDS.

**1989**

The Agency for Health Care Policy and Research (now the Agency for Healthcare Research and Quality) was created.

**1988**

The JOBS program and federal support for child care was created.

The McKinney Act was passed to provide health care to the homeless.

**1984**

National Organ Transplantation Act was signed into law.

**1981**

Identification of AIDS. In 1984, the HIV virus was identified by PHS and French scientists. In 1985, a blood test to detect HIV was licensed.

**1980**

Federal funding provided to states for foster care and adoption assistance.

**1979**

The Department of Education Organization Act was signed into law, providing for a separate Department of Education. HEW became the Department of Health and Human Services, officially arriving on May 4, 1980.

**1977**

The Health Care Financing Administration was created to manage Medicare and Medicaid separately from the Social Security Administration.

Worldwide eradication of smallpox, led by the U.S. Public Health Service.

**1975**

Child Support Enforcement program was established.

**1971**

National Cancer Act was signed into law.

**1970**

The National Health Service Corps was created.

**1966**

International Smallpox Eradication program was established.

Community Health Center and Migrant Health Center programs were launched.

**1965**

Medicare and Medicaid programs were created, making comprehensive health care available to millions of Americans.

Older Americans Act created the nutritional and social programs administered by HHS' Administration on Aging.

Head Start program was created.

**1964**

Release of the first Surgeon General's Report on Smoking and Health.

**1962**

The Migrant Health Act was passed, providing support for clinics serving agricultural workers.

**1961**

First White House Conference on Aging.

**1955**

Licensing of the Salk polio vaccine.

Case: 14-11942    Date Filed: 07/28/2014    Page: 148 of 194

Indian Health Service was transferred to HHS from the Department of Interior.

**1953**

*The Cabinet-level Department of Health, Education and Welfare was created under President Eisenhower, officially coming into existence April 11, 1953. In 1979, the Department of Education Organization Act was signed into law, providing for a separate Department of Education. HEW became the Department of Health and Human Services, officially arriving on May 4, 1980. Some highlight dates in HEW and HHS history:*

**1946**

Communicable Disease Center was established, forerunner of the Centers for Disease Control and Prevention.

**1939**

The Federal Security Agency was created, bringing together related federal activities in the fields of health, education and social insurance.

**1938**

The Federal Food, Drug and Cosmetic Act was passed.

**1935**

The Social Security Act was passed.

**1930**

The National Institute (late Institutes) of Health was created out of the Public Health Service's Hygienic Laboratory.

**1921**

The Bureau of Indian Affairs Health Division was created, forerunner to the Indian Health Service.

**1912**

President Theodore Roosevelt's first White House Conference urged creation of the Children's Bureau to combat exploitation of children.

**1906**

The Pure Food and Drugs Act was passed, authorizing the government to monitor the purity of foods and the safety of medicines, now a responsibility of the FDA.

**1902**

Conversion of the Marine Hospital Service into the Public Health and Marine Hospital Service in recognition of its expanding activities in the field of public health. In 1912, the name was shortened to the Public Health Service.

**1891**

Immigration legislation was passed, assigning the Marine Hospital Service the responsibility for medical examination of arriving immigrants.

**1887**

The federal government opened a one-room laboratory on Staten Island for research on disease, thereby planting the seed that was to grow into the National Institutes of Health.

**1878**

The National Quarantine Act was passed, beginning the transfer of quarantine functions from the states to the federal Marine Hospital Service.

**1871**

Appointment of the first Supervising Surgeon (later called Surgeon General) for the Marine Hospital Service, which had been organized the prior year.

**1862**

President Lincoln appointed a chemist, Charles M. Wetherill, to serve in the new Department of Agriculture. This was the beginning of the Bureau of Chemistry, forerunner to the Food and Drug Administration.

**1798**

Passage of an act for the relief of sick and disabled seamen, which established a federal network of hospitals for the care of merchant seamen, forerunner of today's U.S. Public Health Service.

## Secretaries of HHS and HEW

The Secretary is a member of the President's Cabinet. Nominations to the office of Secretary are referred to the U.S. Senate Committee on Health, Education, Labor and Pensions, as well as the U.S. Senate Committee on Finance. Confirmation is last considered by the full U.S. Senate.

**June 9, 2014 - Present**

- Sylvia M. Burwell

**April 28, 2009 – June 6, 2014**

- Kathleen Sebelius (Archive Collection)

**January 26, 2005 - January 20, 2009**

- Michael O. Leavitt (Archive Collection)

**February 2, 2001 - January 26, 2005**

- Tommy G. Thompson

Case: 14-11942    Date Filed: 07/28/2014    Page: 150 of 194

**January 22, 1993 - January 20, 2001**

- Donna E. Shalala

**March 1, 1989 - January 20, 1993**

- Louis W. Sullivan, M.D

**December 13, 1985 - January 20, 1989**

- Otis R. Bowen, M.D.

**March 9, 1983 - December 13, 1985**

- Margaret M. Heckler

**January 22, 1981 - February 3, 1983**

- Richard S. Schweiker

**August 3, 1979 - January 20, 1981**

- Patricia Roberts Harris

**January 25, 1977 - August 3, 1979**

- Joseph A. Califano, Jr.

**August 8, 1975 - January 20, 1977**

- David Mathews

**February 12, 1973 - August 8, 1975**

- Caspar W. Weinberger

**June 24, 1970 - January 29, 1973**

- Elliot L. Richardson

**January 21, 1969 - June 23, 1970**

- Robert H. Finch

**May 16, 1968 - January 20, 1969**

- Wilbur J. Cohen

**August 18, 1965 - March 1, 1968**

- John W. Gardner

**July 31, 1962 - August 17, 1965**

- Anthony J. Celebrezze

Case: 14-11942    Date Filed: 07/28/2014    Page: 151 of 194

**January 21, 1961 - July 13, 1962**

- Abraham Ribicoff

**August 1, 1958 - January 19, 1961**

- Arthur S. Flemming

**August 1, 1955 - July 31, 1958**

- Marion B. Folsom

**April 11, 1953 - July 31, 1955**

- Oveta Culp Hobby

---

Content created by Assist. Sec./Public Affairs - Digital Communications Division

Content last reviewed on June 6, 2014

# EXHIBIT H

**End Black Lung Frequently Asked Questions**

---

| Expand All | Collapse All |

These Frequently Asked Questions, received from stakeholders at meetings and via email, will be updated on an ongoing basis. If you have questions not answered here, please submit them to askMSHA@dol.gov.

### Respirable Dust Standard

Sampling Devices

1. When are mine operators required to use a control filter with the gravimetric sample (CMDPSU)? Are control filters required for every sample collected? Will this affect sampling the outby designated area (DA)?
   Starting August 1, 2014, mine operators are required to use a control filter with each gravimetric sample (CMDPSU) collected. For instance, if a mine has 4 mechanized mining units (MMUs) and four gravimetric samples are taken for the designated occupations (DOs) then four control filters are required. For outby DAs, if one gravimetric sampler is placed in the outby area then one control filter is needed. If the outby DAs are located along a beltline with two or three outby DAs present, the operator can sample all of the DAs on the same shift and day and use one control filter to represent the outby area. The control filter must remain in the outby area for the entire shift.

2. We have collected samples with the gravimetric sampler since the first requirement to do sampling. We have never needed to submit a control filter. Why do we now need to submit this control filter? What is the additional cost for the control filter?

   Starting August 1, 2014, mine operators are required to use a control filter with each gravimetric sample (CMDPSU) collected. For instance, if a mine has 4 mechanized mining units (MMUs) and four gravimetric samples are taken for the designated occupations (DOs) then four control filters are required. For outby DAs, if one gravimetric sampler is placed in the outby area then one control filter is needed. If the outby DAs are located along a beltline with two or three outby DAs present, the operator can sample all of the DAs on the same shift and day and use one control filter to represent the outby area. The control filter must remain in the outby area for the entire shift.

3. The gravimetric sampler has previously been used to collect respirable coal mine dust samples on shifts for up to 8 hours. The final rule requires that I collect samples for the full shift, which is 10 hours at my mine. Does the gravimetric sampler run the full shift? If not, how do I sample the full shift? (70.201, 71.201, 90.201)

   The approved gravimetric sampler with a fully-charged battery should operate for a 10-hour shift. If a sampler does not operate for the full shift, you should switch out the sampling pump at the sampling location. This pump exchange must be performed by a person certified in sampling.

4. If a CPDM and CMDPSU are operated side-by-side and sampling the same occupation at the same time, will the results be the same for each sampler?

   When two samplers are used at the same location and at the same time, and the inlets are separated by only a few inches, there will be variability, or differences in measured concentrations, related to location even when the samplers are identical, i.e., 2 CMDPSUs or 2 CPDMs, or when a CPDM and a CMDPSU are used. This variability does not affect the accuracy of the samplers. MSHA and NIOSH jointly approved the CPDM under 30 CFR Part 74 for use in underground coal mines, and determined that the device was accurate, precise, reliable, and durable under in-mine conditions.

5. Can an operator use a CPDM while conducting compliance sampling with a CMDPSU or while MSHA is conducting sampling?

   The use of the CPDM is a valuable tool that may be used in determining whether the respirable dust controls in use are adequately protecting miners. Miners and mine operators can use the data from the CPDM to assess the effectiveness of dust controls in different mining conditions and make adjustments to the controls or mining system to prevent miners from overexposure to respirable coal mine dust. For the CPDM to be used effectively as an engineering tool, the operator should use the CPDM more than just during operator or MSHA sampling. The District Manager will look closely at the mine's ventilation plan to determine whether the plan adequately addresses the controls used. If the operator uses controls to maintain dust levels to achieve compliance with the standard based on the CPDM data, and those controls are not included in the ventilation plan, then the District Manager would consider requiring those controls in ventilation plan revisions, if necessary.

6. Does the control filter cassette have to be removed from the plastic bag to be taken underground? Does this cassette remain capped?

   Yes. The control filter cassette is removed from the plastic bag but remains capped during sampling, either underground or on the surface.

7. Do the control filter cassettes have a tamper-resistant seal on the end cap from the factory?

   No. There is no tamper-resistant seal on the end caps from the factory.

Sampling at Surface Operations

1. Is sampling required at preparation plants? (71.1, 71.206)

Case: 14-11942     Date Filed: 07/28/2014     Page: 154 of 194

Yes. The sampling requirements in 30 C.F.R. part 71 apply to all surface coal mines and surface work areas of underground coal mines.

2. What do I do with the sampling pump if the bulldozer breaks down during the shift? Do I let the sampler run the entire shift? (71.201)

MSHA is not changing current procedures for sampling DWPs. The sampler stays with the DWP. If that DWP is assigned other duties because the bulldozer breaks down, the sampler goes with that DWP.

3. I operate a surface mine and have never had a DWP under the previous standards. Why does the rule require sampling of all highwall drills and bulldozers?

The final rule requires each highwall drill operator to be sampled since historical sampling data and MSHA experience indicate that these positions have the greatest potential of being overexposed to respirable quartz and respirable coal mine dust. Bulldozer operators are DWPs since they have similar risks and need additional protection. However, under the final rule, some bulldozer operators could be exempt from sampling requirements. Mine operators with multiple bulldozer operators must sample the DWP exposed to the greatest respirable dust concentration in each work position performing the same activity or task at the same location at the mine and exposed to the same dust generation source.

4. In identifying a DWP, am I required to identify the name of the miner in that position?

No, the miner's name is not required. Under section 71.206(d), an operator must provide the District Manager with a list identifying the specific work positions where DWP samples will be collected.

5. Who is going to determine the DWP numbers whether it be the highwall drill operator, the bulldozer operator, etc.? (71.206)

By October 1, 2014, mine operators must provide the District Manager with a list identifying the specific work positions where the DWP samples will be collected. MSHA will assign a DWP number to each entity submitted by the mine operator and will notify the mine operator.

6. Does a miner have to operate a bulldozer for a certain amount of time each day to be a DWP? (71.206)

No, a DWP is not dependent on the amount of time it is operated. The DWPs are designated in the final rule and include highwall drill operators, bulldozer operators and any other work positions designated by the District Manager.

7. How are highwall drill operators (DWPs) that work at various mine sites or work intermittently at a mine site sampled? (71.206)

Each highwall drill operator is a DWP and must be sampled at the mine where it operates, even if it operates for only one shift.

8. If a mine operator runs a drill on all three shifts, is the operator required to sample the drill as a DWP on one shift per quarter or is the operator required to sample the drill on all three shifts? (71.206)

DWP samples are not required on all shifts. If a mine operator has a highwall drill that is operated on three shifts, the mine operator is required to collect one sample from that DWP on one shift per quarter.

9. If I have multiple bulldozer operators at my mines performing different work, will I need to designate each bulldozer operator as a DWP? (71.206)

If each bulldozer operator at a mine site is performing a different function, each bulldozer operator must be established as a DWP in accordance with section 71.206(c)(2). For example, if one bulldozer operator pushes overburden and another bulldozer operator performs reclamation work at the same location then each bulldozer operator is a DWP. However, in accordance with section 71.206(d), if multiple bulldozer operators push overburden and multiple bulldozer operators perform reclamation work, then the mine operator must sample one bulldozer operator exposed to the greatest concentration of respirable dust pushing overburden and one bulldozer operator exposed to the greatest concentration of respirable dust performing reclamation work.

10. If I have two bulldozers now, designated as DWP 003 and 004, must I sample one or both on August 1, 2014? (71.206)

All currently established DWPs will continue as DWPs on August 1, 2014.

11. We have multiple pits under one identification number and one highwall drill operator and one bulldozer operator that go to several different pits. Do I still need one sample per quarter since the pits are under one mine ID? (71.206)

Sampling is based on the DWPs at each mine. If a highwall drill operator and a bulldozer operator work at multiple pits at your mine, the highwall drill operator is one DWP and the bulldozer operator is one DWP. You will need to collect one sample from each DWP at the mine.

12. If the company has five bulldozer operators who are all performing the same duty and we selected the one bulldozer operator with the greatest dust exposures to be a DWP, under what circumstances would MSHA designate other specific work positions to be sampled? (71.206)

The District Manager may, under section 71.206(m), designate additional work positions for sampling at a surface coal mine and at a surface work area of an underground coal mine where a concentration of respirable dust exceeds 50 percent of the standard in effect at the time the sample is taken, or exceeds 50 percent of the reduced standard when quartz is present.

13. When improvements are made to equipment that reduce respirable dust levels, can the DWP be reassigned or removed? (71.206)

The rule requires that all highwall drill operators be sampled as DWPs. At least one bulldozer operator must be sampled as a DWP and the mine operator must contact the District Manager regarding a change of DWP status.

14. If a load-out operator runs a bulldozer for seven hours a day and then operates a loader to refill stockpiles, does a DWP need to be assigned? Is the individual considered a DWP because a certain amount of time during the shift was spent operating a dozer? (71.206)

If a load-out operator runs a bulldozer for seven hours a day and then operates a loader for stockpile refills, the designated work position is the bulldozer operator. The DWP must be sampled for the full shift and includes normal duties.

15. Miners doing reclamation work at a site, will they be assigned a Designated Work Position (DWP)? (71.206)

If reclamation work is done at a mine, then the operator must sample the DWPs listed in the final rule which include bulldozer operators and other work positions designated by the District Manager.

16. What should a mine operator do if a piece of equipment is off mine property when sampling needs to be conducted? Does the mine operator have to notify MSHA when a piece of equipment is off mine property? (71.209) (at underground mines, 70.212)

Yes, the mine operator must report a change in operational status each time the equipment is moved off mine property. The status change has to be reported within three working days after the equipment leaves mine property.

17. If a quarterly sample from a DWP exceeds the respirable dust standard, and that DWP is not always on mine property, how are we supposed to collect 5 follow-up samples from that DWP? (71.206)

On notification from MSHA that a DWP sample exceeds the standard, the operator must, within 15 calendar days of notification, sample the DWP on each normal work shift until five samples are taken in accordance with section 71.206(g). If the DWP leaves the mine site before all five samples are collected (e.g., two out of five samples were collected), the mine operator must report a change in operational status and continue sampling the DWP on the first shift the DWP returns until five valid representative samples are taken.

18. When a DWP is found to be out of compliance, does the operator have to establish a separate plan for the surface?(71.300)

If you have a DWP that is out of compliance on the surface, you must submit a separate dust control plan for that entity within 15 days after termination of the citation in accordance with section 71.300. Under section 71.301, the District Manager will approve this dust control plan.

19. If a sample from a bulldozer operator exceeds the standard, where should the five additional samples be taken if the bulldozer has been moved to a different location on or off the mine. Does the mine operator sample the machine, the person, or the location? (71.206)

If a sample from the bulldozer operator exceeds the standard and the bulldozer is moved to another location either on or off the mine, the five additional DWP samples will be taken on the bulldozer or bulldozer operator working closest to the location or activity that was being performed when the standard was exceeded.

20. In the past, bulldozer operators were removed from DWP status after several sampling periods. What happens after August 1st? Will they be redesignated as DWPs? (71.206)

By October 1, 2014, the final rule requires each mine operator to provide the District Manager a list identifying the work positions where DWP samples will be collected. MSHA will review the list and may designate additional bulldozer operators as DWPs.

Sampling at Underground Operations

1. If a miner does not complete the normal shift for the occupation, does the Sampling Devices stay with the miner or does the device transfer to the machine? (70.201)
   MSHA requires sampling of occupations at underground coal mines for the full shift. For example, if a miner operating a continuous mining machine leaves the working section before the normal shift for that occupation ends, than the Sampling Devices is transferred to the miner who takes over the operation of the continuous mining machine. The Sampling Devices stays with the occupation throughout the entire shift.

2. August 1, 2014 is the middle of a bimonthly period for mechanized mining units (MMUs). If the operator completes the MMU bimonthly sampling prior to August 1, 2014, will that satisfy the sampling requirement or will additional samples be required that follow the new rule guidelines after August 1? (70.206)

If a mine operator has completed bimonthly sampling of MMUs under the existing standards by August 1, 2014, the existing sampling requirements are satisfied. The first bi-monthly sampling period of MMUs under the new rule is September 1-October 31, 2014.

3. If we have a super section with two MMUs and we have two shuttle cars behind each continuous mining machine and another shuttle car between the two MMUs, how do you sample the shuttle cars? (70.208)

If you are using blowing face ventilation or you have split ventilation providing air to both units, you must sample the shuttle cars as ODOs. Each ODO must be sampled with that MMU. If there is a shuttle car that travels between both MMUs during production, an operator must sample that shuttle car according to one of the following sampling procedures: 1) The shuttle car that travels between each MMU can be given a unique number so that it can be identified as the shuttle car that services both MMUs. Under this sampling procedure, the operator of the shuttle car that travels between each MMU can wear one CPDM, both MMUs' shuttle cars must be sampled at the same time; or, 2) The operator can sample all shuttle cars on one MMU and then sample all shuttle cars on the other MMU. Under this sampling procedure, sampling does not occur at the same time and the shuttle car that travels between both MMUs is sampled twice.

4. I use blowing face ventilation. Why do I need to sample my shuttle cars while those using exhausting face ventilation are not required? (70.208)

   The need to sample shuttle cars on blowing face ventilation is because these occupations are in the return air from the continuous mining machine and are subject to exposure to higher concentrations of respirable dust.

5. I am in the middle of collecting my 15 samples for the DO when the continuous mining machine breaks down. It will take 3 days to repair the machine. Do I have to start the consecutive shift sampling all over? (70.208, 70.212)

   The rule requires that MSHA be notified of a change in operational status that affects sampling of the mechanized mining unit (MMU). MSHA must be notified within 3 working days after the status change has occurred. If you notify MSHA that this MMU is in nonproducing status, then the consecutive shift sampling will be put on hold. Once the equipment is repaired and you begin operating the MMU, you must notify MSHA that the MMU is back in producing status. You must immediately resume your consecutive shift sampling to obtain the 15 samples required. This process allows you to resume the consecutive shift sampling requirement where you left off.

5. MSHA is making me put a lot more rock dust in my mine. How am I supposed to meet this rock dust requirement and still comply with the new respirable dust standard on each shift? (70.100, 70.101)

   Rock dust is required to prevent coal mine dust explosions. The respirable dust samples from underground mines do not reflect an increase in respirable dust levels with rock dusting increases since 2010. Rather, the average respirable dust concentrations have been dropping steadily since 2010. Mine operators should obtain from suppliers rock dust that has as little respirable size particles as possible and exercise care in the application of the rock dust to limit the exposure of miners who are working downwind. These actions will reduce or eliminate the potential impact on respirable coal mine dust levels.

