Nos. 14-11942-EE & 14-12163-EE (Consolidated)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

NATIONAL MINING ASSOCIATION, ALABAMA COAL ASSOCIATION, WALTER ENERGY, INC., and WARRIOR INVESTMENT CO., INC., *Petitioners*, *No. 14-11942-EE*,
*and*
MURRAY ENERGY CORP., AMERICAN ENERGY CORP.,THE OHIO VALLEY COAL CO., THE AMERICAN COAL CO., OHIO AMERICAN ENERGY, INC., UTAH AMERICAN ENERGY, INC., WEST RIDGE RESOURCES, INC., KENAMERICAN RESOURCES, INC., MURRAY AMERICAN ENERGY, INC., THE HARRISON COUNTY COAL CO., THE MARION COUNTY COAL CO., THE MARSHALL COUNTY COAL CO., THE MONONGALIA COUNTY COAL CO., and THE OHIO COUNTY COAL CO., *Petitioners*, *No.14-12163-EE*,
*v.*
SECRETARY OF LABOR, MINE SAFETY
AND HEALTH ADMINISTRATION ("MSHA"),
*Respondent.*

_____

ON PETITIONS FOR REVIEW OF A FINAL RULE OF
THE MINE SAFETY AND HEALTH ADMINISTRATION

_____

**Amicus Curiae Brief in Support of the Secretary of Labor**
**on behalf of the National Black Lung Association and**
**the National Coalition of Black Lung and Respiratory Disease Clinics**

_____

STEPHEN A. SANDERS
APPALACHIAN CITIZENS' LAW CENTER
317 Main Street
Whitesburg, KY  41858
Telephone (606) 633-3929
steve@appalachianlawcenter.org

## STATEMENTS PURSUANT TO FRAP 26.1 AND 11TH CIR. RULE 26.1-1

*Corporate Disclosure Statement*: The National Black Lung Association is not a corporate entity; the National Coalition of Black Lung and Respiratory Disease Clinics, Inc. is a non-profit corporation chartered in Tennessee and there is no publicly held corporation that owns 10% or more of its stock.

*Certificate of Interested Persons*: The Amici Curiae adopts the lists of persons and entities identified in the Petitioners' Certificates of Interested Persons and the Respondent's Certificate of Interested Persons, and lists the following persons having an interest in the above-captioned case:

Katie Sweeney, National Mining Association and the affiliated petitioners

Michael O. McKown and Gary M. Broadbent, Murray Energy Corporation and the affiliated petitioners

Thomas Perez, Secretary, U.S. Department of Labor,

Joseph Main, Assistant Secretary, Mine Safety and Health Administration

Jackson Lewis P.C. - Henry Chajet, Avidan Meyerstein, Collin Udell, Genea O. Bell and Ross J. Watzman (Petitioners' counsel)

Crowell & Moring LLP - Thomas C. Means, Edward M. Green and Daniel W. Wolff (Petitioner's counsel)

Edward Waldman and Samuel Charles Lord, U.S. Department of Labor, Office of the Solicitor (Respondent's counsel)

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................ **II**

**STATEMENT OF THE IDENTITY OF AMICI CURIAE, ITS INTEREST**

**AND THE SOURCE OF ITS AUTHORITY TO FILE** ......................................**V**

**STATEMENT OF THE ISSUES** ..........................................................**1**

**SUMMARY OF THE ARGUMENT** ....................................................**1**

**ARGUMENT** ...............................................................................**1**

   I. INTRODUCTION ....................................................................1

   II. THE SECRETARY IS ENTITLED TO DEFERENCE......................................6

   III. THE RULE IS NOT ARBITRARY AND CAPRICIOUS..............................8

   CONCLUSION ........................................................................13

**CERTIFICATE OF COMPLIANCE** ..................................................**15**

**CERTIFICATE OF SERVICE** ........................................................**16**

## TABLE OF AUTHORITIES

CASES

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984) -6,

  7

*MCI  Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218 (1994).-------------------------- 7

*Motor Veh. Mfrs. Ass'n v. State Farm Ins.,* 463 U.S. 29 (1983)---------------------- 8

*Nat'l Min. Ass'n v. Sec'y of Labor,* 589 F.3d 1368 (11th Cir. 2009) ---------------- 7