Quartz

1. Can operators do optional quartz sampling after 8/1/14? (70.100, 70.101)
   Starting August 1, 2014, MSHA will no longer accept operator quartz samples for analysis. MSHA will analyze only MSHA inspector samples for quartz to establish the dust standard.

2. If the 0.1 mg/m3 (100 µg/m3) quartz standard is exceeded, will MSHA issue a citation? (70.101, 71.101, 90.101)

   No. Quartz will be addressed as it is under the existing standard, that is, through a reduced dust standard.

3. Is the citation level for a reduced respirable dust standard when quartz is present based on the new Excessive Concentration Values (ECV)? (70.101, 71.101, 90.101)

   Yes, on August 1, 2014, Excessive Concentration Values (ECV) will be used to determine compliance on all respirable dust samples.

4. Under the existing standards for underground coal mines, a new reduced standard due to the presence of quartz begins on the first production shift during the next bimonthly sampling cycle. Will that continue under the final rule? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

   No. Under the final rule, when the respirable dust standard is changed due to the presence of quartz, the new reduced standard becomes effective 7 days after the date of notification of the new standard by MSHA.

5. If a reduced standard due to the presence of quartz is in effect when MSHA takes a dust sample, will the sample be subject to the standard in effect on the day the sample was taken? (70.101, 71.101, 90.101)

   The final rule does not change MSHA's procedure for evaluating compliance with a reduced respirable dust standard. The sample will be subject to the standard in effect on the day the MSHA sample was taken.

6. Under the final rule, operator samples will not be analyzed for quartz. Will MSHA inspectors be using gravimetric samplers (CMDPSU)? (70.101, 71.101, 90.101)

   Yes, MSHA will use gravimetric samplers when analyzing sampling results for quartz.

7. If we are on a reduced standard due to quartz on July 31, 2014, what happens on August 1, 2014? (70.101, 71.101, 90.101)

   If a reduced standard is in effect on July 31, 2014, the same reduced standard is in effect on August 1, 2014.

8. How often will samples be analyzed for quartz? (70.101, 71.101, 90.101)

   MSHA samples will be analyzed for quartz once each quarter.

9. How is a reduced standard established based on the percentage of quartz? (70.101, 71.101, 90.101)

   A reduced standard is based on the formula in the final rule which is the same formula in the existing standards. The standard in the final rule is designed to limit a miner's exposure to respirable quartz to 0.1 mg/m3 (100 µg/m3) based on the existing 2.0 mg/m3 respirable dust standard.

Compliance/Corrective Action/Citations

1. What are the ECVs? Why are there so many different ECVs? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)
   The ECVs (Excessive Concentration Values) are the levels which have been determined to show, with 95% confidence, that a single sample or the average of a specific number of samples has exceeded the applicable respirable dust standard. There are

Case: 14-11942     Date Filed: 07/28/2014     Page: 157 of 194

2 ECV tables in parts 70, 71, and 90. Tables 70-1, 71-1 and 90-1 apply to single full-shift samples using either the gravimetric (CMDPSU) or CPDM sampler. Tables 70-2, 71-2 and 90-2 apply to averages of more than one single full-shift sample using either the CMDPSU or CPDM.

2. What corrective actions am I required to take? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

Acceptable corrective actions that would lower dust exposures are determined by the mine operator based on an evaluation as to the cause of the high dust concentration. In most cases, corrective actions include increasing air, water pressure or water sprays; replacing or unplugging water sprays and tightening ventilation controls; more frequent checking and cleaning of dust filters or dust collectors; or a different placement of ventilation controls or water sprays; or repositioning of a miner. It may require increased checking of the dust controls during the shift to make sure they are in place. It could be monitoring with CPDMs to identify what may be causing excessive dust levels and correcting the conditions found. These are examples of the several options for mine operators to consider.

3. Since it takes days to get CMDPSU sample results from the MSHA lab, when do I take corrective action? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

When you receive notice from MSHA of the sampling results.

4. MSHA has stated that it will use a single full-shift sample to make a noncompliance determination. If multiple occupations are found to meet or exceed the ECV, will MSHA issue a citation for each overexposure? (72.800)

If multiple MSHA samples taken at roughly the same time indicate overexposures, MSHA will evaluate the dust generation sources. If the dust is generated from a common source (i.e., the operation of the continuous mining machine), then one citation would be issued listing all overexposures in the citation. However, when dust is generated from multiple sources requiring multiple corrective actions, then more than one citation may be issued. For an MMU using split ventilation, if excessive dust levels are found on two occupations (e.g., the shuttle car operator and the roof bolting machine operator) that operate in different splits of intake air, then two citations would be issued. Both citations would require corrective actions to reduce dust levels in the two different areas of the MMU.

5. What controls or changes would have to be made to terminate the citation for meeting or exceeding the ECV? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

It depends on the conditions or circumstances. Dust control parameters in the approved Mine Ventilation Plan, including revised parameters that reflect control measures to abate the citation must be followed by the mine operator. Such measures may involve more air; more water pressure; addition of water sprays or changes in spray design, patterns or locations; improved dust filtering; adding shield tip sprays or shield mist sprays for shield tops; using water infusion in coal blocks to be mined; and other engineering controls.

6. Can a mine operator's corrective action consist of new technology? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

Yes. The corrective action can consist of new technology. The corrective action must be recorded in a book. The mine operator is in the best position to decide if the ventilation plan needs to be revised to incorporate the new technology.

7. Is retraining an employee considered a corrective action? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

Providing training to a miner may be considered a corrective action. Engineering controls and work practices such as repositioning a miner may be used to address any sample that meets or exceeds the ECV. Under some circumstances, miners may need additional training if they have failed to use appropriate controls already provided or have used those controls ineffectively. For example, retraining a miner on how to properly hang a ventilation curtain may be a corrective action if it results in lowering the dust concentration to the standard.

8. How do I know what corrective action to take if I do not remember what the conditions were during the sampling? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

The results of the On-Shift Examinations required by the final rule will provide mine operators with additional information on the type of corrective actions needed. Mine operators are in the best position to know, and evaluate what the conditions were at the time of the sampling. Mine operators will be able to review the On-Shift Examination record of the shift on which the excessive dust concentration occurred. This review will help mine operators identify the cause of the excessive concentration when sampling was conducted so that immediate corrective actions can be taken to eliminate the problem.

9. What action is required if I receive a citation for meeting or exceeding the ECV? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

The final rule requires that you: (1) provide respiratory protection to affected miners,(2) take immediate corrective action to comply with the respirable dust standard, (3) record the corrective action taken, and (4) begin sampling within 8 days after the citation is issued. The citation will be terminated when each of the required abatement samples complies with the respirable dust standard. At underground coal mines, revised dust control parameters as part of the Mine Ventilation Plan must be submitted and approved by MSHA.

10. Is fit testing required when operators provide respiratory equipment to miners? (72.700)

No. Respirator training is required that includes the care, fit, use, and limitations of each type of respirator that is made available.

11. What happens if I don't start sampling within 8 days after I receive a citation? (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)

Unless you have notified MSHA and received an extension of time, it is a violation.

12. If one sample meets or exceeds the ECV, is the immediate corrective action required to be included in the Mine Ventilation Plan? (70.206, 70.207, 70.208, 70.209)

No. However, if the corrective action taken after one sample meets or exceeds the ECV is a type of control that should be implemented on all shifts to maintain dust levels to comply with the standards, then this action should be included in the Mine Ventilation Plan.

13. When is a ventilation plan revision required? (70.206, 70.207, 70.208, 70.209)

A ventilation plan revision is required after a citation is issued. To terminate the citation, the operator must take five valid representative samples that are all at or below the applicable standard, the operator must submit to the District Manager revised dust control parameters as part of the Mine Ventilation Plan, and the revisions must be approved by the District Manager. The revised parameters must show the control measures used by the operator to lower the concentration to at or below the standard.

13. If one DWP sample taken by a mine operator exceeds the ECV, the operator takes corrective action, and records the corrective action, does the operator have to send a respirable dust control plan to the MSHA district manager? (71.300)

No. The operator needs to submit a respirable dust control plan specific to the DWP to the District Manager if a citation is issued and terminated.

14. Will I be cited for not complying with the mine ventilation plan if the corrective action taken wasn't in the plan? (70.206, 70.207, 70.208, 70.209)

No. The mine operator will not be cited if the corrective action is not in the mine ventilation plan.

15. If we have one sample that exceeds the ECV and we take a specific corrective action, do we have to continue with this corrective action on each subsequent shift or just for this one occurrence? (70.206, 70.207, 70.208, 70.209)

It depends on the circumstances. If you determine that this corrective action is necessary to continuously maintain dust levels below the ECV, the corrective action taken should be included as part of the mine ventilation plan. However, if you determine that the corrective action is not needed to continuously maintain dust levels below the ECV, the corrective action does not have to be included in the ventilation plan.

Engineering Controls/Best Practices

1. What controls does MSHA think I can use to lower the dust levels in my mine? I am doing all I can now. (70.206, 70.207, 70.208, 70.209, 71.206, 90.207)
Existing engineering controls are available that can be used to reduce the respirable coal mine dust concentrations in the mine. MSHA has reviewed the engineering controls in use on many inspection surveys to evaluate whether using additional engineering controls would have likely reduced the dust concentration to levels at or below the standard. Survey results indicated that additional or adjustment to controls would likely reduce respirable dust concentrations. MSHA determined that many MMUs could: increase air quantity, air velocity, the number of water sprays, and water pressure; change the type of sprays and/or direction of sprays, balance the quantity of air delivered to the face with the scrubber air quantity; change the type of screen that is used in the scrubber system, and/or change from blowing face ventilation to exhausting face ventilation. Changing dust controls was an option at all MMUs that MSHA reviewed. On some MMUs that used blowing face ventilation and a scrubber, the air quantity provided was less than the scrubber air quantity, causing an imbalanced system and the potential for respirable dust overexposures. Because the amount of air available at the last open crosscut was greater than at the face, the air could easily be increased at the face to provide greater protection of miners' health. The number of water sprays, while important, is not the only spray variable affecting dust control; the location, flow rate, spray pattern, and droplet size are variables that impact dust levels where miners work. MSHA will provide compliance assistance on dust controls that are available and practical and hold workshops for interested stakeholders to disseminate this information.

2. Why not use airstream helmets or respirators or other personal protective devices? (72.700)

The Mine Act requires that mine operators provide miners with a safe environment. The Mine Act specifically states, "Use of respirators shall not be substituted for environmental control measures in the active workings." MSHA believes that reducing the amount of dust miners are exposed to is the best way to ensure a healthful work place for miners, as the Mine Act requires. Operators are not only allowed to use respirators as a supplemental control, they are required to make NIOSH-approved respiratory equipment available to all miners affected by an overexposure as determined by either an MSHA- or operator-collected respirable dust sample. Personal protective equipment, such as airstream helmets or respirators, are supplemental controls that operators may use, but they are not a substitute for engineering controls – and engineering controls exist and are used today that can maintain respirable dust levels at or below the standard.

Recordkeeping

1. The rule says I have to record the amount of material produced on each MMU during each production shift. How am I supposed to determine that without belt scales? (70.201)
The final rule requires that the production of material be recorded for each MMU on each shift. If you do not have scales located to provide that information, then an alternative method must be used. An alternative method may be to determine during each shift the distance of advance along with a calculation to transform that distance into tonnage based on the material being mined (total material including coal and rock).

2. If I have a shift on which I normally produce but for some reason I do not produce any material, then do I record zero production and include that in the 30-shift average for determining a normal production shift? (70.201)

*Revised July 1, 2014: Under section 70.201(g), the operator is required to record the amount of run-of-mine material (coal and rock) produced by each MMU during each shift. Zero production will not be included to establish the 30-shift average for determining a normal production shift. The 30-shift average represents typical production levels and mining conditions.

3. The record of corrective action taken is to be certified by the mine foreman or equivalent mine official. Who is an equivalent mine official?

As with other existing MSHA Recordkeeping requirements, an equivalent mine official is any person with authority, who is informed of mine conditions, and who can implement any necessary changes to maintain compliance with respirable dust standards.

4. What is a secure book? Can I purchase a diary or do I have to use a book issued by MSHA?

A secure record book is one that is not susceptible to alteration. MSHA does not issue record books.

5. Can records of shift length and production for each shift be electronically recorded?

Yes, you are allowed to electronically record the shift length and production for each shift provided the records are secure and not susceptible to alteration.

6. Do the records have to be kept at the mine site, or can they be at the central office?

As with other existing MSHA Recordkeeping requirements, the regulations require that these records must be made readily available to MSHA inspectors.

7. The certified person who assembles the pumps does not have to be the same certified person that does the On-Shift Examinations(s) of the pump and signs the dust card, is that a correct interpretation? If not, someone will be working a 14 to 15 hour shift.

Yes, the certified person who assembles the sampling pumps does not need to be the same certified person who conducts the On-Shift Examination.

8. We assume that the practice of requiring a shift to be 480 minutes with a +/- 15 minute leeway will go away on August 1, 2014 and the dust card will be filled in with the exact minutes that the sample runs portal to portal. Is that correct?

Correct.

Training and Certification

1. I am currently certified by MSHA to collect samples. Do I have to attend a class and pass the test to be certified again? How long is my certification good? (70.202, 70.203, 71.202, 71.203, 90.202, 90.203)
Those persons currently certified to collect respirable dust samples under the previous standards will continue to be certified under the new requirements and do not need to take a class to continue their certification. Persons currently certified must be recertified every 3 years under the new rule. The certification for Sampling and the certification for Maintenance and Calibration are good for 3 years. You must recertify by taking and passing the MSHA tests.

2. Who conducts the certification training? Are MSHA personnel who conduct sampling certified? (70.202, 70.203, 71.202, 71.203, 90.202, 90.203)

MSHA conducts the certification training and MSHA personnel who conduct sampling are certified. MSHA provides two separate courses of instruction: (1) certification for respirable dust sampling; and (2) certification for maintenance and calibration of coal mine dust sampling equipment. Training classes are conducted at the National Mine Health and Safety Academy, at local MSHA district and field offices, and at the mine site upon request to the local coal district office.

3. What does it take to successfully pass the certification test for sampling with the gravimetric sampler (CMDPSU)? (70.202, 71.202, 90.202)

To successfully pass the certification test for sampling with the gravimetric sampler (CMDPSU), you must answer correctly 80% of the 154 questions on the written examination and complete 100% of the practical portion of the test. This practical portion includes filling out a dust data card, assembling the sampling pump assembly, and performing pre-inspection checks of the sampling pump.

4. If I get certified for sampling with the gravimetric sampler (CMDPSU) and for maintenance and calibration on the gravimetric sampler before August 1, 2014, is it correct that these certifications are good for the next three years? (70.202, 71.202, 90.202)

If you are certified for sampling with the gravimetric sampler and for maintenance and calibration on the gravimetric sampler any time before August 1, 2014 (the effective date of the rule), these certifications are good for 3 years after the effective date of the rule, which is until August 1, 2017.

On-Shift Examination

1. Under the § 75.362 On-Shift Examination requirements, what does the examination include? Are there other new On-Shift Examination requirements? (75.362)
Like the existing rule, the examination must include air quantities and velocities; water pressures and flow rates; excessive leakage in the water delivery system; water spray numbers and orientations; section ventilation and control device placement. New requirements in the final rule require the following dust control parameters to be examined: roof bolting machine dust collector vacuum levels; scrubber air flow rate; work practices required by the ventilation plan; and any other dust suppression measures. The final rule also includes requirements for: making and retaining a record of the examination results and any

corrective action taken, the certified person directing the examination to certify that the exam was made and to verify the examination results; and the mine foreman or equivalent mine official to countersign each examination record.

2. What is an acceptable On-Shift Examination record? (75.362)

Under section 75.362 (a)(2), the operator is required to record the results of the On-Shift Examination and the results of the corrective action taken. The record should include the specific measurements and observations made of the dust control parameters specified in the ventilation plan. The record must also include any deficiencies and corrective actions taken.Specific measurements of the air velocity and quantity, water pressure and flow rates are not required if continuous monitoring of these controls is used and indicates that the dust controls are functioning properly.

3. My mines use continuous mining machines with a scrubber. The scrubber "makes" air in the face. Why does the rule require me to determine the air in the mining face with the scrubber turned off? (75.325)

A dust scrubber does not "make" air. The scrubber is a supplemental dust control device and does aid in directing the air provided in the face area. However, the scrubber can only work with the air that is provided to the face. It is important that the scrubber be balanced with the ventilating air provided to the area where the continuous mining machine is working. The air provided by the MMU ventilation system must be determined without the aid of the scrubber so that the scrubber can be provided with the amount of air for which it is rated and dust-laden air is not recirculated.

Mine Ventilation Plan

1. If the dust parameters are the same on every MMU, is there a need to have a separate Mine Ventilation Plan for each MMU? (75.371)
Yes. The general plan does not address the differences between MMUs and different mining machines. No two units are exactly alike and those differences must be addressed. Specifying general controls does not let miners and management personnel know what specifically works to control respirable dust concentrations for a specific mining machine in a specific location in the mine.

2. I have had an approved ventilation plan for years with all my dust controls specified such that it covered all MMUs in the mine. Now MSHA is requiring that I provide the controls for each MMU. Why is it necessary to cover each MMU when there is nothing wrong with the general plan? (75.371)

The general plan does not address the differences between MMUs and different mining machines. Generally, no two units are exactly alike and those differences must be addressed. Specifying general controls does not let miners and management personnel know what specifically works to control respirable dust concentrations for a specific mining machine in a specific location in the mine. In appropriate circumstances, the controls for one MMU may be the same as or similar to another MMU's controls, but the controls must be specified for each MMU.

Medical Surveillance

1. What are the new requirements for Medical Surveillance and how will they be implemented? (72.100)
The new MSHA rule adds spirometry testing to the existing chest x-ray examination program, and expands health surveillance program coverage to include workers at surface coal mines, in addition to previously eligible underground coal mines. CDC/NIOSH is responsible for implementing the expanded health surveillance program. Although underground coal mines are required to post a NIOSH-approved health examination plan for underground miners every five years, on August 1, 2014, MSHA will extend health examination requirements to all surface mines. Mine operators can currently submit Mine Plans using the currently available form, Coal Mine Operator's Plan Form, available at http://www.cdc.gov/niosh/topics/surveillance/ORDS/CoalWorkersHealthSurvProgram.html Contractors completing the form do not need to indicate at which mines they are operating, and should indicate the number of miles from the location of the contractor to the X-Ray Facility. For Surface Operators and Contractors, leave the x-ray begin and end dates blank. NIOSH will assign these dates for all new plans. The following questions and answers provide important guidance for coal operators, both underground and surface.

2. We currently have a NIOSH-approved plan for providing miners with chest x-rays, which includes occupational history, under the Department of Health and Human Services (HHS) regulations at 42 CFR part 37. What else do we need to do under the final rule regarding the requirements for periodic examinations? (72.100)

Under the final rule, coal mine operators must develop and submit for approval to NIOSH a plan in accordance with NIOSH's regulations under 42 CFR part 37, which contain procedures for providing miners with the examinations required in Section 72.100(a) of MSHA's final rule. The examinations must be provided at no cost to the miner and include chest x-rays, spirometry, occupational history, and symptom assessment. They must be done at facilities approved by NIOSH. Mine operators must also submit to NIOSH a roster specifying the name and current address of each miner covered by the plan. Existing 42 CFR part 37 includes provisions for chest x-rays, occupational history and approval of x-ray facilities but does not address spirometry, symptom assessment or approval of spirometry facilities. HHS is drafting its regulations to include spirometry, symptom assessment, and the approval of spirometry facilities. Until the new spirometry requirements are in place, a coal mine operator with an existing NIOSH-approved plan does not need to revise or resubmit that plan (except according to the existing plan's expiration schedule).

3. We do not currently have a NIOSH-approved plan. What do we need to do? (72.100)

A coal mine operator without an existing NIOSH-approved plan, including a surface coal mine operator, must develop and submit for approval to NIOSH a plan in accordance with existing 42 CFR part 37 and submit a roster of the name and current address of each miner

covered by the plan. Under 42 CFR § 37.4(a), NIOSH provides a 60-day period for an operator without an approved plan to submit a plan. Therefore, as of September 30, 2014 (within 60 days of August 1, 2014), all coal mine operators must either have an existing NIOSH-approved plan or have submitted a plan to NIOSH for approval under existing 42 CFR part 37. New mines opening after August 1, 2014 would need to submit a plan within 60 days of opening.