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*

   87 F.3d 1242 (11th Cir. 1997).------------------------------------------------------- 8

*United States v. Mead Corp.,* 533 U.S. 218 (2001) ------------------------------------ 6

*Usery v. Turner Elkhorn Coal Company*, 428 U.S. 1, 5 (1976) ----------------------- 1

S<small>TATUTES</small>

29 U.S.C. § 671 --------------------------------------------------------------------------- 3

30 U.S.C § 811 ---------------------------------------------------------------------------- 2

30 U.S.C. § 801 --------------------------------------------------------------------------- 6

30 U.S.C. § 813 --------------------------------------------------------------------------- 2

30 U.S.C. § 841(b) ----------------------------------------------------------------------- 3

30 U.S.C. § 842(b)(2) -------------------------------------------------------------------- 2

30 U.S.C. § 842(d) --------------------------------------------------------------------- 3, 4

O<small>THER</small> A<small>UTHORITIES</small>

20 C.F.R. § 718.201(a) ------------------------------------------------------------------- 2

79 Fed. Reg. 24,814 ---------------------------------------------------------------------- 5

Billy J. Maggard, Comment on *Lowering Miners' Exposure to Respirable Coal*

   *Mine Dust, Including Continuous Personal Dust Monitors*------------------------- 9

Clarrice E. Howard, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ------------------------ 12

Don Hayes, Sr**.**, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust,Including Continuous Personal Dust Monitors* ------------------------------- 10

Edgar Huggins, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ------------------------------- 11

Leonard Fleming, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ------------------------ 10

NIOSH, *Coal Mine Dust Exposures and Associated Health Outcomes:  A Review of Information Published Since 1995* v (2011). ------------------------------------- 5

NIOSH, *Criteria for a Recommended Standard:  Occupational Exposure to Respirable Coal Mine Dust* iii (1995) ------------------------------------------------ 4

Ralph Varney, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ------------------------------- 11

Ronald Martin, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ------------------------------- 11

W.A. Wade, et al., *Severe Occupational Pneumoconiosis Among West Virginia Coal Miners: One Hundred Thirty-Eight Cases of Progressive Massive Fibrosis Compensated Between 2000 and 2009*, 139 Chest 1458 (2011) -------------------- 5

## STATEMENT OF THE IDENTITY OF AMICI CURIAE, ITS INTEREST AND THE SOURCE OF ITS AUTHORITY TO FILE

The National Black Lung Association (NBLA) is an organization of coal miners and friends and families of coal miners who are concerned about the disability of coal miners due to exposure to excessive dust. The NBLA president, Joe Massie, submitted a comment to the U.S. Department of Labor during the rule-making strongly supporting the regulations MSHA proposed. The NBLA has authorized the filing of this brief.

The National Coalition of Black Lung and Respiratory Disease Clinics, Inc. ("National Coalition"), is an organization of the staff of respiratory clinics which provide diagnosis, treatment, education, and compensation counseling to coal miners with, or at risk for, black lung disease. Dr. Robert Cohen, Medical Director of the National Coalition, submitted a comment during rule-making on behalf of the National Coalition strongly endorsing the proposed regulations. The National Coalition board has authorized the filing of this brief.

Pursuant to FRAP 29(c)(5), counsel states that he authored the brief with the assistance of Evan Smith, a lawyer who works in his office. No party—other than the amici curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting of the brief.

## STATEMENT OF THE ISSUES

1.  Whether the Secretary has authority to promulgate improved dust standards for our nation's coal mines

2.  Whether the Secretary is entitled to deference and reasonably exercised his authority in promulgating the Dust Rule

## SUMMARY OF THE ARGUMENT

The Rule is a mandatory health standard mandated by Congress to protect coal miners from occupational lung disease due to dust exposure.  The Secretary properly issued the Rule.  It is a reasonable exercise of the Secretary's authority.