4. What examinations do we need to provide to new miners? (72.100)

   Effective August 1, 2014, all coal mine operators must provide all new miners with the mandatory examinations consisting of chest x-rays and occupational history within 30 days after beginning employment. However, on or after August 1, 2014, for a miner beginning employment at a mine without an existing NIOSH-approved plan, MSHA will allow 30 days after NIOSH approves the plan to provide the mandatory examinations. All miners beginning employment on or after August 1 but before the date of a plan approval must be given the mandatory examinations within 30 days after the date of the plan approval. All miners beginning employment on or after August 1 at a mine with an approved plan must be given the mandatory examinations within 30 days after beginning employment.

5. What do we need to do when HHS revises its regulations at 42 CFR part 37?

   After the new NIOSH spirometry requirements are in place, and facilities become certified to conduct spirometry examinations, MSHA will notify coal mine operators that they must: (1) submit to NIOSH plan revisions to comply with the new spirometry requirements, including the names of NIOSH-approved spirometry facilities; and (2) provide all miners beginning employment on or after August 1 with the spirometry examination and symptom assessment within 30 days after beginning employment or, if the plan revision has not been approved as of the employment date, within 30 days after the date NIOSH approves the plan revision. The plan submittal form is available from NIOSH and MSHA.

Contractors

1. Does the final rule apply to construction workers or Contractors working on mine property?
   Yes, any individual working in a mine is a miner under the Mine Act and the requirements of the final rule apply.

2. If a contractor is not compliant with the final rule, does the mine operator have the authority to shut down the contractor's operation? Is MSHA giving the operator the authority to shut down the contractor if one sample is not compliant?

   The final rule does not change any existing relationship between an operator and a contractor with respect to responsibility for compliance.

3. A contractor may not have a permanent bulletin board to post sample results. Who should post the sampling results?

   The final rule does not change the existing method of posting sampling results. Contractors should continue to post sampling results as they are currently doing. The contractor can either make arrangements to have their own bulletin board or use the mine operator's board.

4. Is the contractor or the mine operator responsible for collecting dust samples? What is the sampling requirement for Contractors? Who will MSHA notify if noncompliance is determined, the mine operator or the contractor, or both?

   The final rule does not change who is responsible for collecting dust samples -- either the production operator or the independent contractor operator may collect dust samples. In addition, the final rule does not change how MSHA provides notice of the sampling results. MSHA will continue its current system of notifying the person listed on the operator's legal ID form for receiving respirable dust sampling information. The MSHA report containing dust sampling results must be posted for at least 31 days on the mine bulletin board.

5. Will a contractor who regularly works at a mine collecting respirable dust samples be assigned any kind of position to be sampled?

   No. Under the final rule, a contractor who regularly collects samples will not be designated as a DWP at surface mines, or DA, DO, or ODO at underground mines.

# EXHIBIT I

L 91-173
Sec. 20:



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF MINES
WASHINGTON, D.C. 20240

FILE COPY
DO NOT REMOVE

November 18, 1969

Honorable John N. Erlenborn
House of Representatives
Washington, D.C. 20515

Dear Mr. Erlenborn:

You have asked us to review our position with regard to
single shift vs. multi-shift averaging for applying dust
standards under the coal mine health and safety legislation
now pending in the Congress.  In his letter of July 17 to
the Chairman, Labor and Public Welfare Committee, United
States Senate, Secretary Hickel made the following points:

> "The Bureau of Mines testing experience to date
> and that in other countries (e.g. England and
> Germany) shows that about a 60 percent variability
> is inherent in the results when sampling from
> one full shift to another.  The reason for this
> variability is not yet understood.  For example,
> a single 4.5 reading could in actuality be as high
> as 7.3 or as low as 1.7.  However, when a series
> of full shift samples are taken it is possible to
> determine more closely the true value with the
> use of statistical techniques averaging the
> samples.  If the mean value of several such samples
> falls above a fixed upper limit which is estab-
> lished for the sampling program by these statistically
> valid methods, the Bureau of Mines would, under the
> Print, take the enforcement action required and
> expect that such action would stand the test in
> any review proceeding initiated by the operator.

> "As our measuring technology improves and we have
> a better understanding of the variables, we should
> be able to reduce the number of shifts necessary
> to obtain an enforceable sample, possibly to a point
> where a one or two shift sample may be sufficient."

A random sampling of the data from the 29-mine survey conducted by the Bureau of Mines on which the Secretary's comments were based indicated that 41 percent of the individual shift measurements were above, and 59 percent below the mean values. Using an individual shift measurement would result, therefore, in 40 percent of the faces failing to meet a given mean even though they would meet that mean if a multiple shift average were used.

Recent experimental data developed by the Bureau of Mines reinforces Secretary Hickel's conclusion that under current technology multi-shift averaging is an essential element in prudent administration of the proposed dust standard.  In recent experiments undertaken in five mines under controlled conditions, we found that the deviation from the average for face-generated dust over several shifts ranges from a low in one mine of -88 percent, to a high in another mine of +133 percent.  The average for these five mines ranged from -34 percent to +66 percent. In these tests 50 percent of the measurements were above a given mean and would not have met the mean using a single shift measurement although they would have met the mean based on multi-shift averages.  It should be pointed out that these data were gathered under controlled conditions with Bureau of Mines specialists in constant attendance during the sampling period.  In everyday operations it is probable that variations from the average may exceed the above values.

We are not yet able to assign an explanation for the variability noted in these test results.  We have been unable to correlate the observed variation with production and other variables that we have thus far isolated in our studies.  In time we believe that the variations from average values will be explained but there is no guarantee as yet that they can be controlled.

The proponents of the single shift measurement may not have been aware of the fact that the 60 percent variability operates in both directions.  Thus, a mine with a multiple shift average of as much as 7.5 mg/m$^3$ could on a single shift basis yield a 3.0 reading.  Application of the single shift rule, therefore, may serve to penalize an operator whose mine is actually generating exposures well within the permissible range and fail to penalize an operator whose mine offers long-term average exposures that are substantially in excess of the limits established by Congress.



There is a consensus of medical opinion that deleterious
effects of respirable dust are assignable to long-term
accumulated exposures, not to short-term peaks such as those
that would be encountered in a single shift; as a result
the exposure and incidence data that have been relied upon
for development of the standard were developed from <u>average</u>
multi-shift exposure, not single shift average exposures.

It seems to us, therefore, that the medical evidence supports
and the statistical evidence requires multi-shift averages
for pneumoconiosis-producing dusts.  If the legislation
requires the standard to be administered on a single-shift
average only, as in the Senate version, it will prescribe
not an <u>average</u> but a maximum standard, and one that experience
indicates is simply beyond the capability of a major segment
of the industry at this time.  On the basis of 60 percent
variability, imposition of a <u>maximum</u> 3.0 mg/m$^3$ standard would
require the industry to meet an average of 1.9 mg/m$^3$ in order
to achieve full compliance.  There is no evidence to indicate
that current technology supports adoption of such a standard.

Some of the proponents for the single-shift criteria appear to
recognize the above facts, but point out that the Secretary
would be free to levy a token fine for violations within the
range of statistical variation.  We urge against this approach.
Resort to tokenism in application of penalties for dust vio-
lations will tend to weaken administration of the entire act.
The Congress initially, and in subsequent actions the Secretary
of the Interior, should promulgate meaningful standards and tho
standards should be rigorously enforced.  Tokenism has no place
in a firm enforcement framework.

Proponents of single-shift measurements have also indicated
their fear that multi-shift averaging will lead to manipulation
of dust counts by the operators and widespread noncompliance
with Congressional intent.  For example, there is concern that
we would include maintenance shifts with producing shifts in
arriving at multi-shift averages.  We should make it clear that
for compliance with the dust standard, we plan to obtain dust
measurements on producing shifts only.  More important, there
is no way, under the enforcement methods that we propose, for
there to be any greater possibility for manipulation in a multi
shift average measurement than in a single-shift measurement.

Currently, we are of the view that measurements over a minimum
of five producing shifts would yield statistically valid result
To accomplish this, operators will be required to issue samplin
units to workers on one of each three production shifts in each
section of the mine, for sampling at a point to be specified by
the Secretary; and for shifts that the Secretary may prescribe.
At the end of each shift, the worker will mail the samples to
the Bureau of Mines where it will be weighed and the
results coded into a computer.  Section samples will be

staggered so that in large mines some portions of the work force will be sampling the atmosphere in the work environment on almost every production shift. Deviations from the standard would trigger a Bureau of Mines dust evaluation. Through this program, we will have an almost continuous indication of the dust conditions in every mine in the country.

The Bureau of Mines will conduct a thorough dust evaluation in each producing mine at least twice annually. This appraisal will include dust sampling of each man in the producing area and in other locations if necessary, an evaluation of the company's sampling program, as well as the measurement of other engineering parameters relating to dust control such as measurement of air volume and air movement at the face and the effectiveness with which water is being used as a dust suppressant. At this time an evaluation will also be made of all dust control and dust suppression equipment as to its effectiveness and its state of maintenance. Based on these semi-annual inspections, definite recommendations will be offered to the mining companies for the improvement of dust conditions underground. This system will be under constant surveillance through a system of spot checks.

There is every indication that the coal mine health and safety legislation that will finally be passed by this Congress will be hailed as a landmark in advancing industrial safety. It would be unfortunate if the bill were to be remembered principally for an unenforceable provision. We, therefore, urge that the legislation provide authority in the Secretary of the Interior to require dust measurements at such intervals and of such duration as to yield statistically valid results. Currently, this would require multi-shift averaging.

                        Sincerely yours,


                        Director

# EXHIBIT J

## § 46:6    Each word given effect

"It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute."[1] A stat-

---

**[Section 46:6]**

[1]**United States.** Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S. Ct. 1447, 131 L. Ed. 2d 328, Fed. Sec. L. Rep. (CCH) P 98,681 (1995); United States v. Menasche, 348 U.S. 528, 75 S. Ct. 513, 99 L. Ed. 615 (1955); Helton v. Fauver, 930 F.2d 1040 (3d Cir. 1991); U.S. Army Engineer Center v. Federal Labor Relations Authority, 762 F.2d 409, 119 L.R.R.M. (BNA) 2854 (4th Cir. 1985); Arredondo v. U.S., 120 F.3d 639, 1997 FED App. 0239P (6th Cir. 1997); Lyons v. Ohio Adult Parole Authority, 105 F.3d 1063, 1997 FED App. 0025P (6th Cir. 1997) and (implied overruling on other grounds recognized by,Lake Cumberland Trust, Inc. v. U.S. E.P.A., 954 F.2d 1218, 22 Envtl. L. Rep. 20558 (6th Cir. 1992), opinion modified on reh'g, (Apr. 10, 1992); Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor v. Goudy, 777 F.2d 1122 (6th Cir. 1985); U.S. v. Talley, 16 F.3d 972 (8th Cir. 1994); Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 34 Fed. R. Serv. 3d 1243, 26 Envtl. L. Rep. 20983 (9th Cir. 1996), as amended on denial of reh'g, (May 30, 1996); Spiegel v. Ryan, 946 F.2d 1435 (9th Cir. 1991); Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427, 33 Env't. Rep. Cas. (BNA) 1693, 22 Envtl. L. Rep. 20007 (9th Cir. 1991); Tabor v. Ulloa, 323 F.2d 823 (9th Cir. 1963) (". . . [a] legislature is presumed to have used no superfluous words"); American Stores Co. v. American Stores Co. Retirement Plan, 928 F.2d 986, 13 Employee Benefits Cas. (BNA) 1809 (10th Cir. 1991); Abourezk v. Reagan, 785 F.2d 1043 (D.C. Cir. 1986) and judgment aff'd, 484 U.S. 1, 108 S. Ct. 252, 98 L. Ed. 2d 1 (1987); Central & Southern Motor Freight Tariff Ass'n v. U.S., 757 F.2d 301 (D.C. Cir. 1985); National Ass'n of Recycling Industries, Inc. v. I. C. C., 660 F.2d 795, 212 (D.C. Cir. 1981); In re Permanent Surface Min. Regulation Litigation, 653 F.2d 514, 15 Env't. Rep. Cas. (BNA) 1802, 11 Envtl. L. Rep. 20941 (D.C. Cir. 1981); Texas State Com'n for the Blind v. U.S., 796 F.2d 400 (Fed. Cir. 1986); Masayesva for and on Behalf of Hopi Indian Tribe v. Zah, 792 F. Supp. 1172 (D. Ariz. 1992); In re Roxford Foods Litigation, 790 F. Supp. 987 (E.D. Cal. 1991); Rincon Band of Mission Indians v. San Diego County, 324 F. Supp. 371 (S.D. Cal. 1971), judgment rev'd on other grounds, 495 F.2d 1 (9th Cir. 1974); Gary v. U.S., 708 F. Supp. 1188, 89-1 U.S. Tax Cas. (CCH) P 9269, 71A A.F.T.R.2d 93-5115 (D. Colo. 1989); Arvin-Edison Water Storage Dist. v. Hodel, 610 F. Supp. 1206 (D.D.C. 1985); Miller v. Callahan, 964 F. Supp. 939, 53 Soc. Sec. Rep. Serv. 563, Unempl. Ins. Rep. (CCH) P 15785B (D. Md. 1997); Bryant v. Better Business Bureau of Greater Maryland, Inc., 923 F. Supp. 720, 15 A.D.D. 798, 5 A.D. Cas. (BNA) 625, 70 Fair Empl. Prac. Cas. (BNA) 870 (D. Md. 1996); Allende v. Shultz, 605 F. Supp. 1220 (D. Mass. 1985); Matter of Bell, 215 B.R. 266 (Bankr. N.D. Ga. 1997); In re Dow Corning Corp., 215 B.R. 346, 31 Bankr. Ct. Dec. (CRR) 954, 32 Collier Bankr. Cas. 2d (MB) 151 (Bankr. E.D. Mich. 1997), opinion supplemented, 215 B.R. 526, 31 Bankr. Ct. Dec. (CRR) 1144 (Bankr. E.D. Mich. 1997); Hewlett-Packard Co. v. U.S., 41 Fed. Cl. 99, 42 Cont. Cas. Fed. (CCH) P 77318 (1998).

Wherever reasonable, the court will adopt the construction which gives effect to all provisions of the statute. Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43, 2001 A.M.C. 1320 (1st Cir. 1999); State of Ala. ex rel. Baxley v. Tennessee Valley Authority, 467 F. Supp. 791 (N.D. Ala. 1979), judgment rev'd on other grounds, 636 F.2d 1061 (5th Cir. 1981); Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western Dist. of Mich., 46 F. Supp. 2d 689, 51 Fed. R. Evid. Serv. 1419 (W.D. Mich. 1999); Melrose Associates, L.P. v. U.S., 43 Fed. Cl. 124 (1999), opinion supplemented on other grounds, 45 Fed. Cl. 56 (1999),

**§ 46:6**

ute should be construed so that effect is given to all its provisions,

---

aff'd, 4 Fed. Appx. 936 (Fed. Cir. 2001) and aff'd, 4 Fed. Appx. 936 (Fed. Cir. 2001); Abramson v. U.S., 42 Fed. Cl. 621, 6 Wage & Hour Cas. 2d (BNA) 801 (1998).

The text of the Bevill Amendment juxtaposes the terms "determination" and "regulation" signifying that the two terms were intended to have distinct meanings; American Portland Cement Alliance v. E.P.A., 101 F.3d 772, 43 Env't. Rep. Cas. (BNA) 1705, 27 Envtl. L. Rep. 20535 (D.C. Cir. 1996).

Rosenberg v. XM Ventures, 274 F.3d 137, Fed. Sec. L. Rep. (CCH) P 91641 (3d Cir. 2001); In re Luongo, 259 F.3d 323, 38 Bankr. Ct. Dec. (CRR) 43, 2001-2 U.S. Tax Cas. (CCH) P 50527, 88 A.F.T.R.2d 2001-5752 (5th Cir. 2001).

In re Sullivan, 238 B.R. 230 (Bankr. D. Mass. 1999); Shoshone Indian Tribe of Wind River Reservation, Wyoming v. U.S., 51 Fed. Cl. 60, 163 O.G.R. 241 (2001), aff'd, 364 F.3d 1339, 163 O.G.R. 259 (Fed. Cir. 2004), cert. denied, 544 U.S. 973, 125 S. Ct. 1824, 161 L. Ed. 2d 723 (2005) and cert. denied, 544 U.S. 973, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005); Chaney v. U.S., 45 Fed. Cl. 309, 84 A.F.T.R.2d 99-7137 (1999); Pangelinan v. Gutierrez, 2000 Guam 11, 2000 WL 263216 (Guam 2000), decision aff'd, 276 F.3d 539 (9th Cir. 2002).

U.S. v. Lillyblad, 56 M.J. 636 (N.M.C.C.A. 2001).

Arevalo v. Ashcroft, 344 F.3d 1 (1st Cir. 2003); Shoshone Indian Tribe of Wind River Reservation v. U.S., 364 F.3d 1339, 163 O.G.R. 259 (Fed. Cir. 2004), cert. denied, 544 U.S. 973, 125 S. Ct. 1824, 161 L. Ed. 2d 723 (2005) and cert. denied, 544 U.S. 973, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005); Hamilton v. Werner Co., 268 F. Supp. 2d 1085 (S.D. Iowa 2003); Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney For Western Dist. of Michigan, 198 F. Supp. 2d 920 (W.D. Mich. 2002), aff'd, 369 F.3d 960, 2004 FED App. 0151P (6th Cir. 2004); U.S. v. Mills, 186 F. Supp. 2d 965 (E.D. Wis. 2002).

Butler v. U.S., 442 F. Supp. 2d 1311, 28 Int'l Trade Rep. (BNA) 1961 (Ct. Int'l Trade 2006); Clark v. Arizona, 126 S. Ct. 2709, 165 L. Ed. 2d 842 (U.S. 2006); Chippewa Cree Tribe of the Rocky Boy's Reservation v. U.S., 69 Fed. Cl. 639 (2006).

**Alabama.** Davis v. Gobble-Fite Lumber Co., Inc., 592 So. 2d 202 (Ala. 1991); Carroll v. Alabama Public Service Commission, 281 Ala. 559, 206 So. 2d 364, 72 Pub. Util. Rep. 3d (PUR) 525 (1968).

If there is irreconcilable conflict between different provisions in the same act, the later in order of arrangement is given effect. State v. Crenshaw, 287 Ala. 139, 249 So. 2d 622 (1971).

**Alaska.** Peninsula Marketing Ass'n v. Rosier, 890 P.2d 567 (Alaska 1995); City of Kenai v. Kenai Peninsula Newspapers, Inc., 642 P.2d 1316 (Alaska 1982); Libby v. City of Dillingham, 612 P.2d 33 (Alaska 1980).

Municipality of Anchorage v. Repasky, 34 P.3d 302, 158 Ed. Law Rep. 822 (Alaska 2001); Fancyboy v. Alaska Village Elec. Co-op., Inc., 984 P.2d 1128 (Alaska 1999); State v. Roberts, 999 P.2d 151 (Alaska Ct. App. 2000); Zamora v. Reinstein, 185 Ariz. 272, 915 P.2d 1227 (1996); State v. Garza Rodriguez, 164 Ariz. 107, 791 P.2d 633 (1990); Torrez v. State Farm Mut. Auto. Ins. Co., 130 Ariz. 223, 635 P.2d 511 (Ct. App. Div. 1 1981).

**Arkansas.** Cupp v. Frazier's Heirs, 239 Ark. 77, 387 S.W.2d 328 (1965).

**California.** Kilgore v. Younger, 30 Cal. 3d 770, 180 Cal. Rptr. 657, 640 P.2d 793, 8 Media L. Rep. (BNA) 1886 (1982); California Housing Finance Agency v. E.R. Fairway Associates I, 37 Cal. App. 4th 1508, 44 Cal. Rptr. 2d 591 (3d Dist. 1995); Rodriguez v. Superior Court, 14 Cal. App. 4th 1260, 18 Cal. Rptr. 2d 120 (5th Dist. 1993), as modified, (Apr. 30, 1993); Flint v. Sacramento County Employees' Retirement Assn., 164 Cal. App. 3d 659, 210 Cal. Rptr. 439 (3d Dist. 1985); Campbell v. Armstrong, 26 Cal. App. 3d 1, 102 Cal. Rptr. 583 (1st Dist. 1972),

§ 46:6                                  Sutherland Statutory Construction

opinion vacated on other grounds, 9 Cal. 3d 482, 107 Cal. Rptr. 777, 509 P.2d 689 (1973); County of Sacramento v. Superior Court, 20 Cal. App. 3d 469, 97 Cal. Rptr. 771 (3d Dist. 1971).