## ARGUMENT

### I. *Introduction*

Congress passed the Federal Coal Mine Health and Safety Act of 1969 (which was re-designated the Federal Mine Safety and Health Act of 1977) ("the Act"), 30 U.S.C. § 801 *et seq.*, setting mandatory safety and health standards for the nation's coal industry in an attempt to protect coal miners. Congress particularly was concerned about respiratory illnesses caused by coal mining work. In *Usery v. Turner Elkhorn Coal Company*, 428 U.S. 1, 5 (1976), the Supreme Court stated:

> Coal workers pneumoconiosis black lung disease affects a high percentage of American coal miners with severe, and frequently crippling, chronic respiratory impairment. The disease is caused by long-term inhalation of coal dust.

Coal workers' pneumoconiosis is irreversible, incurable, and it can cause disability and death. For purposes of the Act, pneumoconiosis includes any chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. 20 C.F.R. § 718.201(a). It includes a variety of respiratory diseases including coal workers' pneumoconiosis, silicosis, and massive pulmonary fibrosis. *Id.* Miners who inhale coal dust also may develop chronic obstructive pulmonary disease. *Id.*

A main purpose of the Act is to prevent new developments of workplace respiratory illnesses and prevent the worsening of existing respiratory illnesses. Sections 101 and 103 of the Mine Act authorize the Secretary to promulgate mandatory safety and health standards for the nation's mines and to conduct regular inspections of those mines. *See* 30 U.S.C §§ 811, 813. Section 202(b)(2) of the Mine Act, originally enacted as part of the Coal Act, set the initial exposure standard at 3.0 milligrams of respirable dust per cubic meter of air (3.0 mg/m³). 30 U.S.C. § 842(b)(2). Congress directed that effective three years after December 30, 1969, the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of such mine is exposed must be no greater than 2.0 mg/m³. The Act further stated that the Secretary of Health and Human Services is required to establish the permissible level of respirable dust in the mine atmosphere during each shift to which each miner in the active

2

workings is exposed be reduced as necessary "below the levels established in this section to a level of personal exposure which will prevent new incidences of respiratory disease and the further development of such disease in any person." 30 U.S.C. § 842(d).

Section 201(b) of the Act stated that the purpose was "to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work under-ground during the period of his entire adult working life without incurring any disability from pneumoconiosis ['black lung' disease] or any other occupation-related disease during or at the end of such period." 30 U.S.C. § 841(b).

The National Institute for Occupational Safety and Health (NIOSH) is a part of the Department of Health and Human Services[1] and is authorized to develop and establish recommended occupational safety and health standards.  29 U.S.C. § 671. NIOSH's role is to conduct research and make recommendations about how to prevent injury and illness arising in the workplace.  One of NIOSH's functions is to conduct x-ray examinations of active coal miners.  NIOSH has documented not just the continued existence of coal workers' pneumoconiosis, but also a significant increase of the incidence of coal workers' pneumoconiosis in miners

---

[1] NIOSH was formerly part of the Department of Health, Education, and Welfare.

working under the 2.0 mg/m³ standard.  In furtherance of the requirement in the Act that the Secretary of Health and Human Services recommend reductions to the respirable dust exposure limits that "will prevent new incidences of respiratory disease and the further development of such disease in any person" (30 U.S.C. § 842(d)), in 1995, NIOSH published a Criteria Document and recommended that the Secretary of Labor reduce the permissible level of respirable dust and mandate other measures to prevent black lung. NIOSH based its recommendations on the fact that "[e]pidemiological studies have clearly demonstrated that miners have an elevated risk of developing occupational respiratory diseases when they are exposed to respirable coal mine dust over a working lifetime at the current MSHA permissible exposure limit (PEL) of 2 mg/m$^3$." NIOSH, *Criteria for a Recommended Standard:  Occupational Exposure to Respirable Coal Mine Dust* iii (1995).[2]  In 2011, NIOSH provided an update to the 1995 Criteria Document.  The update discussed relevant data and studies since 1995 and concluded that the new information does "not contradict or critically modify the primary conclusions and associated recommendations given there. Rather, the new findings strengthen those conclusions and recommendations." NIOSH, *Coal Mine Dust Exposures and*

---

[2]  MSHA-2010-0007-0043.  (Note:  Footnotes are used to provide the Regulations.gov document ID number where the source may be found in the rulemaking record below.)