Curle v. Superior Court, 24 Cal. 4th 1057, 103 Cal. Rptr. 2d 751, 16 P.3d 166 (2001); San Diego Police Officers' Assn. v. City of San Diego Civil Service Com., 104 Cal. App. 4th 275, 128 Cal. Rptr. 2d 248, 19 I.E.R. Cas. (BNA) 715 (4th Dist. 2002), as modified, (Dec. 11, 2002) and as modified on denial of reh'g, (Jan. 9, 2003).

**Colorado.** Bulow v. Ward Terry & Co., 155 Colo. 560, 396 P.2d 232 (1964); Adams-Arapahoe County School Dist. No. 28J v. Wolf, 30 Colo. App. 117, 489 P.2d 348 (1971); Lee v. City and County of Denver, 29 Colo. App. 256, 482 P.2d 389 (1971).

**Connecticut.** Hartford Elec. Light Co. v. Water Resources Commission, 162 Conn. 89, 291 A.2d 721, 3 Env't. Rep. Cas. (BNA) 1953, 2 Envtl. L. Rep. 20253 (1971); State v. Briggs, 161 Conn. 283, 287 A.2d 369 (1971); Archibald v. Sullivan, 152 Conn. 663, 211 A.2d 692 (1965); State ex rel. Sloane v. Reidy, 152 Conn. 419, 209 A.2d 674 (1965); DeCilla v. Zoning Bd. of Appeals of City of New Haven, 27 Conn. Supp. 112, 231 A.2d 543 (C.P. 1967).

**Delaware.** Keeler v. Harford Mut. Ins. Co., 672 A.2d 1012 (Del. 1996), as amended, (Mar. 11, 1996); State v. Croce, 1997 WL 524070 (Del. Super. Ct. 1997).

**District of Columbia.** Shelton v. U.S., 721 A.2d 603 (D.C. 1998); Zhou v. Jennifer Mall Restaurant, Inc., 699 A.2d 348 (D.C. 1997); Tenants Council of Tiber Island-Carrollsburg Square v. District of Columbia Rental Accommodations Commission, 426 A.2d 868 (D.C. 1981).

**Florida.** Gretz v. Florida Unemployment Appeals Com'n, 572 So. 2d 1384 (Fla. 1991); State v. Putnam County Development Authority, 249 So. 2d 6, 2 Env't. Rep. Cas. (BNA) 1638, 1 Envtl. L. Rep. 20339 (Fla. 1971); Greenhut Const. Co. v. Henry A. Knott, Inc., 247 So. 2d 517 (Fla. Dist. Ct. App. 1st Dist. 1971).

The word "felony" when it appears in a state statute is bound to be interpreted according to the meaning assigned by the state constitution. Shields v. Smith, 404 So. 2d 1106 (Fla. Dist. Ct. App. 1st Dist. 1981).

The deliberate use of different terms in different portions of the same statute is strong evidence that it intended different meanings. Ocasio v. Bureau of Crimes Compensation Division of Workers' Compensation, 408 So. 2d 751 (Fla. Dist. Ct. App. 3d Dist. 1982).

**Georgia.** Martin v. Fairburn Banking Co., 218 Ga. App. 803, 463 S.E.2d 507 (1995); Cofer v. Gurley, 146 Ga. App. 420, 246 S.E.2d 436 (1978) (overruled on other grounds by, Williams v. Cofer, 246 Ga. 344, 271 S.E.2d 486 (1980)).

**Hawaii.** Bragg v. State Farm Mut. Auto. Ins. Co., 81 Haw. 302, 916 P.2d 1203 (1996); State v. Kwak, 80 Haw. 297, 909 P.2d 1112 (1995).

**Idaho.** George W. Watkins Family v. Messenger, 118 Idaho 537, 797 P.2d 1385 (1990); Idaho Power Co. v. Idaho Public Utilities Commission, 102 Idaho 744, 639 P.2d 442 (1981).

**Illinois.** Best v. Taylor Mach. Works, 179 Ill. 2d 367, 228 Ill. Dec. 636, 689 N.E.2d 1057, Prod. Liab. Rep. (CCH) P 15123 (1997); People v. Fabing, 143 Ill. 2d 48, 155 Ill. Dec. 816, 570 N.E.2d 329 (1991); Morris v. Broadview, Inc., 385 Ill. 228, 52 N.E.2d 769 (1944); Estep v. Illinois Dept. of Public Aid, 115 Ill. App. 3d 644, 71 Ill. Dec. 402, 450 N.E.2d 1281 (1st Dist. 1983); Tan v. Tan, 3 Ill. App. 3d 671, 279 N.E.2d 486 (1st Dist. 1972).

**Indiana.** Meridian Mortg. Co., Inc. v. State, 182 Ind. App. 328, 395 N.E.2d 433 (1979); Engle v. City of Indianapolis, 151 Ind. App. 344, 279 N.E.2d 827 (1972); In re Adoption of Chaney, 128 Ind. App. 603, 150 N.E.2d 754 (1958).

232

**Iowa.** Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co., 606 N.W.2d 376 (Iowa 2000); Miller v. Westfield Ins. Co., 606 N.W.2d 301 (Iowa 2000); Iowa Ass'n of School Boards v. Iowa Public Employment Relations Bd., 400 N.W.2d 571, 37 Ed. Law Rep. 691 (Iowa 1987); Bork v. Richardson, 289 N.W.2d 622 (Iowa 1980).

**Kansas.** Felten Truck Line, Inc. v. State Bd. of Tax Appeals, 183 Kan. 287, 327 P.2d 836 (1958).

**Louisiana.** Hoffpauir v. City of Crowley, 241 So. 2d 67 (La. Ct. App. 3d Cir. 1970), writ denied, 257 La. 457, 242 So. 2d 578 (1971); Jarrell v. Gordy, 162 So. 2d 577 (La. Ct. App. 3d Cir. 1964); State v. Orleans Parish School Bd., 118 So. 2d 471 (La. Ct. App., Orleans 1960).

A court is free to consider the spirit of the law only when its expressions are dubious. Benoit v. Benoit, 379 So. 2d 270 (La. Ct. App. 3d Cir. 1979).

Williams v. Abadie, 857 So. 2d 1118 (La. Ct. App. 4th Cir. 2003); Breaux v. Lafourche Parish Council, 851 So. 2d 1173 (La. Ct. App. 1st Cir. 2003), writ denied, 860 So. 2d 1163 (La. 2003); Chelette v. Valentine, 747 So. 2d 69 (La. Ct. App. 3d Cir. 1999), writ denied, 751 So. 2d 253 (La. 1999).

**Maryland.** Fisher v. Bethesda Discount Corp., 221 Md. 271, 157 A.2d 265 (1960); Doneski v. Comptroller of Treasury, 91 Md. App. 614, 605 A.2d 649 (1992).

**Massachusetts.** Town Crier, Inc. v. Chief of Police of Weston, 361 Mass. 682, 282 N.E.2d 379 (1972); Commissioner of Corporations and Taxation v. Chilton Club, 318 Mass. 285, 61 N.E.2d 335 (1945); Bartlett v. Greyhound Real Estate Finance Co., 41 Mass. App. Ct. 282, 669 N.E.2d 792 (1996); Wolfe v. Gormally, 440 Mass. 699, 802 N.E.2d 64 (2004).

**Michigan.** Feld v. Robert & Charles Beauty Salon, 435 Mich. 352, 459 N.W.2d 279 (1990); State ex rel. Wayne County Prosecuting Attorney v. Levenburg, 406 Mich. 455, 280 N.W.2d 810 (1979) (abrogated on other grounds by, Michigan ex rel. Wayne County Prosecutor v. Bennis, 447 Mich. 719, 527 N.W.2d 483 (1994)) ("assignation" is not synonymous with "prostitution"); Stowers v. Wolodzko, 386 Mich. 119, 191 N.W.2d 355 (1971); Mason County Civil Research Council v. Mason County, 343 Mich. 313, 72 N.W.2d 292 (1955); People v. McDaniel, 256 Mich. App. 165, 662 N.W.2d 101 (2003), appeal dismissed, 692 N.W.2d 387 (Mich. 2005) and (abrogated on other grounds by, People v. Francisco, 474 Mich. 82, 711 N.W.2d 44 (2006)); Great Lakes Sales, Inc. v. State Tax Com'n, 194 Mich. App. 271, 486 N.W.2d 367 (1992).

**Missouri.** Vocational Services, Inc. v. Developmental Disabilities Resource Bd., 5 S.W.3d 625 (Mo. Ct. App. W.D. 1999); State ex rel. Wright v. Carter, 319 S.W.2d 596 (Mo. 1958); Wehmeier v. Public School Retirement System of Missouri, 631 S.W.2d 893, 4 Ed. Law Rep. 315 (Mo. Ct. App. E.D. 1982); McRoberts v. McRoberts, 555 S.W.2d 682 (Mo. Ct. App. 1977); Welborn v. Southern Equipment Co., 386 S.W.2d 432 (Mo. Ct. App. 1964), transferred to Mo. S. Ct., 395 S.W.2d 119 (Mo. 1965)

**Montana.** Yurkovich v. Industrial Acc. Bd., 132 Mont. 77, 314 P.2d 866 (1957).

"The legislature does not perform useless acts." Kish v. Montana State Prison, 161 Mont. 297, 505 P.2d 891 (1973).

**Nebraska.** State v. Glover, 212 Neb. 713, 325 N.W.2d 155 (1982); Rose v. Hooper, 175 Neb. 645, 122 N.W.2d 753 (1963); School Dist. No. 228 of Holt County v. State Bd. of Ed., 164 Neb. 148, 82 N.W.2d 8 (1957); State v. Bartley, 39 Neb. 353, 58 N.W. 172 (1894).

**Nevada.** Tomlinson v. State, 110 Nev. 757, 878 P.2d 311 (1994).

**New Hampshire.** Appeal of Village Bank and Trust Co., 124 N.H. 492, 471 A.2d 1187 (1984); Blue Mountain Forest Ass'n v. Town of Croydon, 117 N.H. 365, 373 A.2d 1313 (1977).

**New Jersey.** State v. Reynolds, 124 N.J. 559, 592 A.2d 194 (1991); Darel v. Pennsylvania Mfrs. Ass'n Ins. Co., 114 N.J. 416, 555 A.2d 570 (1989); Cosmair, Inc. v. Director, New Jersey Div. of Taxation, 109 N.J. 562, 538 A.2d 788 (1988); United Bldg. and Const. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden, 88 N.J. 317, 443 A.2d 148 (1982), judgment rev'd on other grounds, 465 U.S. 208, 104 S. Ct. 1020, 79 L. Ed. 2d 249, 33 Empl. Prac. Dec. (CCH) P 34151, 100 Lab. Cas. (CCH) P 55437 (1984); City of Passaic v. Local Finance Bd. of Dept. of Community Affairs, 88 N.J. 293, 441 A.2d 736 (1982); State v. Thomas, 322 N.J. Super. 512, 731 A.2d 532 (App. Div. 1999); Calabro v. Campbell Soup Co., 244 N.J. Super. 149, 581 A.2d 1318 (App. Div. 1990), judgment aff'd, 126 N.J. 278, 597 A.2d 83 (1991); Rainbow Inn, Inc. v. Clayton Nat. Bank, 86 N.J. Super. 13, 205 A.2d 753 (App. Div. 1964); General Roofing Co. v. Borough of Belman, 77 N.J. Super. 469, 187 A.2d 16 (App. Div. 1962); Hepler v. Director, Div. of Taxation, 15 N.J. Tax 261, 1995 WL 795605 (1995), aff'd, 16 N.J. Tax 56, 1996 WL 636059 (Super. Ct. App. Div. 1996).

**New York.** Rosner v. Metropolitan Property and Liability Ins. Co., 96 N.Y.2d 475, 729 N.Y.S.2d 658, 754 N.E.2d 760 (2001).

**North Dakota.** District One Republican Committee v. District One Democrat Committee, 466 N.W.2d 820 (N.D. 1991); DeLair v. LaMoure County, 326 N.W.2d 55 (N.D. 1982); Rothe v. S-N-Go Stores, Inc., 308 N.W.2d 872 (N.D. 1981); Mandan Supply, Inc. v. Steckler, 244 N.W.2d 698 (N.D. 1976).

**Ohio.** State v. Kasnett, 30 Ohio App. 2d 77, 59 Ohio Op. 2d 197, 283 N.E.2d 636 (4th Dist. Athens County 1972), judgment rev'd on other grounds, 34 Ohio St. 2d 193, 63 Ohio Op. 2d 307, 297 N.E.2d 537 (1973) and (overruling on other grounds recognized by, Johnson v. State, 755 S.W.2d 92 (Tex. Crim. App. 1988), judgment aff'd, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)).

**Oregon.** Quintero v. Board of Parole and Post-Prison Supervision, 329 Or. 319, 986 P.2d 575 (1999); Wingfield v. National Biscuit Co., 8 Or. App. 408, 494 P.2d 905 (1972) (the legislature is not presumed to have done a futile thing when it enacted a provision).

**Pennsylvania.** Globe Sec. Systems Co. v. W.C.A.B. (Guerrero), 518 Pa. 544, 544 A.2d 953 (1988); Colodonato v. Consolidated Rail Corp., 504 Pa. 80, 470 A.2d 475 (1983); Appeal of Stanton, 499 Pa. 151, 452 A.2d 496 (1982); Com. v. McHugh, 406 Pa. 566, 178 A.2d 556 (1962); Com. v. Pierce, 397 Pa. Super. 126, 579 A.2d 963 (1990).

**Rhode Island.** State v. Peterson, 722 A.2d 259 (R.I. 1998); Merciol v. New England Tel. & Tel. Co., 110 R.I. 149, 290 A.2d 907 (1972).

Chappell v. Rhode Island Dept. of Human Services, 2003 WL 21297134 (R.I. Super. Ct. 2003).

**Tennessee.** State v. Levandowski, 1996 WL 315807 (Tenn. Crim. App. 1996), aff'd, 955 S.W.2d 603 (Tenn. 1997); Eyman v. Kentucky Cent. Ins. Co., 870 S.W.2d 530 (Tenn. Ct. App. 1993); Carter v. Jett, 51 Tenn. App. 560, 370 S.W.2d 576 (1963).

**Texas.** Sanders v. Shelton, 970 S.W.2d 721 (Tex. App. Austin 1998); In Interrest of S.H.A., 728 S.W.2d 73 (Tex. App. Dallas 1987), writ refused n.r.e., (July 15, 1987); Badgett v. State, 42 S.W.3d 136 (Tex. Crim. App. 2001); Texas Property and Cas. Ins. Guar. Ass'n v. Johnson, 4 S.W.3d 328 (Tex. App. Austin 1999).

**Utah.** Madsen v. Borthick, 769 P.2d 245 (Utah 1988); Gord v. Salt Lake City, 20 Utah 2d 138, 434 P.2d 449 (1967); Totorica v. Thomas, 16 Utah 2d 175, 397 P.2d 984 (1965); State v. Johnson, 12 Utah 2d 220, 364 P.2d 1019 (1961); Stevenson v. Salt Lake City Corp., 7 Utah 2d 28, 317 P.2d 597 (1957).

State v. Maestas, 2002 UT 123, 63 P.3d 621 (Utah 2002).

**Vermont.** In re Munson Earth Moving Corp., 169 Vt. 455, 737 A.2d 906 (1999); State v. Severance, 120 Vt. 268, 138 A.2d 425 (1958).

**Washington.** Cox v. Helenius, 103 Wash. 2d 383, 693 P.2d 683 (1985); State v. Farmer, 100 Wash. 2d 334, 669 P.2d 1240 (1983); International Paper Co. v. Department of Revenue, 92 Wash. 2d 277, 595 P.2d 1310 (1979); Snow's Mobile Homes, Inc. v. Morgan, 80 Wash. 2d 283, 494 P.2d 216 (1972); State ex rel. Schillberg v. Barnett, 79 Wash. 2d 578, 488 P.2d 255 (1971); Connolly v. State, 79 Wash. 2d 500, 487 P.2d 1050 (1971); Jordan v. O'Brien, 79 Wash. 2d 406, 486 P.2d 290 (1971); State v. Ratliff, 46 Wash. App. 325, 730 P.2d 716 (Div. 1 1986).

Where different words are used in different parts of a statute, they are presumed to have different meanings. State v. Roth, 78 Wash. 2d 711, 479 P.2d 55 (1971).

Statutes should be construed so as to give effect to every word. Western Washington Cement Masons Health & Sec. Trust Funds v. Hillis Homes, Inc., 26 Wash. App. 224, 612 P.2d 436, 107 L.R.R.M. (BNA) 2897, 90 Lab. Cas. (CCH) P 12454 (Div. 1 1980).

**Wisconsin.** State v. Martin, 162 Wis. 2d 883, 470 N.W.2d 900 (1991); State v. Smith, 103 Wis. 2d 361, 309 N.W.2d 7 (Ct. App. 1981), decision aff'd, 106 Wis. 2d 17, 315 N.W.2d 343 (1982); City of Milwaukee v. Shoup Voting Mach. Corp., 54 Wis. 2d 549, 196 N.W.2d 694 (1972); Northern Discount Co. v. Luebke, 6 Wis. 2d 313, 94 N.W.2d 605 (1959).

Wagner v. Milwaukee County Election Com'n, 2003 WI 103, 263 Wis. 2d 709, 666 N.W.2d 816 (2003); Meyer v. Meyer, 2000 WI 132, 239 Wis. 2d 731, 620 N.W.2d 382 (2000).

**Wyoming.** State Bd. of Equalization v. Tenneco Oil Co., 694 P.2d 97 (Wyo. 1985).

Bell, Legislative History Without Legislative Intent: The Public Justifications Approach to Statutory Interpretation, 60 Ohio St. L.J. 1 (1999).

Branham, The Prison Litigation Reform Act's Enigmatic Requirement: What It Means and What Congress, Courts and Correctional Officials Can Learn From It, 86 Cornell L. Rev. 483 (2001).

Eitel & Wertheim, Gramm-Leach-Bliley Update: New Regs, New Problems, New Opportunities 2002, 1299 PLI/Corp. 735 (2002).

Hirsch, Revisions in Need of Revising: The Uniform Disclaimer of Property Interests Act, 29 Fla. St. U. L. Rev. 109 (2001).

Jacobs, Disclosure and Remedies Under the Securities Law, Chapter 4. Statutory Protection Prior to 10b-5 Exchange Act Provisions. § 15 of the Exchange Act.

5A Jacobs, Disclosure and Remedies Under the Securities Laws. § 4.7 (Update 2003).

McQuillin, The Law of Municipal Corporations § 9:22 (3d ed.) The Municipal Charter, Pt IV Construction and Proof.

Schwarz, Unlawful Presence Unlawfully Interpreted, 79 No. 15 Interpreter Releases: Report and Analysis of Immigration and Nationality Law 509 (April 8, 2002).

Tiersma, A Message in a Bottle: Text, Autonomy, and Statutory Interpretation, 76 Tul. L. Rev. 431.

§ 46:6                                     SUTHERLAND STATUTORY CONSTRUCTION

Weiland, Preemption of Environmental Law: Is the U.S. Supreme Court Headed in the Wrong Direction?, 30 Envtl. L. Rep. 10579 (July 2000).

Wright, & Graham, Federal Practice and Procedure: Federal Rules of Evidence 4. Ch. 5 Relevancy and its Limits. Rule 408 Compromise and Offers To Compromise.

See also Wilkinson v. Leland, 27 U.S. 627, 7 L. Ed. 542, 1829 WL 3181 (1829); In re Matthews, 109 F. 603, 1 A.F.T.R. (P-H) P 64 (W.D. Ark. 1901); Ambler v. Whipple, 139 Ill. 311, 28 N.E. 841 (1891); Sherman v. City of Des Moines, 100 Iowa 88, 69 N.W. 410 (1896); Commonwealth v. Certain Intoxicating Liquors, 108 Mass. 19, 1871 WL 8742 (1871); In re New York & Brooklyn Bridge, 72 N.Y. 527, 1878 WL 12517 (1878).