4

*Associated Health Outcomes:  A Review of Information Published Since 1995* v (2011).[3]

NIOSH's findings that black lung continues to afflict miners, to progress to more severe forms in a short period of time, and to afflict miners at increased rates, support the need for the Secretary's regulations to lower respirable dust limits. Black lung still is a major health threat to coal miners.  Coal miners not only continue to develop new cases of respiratory illness, but also do so at sharply increased rates.  Moreover, miners are developing worsened forms of respiratory illness at earlier ages.  *See* W. Alex Wade, et al., *Severe Occupational Pneumoconiosis Among West Virginia Coal Miners: One Hundred Thirty-Eight Cases of Progressive Massive Fibrosis Compensated Between 2000 and 2009*, 139 Chest 1458 (2011) (reporting mean age of 52.6 for miners with severe black lung).[4]

The Secretary of Labor, through the Mine Safety and Health Administration ("MSHA"), issued a final Rule, *Lowering Miner's Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors* ("Rule") on May 1, 2014. 79 Fed. Reg. 24,814.  MSHA stated:

> The purpose of this final rule is to reduce occupational lung diseases in coal miners. Chronic exposure to respirable coal mine dust causes lung diseases including coal workers' pneumoconiosis (CWP), emphysema, silicosis, and chronic bronchitis, known collectively as

---

[3] MSHA-2010-0007-0434.

[4] MSHA-2010-0007-0451.

"black lung." These diseases are debilitating and can result in disability and premature death. Based on data from the National Institute for Occupational Safety and Health (NIOSH), new cases continue to occur among coal miners. The prevalence rate of lung disease among our nation's coal miners continues despite the fact that incurable black lung is preventable. Additionally, young miners are showing evidence of advanced and seriously debilitating lung disease from excessive dust exposure.

## II. *The Secretary Is Entitled to Deference.*

The Secretary's interpretation of the statute is reasonable and entitled to deference through a *Chevron* analysis. *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, *Inc*., 467 U.S. 837 (1984). The Secretary's interpretation of the key statutory provision is entitled to *Chevron* deference because Congress authorized the Secretary to enact regulations that have the force or effect of law, and the Secretary's interpretation was promulgated in the exercise of that authority. *See United States v. Mead Corp.*, 533 U.S. 218 (2001). The Act directs the Secretary of Labor to develop and promulgate "mandatory health and safety standards to protect the health and safety of the Nation's coal or other miners." 30 U.S.C. § 801. Therefore, the Secretary is authorized by Congress to enact rules having the force or effect of law, and the Secretary promulgated the Rule in exercise of that authority. The Rule is a "mandatory health and safety standard," as distinguished from mere "general statements of policy" such as Procedure

Instruction Letters. *See Nat'l Min. Ass'n v. Sec'y of Labor,* 589 F.3d 1368 (11th Cir. 2009).

Step One of a *Chevron* analysis requires the Court to consider whether Congress has spoken directly to the "precise question at issue," which may be determined through tools of statutory interpretation, legislative history, and policy considerations. *Chevron*, 467 U.S. at 842. The issue is not whether the language of the statute explicitly supports the Secretary's interpretation, but whether the language *precludes* the Secretary's interpretation. *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218 (1994). Here, the language of the relevant sections of 30 U.S.C. § 842 consistently demonstrate that Congress declined to speak directly to the "precise question at issue,"—that is, what the dust standard should be going forward—choosing instead to delegate authority to the Secretary of Labor to develop and promulgate mandatory health and safety standards, and to prescribe the process for collection of coal dust samples.

### III. *The Rule Is Not Arbitrary And Capricious.*

Step Two of a *Chevron* analysis involves determining whether the agency action is "reasonable." Reasonableness is achieved through a determination that the agency action is not "arbitrary and capricious." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.,* 463 U.S. 29 (1983). MSHA's interpretation is thoroughly considered and well-explained and should be found to *not* be arbitrary and capricious under *State Farm.* A court generally should not disturb an agency action that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by statute. *Id*. Here, in promulgating the new Rule, the Secretary included relevant scientific bases provided by NIOSH in the Federal Register; the 191-page Rule published in the Federal Register frequently references health and safety data provided by NIOSH. The Secretary's regulation is a reasonable and reasoned approach to a long-standing problem.  The Secretary issued the regulation after thoroughly studying the issue.  The Secretary based this regulation on relevant factors, and it has the authority to regulate as it has done.