Bell, Legislative History Without Legislative Intent: The Public Justification Approach to Statutory Interpretation, 60 Ohio State L J 1 (1999); Plank, The Outer Boundaries of the Bankruptcy Estate, 47 Emory L J 1193 (1998); Cole, State Private Property Rights Acts: The Potential for Implicating Federal Environmental Programs, 76 Tex L Rev 685 (1998); Olson, The R.S. 2477 Right of Way Dispute: Constructing a Solution, 27 Envtl. L. 289 (1997); Dickerson, Curtailing Civil RICO's Long Reach: Establishing New Boundaries for Venue and Personal Jurisdiction under 18 USC § 1965, 75 Nebraska L Rev 476 (1996); McFarland, Lewis v. United States: A Requiem for Aggregation, 46 Catholic U L Rev 1057 (1997); Prentice, Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b). 75 North Carolina L Rev 691 (1997); Y'Barbo, The Effect of Fogerty v. Fantasy on the Award of Attorney's Fees in Copyright Disputes, 5 Texas Intellectual Prop L J 231 (1997); Holder, Say What you Mean and Mean What you Say: The Resurrection of Plain Meaning in California Courts, 30 UC Davis L Rev 569 (1997); Beck, Loan Repayment Assistance Programs for Public-Interest Lawyers: Why Does Everyone Think They Are Taxable, 40 N Y L Sch L Rev 251 (1996); Fausey, Does the United Nations' Use of Collective Sanctions to Protect Human Rights Violate Its Own Human Rights Standards, 10 Conn J Int'l L 193 (1994); Frye, Municipal Sewer Authority Liability Under CERCLA: Should Taxpayers Be Liable for Superfund Cleanup Costs?: Westfarm Associates Ltd Partnership v. International Fabricare Institute, 14 Stan Envtl L J 61, 78 (1995); Gomez, The Consequences of Nonappearance: Interpreting New Section 242B of the Immigration and Nationality Act, 30 San Diego L Rev 75 (1993); Houck, The Endangered Species Act and Its Implication by the U.S. Departments of Interior and Commerce, 64 U Colo L Rev 277 (1993); Joshi, Recovering Payment of Another Person's Taxes: United States v. Williams, 49 Tax Law 241 (1995); Lawson & Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke LJ 267 (1993); Note, The Jurisdiction of State Attorneys General to Challenge Bank Mergers Under the Antitrust Laws, 110 Banking LJ 500 (1994); Oddi, Reverse Informed Consent: The Unreasonably Dangerous Patient, 46 Vand L Rev 1417 (1993); Parish, Membership in a Particular Social Group under the Refugee Act of 1980: Social Identity and the Legal Concept of the Refugee, 92 Colum L Rev 923 (1992); Paulsen, A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment, 103 Yale LJ 677 (1993); Saraisky, How to Construe Section 1782: A Textual Prescription to Restore the Judge's Discretion, 61 U Chi L Rev 1127 (1994); Van Patten, Chapter 12 in the Courts, 36 SD L Rev 52 (1993); Wisniewski, Residential Mortgages Under Chapter 13 of the Bankruptcy Code: The Increasing Case Against Cramdown After Dewsnup v. Timm, 46 Vand L Rev 1031 (1993).

Cook, Constitutional Right of the Accused, Ch.2 Constitutional Limits on the Prosecution of Offenses, § 2:2 Theories of Interpretation-The Independent Content Approach (2004 Database updated); McFarland, Dictum Run Wild: How

236

so that no part will be inoperative or superfluous,[2] void or insignifi-

---

Long-Arm Statutes Extended to the Limits of Due Process, 84 B U L. Rev. 491 (2004).

    Jacobs, Disclosure and Remedies Under the Securities Laws § 4:7.

    McQuillin, The Law of Municipal Corporations § 9.22.

    Dutcher, A Discussion of the Mechanics of the DMCA Safe Harbors and Subpoena Power, as Applied in RIAA v. Verizon Internet Services, 21 Santa Clara Computer and High Tech L J 493 (2005).

    [2]**United States.** ErieNet, Inc. v. Velocity Net, Inc., 156 F.3d 513 (3d Cir. 1998); U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 117 A.L.R. Fed. 679 (3d Cir. 1991) (rejected on other grounds by, U.S. ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 12 I.E.R. Cas. (BNA) 1040, 40 Cont. Cas. Fed. (CCH) P 76828, 136 Lab. Cas. (CCH) P 10308, 33 Fed. R. Serv. 3d 543 (9th Cir. 1995)); Com. of Pa., Dept. of Public Welfare v. U.S. Dept. of Health and Human Services, 928 F.2d 1378, 33 Soc. Sec. Rep. Serv. 30 (3d Cir. 1991); U.S. v. Cheape, 889 F.2d 477 (3d Cir. 1989); U.S. v. Union Gas Co., 792 F.2d 372, 24 Env't. Rep. Cas. (BNA) 1513, 16 Envtl. L. Rep. 20818 (3d Cir. 1986), cert. granted, judgment vacated on other grounds, 479 U.S. 1025, 107 S. Ct. 865, 93 L. Ed. 2d 821, 25 Env't. Rep. Cas. (BNA) 1920 (1987); Arredondo v. U.S., 120 F.3d 639, 1997 FED App. 0239P (6th Cir. 1997)); Lyons v. Ohio Adult Parole Authority, 105 F.3d 1063, 1997 FED App. 0025P (6th Cir. 1997) and (implied over-ruling on other grounds recognized by,Lake Cumberland Trust, Inc. v. U.S. E.P.A., 954 F.2d 1218, 22 Envtl. L. Rep. 20558 (6th Cir. 1992), opinion modified on reh'g, (Apr. 10, 1992); In re Bellanca Aircraft Corp., 850 F.2d 1275, 20 Collier Bankr. Cas. 2d (MB) 19, Bankr. L. Rep. (CCH) P 72385, 7 U.C.C. Rep. Serv. 2d 656 (8th Cir. 1988); In re Catapult Entertainment, Inc., 165 F.3d 747, 33 Bankr. Ct. Dec. (CRR) 1058, 41 Collier Bankr. Cas. 2d (MB) 858, Bankr. L. Rep. (CCH) P 77886 (9th Cir. 1999); Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427, 33 Env't. Rep. Cas. (BNA) 1693, 22 Envtl. L. Rep. 20007 (9th Cir. 1991); Tyler v. U.S., 929 F.2d 451 (9th Cir. 1991); Bridger Coal Company/Pacific Minerals, Inc. v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor, 927 F.2d 1150 (10th Cir. 1991); Knutzen v. Eben Ezer Lutheran Housing Center, 815 F.2d 1343 (10th Cir. 1987); Office of Consumers' Counsel, State of Ohio v. F.E.R.C., 783 F.2d 206 (D.C. Cir. 1986); Tyonek Native Corp. v. Secretary of Interior of U.S., 629 F. Supp. 554 (D. Alaska 1986), decision rev'd on other grounds, 836 F.2d 1237 (9th Cir. 1988); Masayesva for and on Behalf of Hopi Indian Tribe v. Zah, 792 F. Supp. 1172 (D. Ariz. 1992); In re Roxford Foods Litigation, 790 F. Supp. 987 (E.D. Cal. 1991); Nehmer v. U.S. Veterans' Admin., 712 F. Supp. 1404 (N.D. Cal. 1989); Pauly v. Eagle Point Software Co., Inc., 958 F. Supp. 437, 3 Wage & Hour Cas. 2d (BNA) 1565 (N.D. Iowa 1997); Crow v. U.S., 659 F. Supp. 556 (D. Kan. 1987); Sheppard v. Riverview Nursing Centre, Inc., 870 F. Supp. 1369, 66 Fair Empl. Prac. Cas. (BNA) 996 (D. Md. 1994), vacated, 88 F.3d 1332, 71 Fair Empl. Prac. Cas. (BNA) 218, 68 Empl. Prac. Dec. (CCH) P 44111, 35 Fed. R. Serv. 3d 522 (4th Cir. 1996); U.S. v. Any and All Radio Station Transmission Equipment, et al., Located at 2903 Bent Oak Highway, Adrian, Mich., 19 F. Supp. 2d 738 (E.D. Mich. 1998), rev'd on other grounds, 204 F.3d 658, 2000 FED App. 0069P (6th Cir. 2000); Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western Dist. of Mich., 46 F. Supp. 2d 689, 51 Fed. R. Evid. Serv. 1419 (W.D. Mich. 1999); Resolution Trust Corp. v. Rahn, 854 F. Supp. 480 (W.D. Mich. 1994); International Soc. for Krishna Consciousness, Inc. v. Lee, 105 F.R.D. 435 (S.D. N.Y. 1984); Prosser v. Prosser, 34 V.I. 139, 921 F. Supp. 1428 (D.V.I. 1996); In re Peet Packing Co., 233 B.R. 387, 34 Bankr. Ct. Dec. (CRR) 287, 42 Collier Bankr. Cas. 2d (MB) 399 (Bankr. E.D. Mich. 1999); In re Dow Corning Corp., 215 B.R. 346, 31 Bankr. Ct. Dec. (CRR) 954, 32

Collier Bankr. Cas. 2d (MB) 151 (Bankr. E.D. Mich. 1997), opinion supplemented, 215 B.R. 526, 31 Bankr. Ct. Dec. (CRR) 1144 (Bankr. E.D. Mich. 1997); Pacific Nat. Cellular v. U.S., 41 Fed. Cl. 20 (1998); Floral Trade Council v. U.S., 23 Ct. Int'l Trade 20, 41 F. Supp. 2d 319, 21 Int'l Trade Rep. (BNA) 1039 (1999).

Kundrat v. District of Columbia, 106 F. Supp. 2d 1 (D.D.C. 2000).

Lindsey v. Tacoma-Pierce County Health Dept., 195 F.3d 1065, 28 Media L. Rep. (BNA) 1170 (9th Cir. 1999), opinion amended on other grounds, 203 F.3d 1150 (9th Cir. 2000).

U.S. v. Miami University, 294 F.3d 797, 166 Ed. Law Rep. 464, 30 Media L. Rep. (BNA) 2057, 2002 FED App. 0213P (6th Cir. 2002).

In re Sullivan, 238 B.R. 230 (Bankr. D. Mass. 1999).

TRW Inc. v. Andrews, 534 U.S. 19, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001).

Dole Food Co. v. Patrickson, 538 U.S. 468, 123 S. Ct. 1655, 155 L. Ed. 2d 643, 188 A.L.R. Fed. 661 (2003).

Cole v. Central States Southeast and Southwest Areas Health and Welfare Fund, 225 F. Supp. 2d 96, 29 Employee Benefits Cas. (BNA) 1173 (D. Mass. 2002).

U.S. v. Aisenberg, 247 F. Supp. 2d 1272 (M.D. Fla. 2003), rev'd in part on other grounds, vacated in part on other grounds, 358 F.3d 1327 (11th Cir. 2004).

Hibbs v. Winn, 542 U.S. 88, 124 S. Ct. 2276, 159 L. Ed. 2d 172 (2004); In re Sunterra Corp., 361 F.3d 257, 42 Bankr. Ct. Dec. (CRR) 222, 51 Collier Bankr. Cas. 2d (MB) 1276, Bankr. L. Rep. (CCH) P 80068 (4th Cir. 2004); U.S. v. Vargas-Duran, 356 F.3d 598 (5th Cir. 2004); U.S. v. Ramirez-Sanchez, 338 F.3d 977 (9th Cir. 2003); U.S. ex rel. Totten v. Bombardier Corp., 2003 WL 22769033 (D.D.C. 2003), order aff'd, 380 F.3d 488 (D.C. Cir. 2004), cert. denied, 544 U.S. 1032, 125 S. Ct. 2257, 161 L. Ed. 2d 1059 (2005); Hamilton v. Werner Co., 268 F. Supp. 2d 1085 (S.D. Iowa 2003); Tesoro Hawaii Corp. v. U.S., 58 Fed. Cl. 65 (2003), rev'd on other grounds, 405 F.3d 1339, 15 A.L.R. Fed. 2d 755 (Fed. Cir. 2005); ABF Freight System, Inc. v. U.S., 55 Fed. Cl. 392 (2003).

Soliman v. Gonzales, 419 F.3d 276 (4th Cir. 2005); Senior Resources v. Jackson, 412 F.3d 112 (D.C. Cir. 2005); In re Asia Global Crossing, Ltd., 344 B.R. 247, 46 Bankr. Ct. Dec. (CRR) 182 (Bankr. S.D. N.Y. 2006); Roper v. Nicholson, 20 Vet. App. 173 (2006); Dingess v. Nicholson, 19 Vet. App. 473 (2006), aff'd, 483 F.3d 1311 (Fed. Cir. 2007) and aff'd, 2007 WL 1686737 (Fed. Cir. 2007).

**Alabama.** Ex parte Welch, 519 So. 2d 517 (Ala. 1987).

Ex parte Wilson, 854 So. 2d 1106 (Ala. 2002).

**Alaska.** Peninsula Marketing Ass'n v. Rosier, 890 P.2d 567 (Alaska 1995); Homer Elec. Ass'n v. Towsley, 841 P.2d 1042 (Alaska 1992); McKeown v. Kinney Shoe Corp., 820 P.2d 1068, 30 Wage & Hour Cas. (BNA) 1052, 126 Lab. Cas. (CCH) P 57529 (Alaska 1991); 22,757 Sq. Ft., More or Less v. State, 799 P.2d 777 (Alaska 1990); Faulk v. Estate of Haskins, 714 P.2d 354 (Alaska 1986); King v. Alaska State Housing Authority, 633 P.2d 256 (Alaska 1981).

Municipality of Anchorage v. Repasky, 34 P.3d 302, 158 Ed. Law Rep. 822 (Alaska 2001); Ault v. State, 73 P.3d 1248 (Alaska Ct. App. 2003); Tanque Verde Unified School Dist. No. 13 of Pima County v. Bernini, 206 Ariz. 200, 76 P.3d 874, 181 Ed. Law Rep. 245 (Ct. App. Div. 2 2003), as corrected, (Nov. 6, 2003); Zamora v. Reinstein, 185 Ariz. 272, 915 P.2d 1227 (1996); Jackson v. City of Blytheville Civil Service Com'n, 345 Ark. 56, 43 S.W.3d 748, 143 Lab. Cas. (CCH) P 59289 (2001).

**Arkansas.** Western Carroll County Ambulance Dist. v. Johnson, 345 Ark. 95, 44 S.W.3d 284 (2001).

**California.** San Diego Police Officers' Assn. v. City of San Diego Civil Service Com., 104 Cal. App. 4th 275, 128 Cal. Rptr. 2d 248, 19 I.E.R. Cas. (BNA)

715 (4th Dist. 2002), as modified, (Dec. 11, 2002) and as modified on denial of reh'g, (Jan. 9, 2003); Rodriguez v. Superior Court, 14 Cal. App. 4th 1260, 18 Cal. Rptr. 2d 120 (5th Dist. 1993), as modified, (Apr. 30, 1993).

**Colorado.** People v. Terry, 791 P.2d 374 (Colo. 1990); Estate of David v. Snelson, 776 P.2d 813 (Colo. 1989).

**Connecticut.** First Bethel Associates v. Town of Bethel, 231 Conn. 731, 651 A.2d 1279 (1995); Turner v. Turner, 219 Conn. 703, 595 A.2d 297 (1991).

**Delaware.** State v. Croce, 1997 WL 524070 (Del. Super. Ct. 1997).

**District of Columbia.** District of Columbia v. Thompson, 593 A.2d 621 (D.C. 1991); District of Columbia v. Acme Reporting Co., 530 A.2d 708 (D.C. 1987); McDaniels v. District of Columbia Dept. of Employment Services, 512 A.2d 990 (D.C. 1986).

**Florida.** When construing an election contest statute no single statutory provision should be construed in such a way as to render meaningless or absurd any other statutory provision. Gore v. Harris, 772 So. 2d 1243 (Fla. 2000), rev'd on other grounds, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000).

Caloosa Property Owners Ass'n, Inc. v. Palm Beach County Bd. of County Com'rs, 429 So. 2d 1260 (Fla. Dist. Ct. App. 1st Dist. 1983).

**Georgia.** Anderson v. State, 261 Ga. App. 716, 583 S.E.2d 549 (2003); Monticello, Ltd. v. City of Atlanta, 231 Ga. App. 382, 499 S.E.2d 157 (1998).

**Hawaii.** State v. Kwak, 80 Haw. 297, 909 P.2d 1112 (1995).

Torres v. Torres, 100 Haw. 397, 60 P.3d 798, 30 Employee Benefits Cas. (BNA) 1183 (2002), as amended, (Jan. 6, 2003).

**Idaho.** Evans v. Teton County, 139 Idaho 71, 73 P.3d 84 (2003); Sweitzer v. Dean, 118 Idaho 568, 798 P.2d 27 (1990).

**Illinois.** Best v. Taylor Mach. Works, 179 Ill. 2d 367, 228 Ill. Dec. 636, 689 N.E.2d 1057, Prod. Liab. Rep. (CCH) P 15123 (1997); People v. Murphy, 108 Ill. 2d 228, 91 Ill. Dec. 653, 483 N.E.2d 1288 (1985); Sadat v. American Motors Corp., 104 Ill. 2d 105, 83 Ill. Dec. 577, 470 N.E.2d 997, 1984-2 Trade Cas. (CCH) P 66245 (1984); People v. Singleton, 103 Ill. 2d 339, 82 Ill. Dec. 666, 469 N.E.2d 200 (1984); People v. Liberman, 228 Ill. App. 3d 639, 170 Ill. Dec. 139, 592 N.E.2d 575 (4th Dist. 1992).

A.P. Properties, Inc. v. Goshinsky, 186 Ill. 2d 524, 239 Ill. Dec. 600, 714 N.E.2d 519 (1999).

**Indiana.** Guinn v. Light, 558 N.E.2d 821 (Ind. 1990).

**Iowa.** Miller v. Marshall County, 641 N.W.2d 742 (Iowa 2002).

Thoms v. Iowa Public Employees' Retirement System, 715 N.W.2d 7 (Iowa 2006).

**Kansas.** State ex rel. Stephan v. Kansas Racing Com'n, 246 Kan. 708, 792 P.2d 971 (1990).

**Kentucky.** Daviess County v. Snyder, 556 S.W.2d 688 (Ky. 1977).

**Louisiana.** Breaux v. Lafourche Parish Council, 851 So. 2d 1173 (La. Ct. App. 1st Cir. 2003), writ denied, 860 So. 2d 1163 (La. 2003); Lasyone v. Phares, 818 So. 2d 1068 (La. Ct. App. 1st Cir. 2002), writ denied, 827 So. 2d 423 (La. 2002).

**Maryland.** Blondell v. Baltimore City Police Dept., 341 Md. 680, 672 A.2d 639 (1996).

Gillespie v. State, 370 Md. 219, 804 A.2d 426 (2002).

**Massachusetts.** Bankers Life and Cas. Co. v. Commissioner of Ins., 427 Mass. 136, 691 N.E.2d 929 (1998); Pentucket Manor Chronic Hosp., Inc. v. Rate Setting Com'n, 394 Mass. 233, 475 N.E.2d 1201 (1985); School Committee of Brock-

ton v. Teachers' Retirement Bd., 393 Mass. 256, 471 N.E.2d 61, 21 Ed. Law Rep. 651 (1984); Com. v. Soto, 47 Mass. App. Ct. 914, 712 N.E.2d 1164 (1999), aff'd, 431 Mass. 340, 727 N.E.2d 811 (2000).

Associated Subcontractors of Massachusetts, Inc. v. University of Massachusetts Bldg. Authority, 442 Mass. 159, 810 N.E.2d 1214, 189 Ed. Law Rep. 332 (2004); Wolfe v. Gormally, 440 Mass. 699, 802 N.E.2d 64 (2004); Lynch v. Com., 54 Mass. App. Ct. 347, 765 N.E.2d 774 (2002).

Lowery v. Klemm, 446 Mass. 572, 845 N.E.2d 1124, 98 Fair Empl. Prac. Cas. (BNA) 75 (2006).

**Michigan.** American Federation of State, County and Municipal Employees v. City of Detroit, 468 Mich. 388, 662 N.W.2d 695 (2003); Great Lakes Sales, Inc. v. State Tax Com'n, 194 Mich. App. 271, 486 N.W.2d 367 (1992).

**Minnesota.** Wolfer v. Microboards Manufacturing, LLC, 654 N.W.2d 360 (Minn. Ct. App. 2002).

**Missouri.** Engine Masters, Inc. v. Kirn's, Inc., 872 S.W.2d 644 (Mo. Ct. App. E.D. 1994).

**Nebraska.** Gilroy v. Ryberg, 266 Neb. 617, 667 N.W.2d 544 (2003); Keller v. Tavarone, 265 Neb. 236, 655 N.W.2d 899 (2003); State v. Johnson, 12 Neb. App. 247, 670 N.W.2d 802 (2003), decision aff'd, 269 Neb. 507, 695 N.W.2d 165 (2005).