"[T]he focal point for judicial review of an administrative action should be the administrative record." *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,* 87 F.3d 1242 (11th Cir. 1997). In this case, the "record" consisting of the final Rule as published in the Federal Register and all of the evidence and data MSHA based the standard on, as well as comments

submitted during the Notice and Comment period that the Secretary addressed in the Rule, show that the Secretary acted reasonably

The record reflects that black lung remains a serious respiratory threat to miners notwithstanding over 30 years of dust control and MSHA regulation. Comments submitted to MSHA in response to the proposed rule by those familiar with the terrible impact of black lung disease support the need to protect miners from coal mine dust exposure more effectively. Billy Maggard wrote:

> My comment is to do all you can to prevent this deadly disease. It eats away your lungs like cancer. Soon my lungs will be gone and I will be needing a transplant. It also puts such a burden on your family, especially my wife who has tried to do the best she can and she is very sick herself with an incurable bone disease but she makes sure she gives me my breathing treatments 3 x a day and then I'm on oxygen at home around the clock, also my many medicines for breathing she has to help me with. So please MSHA find some way to stop this deadly disease. It is killing us all. I am now on my last days.

Billy J. Maggard, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-52.pdf.[5]

Others affected by black lung voiced similar concerns. Don Hayes wrote:

> I worked for Arch Mineral Coal their office is in St. Louis, [Missouri]. I worked for over 20 years as a heavy equ. operator and I never refused no overtime and I could run any piece of equ. they have because I had 3 kids in college at the same time and I wanted a better life for them. It is to late for me about black lung or rock dust on my lungs because I have see many doctors and they tell me there is

_____

[5] MSHA-2010-0007-0326.

nothing no body can do for me because of the rock dust on my lungs, but I use oxygen to help me breathe 24 hours a day and I will as long as I live even when I take a shower, but the young miners might be helped if MSHA's could help or make the coal companies do a better job and give some classes one day every 6 months or so and tell the young miners how danger the dust really is. I know we need the coal and, but I am living profed that your health is important as well, but with a 8th grade education you are lucky to fine a job of anything. I hope you will be able to help the young miners.

Don Hayes, Sr., Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-53.pdf.[6]

Leonard Fleming, who had worked as an underground miner and later became the Deputy Commissioner of the Kentucky Department of Mines and Minerals, commented that he

worked in a safe mine where we tried to control the dust yet it was not enough to protect me from Black Lung. Too many miners are still working in too much dust and getting Black Lung. . . . . MSHA needs to prevent young miners from getting Black Lung. These young miners are healthy and they think that Black Lung will not be a problem for them. They do not realize the danger working in coal mine dust. . . . . After the miner stops work Black Lung continues to cause injury and eventually it causes the miner to become like I am now, with constant shortness of breath and not enough air to climb a flight of stairs or walk a short distance on level ground.

Leonard Fleming, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-10.pdf.[7]

---

[6] MSHA-2010-0007-0327

[7] MSHA-2010-0007-0280.

Another former miner, Edgar Huggins, wrote:

I worked as a coal miner for 37 years underground.  I always tried to follow the proper safety procedures at the mines.  We tried to control the coal dust. We hung ventilation curtains, exhaust fans and water sprays to control the dust.  Despite our best efforts to control the dust I got Black Lung. I now have a severe breathing impairment.

Edgar Huggins, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-47.pdf.[8]

Ralph Varney stated that he worked as a miner, and that despite the miners' best efforts to control coal mine dust, he developed black lung.  Mr. Varney said he used oxygen to breath and was totally disabled.

*See* Ralph Varney, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011),        http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-58.pdf.[9]

Ronald Martin, who worked 17 years as a miner, said he was in the last stage of black lung and "can't breath but little."

Ronald Martin, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-59.pdf.[10]

Clarrice Howard wrote about her husband, James Albert Howard, who worked as a miner for eighteen years.  He had black lung and a severe breathing

---

[8] MSHA-2010-0007-0321.

[9] MSHA-2010-0007-0332.

[10] MSHA-2010-0007-0333.

11

impairment. Mr. Howard used a portable oxygen tank to breath.  Mrs. Howard said that he had "Constant shortness of breath and not enough air to climb up a few steps or go for a short walk with me."