**Nevada.** Tomlinson v. State, 110 Nev. 757, 878 P.2d 311 (1994).

**New Hampshire.** Glick v. Town of Ossipee, 130 N.H. 643, 547 A.2d 231 (1988).

**New Jersey.** Pine Belt Chevrolet, Inc. v. Jersey Cent. Power and Light Co., 132 N.J. 564, 626 A.2d 434 (1993); McGlynn v. New Jersey Public Broadcasting Authority, 88 N.J. 112, 439 A.2d 54, 7 Media L. Rep. (BNA) 2446, 27 A.L.R.4th 322 (1981); Breitwieser v. State-Operated School Dist. of City of Jersey City, Hudson County, 286 N.J. Super. 633, 670 A.2d 73, 106 Ed. Law Rep. 751 (App. Div. 1996); Sanders v. Hunter, 253 N.J. Super. 666, 602 A.2d 809 (Law Div. 1991); Calabro v. Campbell Soup Co., 244 N.J. Super. 149, 581 A.2d 1318 (App. Div. 1990), judgment aff'd, 126 N.J. 278, 597 A.2d 83 (1991).

**North Carolina.** Huntington Properties, LLC v. Currituck County, 153 N.C. App. 218, 569 S.E.2d 695 (2002).

**Ohio.** State v. McNulty, 111 Ohio App. 3d 828, 677 N.E.2d 405 (6th Dist. Ottawa County 1996).

**Oklahoma.** In re Baby Girl L., 2002 OK 9, 51 P.3d 544 (Okla. 2002), as clarified on other grounds on reh'g, (July 1, 2002).

**Pennsylvania.** Com. v. Pierce, 397 Pa. Super. 126, 579 A.2d 963 (1990); Key Sav. and Loan Ass'n v. Louis John, Inc., 379 Pa. Super. 226, 549 A.2d 988 (1988).

**Rhode Island.** Rhode Island Dept. of Mental Health, Retardation and Hospitals v. R.B., 549 A.2d 1028 (R.I. 1988).

Chappell v. Rhode Island Dept. of Human Services, 2003 WL 21297134 (R.I. Super. Ct. 2003).

**South Carolina.** Sea Island Scenic Parkway Coalition v. Beaufort County Bd. of Adjustments and Appeals, 316 S.C. 231, 449 S.E.2d 254 (Ct. App. 1994), decision rev'd on other grounds, 321 S.C. 548, 471 S.E.2d 142 (1996).

**South Dakota.** State v. Peterson, 722 A.2d 259 (R.I. 1998); Mid-Century Ins. Co. v. Lyon, 1997 SD 50, 562 N.W.2d 888 (S.D. 1997).

Gloe v. Iowa Mut. Ins. Co., 2005 SD 29, 694 N.W.2d 238 (S.D. 2005).

**Tennessee.** It is the court's duty to reconcile the statutory provisions to give them consistent meaning and a harmonious purpose. First Tennessee Bank, N.A. v. Dougherty, 963 S.W.2d 507 (Tenn. Ct. App. 1997); State v. Levandowski,

---

1996 WL 315807 (Tenn. Crim. App. 1996), aff'd, 955 S.W.2d 603 (Tenn. 1997); Eyman v. Kentucky Cent. Ins. Co., 870 S.W.2d 530 (Tenn. Ct. App. 1993).

State v. Morrow, 75 S.W.3d 919 (Tenn. 2002); Henderson v. City of Chattanooga, 133 S.W.3d 192, 32 Media L. Rep. (BNA) 1137 (Tenn. Ct. App. 2003).

**Texas.** Sanders v. Shelton, 970 S.W.2d 721 (Tex. App. Austin 1998); Matter of A.F., 895 S.W.2d 481 (Tex. App. Austin 1995); Price v. State, 840 S.W.2d 694 (Tex. App. Corpus Christi 1992), petition for discretionary review refused, (Feb. 11, 1993).

Texas Property and Cas. Ins. Guar. Ass'n v. Johnson, 4 S.W.3d 328 (Tex. App. Austin 1999).

**Vermont.** State v. Beattie, 157 Vt. 162, 596 A.2d 919 (1991); State v. Kreth, 150 Vt. 406, 553 A.2d 554 (1988).

**Washington.** Washington Economic Development Finance Authority v. Grimm, 119 Wash. 2d 738, 837 P.2d 606 (1992).

**West Virginia.** Cogar v. Faerber, 179 W. Va. 600, 371 S.E.2d 321 (1988).

**Wisconsin.** Gaertner v. Holcka, 219 Wis. 2d 436, 580 N.W.2d 271 (1998); State v. Martin, 162 Wis. 2d 883, 470 N.W.2d 900 (1991).

Wagner v. Milwaukee County Election Com'n, 2003 WI 103, 263 Wis. 2d 709, 666 N.W.2d 816 (2003); Meyer v. Meyer, 2000 WI 132, 239 Wis. 2d 731, 620 N.W.2d 382 (2000).

**Wyoming.** State By and Through Dept. of Family Services v. Jennings, 818 P.2d 1149 (Wyo. 1991).

In the Matter of the Workers' Compensation Claim of Newman, 2002 WY 91, 49 P3d 163 (2002).

Hamermesh, Corporate Democracy and Stockholder Adopted By-laws: Taking Back the Street, 73 Tul L Rev 409 (1998); Wright and Graham, Federal Practice and Procedure: Evidence Ch 5 Relevancy and Its Limits, Rule 408 Compromise and Offers to Compromise, § 5310 Permissible Uses — Discoverable Evidence.

Dickerson, Lifestyles of the Not-So-Rich or Famous: The Role of Choice and Sacrifice in Bankruptcy, 45 Buff L Rev 629 (1997); Griffith, Truth in Lending—The Right of Rescission, Disclosure of the Finance Charge, and Itemization of the Amount Financed in Close-End Transactions, 6 Geo Mason L Rev 191 (1998); Rowe, Not Bad for Government Work: Does Anyone Else Think the Supreme Court is Doing a Halfway Decent Job in its Erie-Hanna Jurisprudence?, 73 Notre Dame L Rev 963 (1998); Finn, The Public Interest and Bell Entry into Long-Distance Under Section 271 of the Communications Act, 5 CommLaw Conspectus 203 (1997); Ross & Josephson, The Electoral College and the Popular Vote, 12 J Law & Politics 665 (1996); Luh, Pay or Don't Play: Background Music and the Small Business Exemption of Copyright Law, 16 Loyola L A Ent L J 711 (1996); Dickerson, Curtailing Civil RICO's Long Reach: Establishing New Boundaries for Venue and Personal Jurisdiction under 18 USC § 1965, 75 Nebraska L Rev 476 (1996); Nance, Verbal Completeness and Exclusionary Rules under the Rules of Evidence, 75 Texas L Rev 51 (1966); Bryan, The Battle Between Mens Rea and the Public Welfare: United States v. Laughlin Finds a Middle Ground, 6 Fordham Envtl L J 157, 169 (1995); Daugherty, The Unfulfilled Promise On an End to Timber Dominance On the Tongass: Forest Service Implementation of the Tongass Timber Reform Act, 24 Envtl L 1573 (1994); Duncan, The Oil Pollution Act of 1990's Effect on the Shipowners Limitation of Liability Act, 5 USF Maritime LJ 303, 312–321 (1993); Frye, Municipal Sewer Authority Liability Under CERCLA: Should Taxpayers Be Liable for Superfund Cleanup Costs?: Westfarm Associates Ltd Partnership v. International Fabricare Institute, 14 Stan Envtl L J 61, 78 (1995); Houck, The Endangered

SUTHERLAND STATUTORY CONSTRUCTION

§ 46:6

cant,[3] and so that one section will not destroy another unless the

---

Species Act and its Implementation by the U.S. Departments of Interior and Commerce, 64 U Colo L Rev 277 (1993); Martin, Conspiratorial Children? The Intersection of the Federal Juvenile Delinquency Act and the Federal Conspiracy Law, 74 BU L Rev 859 (1994); Oddi, Reverse Informed Consent: The Unreasonably Dangerous Patient, 46 Vand L Rev 1417 (1993).

Cardiff, Conflict in the California Coastal Act: Sand and Seawalls, 38 Cal. W. L. Rev. 255 (2001).

Cook, Constitutional Rights of the Accused (3d ed.) § 2.3.

Eitel & Wertheim, Gramm-Leach-Bliley Update: New Regs, New Problems, New Opportunities 2002, 1299 PLI/Corp. 735 (2002).

Federbush, The Unclear Scope of Unconscionability in FDUTPA, 74-Aug. Fla. B.J. 49 (2000).

Fein, Broker dealer Regulation: Study Materials 191 (A.L.I.-A.B.A. Course of Study, January 10, 2002).

Hirsch, Revisions in Need of Revising: The Uniform Disclaimer of Property Interests Act, 29 Fla. St. U. L. Rev. 109 (2001).

5A Jacobs, Disclosure and Remedies Under the Securities Laws. § 4.7 (Update, 2003).

Schwarz, Unlawful Presence Unlawfully Interpreted, 79 No. 15 Interpreter Releases: Report and Analysis of Immigration and Nationality Law 509 (April 8, 2002).

Tiersma, A Message in a Bottle: Text, Autonomy, and Statutory Interpretation, 76 Tul. L. Rev. 431.

Warner, The Triumph of Hope Over Experience: The Bipartisan Campaign Reform of 2002 and the First Amendment, 13 Geo. Mason U. Civ. Rts L.J. 1 (2003)

23 Wright, Miller & Cooper, Federal Practice and Procedure § 5310 Federal Rules of Evidence.

Note, The Supreme Court, 2003 Term, Leading Cases, III Federal Statutes and Regulations, 118 Harv. L. Rev. 486 (2004).

Sur, Jealous Guardians in the Psychedelic Kingdom: Federal regulation of Electricity Contracts in Bankrupcy, 152 U. Pa. L. Rev. 1697 (2004).

Katz, Blumenthal v. Barnes: Civil Common Law Powers of the State Attorney General in the Charitable Sector, 17 Qinnipiac Prob. L. J. 383 (2004).

Wright & Graham, Federal Rules of Evidence, Ch. 5 Relevancy and Its Limits, Rule 408. Compromise and Offers to Compromise, § 5310 Permissible Uses—"Discoverable Evidence" (2004, Updated supplement).

McQuillin, The Law of Municipal Corporations § 9.22.

Paulson, No Endangered Species Left Behind: Correcting the Inequity in Habitat Designation for Pre-1978 Amendment Listed Species, 25 U. Haw. L. Rev. 525 (2003).

Dutcher, A Discussion of the Mechanics of the DMCA Safe Harbors and Subpoena Power, as Applied in RIAA v. Verizon Internet Services, 21 Santa Clara Computer and High Tech L J 493 (2005).

Johnson, Bankruptcy — The Defalcation Exception to Discharge: Should A Fiduciary's Mistake Prohibit a Discharge from Debt?. 27 W New Eng L Rev 93 (2005). Wasson, Taking Biologics for Granted? Takings, Trade Secreta, and Off-Patent Biological Products, 2005 Duke L & Tech Rev 4 (2005).

[3]**United States.** ErieNet, Inc. v. Velocity Net, Inc., 156 F.3d 513 (3d Cir. 1998); U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 117 A.L.R. Fed. 679 (3d Cir. 1991) (rejected on other grounds by, U.S. ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 12 I.E.R. Cas.

(BNA) 1040, 40 Cont. Cas. Fed. (CCH) P 76828, 136 Lab. Cas. (CCH) P 10308, 33
Fed. R. Serv. 3d 543 (9th Cir. 1995)); Com. of Pa., Dept. of Public Welfare v. U.S.
Dept. of Health and Human Services, 928 F.2d 1378, 33 Soc. Sec. Rep. Serv. 30 (3d
Cir. 1991); Indianapolis Power and Light Co. v. I. C. C., 687 F.2d 1098 (7th Cir.
1982); In re Catapult Entertainment, Inc., 165 F.3d 747, 33 Bankr. Ct. Dec. (CRR)
1058, 41 Collier Bankr. Cas. 2d (MB) 858, Bankr. L. Rep. (CCH) P 77886 (9th Cir.
1999); People of State of Cal. ex rel. State Water Resources Control Bd. v. E.P.A.,
511 F.2d 963, 7 Env't. Rep. Cas. (BNA) 1667, 5 Envtl. L. Rep. 20213 (9th Cir.
1975), judgment rev'd on other grounds, 426 U.S. 200, 96 S. Ct. 2022, 48 L. Ed. 2d
578, 8 Env't. Rep. Cas. (BNA) 2089, 6 Envtl. L. Rep. 20563 (1976); Knutzen v.
Eben Ezer Lutheran Housing Center, 815 F.2d 1343 (10th Cir. 1987); Gary v. U.S.,
708 F. Supp. 1188, 89-1 U.S. Tax Cas. (CCH) P 9269, 71A A.F.T.R.2d 93-5115 (D.
Colo. 1989); Pauly v. Eagle Point Software Co., Inc., 958 F. Supp. 437, 3 Wage &
Hour Cas. 2d (BNA) 1565 (N.D. Iowa 1997); Allende v. Shultz, 605 F. Supp. 1220
(D. Mass. 1985); Grand Traverse Band of Ottawa and Chippewa Indians v. U.S.
Atty. for Western Dist. of Mich., 46 F. Supp. 2d 689, 51 Fed. R. Evid. Serv. 1419
(W.D. Mich. 1999); F.D.I.C. v. diStefano, 839 F. Supp. 110 (D.R.I. 1993); In re Peet
Packing Co., 233 B.R. 387, 34 Bankr. Ct. Dec. (CRR) 287, 42 Collier Bankr. Cas.
2d (MB) 399 (Bankr. E.D. Mich. 1999); Melrose Associates, L.P. v. U.S., 43 Fed. Cl.
124 (1999), opinion supplemented on other grounds, 45 Fed. Cl. 56 (1999), aff'd, 4
Fed. Appx. 936 (Fed. Cir. 2001) and aff'd, 4 Fed. Appx. 936 (Fed. Cir. 2001); Abram-
son v. U.S., 42 Fed. Cl. 621, 6 Wage & Hour Cas. 2d (BNA) 801 (1998); Floral
Trade Council v. U.S., 23 Ct. Int'l Trade 20, 41 F. Supp. 2d 319, 21 Int'l Trade Rep.
(BNA) 1039 (1999).

In re Sullivan, 238 B.R. 230 (Bankr. D. Mass. 1999).

TRW Inc. v. Andrews, 534 U.S. 19, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001).

Hibbs v. Winn, 542 U.S. 88, 124 S. Ct. 2276, 159 L. Ed. 2d 172 (2004); U.S.
ex rel. Totten v. Bombardier Corp., 2003 WL 22769033 (D.D.C. 2003), order aff'd,
380 F.3d 488 (D.C. Cir. 2004), cert. denied, 544 U.S. 1032, 125 S. Ct. 2257, 161 L.
Ed. 2d 1059 (2005); U.S. v. Aisenberg, 247 F. Supp. 2d 1272 (M.D. Fla. 2003), rev'd
in part on other grounds, vacated in part on other grounds, 358 F.3d 1327 (11th
Cir. 2004).

Senior Resources v. Jackson, 412 F.3d 112 (D.C. Cir. 2005); Roper v. Nichol-
son, 20 Vet. App. 173 (2006); Dingess v. Nicholson, 19 Vet. App. 473 (2006), aff'd,
483 F.3d 1311 (Fed. Cir. 2007) and aff'd, 2007 WL 1686737 (Fed. Cir. 2007).

**Alabama.** Alabama State Bd. of Health ex rel. Baxley v. Chambers County,
335 So. 2d 653 (Ala. 1976).

Ex parte Wilson, 854 So. 2d 1106 (Ala. 2002).

**Alaska.** Peninsula Marketing Ass'n v. Rosier, 890 P.2d 567 (Alaska 1995);
Homer Elec. Ass'n v. Towsley, 841 P.2d 1042 (Alaska 1992); McKeown v. Kinney
Shoe Corp., 820 P.2d 1068, 30 Wage & Hour Cas. (BNA) 1052, 126 Lab. Cas.
(CCH) P 57529 (Alaska 1991); 22,757 Sq. Ft., More or Less v. State, 799 P.2d 777
(Alaska 1990).

Municipality of Anchorage v. Repasky, 34 P.3d 302, 158 Ed. Law Rep. 822
(Alaska 2001); Ault v. State, 73 P.3d 1248 (Alaska Ct. App. 2003).

**Arkansas.** Commercial Printing Co. v. Rush, 261 Ark. 468, 549 S.W.2d 790,
2 Media L. Rep. (BNA) 1951 (1977).

**California.** Rodriguez v. Superior Court, 14 Cal. App. 4th 1260, 18 Cal.
Rptr. 2d 120 (5th Dist. 1993), as modified, (Apr. 30, 1993); AFL-CIO v. Deukme-
jian, 212 Cal. App. 3d 425, 260 Cal. Rptr. 479, 14 O.S.H. Cas. (BNA) 1132 (3d Dist.
1989).

§ 46:6                                            SUTHERLAND STATUTORY CONSTRUCTION

provision is the result of obvious mistake or error.[4] No clause,

**District of Columbia.** District of Columbia v. Thompson, 593 A.2d 621 (D.C. 1991); Richardson v. District of Columbia Redevelopment Land Agency, 453 A.2d 118 (D.C. 1982).

**Hawaii.** State v. Kwak, 80 Haw. 297, 909 P.2d 1112 (1995).

Torres v. Torres, 100 Haw. 397, 60 P.3d 798, 30 Employee Benefits Cas. (BNA) 1183 (2002), as amended, (Jan. 6, 2003).

**Maryland.** Blondell v. Baltimore City Police Dept., 341 Md. 680, 672 A.2d 639 (1996).

**Nebraska.** Keller v. Tavarone, 265 Neb. 236, 655 N.W.2d 899 (2003).

**Nevada.** Tomlinson v. State, 110 Nev. 757, 878 P.2d 311 (1994).

**New Jersey.** Square Brighton Corp., Inc. v. City of Atlantic City, 287 N.J. Super. 450, 671 A.2d 203 (App. Div. 1996), judgment aff'd, 148 N.J. 55, 689 A.2d 712 (1997).

**Rhode Island.** Chappell v. Rhode Island Dept. of Human Services, 2003 WL 21297134 (R.I. Super. Ct. 2003).

**South Dakota.** Gloe v. Iowa Mut. Ins. Co., 2005 SD 29, 694 N.W.2d 238 (S.D. 2005).

**Tennessee.** State v. Morrow, 75 S.W.3d 919 (Tenn. 2002); Henderson v. City of Chattanooga, 133 S.W.3d 192, 32 Media L. Rep. (BNA) 1137 (Tenn. Ct. App. 2003).

**Texas.** Badgett v. State, 42 S.W.3d 136 (Tex. Crim. App. 2001).

**Washington.** Washington Economic Development Finance Authority v. Grimm, 119 Wash. 2d 738, 837 P.2d 606 (1992).

Rowe, Not Bad for Government Work: Does Anyone Else Think the Supreme Court is Doing a Halfway Decent Job in its Erie-Hanna Jurisprudence?, 73 Notre Dame L Rev 963 (1998); Luh, Pay or Don't Play: Background Music and the Small Business Exemption of Copyright Law, 16 Loyola L A Ent L J 711 (1996); Dickerson, Curtailing Civil RICO's Long Reach: Establishing New Boundaries for Venue and Personal Jurisdiction under 18 USC § 1965, 75 Nebraska L Rev 476 (1996); Duncan, The Oil Pollution Act of 1990's Effect on the Shipowners Limitation of Liability Act, 5 USF Maritime LJ 303, 312–321 (1993).

Jacobs, Disclosure and Remedies Under the Securities Laws, Chapter 4 Statutory Protections Prior to 10bb 5 Exchange Act Provisions, 5A Disclosure & Remedies Under the Sec Laws § 4:7 (1981).

Tiersma, A Message in a Bottle: Text, Autonomy, and Statutory Interpretation, 76 Tul. L. Rev. 431.

Note, The Supreme Court, 2003 Term, Leading Cases, III Federal Statutes and Regulations, 118 Harv. L. Rev. 486 (2004).

Katz, Blumenthal v. Barnes: Civil Common Law Powers of the State Attorney General in the Charitable Sector, 17 Qinnipiac Prob. L. J. 383 (2004).

Paulson, No Endangered Species Left Behind: Correcting the Inequity in Habitat Designation for Pre-1978 Amendment Listed Species, 25 U. Haw. L. Rev. 525 (2003).