Clarrice E. Howard, Comment on *Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*, MSHA.GOV (May 20, 2011), http://www.msha.gov/REGS/Comments/2010-25249/AB64-COMM-68.pdf.[11]

The Rule addresses the areas where weaknesses in the current system are present—the inadequate 2 mg/m$^3$ standard, averaging of sampling, lack of contemporaneous data, dust sampling at 50% of production, and sampling for less than the full working shift. The Rule will reduce the respirable dust standard to 1.5 mg/m$^3$ (to take effect in August 2016); it allowed MSHA to rely on a single sample to determine compliance; it required the mines to measure the concentration of respirable coal mine dust continuously, and in real-time; it  requires sampling at 80% of the average production; and requires sampling for the entire working shift.

The Rule also requires additional testing of respiratory health:  spirometry testing, occupational history, and symptom assessment must also be obtained, in addition to the periodic chest radiographic (x-ray) examinations required to be offered by mine operators to underground miners under NIOSH's existing standards. The additional medical surveillance requirements will alert miners to

---

[11] MSHA-2010-0007-0353.

any abnormal declines in lung function, which is common evidence of chronic obstructive pulmonary disease and may not be detected by chest x-rays. Notification of reduced lung function will enable miners to be proactive in protecting their health. The Rule extends the same medical surveillance requirements afforded underground miners, including chest x-ray examinations, to surface miners because they are also at risk of developing lung diseases and material impairment of health or functional capacity from exposure to respirable coal mine dust. In addition, the Rule extends Part 90 miner transfer rights, which are currently provided to underground miners who have x-ray evidence of pneumoconiosis, to surface miners who have evidence of pneumoconiosis. Under 30 C.F.R. part 90, these miners can elect to work in less dusty atmospheres to prevent the progression of disease. The medical surveillance requirements will provide improved health protection for all coal miners.

## *CONCLUSION*

Miners continue to develop coal workers' pneumoconiosis, significant respiratory impairment, and premature death as a result of dust exposure. The Rule is a reasonable exercise of the Secretary's authority to prevent future illnesses and deaths among miners caused by exposure to excessive dust. The Rule is a reasonable enforcement action taken at the direction of Congress and it is needed

to further the purpose of the Act and protect miners from disability and death due to black lung disease. The Court should deny the petitions.

Respectfully submitted,

/s/ Stephen A. Sanders
STEPHEN A. SANDERS
APPALACHIAN CITIZENS' LAW CENTER
317 Main Street
Whitesburg, KY  41858
Telephone (606) 633-3929
steve@appalachianlawcenter.org

14

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 3,082 words, excluding the portions of the brief exempted by FRAP 32(a)(7)(B)(iii). This brief has been prepared in a proportionally spaced typeface using 14 points Times New Roman font.

15

## <u>CERTIFICATE OF SERVICE</u>

This will certify that I electronically filed the foregoing brief with the Court's Clerk on October 21, 2014, by using the Court's CM/ECF electronic filing system, which will send notice to the following:

Henry Chajet                       Thomas C. Means
Avidan Meyerstein              Edward M. Green
Collin Udell                       Daniel W. Wolff
Jackson Lewis P.C.             Crowell & Moring LLP
10701 Parkridge Blvd., Suite 300   1001 Pennsylvania Ave., N.W.
Reston, Virginia 20191         Washington, D.C. 20004

Edward Waldman and
Samuel Charles Lord
Office of the Solicitor, U.S. Department of Labor
1100 Wilson Blvd., Suite 2200
Arlington, VA 22209-2296

This will further certify that on October 21, 2014, I served copies of the foregoing brief on the following via electronic mail:

Michael O. McKown          Katie Sweeney
Gary M. Broadbent           National Mining Association
Murray Energy Corp.          101 Constitution Av NW,
46226 National Road          Suite 500 East
Saint Clairsville, OH 43950    Washington, D.C. 20001
mmckown@coalsource.com    KSweeney@nma.org
gbroadbent@coalsource.com

Genea O. Bell
Ross J. Watzman
Jackson Lewis P.C.
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
Genea.Bell@jacksonlewis.com
Ross.Watzman@jacksonlewis.com

/s/ Stephen A. Sanders
STEPHEN A. SANDERS