Griffin, Identifying Some Trouble Spots in the Fair Debt Collection Practices Act: A Framwork for Improvement, 83 Neb L Rev 762 (2005). Johnson, Bankruptcy — The Defalcation Exception to Discharge: Should A Fiduciary's Mistake Prohibit a Discharge from Debt?. 27 W New Eng L Rev 93 (2005). Wasson, Taking Biologics for Granted? Takings, Trade Secreta, and Off-Patent Biological Products, 2005 Duke L & Tech Rev 4 (2005).

[4]**United States.** American National Red Cross v. S.G., 505 U.S. 247, 112 S. Ct. 2465, 120 L. Ed. 2d 201 (1992); U.S. v. Dinerstein, 362 F.2d 852 (2d Cir. 1966);

244

Arredondo v. U.S., 120 F.3d 639, 1997 FED App. 0239P (6th Cir. 1997)); Lyons v. Ohio Adult Parole Authority, 105 F.3d 1063, 1997 FED App. 0025P (6th Cir. 1997) and (implied overruling on other grounds recognized by,In re Catapult Entertainment, Inc., 165 F.3d 747, 33 Bankr. Ct. Dec. (CRR) 1058, 41 Collier Bankr. Cas. 2d (MB) 858, Bankr. L. Rep. (CCH) P 77886 (9th Cir. 1999); Boise Cascade Corp. v. U.S. E.P.A., 942 F.2d 1427, 33 Env't. Rep. Cas. (BNA) 1693, 22 Envtl. L. Rep. 20007 (9th Cir. 1991); Knutzen v. Eben Ezer Lutheran Housing Center, 815 F.2d 1343 (10th Cir. 1987); American Federation of Government Employees, Local 2782 v. Federal Labor Relations Authority, 803 F.2d 737, 123 L.R.R.M. (BNA) 3111 (D.C. Cir. 1986); United Scenic Artists, Local 829, Broth. of Painters and Allied Trades, AFL-CIO v. N.L.R.B., 762 F.2d 1027, 119 L.R.R.M. (BNA) 2675, 103 Lab. Cas. (CCH) P 11490 (D.C. Cir. 1985); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984); Public Citizen Health Research Group v. Food and Drug Admin., 704 F.2d 1280 (D.C. Cir. 1983); National Ass'n of Recycling Industries, Inc. v. I. C. C., 660 F.2d 795 (D.C. Cir. 1981); In re Surface Min. Regulation Litigation, 627 F.2d 1346, 14 Env't. Rep. Cas. (BNA) 1421, 10 Envtl. L. Rep. 20465 (D.C. Cir. 1980); Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 1975-1976 O.S.H. Dec. (CCH) P 20642, 42 A.L.R. Fed. 763 (D.C. Cir. 1976); International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Donovan, 570 F. Supp. 210, 4 Int'l Trade Rep. (BNA) 2382, 4 Int'l Trade Rep. (BNA) 2392, 4 Int'l Trade Rep. (BNA) 2441 (D.D.C. 1983), order vacated on other grounds, 746 F.2d 855, 6 Int'l Trade Rep. (BNA) 1289 (D.C. Cir. 1984); National Federation of Federal Emp., Local 1622 v. Brown, 481 F. Supp. 704, 24 Wage & Hour Cas. (BNA) 464 (D.D.C. 1979), judgment rev'd on other grounds, 645 F.2d 1017, 24 Wage & Hour Cas. (BNA) 1209, 25 Wage & Hour Cas. (BNA) 142 (D.C. Cir. 1981); In re Brown, 329 F. Supp. 422 (S.D. Iowa 1971).

Estate of Kunze v. C.I.R., 233 F.3d 948, 2000-2 U.S. Tax Cas. (CCH) P 50848, 2000-2 U.S. Tax Cas. (CCH) P 60388, 86 A.F.T.R.2d 2000-6920 (7th Cir. 2000); Bohac v. Department of Agriculture, 239 F.3d 1334, 17 I.E.R. Cas. (BNA) 434 (Fed. Cir. 2001).

U.S. v. Aisenberg, 247 F. Supp. 2d 1272 (M.D. Fla. 2003), rev'd in part on other grounds, vacated in part on other grounds, 358 F.3d 1327 (11th Cir. 2004).

Osage Tribe of Indians of Oklahoma v. U.S., 68 Fed. Cl. 322, 163 O.G.R. 16 (2005); Roper v. Nicholson, 20 Vet. App. 173 (2006); Dingess v. Nicholson, 19 Vet. App. 473 (2006), aff'd, 483 F.3d 1311 (Fed. Cir. 2007) and aff'd, 2007 WL 1686737 (Fed. Cir. 2007).

**Alabama.** Ex parte Welch, 519 So. 2d 517 (Ala. 1987).

Ex parte Wilson, 854 So. 2d 1106 (Ala. 2002).

**Alaska.** 22,757 Sq. Ft., More or Less v. State, 799 P.2d 777 (Alaska 1990); State v. F/V Baranof, 677 P.2d 1245 (Alaska 1984); Williford v. State, 674 P.2d 1329 (Alaska 1983); Alascom, Inc. v. North Slope Borough, Bd. of Equalization, 659 P.2d 1175 (Alaska 1983); Fowler v. City of Anchorage, 583 P.2d 817, 23 Wage & Hour Cas. (BNA) 1015, 84 Lab. Cas. (CCH) P 55144 (Alaska 1978); Isakson v. Rickey, 550 P.2d 359 (Alaska 1976) (abrogated on other grounds by, Commercial Fisheries Entry Commission v. Apokedak, 606 P.2d 1255 (Alaska 1980)).

Federal Deposit Ins. Corp. v. Laidlaw Transit, Inc., 21 P.3d 344, 52 Env't. Rep. Cas. (BNA) 1488 (Alaska 2001); Ault v. State, 73 P.3d 1248 (Alaska Ct. App. 2003); Continental Bank v. Arizona Dept. of Revenue, 131 Ariz. 6, 638 P.2d 228 (Ct. App. Div. 1 1981).

**California.** Rodriguez v. Superior Court, 14 Cal. App. 4th 1260, 18 Cal. Rptr. 2d 120 (5th Dist. 1993), as modified, (Apr. 30, 1993); People v. Jackson, 143 Cal. App. 3d 627, 192 Cal. Rptr. 7 (1st Dist. 1983).

**Colorado.** People in Interest of S.J.C., 776 P.2d 1103 (Colo. 1989).

SUTHERLAND STATUTORY CONSTRUCTION

§ 46:6

---

**Delaware.** State v. Croce, 1997 WL 524070 (Del. Super. Ct. 1997).

Unnecessary words or clauses or those having no meaning in harmony with the legislative intent as understood from the entire act, will be treated as surplusage. Matter of Estate of Smith, 467 A.2d 1274 (Del. Ch. 1983).

**District of Columbia.** Mulky v. U.S., 451 A.2d 855 (D.C. 1982).

**Idaho.** Norton v. Department of Employment, 94 Idaho 924, 500 P.2d 825 (1972).

**Illinois.** Estep v. Illinois Dept. of Public Aid, 115 Ill. App. 3d 644, 71 Ill. Dec. 402, 450 N.E.2d 1281 (1st Dist. 1983); Mission Hills Condominium M-4 Ass'n v. Penachio, 97 Ill. App. 3d 305, 52 Ill. Dec. 916, 422 N.E.2d 1125 (1st Dist. 1981).

**Iowa.** George H. Wentz, Inc. v. Sabasta, 337 N.W.2d 495 (Iowa 1983) (overruled on other grounds by, Henriksen v. Younglove Const., 540 N.W.2d 254 (Iowa 1995)) (overruled on other grounds by, Henriksen v. Younglove Const., 540 N.W.2d 254 (Iowa 1995)); Miller v. Marshall County, 641 N.W.2d 742 (Iowa 2002).

**Maryland.** If the intent of the statute can be discerned from the words utilized in the enactment, with the terminology chosen being given its ordinary and popularly understood meaning, the court need look no further as that clearly expressed intention will control. Andrews v. City of Greenbelt, 293 Md. 69, 441 A.2d 1064 (1982).

**Massachusetts.** Com. v. Gagnon, 387 Mass. 567, 441 N.E.2d 753 (1982), on reh'g, 387 Mass. 768, 443 N.E.2d 407 (1982).

**Michigan.** People v. Dziuba, 139 Mich. App. 789, 363 N.W.2d 33 (1984).

**Missouri.** In re Hough's Estate, 457 S.W.2d 687 (Mo. 1970).

**New Jersey.** Raybestos-Manhattan, Inc. v. Glaser, 144 N.J. Super. 152, 365 A.2d 1 (Ch. Div. 1976), judgment aff'd, 156 N.J. Super. 513, 384 A.2d 176 (App. Div. 1978).

A statute should not be interpreted so as to make it meaningless. McGlynn v. New Jersey Public Broadcasting Authority, 88 N.J. 112, 439 A.2d 54, 7 Media L. Rep. (BNA) 2446, 27 A.L.R.4th 322 (1981).

**North Dakota.** Trinity Medical Center, Inc. v. Holum, 544 N.W.2d 148 (N.D. 1996).

**Oklahoma.** It is asserted that the word "shop" means "a small retail store." To adopt such a definition would render the word "store" in the ordinance meaningless. Robison v. Ray, 1981 OK 141, 637 P.2d 108 (Okla. 1981).

**Oregon.** Murphy v. Nilsen, 19 Or. App. 292, 527 P.2d 736 (1974).

**Rhode Island.** In re Bernard H., 557 A.2d 864 (R.I. 1989).

**Utah.** Brickyard Homeowners' Ass'n Management Committee v. Gibbons Realty Co., 668 P.2d 535 (Utah 1983).

**Washington.** Metcalf v. State, Dept. of Motor Vehicles, 11 Wash. App. 819, 525 P.2d 819 (Div. 1 1974).

Where uncertainty arises from words used by the legislature, a statutory section under construction should be read in context with the entire act and meaning ascribed to it that avoids strained or absurd consequences. State v. Taylor, 30 Wash. App. 844, 638 P.2d 630 (Div. 1 1982), judgment rev'd on other grounds, 97 Wash. 2d 724, 649 P.2d 633 (1982).

**Wisconsin.** Milwaukee County v. Department of Industry, Labor and Human Relations Commission, 80 Wis. 2d 445, 259 N.W.2d 118 (1977).

**West Virginia.** For a Presidential order or Proclamation to create a legal holiday in West Virginia as defined in the state statute that allows him to do so, the President must make his intent clear in his order or proclamation by either citing clear authority to create a holiday or using the applicable language of the statute, and by expressing that the holiday is one for all citizens (claim that proclama-

sentence or word shall be construed as superfluous, void or insignif-
icant if a construction can be found which will give force to and
preserve all the words of the statute.[5] While every word of a statute
must be presumed to have been used for a purpose, it is also the

---

tion commemorating the death of President Richard Nixon established a legal
holiday within West Virginia). Mitchell v. City of Wheeling, 202 W. Va. 85, 502
S.E.2d 182 (1998).

    Dickerson, Lifestyles of the Not-So-Rich or Famous: The Role of Choice and
Sacrifice in Bankruptcy, 45 Buff L Rev 629 (1997); Fausey, Does the United
Nations' Use of Collective Sanctions to Protect Human Rights Violate Its Own
Human Rights Standards, 10 Conn J Int'l L 193 (1994); Martin, Conspiratorial
Children? The Intersection of the Federal Juvenile Delinquency Act and the
Federal Conspiracy Law, 74 BU L Rev 859 (1994).

    Cardiff, Conflict in the California Coastal Act: Sand and Seawalls, 38 Cal.
W. L. Rev. 255 (2001).

    Katz, Blumenthal v. Barnes: Civil Common Law Powers of the State
Attorney General in the Charitable Sector, 17 Qinnipiac Prob L. J. 383 (2004).

    Wasson, Taking Biologics for Granted? Takings, Trade Secreta, and
Off-Patent Biological Products, 2005 Duke L & Tech Rev 4 (2005).

    [5]Cullen, Reverse Age Discrimination Suits and the Age Discrimination in
Employment Act, 18 St. John's L Legal Comment 271 (2003).

    **United States.** Chickasaw Nation v. U.S., 2002-1 C.B. 718, 534 U.S. 84,
122 S. Ct. 528, 151 L. Ed. 2d 474, 2001-2 U.S. Tax Cas. (CCH) ¶ 50765, 2001-2
U.S. Tax Cas. (CCH) P 70172, 88 A.F.T.R.2d 2001-6967 (2001); Aeroquip-Vickers,
Inc. v. C.I.R., 347 F.3d 173, 2003-2 U.S. Tax Cas. (CCH) P 50693, 92 A.F.T.R.2d
2003-6555, 2003 FED App. 0370P (6th Cir. 2003).

    Padgett v. Nicholson, 19 Vet. App. 133 (2005), revoked in part on other
grounds, 19 Vet. App. 84 (2005) and opinion withdrawn, 19 Vet. App. 334 (2005),
rev'd and remanded on other grounds, 473 F.3d 1364 (Fed. Cir. 2007).

    **Alaska.** City of St. Mary's v. St. Mary's Native Corp., 9 P.3d 1002 (Alaska
2000).

    **California.** Kroupa v. Sunrise Ford, 77 Cal. App. 4th 835, 92 Cal. Rptr. 2d
42 (2d Dist. 1999), as modified, (Jan. 20, 2000).

    **Colorado.** People v. Keller, 985 P.2d 65 (Colo. Ct. App. 1999), judgment
rev'd on other grounds, 29 P.3d 290 (Colo. 2000).

    **Hawaii.** Tax Appeal of County of Maui v. KM Hawaii Inc., 81 Haw. 248,
915 P.2d 1349 (1996).

    **Idaho.** State v. Barnes, 133 Idaho 378, 987 P.2d 290 (1999).

    **Iowa.** Miller v. Marshall County, 641 N.W.2d 742 (Iowa 2002).

    **New Jersey.** Estate of Frost v. Director, Div. of Taxation, 22 N.J. Tax 537,
2005 WL 3100065 (2005).

    **North Carolina.** In seeking to discover and give effect to the legislative
intent, an act must be considered as a whole, and noone of its provisions shall be
deemed uuseless or redundant if they can reasonably be considered as adding
something to the act which is in harmony with its purpose. Living Centers-
Southeast, Inc. v. N.C. Dept. of Health and Human Services, Div. of Facility
Services, Certificate of Need Section, 138 N.C. App. 572, 532 S.E.2d 192 (2000).

    **South Dakota.** Gloe v. Iowa Mut. Ins. Co., 2005 SD 29, 694 N.W.2d 238
(S.D. 2005).

    **Utah.** State v. Maestas, 2002 UT 123, 63 P.3d 621 (Utah 2002).

    **Washington.** State ex rel. Peninsula Neighborhood Ass'n v. Washington
State Dept. of Transp., 142 Wash. 2d 328, 12 P.3d 134 (2000).

§ 46:6                          SUTHERLAND STATUTORY CONSTRUCTION

case that every word excluded from a statute must be presumed to
have been excluded for a purpose.[5] But it has been said that words

Ochoa, Copyright, Derivative Works and Fixation: Is Galoob a Mirage, or
does the Form(gen) of the Alleged Derivative Work Matter?, 20 Santa Clara
Compuer & High Tech L. J. 991 (2004).

Katz, Blumenthal v. Barnes: Civil Common Law Powers of the State
Attorney General in the Charitable Sector, 17 Qinnipiac Prob L. J. 383 (2004).

Jacobs, Disclosure and remedies Under the Securities Laws, Part I. Introduc-
tion, Ch. 4. Statutory Protection Prior to 10b-5-Exchange Act Provisions, VII.
Section 15 of the Exchange Act. § 4:7 Generally (2004 Database updated).

[5]Wasson, Taking Biologics for Granted? Takings, Trade Secreta, and
Off-Patent Biological Products, 2005 Duke L & Tech Rev 4 (2005).

**United States.** Chickasaw Nation v. U.S., 2002-1 C.B. 718, 534 U.S. 84,
122 S. Ct. 528, 151 L. Ed. 2d 474, 2001-2 U.S. Tax Cas. (CCH) ¶ 50765, 2001-2
U.S. Tax Cas. (CCH) P 70172, 88 A.F.T.R.2d 2001-6967 (2001).

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 122 S. Ct. 941, 151 L. Ed.
2d 908, 27 Employee Benefits Cas. (BNA) 1545, 197 A.L.R. Fed. 689 (2002).

City of Columbus v. Ours Garage and Wrecker Service, Inc., 536 U.S. 424,
122 S. Ct. 2226, 153 L. Ed. 2d 430 (2002).

Aeroquip-Vickers, Inc. v. C.I.R., 347 F.3d 173, 2003-2 U.S. Tax Cas. (CCH) P
50693, 92 A.F.T.R.2d 2003-6555, 2003 FED App. 0370P (6th Cir. 2003); Universal
Const. Co., Inc. v. Occupational Safety and Health Review Com'n, 182 F.3d 726, 18
O.S.H. Cas. (BNA) 1769, 1999 O.S.H. Dec. (CCH) P 31861 (10th Cir. 1999); Shams-
houm v. Bombay Cafe, 257 F. Supp. 2d 777 (D.N.J. 2003); Office Max, Inc. v. U.S.,
309 F. Supp. 2d 984, 2004-1 U.S. Tax Cas. (CCH) P 70216, 93 A.F.T.R.2d 2004-1190
(N.D. Ohio 2004), aff'd, 428 F.3d 583, 2005-2 U.S. Tax Cas. (CCH) P 70246, 96
A.F.T.R.2d 2005-6824, 2005 FED App. 0435P (6th Cir. 2005); Shoshone Indian
Tribe of the Wind River Reservation, Wyoming v. U.S., 56 Fed. Cl. 639, 163 O.G.R.
316 (2003).

**Alaska.** Ganz v. Alaska Airlines, Inc., 963 P.2d 1015, 4 Wage & Hour Cas.
2d (BNA) 1527, 136 Lab. Cas. (CCH) P 58457 (Alaska 1998).

**California.** Arden Carmichael, Inc. v. County of Sacramento, 93 Cal. App.
4th 507, 113 Cal. Rptr. 2d 248 (3d Dist. 2001).

People v. Johnson, 28 Cal. 4th 240, 121 Cal. Rptr. 2d 197, 47 P.3d 1064
(2002).

**Connecticut.** Celentano v. Oaks Condominium Ass'n, 265 Conn. 579, 830
A.2d 164 (2003); Office of Consumer Counsel v. Department of Public Utility
Control, Util. L. Rep. ¶ 26794, 2001 WL 1231684 (Conn. Super. Ct. 2001).

**Louisiana.** Chelette v. Valentine, 747 So. 2d 69 (La. Ct. App. 3d Cir. 1999),
writ denied, 751 So. 2d 253 (La. 1999).

Ransome v. Ransome, 822 So. 2d 746 (La. Ct. App. 1st Cir. 2002).

**Minnesota.** Genin v. 1996 Mercury Marquis, VIN No. 2MEBP95F9CX644211,
License No. MN 225 NSG, 622 N.W.2d 114 (Minn. 2001).

**New Jersey.** DKM Residential Properties Corp. v. The Township Of
Montgomery, 182 N.J. 296, 865 A.2d 649 (2005).

**South Dakota.** Gloe v. Iowa Mut. Ins. Co., 2005 SD 29, 694 N.W.2d 238
(S.D. 2005).

**Texas.** City Public Service Bd. of San Antonio v. Public Utility Com'n of
Texas, 9 S.W.3d 868 (Tex. App. Austin 2000), judgment aff'd, 53 S.W.3d 310 (Tex.
2001).

Kerrville HRH, Inc. v. City of Kerrville, 803 S.W.2d 377 (Tex. App. San
Antonio 1990), writ denied, (Apr. 24, 1991).

248

and clauses which are present in a statute only through inadvertence can be disregarded if they are repugnant to what is found, on the basis of other indicia, to be the legislative intent.[7] The same words used twice in the same act are presumed to have the same meaning.[8] Likewise, courts do not construe different terms within a statute to embody the same meaning. However, it is possible to

[7]Mehrbani, Substantive Due Process Claims in the Land-Use Context: The Need for a Simple and Intelligent Stadard of Review, 35 Envtl L Rev 209 (2005).

**United States.** U.S. v. Colon-Ortiz, 866 F.2d 6 (1st Cir. 1989); Oscar v. University Students Co-Op. Ass'n, 939 F.2d 808, R.I.C.O. Bus. Disp. Guide (CCH) P 7815 (9th Cir. 1991), reh'g en banc granted, opinion withdrawn by, 952 F.2d 1566, R.I.C.O. Bus. Disp. Guide (CCH) P 7927 (9th Cir. 1992) and rev'd on other grounds on reh'g en banc, 965 F.2d 783, 75 Ed. Law Rep. 782, R.I.C.O. Bus. Disp. Guide (CCH) P 8020 (9th Cir. 1992); International Broth. of Teamsters v. I.C.C., 801 F.2d 1423 (D.C. Cir. 1986), on reh'g, 818 F.2d 87 (D.C. Cir. 1987).

Bohac v. Department of Agriculture, 239 F.3d 1334, 17 I.E.R. Cas. (BNA) 434 (Fed. Cir. 2001); Little Six, Inc. v. U.S., 229 F.3d 1383, 2000-2 U.S. Tax Cas. (CCH) P 70155, 86 A.F.T.R.2d 2000-6450 (Fed. Cir. 2000).

U.S. v. McCollum, 58 M.J. 323 (C.A.A.F. 2003).

**Alaska.** Homer Elec. Ass'n v. Towsley, 841 P.2d 1042 (Alaska 1992).

**Delaware.** Selective Ins. Co. v. Lyons, 681 A.2d 1021 (Del. 1996); Bestemps v. Gibbs, 1998 WL 960759 (Del. Super. Ct. 1998).

**Georgia.** Department of Transp. v. Petkas, 189 Ga. App. 633, 377 S.E.2d 166 (1988).

**Hawaii.** State v. March, 94 Haw. 250, 11 P.3d 1094 (2000).

**Louisiana.** Jordan v. LeBlanc & Broussard Ford, Inc., 332 So. 2d 534 (La. Ct. App. 3d Cir. 1976).

**New Jersey.** Pine Belt Chevrolet, Inc. v. Jersey Cent. Power and Light Co., 132 N.J. 564, 626 A.2d 434 (1993).

Rider Ins. Co. v. First Trenton Companies, 354 N.J. Super. 491, 808 A.2d 143 (App. Div. 2002).

**North Carolina.** State v. Coffey, 336 N.C. 412, 444 S.E.2d 431 (1994).

**Ohio.** Elder v. Fischer, 129 Ohio App. 3d 209, 717 N.E.2d 730 (1st Dist. Hamilton County 1998).

**Texas.** Matter of A.F., 895 S.W.2d 481 (Tex. App. Austin 1995).

**Utah.** Gull Laboratories, Inc. v. Utah State Tax Com'n, Auditing Div., 936 P.2d 1082 (Utah Ct. App. 1997).

**Vermont.** In re C.S., 158 Vt. 339, 609 A.2d 641 (1992).

Finn, The Public Interest and Bell Entry into Long-Distance Under Section 271 of the Communications Act, 5 CommLaw Conspectus 203 (1997).

[8]**United States.** Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1, Fed. Sec. L. Rep. (CCH) P 98,531 (1995); Victoria Sales Corp. v. Emery Air Freight, Inc., 917 F.2d 705 (2d Cir. 1990); Sheppard v. Riverview Nursing Center, Inc., 88 F.3d 1332, 71 Fair Empl. Prac. Cas. (BNA) 218, 68 Empl. Prac. Dec. (CCH) P 44111, 35 Fed. R. Serv. 3d 522 (4th Cir. 1996); U.S. v. Richards, 67 F.3d 1531 (10th Cir. 1995), opinion vacated on reh'g en banc on other grounds, 87 F.3d 1152 (10th Cir. 1996); ICC Industries, Inc. v. U.S., 5 Fed. Cir. (T) 78, 812 F.2d 694 (1987); Miller v. Callahan, 964 F. Supp. 939, 53 Soc. Sec. Rep. Serv. 563, Unempl. Ins. Rep. (CCH) P 15785B (D. Md. 1997).

If the same words are interpreted the same way and this gives rise to a widely variant interpretation, the court can give the word its various interpreta-

§ 46:6                               SUTHERLAND STATUTORY CONSTRUCTION

interpret an imprecise term differently in two separate sections of a
statute which have different purposes.[9] Yet when the legislature
uses certain language in one part of the statute and different

tions. Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor v.
Forsyth Energy, Inc., 666 F.2d 1104 (7th Cir. 1981).

Ruggiano v. Reish, 307 F.3d 121 (3d Cir. 2002).

Beharry v. Ashcroft, 329 F.3d 51 (2d Cir. 2003), as amended, (July 24,
2003); Lewis v. Philip Morris Inc., 355 F.3d 515, 2004-1 Trade Cas. (CCH) P 74259
(6th Cir. 2004); In re Price, 2004 WL 2550590 (W.D. Tex. 2004); Usinas Siderurgi-
cas De Minas Gerais S/A v. U.S., 26 Ct. Int'l Trade 422, 201 F. Supp. 2d 1304, 24
Int'l Trade Rep. (BNA) 1460 (2002).

**Alaska.** Jonathan v. Doyon Drilling, Inc., 890 P.2d 1121 (Alaska 1995);
Benner v. Wichman, 874 P.2d 949 (Alaska 1994); Kulawik v. ERA Jet Alaska, 820
P.2d 627 (Alaska 1991).

**Connecticut.** State v. Reynolds, 264 Conn. 1, 824 A.2d 611 (2003), repub-
lished at, 264 Conn. 1, 836 A.2d 224 (2003).

**Delaware.** New Castle County Dept. of Land Use v. University of Delaware,
842 A.2d 1201, 185 Ed. Law Rep. 985 (Del. 2004).

**District of Columbia.** Edwards v. U.S., 583 A.2d 661, 8 A.L.R.5th 1006
(D.C. 1990).

**Illinois.** Carlson v. Moline Bd. of Educ., School Dist. No. 40, 231 Ill. App. 3d
493, 172 Ill. Dec. 897, 596 N.E.2d 176, 75 Ed. Law Rep. 1155 (3d Dist. 1992).

**Iowa.** State v. Johnson, 604 N.W.2d 669 (Iowa Ct. App. 1999).

Unless there is apparent legislative intent suggesting the words should not
be consistently defined. Mirabella v. Retirement Bd. of County Employees' Annuity
and Ben. Fund of Cook County, 198 Ill. App. 3d 971, 145 Ill. Dec. 68, 556 N.E.2d
686 (1st Dist. 1990).

**New Jersey.** Pine Belt Chevrolet, Inc. v. Jersey Cent. Power and Light Co.,
132 N.J. 564, 626 A.2d 434 (1993).

**North Dakota.** Trinity Medical Center, Inc. v. Holum, 544 N.W.2d 148
(N.D. 1996); Coldwell Banker-First Realty, Inc. v. Meide & Son, Inc., 422 N.W.2d
375 (N.D. 1988).

**Oklahoma.** Stewart v. Rood, 1990 OK 69, 796 P.2d 321, 21 Envtl. L. Rep.
20026 (Okla. 1990) (overruled on other grounds by, DuLaney v. Oklahoma State
Dept. of Health, 1993 OK 113, 868 P.2d 676 (Okla. 1993)).

**Washington.** State v. Keller, 98 Wash. App. 381, 990 P.2d 423 (Div. 1
1999), aff'd, 143 Wash. 2d 267, 19 P.3d 1030 (2001).

**Washington.** Koker v. Armstrong Cork, Inc., 60 Wash. App. 466, 804 P.2d
659 (Div. 1 1991).

Stidvent, Tort reform in Alaska: Much Ado About Nothing, 16 Alaska L Rev
61 (1999); Gomez, The Consequences of Nonappearance: Interpreting New Section
242B of the Immigration and Nationality Act, 30 San Diego L Rev 75 (1993); Isbell
& Salvi, Ethical Responsibility of Lawyers for Deception by Undercover Investiga-
tors and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrep-
resentation Under the Model Rules of Professional Conduct, 8 Geo J Legal Ethics
791 (1995); Langevoort, Human Behavior and Law, 81 Va L Rev 853, 881 (1995)
(This article has cited the treatise inncorrectly.).

Noah, A Postmodernist Take on the Human Embryo Research Debate, 36
Conn. L. Rev. 1133 (2004).

[9]**United States.** Vanscoter v. Sullivan, 920 F.2d 1441 (9th Cir. 1990); Abbott
Laboratories v. Young, 920 F.2d 984, 17 U.S.P.Q.2d 1027 (D.C. Cir. 1990).

U.S. v. Bean, 537 U.S. 71, 123 S. Ct. 584, 154 L. Ed. 2d 483 (2002):

language in another, the court assumes different meanings were
intended.[10] In like manner, where the legislature has employed a
term in one place and excluded it in another, it should not be

---

Parents Involved in Community Schools v. Seattle School Dist., No. 1, 285
F.3d 1236, 163 Ed. Law Rep. 572 (9th Cir. 2002), opinion withdrawn on other
grounds on grant of reh'g, 294 F.3d 1084, 167 Ed. Law Rep. 38 (9th Cir. 2002).

**Maryland.** Toler v. Motor Vehicle Admin., 373 Md. 214, 817 A.2d 229 (2003).

**New Jersey.** State v. Thomas, 166 N.J. 560, 767 A.2d 459 (2001).

[10]Griffin, Identifying Some Trouble Spots in the Fair Debt Collection Practices
Act: A Framwork for Improvement, 83 Neb L Rev 762 (2005).

**United States.** U.S. v. Ahlers, 305 F.3d 54 (1st Cir. 2002).

Loggerhead Turtle v. County Council of Volusia County, Fla., 307 F.3d 1318,
55 Env't. Rep. Cas. (BNA) 1161, 33 Envtl. L. Rep. 20057 (11th Cir. 2002).

National Data Corp. & Subsidiaries v. U.S., 50 Fed. Cl. 24, 2001-2 U.S. Tax
Cas. (CCH) P 50586, 88 A.F.T.R.2d 2001-5226 (2001), aff'd, 291 F.3d 1381, 2002-1
U.S. Tax Cas. (CCH) P 50451, 89 A.F.T.R.2d 2002-2756 (Fed. Cir. 2002).

American Federation of Labor and Congress of Indus. Organizations v.
Federal Election Com'n, 333 F.3d 168 (D.C. Cir. 2003).

Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718,
158 O.G.R. 601 (2004); Beharry v. Ashcroft, 329 F.3d 51 (2d Cir. 2003), as amended,
(July 24, 2003); Pacific Gas and Elec. Co. v. F.E.R.C., 44 Fed. Appx. 170 (9th Cir.
2002); Jordan v. Principi, 17 Vet. App. 261 (2003), aff'd, 401 F.3d 1296 (Fed. Cir.
2005).

Decca Hospitality Furnishings, LLC v. U.S., 427 F. Supp. 2d 1249, 28 Int'l
Trade Rep. (BNA) 1548 (Ct. Int'l Trade 2006), appeal dismissed, 185 Fed. Appx.
945 (Fed. Cir. 2006); Jama v. Immigration and Customs Enforcement, 543 U.S.
335, 125 S. Ct. 694, 150, 160 L. Ed. 2d 708, 2 A.L.R. Fed. 2d 675 (2005); Richards
v. FleetBoston Financial Corp., 427 F. Supp. 2d 150, 37 Employee Benefits Cas.
(BNA) 1449 (D. Conn. 2006); U.S. v. Rodriguez, 430 F. Supp. 2d 388 (D.N.J. 2006),
opinion vacated in part on other grounds on reconsideration, 464 F. Supp. 2d 387
(D.N.J. 2006); Martinez-Aguero v. Gonzalez, 2005 WL 388589 (W.D. Tex. 2005),
aff'd and remanded on other grounds, 459 F.3d 618 (5th Cir. 2006), cert. denied,
127 S. Ct. 837, 166 L. Ed. 2d 667 (U.S. 2006); In re Paschal, 337 B.R. 274, 55
Collier Bankr. Cas. 2d (MB) 1185, Bankr. L. Rep. (CCH) P 80723 (Bankr. E.D.
N.C. 2006); In re Toro-Arcila, 334 B.R. 224 (Bankr. S.D. Tex. 2005).

**Colorado.** People v. Auman, 67 P.3d 741 (Colo. Ct. App. 2002), as modified
on denial of reh'g, (Nov. 14, 2002) and decision rev'd on other grounds, 109 P.3d
647 (Colo. 2005).

**Connecticut.** Celentano v. Oaks Condominium Ass'n, 265 Conn. 579, 830
A.2d 164 (2003).

**Illinois.** Carver v. Bond/Fayette/Effingham Regional Bd. of School Trustees,
146 Ill. 2d 347, 167 Ill. Dec. 1, 586 N.E.2d 1273, 72 Ed. Law Rep. 967 (1992).

**Maryland.** Toler v. Motor Vehicle Admin., 373 Md. 214, 817 A.2d 229 (2003).

Larkin v. Della Ratta, 2005 MDBT 5, 2005 WL 914372 (Md. Cir. Ct. 2005),
judgment aff'd in part, vacated in part on other grounds, 167 Md. App. 599, 893
A.2d 1219 (2006), cert. denied, 393 Md. 243, 900 A.2d 749 (2006).

Arkush, Preserving "Catalyst" Attorneys' Fees Under the Freedom of Infor-
mation Act in the Waked of Buckhannon Board and Care Home v. West Virginia
Department of Health and Human Services, 37 Harv. C.R.-C.L. L. Rev. 131 (2002).

Federbush, The Unclear Scope of Unconscionability in FDUTPA, 74-Aug
Fla. B.J. 49 (2000).

Hernandez, Property Law, 35 U. Rich. L. Rev. 777 (2001).

SUTHERLAND STATUTORY CONSTRUCTION

implied where excluded.[11] The use of different terms within similar statutes generally implies that different meanings were intended.[12]

---

[11]**United States.** Universal Const. Co., Inc. v. Occupational Safety and Health Review Com'n, 182 F.3d 726, 18 O.S.H. Cas. (BNA) 1769, 1999 O.S.H. Dec. (CCH) P 31861 (10th Cir. 1999); Berkley v. U.S., 48 Fed. Cl. 361 (2000), rev'd, 287 F.3d 1076 (Fed. Cir. 2002); California v. U.S., 47 Fed. Cl. 688 (2000), rev'd and remanded on other grounds, 271 F.3d 1377, 32 Envtl. L. Rep. 20360 (Fed. Cir. 2001).

**California.** McMahon v. Superior Court, 106 Cal. App. 4th 112, 130 Cal. Rptr. 2d 407 (2d Dist. 2003).

**Maryland.** Toler v. Motor Vehicle Admin., 373 Md. 214, 817 A.2d 229 (2003).

**Massachusetts.** National Lumber Co. v. United Cas. and Sur. Ins. Co., Inc., 440 Mass. 723, 802 N.E.2d 82 (2004); Com. v. Gagnon, 439 Mass. 826, 792 N.E.2d 119 (2003); Buddy's Inc. v. Town Of Saugus, 62 Mass. App. Ct. 256, 816 N.E.2d 134 (2004).

Commissioner of Correction v. Superior Court Dept. of Trial Court For County of Worcester, 446 Mass. 123, 842 N.E.2d 926 (2006).

**Michigan.** Houghton Lake Area Tourism & Convention Bureau v. Wood, 255 Mich. App. 127, 662 N.W.2d 758 (2003).

**Minnesota.** Genin v. 1996 Mercury Marquis, VIN No. 2MEBP95F9CX644211, License No. MN 225 NSG, 622 N.W.2d 114 (Minn. 2001).

**New Jersey.** Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 708 A.2d 401 (1998).

**Oregon.** Using a term in one section and not in another section of the same statute indicates that the legislature purposefully intended the omission. State v. Tarrence, 161 Or. App. 583, 985 P.2d 225 (1999).

**Texas.** White v. State, 930 S.W.2d 673 (Tex. App. Waco 1996).

[12]**United States.** Cunningham v. Scibana, 259 F.3d 303 (4th Cir. 2001); Brown v. Ford Motor Co., 10 Fed. Appx. 39, 2001 WL 285072 (4th Cir. 2001); U.S. v. Williams, 340 F.3d 1231 (11th Cir. 2003).

Faus Group, Inc. v. U.S., 358 F. Supp. 2d 1244, 27 Int'l Trade Rep. (BNA) 1045 (Ct. Int'l Trade 2004); U.S. v. Pabon-Cruz, 391 F.3d 86 (2d Cir. 2004); Wachovia Bank v. Schmidt, 388 F.3d 414 (4th Cir. 2004), cert. granted, 545 U.S. 1113, 125 S. Ct. 2904, 162 L. Ed. 2d 293 (2005) and judgment rev'd on other grounds, 546 U.S. 303, 126 S. Ct. 941, 163 L. Ed. 2d 797, 97 A.F.T.R.2d 2006-530 (2006); Union of Needletrades, Industrial and Textile Employers, AFL-CIO, CLC v. U.S. I.N.S., 202 F. Supp. 2d 265 (S.D. N.Y. 2002), judgment aff'd, 336 F.3d 200 (2d Cir. 2003); Doe v. Chao, 346 F. Supp. 2d 840 (W.D. Va. 2004), aff'd in part, rev'd in part and remanded on other grounds, 435 F.3d 492, Unempl. Ins. Rep. (CCH) P 17736B (4th Cir. 2006).

**Colorado.** In re Marriage of Gedgaudas, 978 P.2d 677 (Colo. Ct. App. 1999). People v. Auman, 67 P.3d 741 (Colo. Ct. App. 2002), as modified on denial of reh'g, (Nov. 14, 2002) and decision rev'd on other grounds, 109 P.3d 647 (Colo. 2005).

**Maryland.** Toler v. Motor Vehicle Admin., 373 Md. 214, 817 A.2d 229 (2003).

**Minnesota.** State Farm v. Liberty Mut. Ins. Co., 678 N.W.2d 719 (Minn. Ct. App. 2004).

Ochoa, Copyright, Derivative Works and Fixation: Is Galoob a Mirage, or does the Form(gen) of the Alleged Derivative Work Matter?, 20 Santa Clara Compuer & High Tech L. J. 991 (2004).

Bradley & Flaherty, Executive Power Essentialism and Foreign Affairs, 102 Mich. L. Rev. 545 (2004).

# EXHIBIT K



# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE
## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than*
*one hundred years of Merriam-Webster dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF



G. & C. MERRIAM COMPANY, *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

1965

COPYRIGHT © 1961 BY G. & C. MERRIAM CO.

PREVIOUS EDITIONS
COPYRIGHT © 1909, 1913, 1923, 1924, 1926, 1927, 1930, 1934, 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.

PHILIPPINES COPYRIGHT 1961 BY G. & C. MERRIAM CO.
PREVIOUS EDITIONS PHILIPPINES COPYRIGHT 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.
PREVIOUS EDITION COPYRIGHT 1925 IN PHILIPPINE ISLANDS
BY G. & C. MERRIAM CO.

ALL RIGHTS RESERVED
UNDER INTERNATIONAL AND PAN-AMERICAN COPYRIGHT CONVENTIONS
BY G. & C. MERRIAM CO.

*All rights reserved*

MADE IN THE U. S. A.

R. R. DONNELLEY & SONS COMPANY, THE LAKESIDE PRESS, CHICAGO, ILL., U. S. A.
COMPOSITORS
H. O. HOUGHTON AND COMPANY, THE RIVERSIDE PRESS, CAMBRIDGE, MASS., U. S. A.
PRINTERS AND BINDERS

Case: 14-11942    Date Filed: 07/28/2014    Page: 194 of 194

**accurate** ... *adj* : the quality or state of being accurate

**ac-cu-rate-ly** *adv* ... : in an accurate manner : PRECISELY, EXACTLY

**ac-cu-rate-ness** ... *n* ... : the quality or state of being accurate

**ac-curse** ... *vt* ... : to put under a curse

**ac-cursed** *or* **ac-curst** ... *adj* ...

**ac-cu-sa-tion** ...

**ac-cu-sa-ti-val** ... *adj*

**ac-cu-sa-tive** ...

**ac-cu-sa-tive-ly** *adv*

**ac-cu-sa-tive-ness** *n*

**ac-cu-sa-to-ri-al** *adj*

**ac-cu-sa-to-ry** *adj*

**ac-cuse** ...

**ac-cused** ...

**ac-cus-er** *n*

**ac-cus-tom** ...

**ac-cus-tomed** *adj*

**ac-cus-tomed-ness** *n*

**ace** *n*

**acedia** *n*

**acellular** *adj*

**acentric** *adj*

**-aceous** *adj suffix*

**acephalous** *adj*

...

**acet-** *or* **aceto-** *comb form*

**acetal** *n* ... [ML, fr. LGk *Akephalot*, pl. of *Akephalos*, fr. Gk *akephalos* headless ...]